Kenneth A. Okazaki (3844)
Stephen C. Clark (4551)
Ryan M. Harris (8192)
JONES, WALDO, HOLBROOK & McDONOUGH
170 South Main Street, Suite 1500
Post Office Box 45444
Salt Lake City, Utah  84145-0444
Telephone:  (801) 521-3200

James C. Bradshaw (3768)
Mark R. Moffat (5112)
BROWN, BRADSHAW & MOFFAT
10 West Broadway, Suite 210
Salt Lake City, Utah 84101
Telephone: (801) 532-5297
Facsimile: (801) 532-5298

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE FUNDAMENTALIST CHURCH OF JE-SUS CHRIST OF LATTER-DAY SAINTS, an Association of Individuals,<br><br>    Plaintiff,<br><br>vs.<br><br>BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHUR-TLEFF, Attorney General for the State of Utah; TERRY GODDARD, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah,<br><br>    Defendants. | **FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. 2:08-CV-772-DB<br><br>Judge Dee Benson |

Plaintiff, an Association of members of the Fundamentalist Church of Jesus Christ of Lat-

ter-Day Saints ("FLDS Church" or "Fundamentalist Mormon Church") who have consecrated

their property, services, time and talents to the FLDS Church via a trust, as and for its First

Amended Complaint and Request for Declaratory and Injunctive Relief against the Defendants Mark Shurtleff, Attorney General of the State of Utah, Terry Goddard, Attorney General of the State of Arizona, Bruce R. Wisan, a Court-appointed Special Fiduciary in *In the Matter of the United Effort Plan Trust, et al.*, No. 053900848, Third Judicial District Court of Salt Lake County, State of Utah, Judge Denise Posse Lindberg, District Court Judge, Third Judicial District Court of Salt Lake County, State of Utah, and John Does 1-50 (collectively "Defendants"), would respect-fully show the Court and allege as follows:

## INTRODUCTION

1.  This case arises under the Civil Rights Act of 1866, 42 U.S.C. § 1983; the First Amendment to the United States Constitution as applied to the State of Utah through application of the Fourteenth Amendment; the Fourteenth Amendment; Article I, §§ 1 and 4 of the Utah Con-stitution; the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.X. §§ 2000cc *et seq.* ("RLIUPA"); the Declaratory Judgment Act, 28 U.S.C. § 2201; and Rule 65, Federal Rules of Civil Procedure.

2.  The relief sought herein includes, but is not limited to (1) this Court's declaration that Defen-dants' actions have resulted in violations of Association members' constitutional rights under the Religion Clauses of the First Amendment to the United States Constitution—Establishment Clause and Free Exercise Clause; (2) this Court's declaration that Defendants' actions have resulted in violations of Association members' rights under Article 1, §§ 1 and 4, Utah Constitution; (3) this Court's declaration that Defendant's actions have resulted in violations of Association members' rights under the RLUIPA; (4) this Court's declaration that one of the Utah court's stated rationales for the necessity of reforming the Restated

Trust—that operation of the Reformed Trust would support the illegal activity of bigamy—is invalid because Utah's bigamy statute is unconstitutional under the Religion Clauses of the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment; (5) this Court's declaration that Utah Code Ann. §§ 75-7-1001, -412(1), and -413(1)(c) are unconstitutional as applied to this case; (6) a restatement of the Reformed Trust in a fashion that does not violate state and federal constitutional provisions, or in the alternative, termination of the Reformed Trust with the return of the corpus of the Reformed Trust to those who consecrated property; and (7) preliminary and permanent injunctive relief enjoining the continuing violation of plaintiff's rights as described herein.

## PARTIES AND JURISDICTION

3. Plaintiff is an Association of members of the FLDS Church who have consecrated their property, services, time, and talents to the FLDS Church via a charitable Trust known as the "Amended and Restated Declaration of Trust of the United Effort Plan" ("Restated Trust"), attached hereto as Exhibit "A."

4. Defendants are the Attorneys General of the States of Utah and Arizona, respectively Mark Shurtleff and Terry Goddard; Bruce R. Wisan, a Court-appointed Special Fiduciary in *In the Matter of the United Effort Plan Trust, et al.*, No. 053900848, Third Judicial District Court of Salt Lake County, State of Utah; and Judge Denise Posse Lindberg, District Court Judge, Third Judicial District Court of Salt Lake County, State of Utah; and John Does 1-50.

5. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(3) (deprivations of civil rights); 42 U.S.C. § 2000cc(a)(2) (religious burdens

affecting interstate commerce and/or implementation of land use regulations); and supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

6.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

7.   In the 1930's, a small group of fundamentalist Mormon families began to settle on a piece of land straddling the borders of Utah and Arizona.  This area became known as Short Creek.[1] In 1942, members of the "Priesthood Council," the spiritual leadership of the "Priesthood Work" as the religious movement was then known, formed the United Effort Plan Trust ("UEP Trust"), a religious trust designed to allow the members of the FLDS Church to hold their property in common in pursuit of their religious beliefs.  A copy of the UEP Trust is attached hereto as Exhibit A.  It was intended to be a charitable trust within the meaning of the laws of the State of Utah but, as further set forth below, was determined in *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998), *cert. denied sub nom Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Bradshaw*, 526 U.S. 1130 (1999), not to be a charitable trust, given that there were specifically named and identified beneficiaries.

8.   The FLDS Church traces its roots to the beginnings of the Church of Jesus Christ of Latter Day Saints (the "LDS Church" or "Mormon Church") in the 1830s.  Members of both Churches accept the Bible, the Book of Mormon, the Doctrine and Covenants ("D. & C.")[2], and the Pearl of Great Price as Holy Scripture.

---

[1] The Arizona side of the community of Short Creek ultimately changed its name to Colorado City.  The adjoining Utah town of Hildale was created in 1962.

[2] The beliefs at issue in this case derive primarily from the *Doctrine and Covenants*, which the FLDS believe is a compilation of revelations from God, most of which were received by the

9. Members of the FLDS Church believe that their Church is the true continuation of the only true Church founded by the Prophet Joseph Smith in 1830. FLDS Church members believe that the split occurred around the turn of the century, when the Mormon Church, under great pressure from the federal government, abandoned certain practices (but not their beliefs in those practices) which members of the FLDS Church believe were ordained by God, including the Law of Consecration and Stewardship (D. & C. 42:30-39) and the principle of plural marriage (D. & C. 132:61-62).

10. The Law of Consecration and Stewardship (also known as the United Order of Heaven), which in its present form dates to 1831, is set forth in Section 42 of the Doctrine and Covenants.[3] One author has explained it as follows:

---

Prophet Joseph Smith, for the establishment and governance of the Church in the latter days. It is a standard work of the FLDS Church and functions as its open, ever-expanding, ecclesiastical constitution.

[3] The text of the scripture, which is dated February 9, 1831, follows:

30. And behold, thou wilt remember the poor, and consecrate of thy properties for their support that which thou hast to impart unto them, with a covenant and a deed which cannot be broken.

31. And inasmuch as ye impart of your substance unto the poor, ye will do it unto me; and they shall be laid before the bishop of my church and his counselors, two of the elders, or high priests, such as he shall appoint or has appointed and set apart for that purpose.

32. And it shall come to pass, that after they are laid before the bishop of my church, and after that he has received these testimonies concerning the consecration of the properties of my church, that they cannot be taken from the church, agreeable to my commandments, every man shall be made accountable unto me, a steward over his own property, or that which he has received by consecration, as much as is sufficient for himself and family.

33. And again, if there shall be properties in the hands of the church, or any individuals of it, more than is necessary for their support after this first consecra-

Upon the basic principle that the earth and everything on it belongs to the Lord, every person who was a member of the church at the time the system was introduced or became a member thereafter was asked to "consecrate" or deed all his property, both real and personal, to the bishop of the church.  The bishop would then grant an "inheritance" or "stewardship" to every family out of the properties so received, the amount depending on the wants and needs of the family, as determined jointly by the bishop and the prospective steward. . . .  It was expected that in some cases the consecrations would considerably exceed the stewardships. Out of the surplus thus made possible the bishop would grant stewardships to the poorer and younger members of the church who had no property to consecrate.

---

tion, which is a residue to be consecrated unto the bishop, it shall be kept to administer to those who have not, from time to time, that every man who has need may be amply supplied and receive according to his wants.

34.     Therefore, the residue shall be kept in my storehouse, to administer to the poor and the needy, as shall be appointed by the high council of the church, and the bishop and his council;

35.     And for the purpose of purchasing lands for the public benefit of the church, and building houses of worship, and building up the New Jerusalem which is hereafter to be revealed--

36.     That my covenant people may be gathered in one in that day when I shall come to my temple.  And this I do for the salvation of my people.

37.     And it shall come to pass, that he that sinneth and repenteth not shall be cast out of the church, and shall not receive again that which he has consecrated unto the poor and the needy of my church, or in other words, unto me--

38.     For inasmuch as ye do it unto the least of these, ye do it unto me.

39.     For it shall come to pass, that which I spake by the mouths of my prophets shall be fulfilled; for I will consecrate of the riches of those who embrace my gospel among the Gentiles unto the poor of my people who are of the house of Israel.

D. & C. 42:30-39.  *See also* D. &. C. 83:5-6.

L. Arrington, F. Fox & D. May, *Building the City of God* 15 (1976) (footnote omitted).   The

FLDS believe that this  principle is also reflected in verses of the Bible[4] and the Book of Mor-

mon.[5]

11. In the 1830s, attempts were made to institute the Law of Consecration and Stewardship in the

Mormon community in Kirtland, Ohio, and later in Jackson County, Missouri.  *Id*. at 21-22.

Before the system was fully implemented, persecution of the Mormons in Missouri thwarted

implementation of the system in the mid-1830s.  *Id*. at 30, 32.  In 1841, the law of tithing,

which requires church members to donate ten percent of their annual "increase" to the

church, came into use as a reasonable substitute for the Law of Consecration and Steward-

ship, and was considered more suitable to the ways of the world.  *Id*. at 37-38.

12. Another major effort to implement the Law of Consecration and Stewardship occurred in the

1870s under Brigham Young, then President of the Mormon Church whose adherents be-

---

[4] Acts 4:32-35 provides:

> And the multitude of them that believed were of one heart and of one soul: neither said any of them that ought of the things which he possessed was his own; but they had all things common. . . .  Neither was there any among them that lacked: for as many as there were possessors of lands or houses sold them, and brought the prices of the things that were sold, [a]nd laid them down at the apostles' feet: and distribution was made unto every man according as he had need.

In addition, the story of Ananias and Sapphira in Acts 5 demonstrates application of the law of consecration by St. Peter.

[5] 4 Nephi 2-3 provides:

> [T]here were no contentions and disputations among them, and every man did deal justly one with another.  And they had all things common among them; therefore there were not rich and poor, bond and free, but they were all made free, and partakers of the heavenly gift.

lieved him to be the modern day prophet, seer and revelator, and it is this effort to which the system in use by the FLDS Church can be traced.  Although a consecration movement had persisted in limited form in the 1850s and in a cooperative movement in 1868-69, Brigham Young envisioned a broader system. "'This cooperative movement,' said Brigham Young in 1869, 'is only a stepping stone to what is called the Order of Enoch, but which is in reality the order of Heaven.'"  L. Arrington, *Great Basin Kingdom* 322 (1958).

13. In the early 1870s, Brigham Young caused "United Order" communities to be established throughout Utah.  The movement, however, had lost its momentum by 1877, when Brigham Young died.  *Id*. at 337-38.  John Taylor, Young's successor as president and prophet of the Mormon Church, regarded living the United Order as a desirable but subordinate religious goal, and even the most successful Orders had been disbanded by the end of the 1880s.  *Id*. at 338.

14. FLDS Church members believe that in 1886, President Taylor ordained several members of the Mormon Church, including Lorin C. Woolley, to carry out a special assignment.  Taylor feared the course that secular events were forcing the Church to take, and accordingly authorized these individuals to preserve and maintain certain  principles and practices of the LDS Church that were under being legally, politically, and culturally undermined, including the United Order and polygamy.  Woolley was the last survivor of this ordained group, and FLDS Church members believe that Woolley organized a "Priesthood Council" in the late 1920s, consisting of specially ordained members called to carry out the assignment given by Taylor to Woolley.  At the time the Priesthood Council was organized, the religious movement that eventually became the FLDS Church was known as the "Priesthood Work."  FLDS

members believe that the UEP, the FLDS Church, and the Priesthood Council that currently leads the Church, are each continuations of the Priesthood Work and the Priesthood Council organized, ordained, and pursued by Woolley under authorization by President Taylor.

15. In 1942, the leaders of the Priesthood Council, in order to facilitate the living of the United Order of Heaven, formed the UEP Trust. A trust agreement was signed because Church members needed a legal relationship to hold their property in common, as instructed by scripture.

16. The UEP Trust was operated under the direction of the Priesthood Council according to its religious mandate. From 1942 until 1984, all meetings of the UEP Trust were held in conjunction with meetings of the Priesthood Council, and the property was used to support the religious mission of the Church, to provide for the just wants and needs of its members.

17. But for the spiritual Law of Consecration and the United Order as outlined in Holy Scripture, the UEP Trust would never have come into existence. The Law of Consecration and the United Order, by definition, cannot maintain their existence absent full ecclesiastical input and control.

18. Although "consecration" is often described as a kind of gift, FLDS Church members believe that consecration is more accurately conceived of as an expression of faith than a mere donation or exchange of tangible property. One consecrates one's personal allegiance, one's faith, and one's commitment to the Church, its leaders, and its principles. The United Order is a union of faith, not just of economic activity. L. Cook, *Joseph Smith and the Law of Consecration* 6, 16 (1985). An individual who has made the religious consecration may seek a "stewardship," or permission to use such portion of UEP Trust property as is necessary to

satisfy the just wants and needs of his family, as determined by FLDS Church leaders.  There is no formal conveyance involved in a grant of stewardship.  One who has ceased to maintain the necessary religious commitment loses his right to continued use of UEP Trust property. See D. & C. 42:37.

19. Although the ultimate objective of the United Order is to form a religiously integrated community holding all of its property in common, the United Effort Plan held only real estate and improvements, consecrated over the years by Church members.  Almost without exception, FLDS members lived on land that was consecrated by their ancestors or by others.  Many of the people who consecrated property to the Church are deceased.  All of those who consecrated  property to the Plan did so on the understanding that it would be used by the Bishop of the Church to facilitate the living of the United Order and FLDS principles and practices generally as set forth in Church Doctrine and Holy Scripture.

20. The Doctrine and Covenants, the ecclesiastical constitution of the FLDS Church, commands that property consecrated to the trust "shall be disposed of by a council, composed of the first presidency of my church, and of the bishop and his council, and by my high council; and by mine own voice unto them, sayeth the Lord."  D. & C. 120.  Church leaders are instructed that consecrated property shall be "kept to administer to those who have not, from time to time, that every man who has need may be amply supplied and receive according to his wants."  D. & C. 42:33.  These principles were incorporated into the trust agreement.

21. The FLDS practice of the United Order is absolutely dependent upon the exercise of spiritual discretion of the trustees to determine what constitutes the "just wants and needs" of FLDS members who would occupy and maintain real property owned by the Trust, as measured and

determined by their own understanding of the requirements of the FLDS Church's religious beliefs and practices, and without interference from government or other secular authorities.

22. The 1942 Trust and the 1998 Restated Trust provided a mechanism for religious expression, both directly and as an expression of the United Order, and indirectly in facilitating the communal life required by scripture. Thus, for example, the land of the trust was made available to members for construction of personal residences, which in turn were consecrated to the Order. The lands of the Trust were also made available to members for agriculture, and its agricultural produce was used to support the Bishop's Storehouse, which in turn redistributed that output to members according to their just wants and needs, applying a religious standard ("Therefore, the residue shall be kept in my storehouse, to administer to the poor and the needy, as shall be appointed by the high council of the church, and the bishop and his council." D & C 42:34.).

23. In *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998) ), *cert. denied sub nom Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Bradshaw*, 526 U.S. 1130 (1999), the Utah Supreme Court concluded that the UEP Trust was not a charitable trust, and that certain people who had consecrated real property and made improvements on the land were entitled to life estates under the doctrine of Unjust Enrichment. The Court remanded for further proceedings under Utah's Occupying Claimants Act.

24. On November 3, 1998, Rulon T. Jeffs, Fred M. Jessop, LeRoy S. Jeffs, Warren S. Jeffs, Truman I. Barlow, Winston K. Blackmore, James K. Zitting, as Trustees and Rulon T. Jeffs, President and Corporation Sole of the FLDS Church, executed the Restated Trust.

25. The purpose for executing the Restated Trust was to rectify the status of the UEP Trust by

making it a public charitable trust within the meaning of Utah Law, as was the original intent

of the settlors of the UEP Trust in 1942. The Restated Trust broadened the class of benefici-

aries substantially. Instead of being limited to those who had contributed property to the

Trust, it consisted of FLDS Church members who "consecrate their lives, times, talents, and

resources to the building and establishment of the Kingdom of God on Earth under the direc-

tion of the President of the [FLDS] Church." The Restated Trust provides in relevant part:

> The United Effort Plan Trust is a *religious* and charitable trust. It is the legal entity of the United Effort Plan. The Trust was created by Declaration of Trust dated November 9, 1942, and was amended April 10, 1946.

> *The United Effort Plan Trust is a spiritual (Doctrine & Covenants, 29:34) step toward living the Holy United Order.* **It exists to preserve and advance the religious doctrines and goals of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, previously known as "The Priesthood Work," or "The Work" (the "Church")**. *The United Effort Plan is under the direction of the President of the Church, who holds the keys of Priesthood authority (which keys have continued from Joseph Smith, Jr. to Brigham Young, John Taylor, John W. Woolley, Lorin C. Woolley, John Y. Barlow, Leroy S. Johnson, and Rulon T. Jeffs). The doctrines and laws of the Priesthood and the Church are found in the Book of Mormon, the Doctrine and Covenants, the Pearl of Great Price, the Holy Bible, the sermons of the holders of the keys of Priesthood authority, and present and future revelations received through the holder of those keys; and are the guiding tenets by which the Trustees of the United Effort Plan Trust shall act....*

> *Rulon T. Jeffs holds the keys of Priesthood authority and so serves as the President of the Church.* President Jeffs is also the sole remaining original Trustee and subscriber of the United Effort Plan Trust, and President of the Board of Trustees of the United Effort Plan Trust. In those capacities, he . . . [and other Trustees], hereby amend and restate the Declaration of Trust to more clearly set out its purposes and manner of operation. The document is a total restatement and amendment of the Declaration of Trust. It supersedes all previous documents, including all documents filed of public record in Utah and Arizona and with various courts. *The Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, a corporation sole, hereby ratifies this amendment. This Amended and Restated Declaration of Trust has also been approved by the Priesthood and sustained by the Church membership....*

*The United Effort Plan is the effort on the part of Church members toward the Holy United Order.  This central principle of the Church requires the gathering together of the faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership.*  *The Board of Trustees, in their sole discretion, shall administer the Trust consistent with its religious purpose to provide for Church members according to their wants and needs, insofar as their wants are just (Doctrine and Covenants, Section 82:17-21).*

*A consecration is an unconditional dedication to a sacred purpose.*  Consecration of real estate to the United Effort Plan is accomplished by a deed of conveyance.  Church members also consecrate their time, talents, money, and materials to *the Lord's storehouse, to become the property of the Church and, where appropriate, the United Effort Plan Trust.*  ***All consecrations made to or for the benefit of the United Effort Plan Trust are dedicated to the sacred purpose of the United Effort Plan*** and without any reservation or claim of right and/or ownership.  Improvements made by persons living on United Effort Plant Trust property become the property of the Trust and are consecrations to the Trust.

The privilege to participate in the United Effort Plan and live upon the lands and in the buildings of the United Effort Plan Trust is granted, and may be revoked, by the Board of Trustees.  *Those who seek that privilege commit themselves and their families to live their lives according to the principles of the United Effort Plan and the Church, and they and their families consent to be governed by the Priesthood leadership and the Board of Trustees.  They must consecrate their lives, time, talents and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the Church and his appointed officers.  All participants living on United Effort Plan property must act in the spirit of charity (Moroni 7:6-10, 45-48).  They must live in the true spirit of brotherhood (Matthew 22:36-40) and there shall be no disputations among them (3 Nephi 18:34).  **The Trust is most firmly committed to these goals.***  People who are granted the privilege to live on United Effort Plan Trust property acknowledge by their presence upon the land their acceptance of the terms of this Trust. . . .*

Participation in the United Effort Plan and use of property owned by the United Effort Plan Trust is not and does not become a right or claim of anyone who may benefit in any way from the Trust.  Use of Trust property must be within rules and standards set by the Board of Trustees.  The Board of Trustees may require individuals and their families to relocate to different locations on United Effort Plan Trust property or to share a location with others.  Participants who, in the opinion of the Presidency of the Church, do not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church shall remove themselves from the Trust property and, if they do not, the

Board of Trustees may in its discretion cause their removal.  At such time as they reform their lives and the lives of their family members and are again approved by the Priesthood and the Board of Trustees they may again be permitted to participate in the United Effort Plan.  The Board of Trustees shall have no obligation whatsoever to return all or any part of consecrated property back to a consecrator or to his or her descendants.

> To carry out its religious mission and charitable purpose, the Trust shall be administered by a Board of Trustees consisting of not less [*sic*] than three nor more than nine Trustees appointed in writing by the President of the Church. . . .

> The Trust is intended to be a charitable trust of perpetual duration; however, in the event of termination of this Trust, whether by the Board of Trustees or by reason of law, *the assets of the Trust Estate at that time shall become the property of the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, corporation sole.*  (Emphasis supplied.)

26. On May 26, 2005, in *In the Matter of the United Effort Plan Trust (Dated November 9, 1942, Amended April 10, 1946, and Amended and Restated on November 3, 1998)*, Case No. 053900848, Third Judicial District Court of Salt Lake County, State of Utah, the Attorney General of the State of Utah, who has essentially declared war on the FLDS community due, in part, to the practice of polygamy, filed a Petition asking the Court to remove or suspend the then-Trustees of the Restated Trust.  The Attorney General of the State of Arizona moved to intervene and was treated by all concerned as a party to the action.

27. On May 27, 2005, the Court granted the Utah Attorney General's *ex parte* motion for temporary restraining order ("TRO"), suspended the Restated Trust's trustees and appointed a Special Fiduciary.  On June 6, 2005, the Court extended the TRO, and on June 22, 2005, the Court granted the Utah Attorney General's Petition.  The Court found that the trustees had committed breaches of trust by failing to protect Restated Trust property, to defend claims against the Restated Trust, to administer the Restated Trust with reasonable care and caution,

-14-

to account, to segregate the assets between charitable and private beneficiaries, and to appear before the Court.

28. In a Memorandum Decision of December 13, 2005, Judge Denise Posse Lindberg stated that the "Utah and Arizona AG's standing is predicated on the assumption that the Trust is a charitable trust.  If it is, the AGs are the community's representatives responsible for ensuring that the *charitable purposes of the Trust are protected*."  (Emphasis supplied.)  Upon analysis, the Court concluded that the Restated Trust was the operative instrument, having fully superseded the UEP Trust.  Moreover, the Court concluded that the Restated Trust was "charitable in nature," and that the respective Attorneys General had standing to appear on behalf of the religious Restated Trust.

29. The Court concluded that the religious Restated Trust was in need of reformation, and found that the Utah Code granted the Courts certain powers to modify trusts, and in the case of charitable trusts, "the court *may* apply *cy pres* to modify or terminate the trust by directing that the trust property be applied or distributed, in whole or in part, in a manner *consistent with the settlor's charitable purposes*" (emphasis supplied), that is that when the settlor's purposes or objectives cannot be fully implemented for some practical or legal reason, the Court *may* amend the terms of the charitable trust *as closely as possible to the original intention of the settlor to prevent the trust from failing—but only if the settlor manifested a more general intention to devote the property to charitable purposes*.

30. The Court purported to be guided by three principles: "First, the Court will work to preserve the Trust's charitable intent.  Second, the Court will only enforce the Trust's legitimate and legal purposes.  Third, the Court will employ 'neutral principles of law.'"

31. The Court explained that "a charitable trust has two essential requirements: First, beneficiar-

ies of a charitable trust constitute a definite class, but the beneficiaries within that class are

indefinite.  Second, the trust must have a purpose that is beneficial to the community."

32. As to the first requirement, the Court found that the *Jeffs* Court had expanded the class of po-

tential beneficiaries to include those who had "consecrated" their "lives, time, talents and re-

sources" in addition to those who had consecrated real property.

33. As to the second requirement, the Court found that charitable trust purposes include *"the ad-*

*vancement of religion."*  The Court specifically identified the following "purposes" set forth

in the Restated Trust: *"One is 'to preserve and advance the religious doctrines and goals of*

*the [FLDS Church].'*  The other is 'to provide for Church members according to their wants

and their needs, insofar as their wants are just.'"  As to the first "purpose," the Court identi-

fied support of the FLDS Church's religiously motivated practice of polygamy as an im-

proper purpose of the Restated Trust.

34. The Court concluded that the Restated Trust need not fail but could be "reformed to imple-

ment those specified <u>lawful</u> *religious and charitable purposes*."  (Underlining in original,

emphasis supplied.)

35. In a declaration that was clearly hostile and anathema to the religious language, religious

purpose, religious mechanism for implementation of charitable purposes, and the remaining

*lawful* religious purposes of the Restated Trust, however, the Court stated:

> The Court presumes that the FLDS Church also promotes practices that are not
> contrary to law or against public policy.  The Trust *arguably* could be structured
> to support those legal religious "doctrines and goals."  The problem, however, is
> that the Court is barred by the First Amendment from inquiring into the Church's
> doctrines or from parsing those doctrines to define which would be legally sup-
> portable by a charitable trust.  Rather than risk excessive entanglement with pro-

tected religious expression, the Court concludes that the safer course is to focus on the [Restated Trust's] narrower "purpose" statement which states that the Trust's "religious purpose" is to provide for Church members in need and—presumably as resources permit—for their "just wants."

36. The Court stated that "[c]ourts can, without violating the First Amendment, resolve property disputes involving religious organizations by applying 'neutral principles of law.[']  In doing so, however, civil courts must refrain from 'resolving underlying controversies over religious doctrine. . . .  [C]ourts are prohibited by the First Amendment from resolving 'rights to the use and control of church property on the basis of a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church . . . while the other group of claimants has departed substantially therefrom.  In short, courts must separate that which is primarily ecclesiastical from that which is primarily secular, and *must defer to ecclesiastical authority for ecclesiastical determinations*."

37. In FLDS doctrine, the Bishop's determination of a member's just wants and needs is singularly and exclusively a religious decision.  The scripture upon which it is based is in the words of Jesus Christ, who says to the "elders of my church:"  "[It] is a residue to be consecrated unto the bishop, it shall be kept to administer to those who have not, from time to time, that every man who has need may be amply supplied and receive according to his wants.  Therefore, the residue shall be kept in my storehouse, to administer to the poor and the needy, as shall be appointed by the high council of the church, and the bishop and his council."  (D & C 42:33-34.)  The determination of just wants and needs thus involves comparing the needs of the individual with the good of the collective, applying a religious standard to determine the "just wants and needs" of each.

38. Nevertheless, the Court invited the parties to make proposals for the reformation of the Re-

stated Trust (ultimately "Reformed Trust") consistent with the following principles:

a.     The Reformed Trust must continue to satisfy the requirements of a "chari-

table trust," including that its beneficiaries "constitute a definite class, but the beneficiaries

within the class are indefinite," and the Reformed Trust's purpose is "beneficial to the commu-

nity."  The "beneficial purpose" requirement could not include the promotion of the FLDS

Church's religious doctrines and goals, but may include providing for the "needs" and "just

wants" of the beneficiaries by a secular "board of trustees" prohibited from applying a religious

test.

b.     Only the "legitimate and legal" purposes of the Restated Trust would be

carried into the reformed instrument.  The Reformed Trust could not be used to support the prac-

tice of polygamy, but it could support "*lawful* religious and charitable purposes."  (Emphasis

supplied.)

c.     "Neutral principals" must be employed to reform the Reformed Trust,

consistent with the decision of the United States Supreme Court in *Jones v. Wolf*, 443 U.S. 595,

602 (1979).

39. The Court said these principles must govern the future administration of the Reformed Trust.

The Reformed Trust must "provide a vehicle for ecclesiastical input," but it must also "pro-

vide future trustees with a set of neutral criteria to apply in evaluating the relative needs of

potential beneficiaries," including a "mechanism—independent of priesthood input—for es-

tablishing their 'just wants.'"

-18-

40. On April 6, 2006, the Special Fiduciary submitted a proposed Reformed Trust, and on Octo-

ber 25, 2006, the court created the Reformed Trust.  Seventeen paragraphs were replaced

with over 175 and a lengthy appendix.  The most important changes relate to the role of the

FLDS Church doctrine and its leaders under the Reformed Trust.

41. The Restated Trust existed to "preserve and advance the religious doctrines and goals" of the

FLDS Church.  Moreover:

> *The United Effort Plan is the effort on the part of Church members toward the Holy United Order.  This central principle of the Church requires the gathering together of the faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership.  The Board of Trustees, in their sole discretion, shall administer the Trust consistent with its religious purpose to provide for Church members according to their wants and needs, insofar as their wants are just (Doctrine and Covenants, Section 82:17-21).*

42. The Court inexplicably argued that a reformation of the Restated Trust was required under

trust law, even though the Court, through the reformation, eliminated the very reasons for the

Restated Trust's existence—but for the religious and spiritual doctrines of the United Order

and the Law of Consecration, and the practice of polygamy and other FLDS beliefs and prac-

tices, the UEP Trust would never have come into existence.  The UEP Trust was formed so

FLDS Church members could live the United Order and the Law of Consecration by seeking

religious stewardships within the meaning of Holy Scripture.  FLDS Church members cannot

practice the United Order or the Law of Consecration under the Reformed Trust.

43. The concepts of "needs" and "just wants" were thoroughly embedded in the religious doc-

trine and practice, and but for the religious doctrine and practice, there would have been no

Restated Trust to reform.  The sole purpose of the trust was to carry out religious practices

and objectives.  The purpose of the Restated Trust was to promote the "Holy United Order,"

which required FLDS Church members to gather on "consecrated and sacred lands." The trustees were charged with using those lands to achieve the Restated Trust's religious purpose.

44. By contrast, the Reformed Trust states:

> The reformation and administration of the Trust shall be based on neutral principles of law; the reformation shall not be based on religious doctrine or practice and shall not attempt to resolve underlying controversies over religious doctrine. The reformation shall allow for ecclesiastical input of a non-binding nature and a mechanism—independent of priesthood input—for establishing benefits under the Trust.

45. The Reformed Trust imposes additional separation between the Trust and the FLDS Church. Under the Restated Trust, the FLDS Church President was a trustee and president of the board of trustees, having the authority to appoint and dismiss other trustees at will. The Reformed Trust calls upon the Court to appoint the initial board, which eventually becomes self-perpetuating, with detailed rules governing appointments and removal from office. Further, the FLDS Church was the remainder beneficiary under the Restated Trust. Under the Reformed Trust, and contrary to the clear language set forth in the Restated Trust, in the case of termination assets are to be distributed to "Trust Participants," which is broadly defined to include those who contributed to the Trust.

46. The Court's reformation of the Restated Trust fundamentally secularized it. Not only has the purpose of "preserving and advancing" "religious doctrines and goals" disappeared, but the beneficiaries' "needs" and "just wants" are to be determined with secular rationale and, at most, "non-binding" ecclesiastical input into the meaning of those terms. The tight structural connection between the FLDS Church and the Restated Trust has been cut. The Restated Trust is no longer an integral part of the religious life of the community. Hence, the principal

purposes of the UEP Trust and the Restated Trust cannot be implemented under the Re-formed Trust.  Now, the Reformed Trust is being managed by the State of Utah beyond the control of FLDS Church leaders, and the religious convictions disappeared and were replaced by a secularized focus on housing, education and the other economic benefits.

47. Utah, through its Attorney General and the Third District Court, is interfering in obvious ways with the exercise of religion by the members of the FLDS Church, all in violation of State and Federal Free Exercise Clauses.

48. In its Memorandum Opinion, the Court purported to identify "fundamentally flawed and un-workable" provisions of the Reformed Trust, but focused primarily on eliminating religious principles from the governing terms of the Reformed Trust and on minimizing ecclesiastical control over its administration.  Recognizing them as a consequence of reformation does not make them a ground for reformation.  The Memorandum Opinion, in fact, revealed only two elements of the Reformed Trust that might be characterized as inherent flaws in the instru-ment itself.  The first is the power of the President of the FLDS Church, whom the Court concluded had committed serious and continuing breaches of his fiduciary duties, making it necessary to remove him from Trust administration.  The second flaw was allowing the FLDS Church to be the remainder beneficiary, in line to take ownership of all its assets should the Trust be terminated for any reason.  The Court noted that it is not unusual for reli-gious corporations to be remainder beneficiaries of trusts.  But "[a]llowing the Corporation of the President of the FLDS Church to be the remainder beneficiary of Trust assets would di-rectly further illegal practices [such as polygamy] espoused by the FLDS Church and its cur-rent president."

a.      First, the United Order is a separate religious expression of the FLDS Church; indeed, it is a fundamental precept of Christianity.  The Court's confiscation of the assets of the Trust on the basis described essentially condemns all of the teachings of the Church because of one of its beliefs; and it prohibits all of the Church's members, including those who do not practice polygamy, from enjoying the full benefit of their religious exercise.

b.      Moreover, Utah's bigamy statute is unconstitutional and does not provide a legitimate basis for reformation of the Restated Trust.

c.      Finally, even accepting the Court's premise at face value, both of the difficulties it identified could have been remedied with a reformation much less sweeping in its scope than the complete overhaul and secularization of the Reformed Trust.

49. By requiring a completely secularized reformation of the Restated Trust which is being managed under the auspices of the State of Utah, the Third District Court and the Attorney General for the State of Utah, rather than restating the trust in a manner that did not violate state and federal constitutional provisions, terminating the Restated Trust and having the corpus revert either to the FLDS Church as the remainder beneficiary as was intended by the Settlor, or to those who had consecrated property to the Trust through a truly "neutral" process involving the application of settled principles of real property law, the State of Utah has violated and continues to violate state and federal Establishment Clauses by, among others, preferring non-religion over religion and proscribing the legal and legitimate practices of the FLDS Church, which are many, and which include the Holy United Order.  Moreover, Utah, through its Attorney General and the District Court has taken control of, secularized and—

apparently for a substantial period of time—will administer the Trust, which was created for the purpose of enabling Church members to seek to participate in a religiously-based, communitarian economic program.

50. Under the doctrine of *cy pres*, "[i]f property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impractical or illegal to carry out the particular purpose, **and** *if the settlor manifested a more general intention to devote the property to charitable purposes*, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."  Restatement of Trusts § 399 (emphasis supplied).  It is clear from the language of the Restated Trust that the Settlor did not "manifest[] a more general intention to devote the property to charitable purposes."

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief, 42 U.S.C. § 1983 —All Defendants)

51. Plaintiff incorporates all facts set forth above as though fully set forth herein.

52. 28 U.S.C. § 2201 provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

53. Pursuant to and within the meaning of 42 U.S.C. § 1983, Association members have been deprived of federal constitutional rights by persons acting under color of state law—a statute,

ordinance, regulation, custom or usage.  Moreover, the violation of the Association members' rights is attributable to enforcement of a governmental policy or practice.

54. The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

55. Association members are entitled to this Court's declaration that the unique remedy fashioned by the District Court in the exercise of its discretion to address a breach of fiduciary duty is inconsistent with the constitution because it deprives Association members of the right and ability to seek a stewardship within the meaning of the United Order and the Law of Consecration, and because the remedy had and continues to have a significant impact on the exercise of religion.  The Restated Trust existed in tandem with, and in the service of, the FLDS Church and its members and cannot function in its secularized derivation.

56. Plaintiff Association members are entitled to this Court's declaration that the unique remedy fashioned by the District Court in the exercise of its discretion is further inconsistent with the First Amendment because it violates the Establishment Clause.

## SECOND CLAIM FOR RELIEF

### (DECLARATORY RELIEF, ARTICLE 1, §§ 1 AND 4, UTAH CONSTITUTION —ALL DEFENDANTS)

57. Plaintiff incorporates all facts set forth above as though fully set forth herein.

58. The Utah Constitution provides:  "All men have the inherent and inalienable right . . . to worship according to the dictates of their consciences . . . ."  Article I, § 1.  It further provides: "The rights of conscience shall never be infringed.  The State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . ."  Article I, § 4.

863750.1

59. Association members are entitled to this Court's declaration that the unique remedy fashioned by the District Court in the exercise of its discretion to address a breach of fiduciary duty is inconsistent with the constitutional provision because it deprives Association members the right and ability to seek a stewardship within the meaning of the United Order and the Law of Consecration, and because the remedy had and continues to have a significant impact on the exercise of religion.

60. Association members are entitled to this Court's declaration that the unique remedy fashioned by the District Court in the exercise of its discretion is further inconsistent with the Utah Constitution because it violates the Establishment Clause.

### THIRD CLAIM FOR RELIEF

### (VIOLATION OF RLUIPA, 42 U.S.C. § 2000CC –DEFENDANT WISAN)

61. Plaintiff incorporates all facts set forth above as though fully set forth herein.

62. At all times subsequent to his appointment, Defendant Wisan has sought to place Trust property into individual private ownership.

63. Consistent with that goal, Defendant Wisan has pursued government approvals for the subdivision of parcels of Trust property that has historically been held in common ownership.

64. Defendant Wisan has filed reports with the Third District Court which outline the major administrative trust issues. With limited early exceptions, these reports include a section entitled "STATUS OF SUBDIVIDING TRUST PROPERTY."

65. These reports outline the intention of Defendant Wisan to subdivide and privatize UEP property and document the substantial efforts he undertaken to implement the land use regulations of Arizona and Utah in furtherance of his stated goal.

66. On  September 10, 2007, Defendant Wisan appeared before the Colorado City Council and requested approval of a preliminary subdivision plat in regards to Trust property.

67. Acting  pursuant Arizona law and its own subdivision ordinance, the Colorado City Council voted to approve the plat.

68. On January 7, 2007, Defendant Wisan filed a Complaint for Declaratory Relief and Petition for Extraordinary Writs in the Nature of Mandamus in the Fifth Judicial District Court of Washington County Utah, Case No. 070500105.  The Defendants were the Washington County recorder, Hildale City and the Twin Cities Water Authority.

69. In that case, Defendant Wisan alleged that a subdivision plat which conforms in all respects with the requirements of Utah code Ann. 10-9-603(1) had been prepared. It was further alleged that such plat could not be recorded because Hildale City officials were concerned with offending the FLDS church and/or its leaders which were opposed to the subdivision.

70. On December 18, 2007, the Fifth District Court entered a default judgment ordering that the Plat be immediately recorded upon delivery to the Washington county recorder. The order includes a finding that the Plat complies with the statutory requirements of Utah Code Ann. § 10-9a-603 and all applicable county requirements.

71. On December 21, 2007, TCWA filed a motion to set aside the default judgment. The court agreed to strike the Default Judgment but left the Default certificates in place.

72. 42 U.S.C. § 2000cc provides that no Government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person including a religious assembly or institution unless the government demonstrates the imposition of the burden on that person assembly or institution (A) is in furtherance of a compelling

governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

73. Defendant Wisan is the "government" in carrying out his mandate from the State of Utah to administer the Trust in accordance with "neutral laws" and secular principles, including his plan to subdivide parcels of Trust property that has historically been held in common owner-ship.

74. In obtaining the approval of a preliminary subdivision plat from the Colorado City Council, Defendant Wisan has implemented the land use regulations of Colorado City, Mojave County, and the State of Arizona.

75. In obtaining the judgment in the Mandamus action, Defendant Wisan has implemented the land use regulations of Hildale City, Washington County and the State of Utah.

76. In pursuit of his goal of subdividing and privatizing Trust property, Defendant Wisan has implemented state, county and municipal land use regulations in a manner that imposes a substantial burden on the ability of Plaintiff Association members to participate in the law of consecration and stewardship.

77. The burden imposed affects interstate commerce.

78. Plaintiff Association members have a property interest in the land that is the subject of the land use regulations.

79. There are less restrictive alternatives than application of these land use regulations to com-munally-owned Trust property, and the Government has no compelling interest that is fur-thered by their implementation under these circumstances.

80. Plaintiff Association members are entitled to this Court's declaration that the unique remedy

fashioned by the District Court in the exercise of its discretion violates the RLUIPA.

### FOURTH CLAIM FOR RELIEF

**(DECLARATORY RELIEF, UTAH CODE ANN. § 76-7-101 IS UNCONSTITUTIONAL—ALL DEFENDANTS)**

81. Plaintiff incorporates all facts set forth above as though fully set forth herein.

82. Utah's laws targeting plural marriage and the relationships and behaviors of its participants

have never been reviewed by federal courts under a modern due process, equal protection, or

First Amendment analysis.  The analysis under which they were upheld—that polygamy is

"immoral," "odious," and "lecherous;" and, "until the establishment of the Mormon Church,

was almost exclusively a feature of the life of Asiatic and of African people," *Reynolds v.*

*United States*, 98 U.S. 145, 164 (1878)—is clearly no longer valid.  To survive scrutiny to-

day, those laws must be justified on some basis other than regulation of morality.  Regulation

of a person's "liberty"—especially in matters of family, sexuality, and procreation—based on

principles of morality no longer suffices to justify criminal penalties or other disabilities,

even under the most relaxed level of constitutional scrutiny.

83. The United States Supreme Court recently found that a Texas law criminalizing consensual

homosexual sodomy was unconstitutional under a substantive due process analysis.  *Law-*

*rence v. Texas*, 539 U.S. 558 (2003).  Relying on a long line of cases recognizing a right of

privacy in matters of family and procreation, the Court viewed the Texas law as an effort to

legislate morality in a protected sphere:  "[O]ur laws and tradition afford constitutional pro-

tection to personal decisions relating to marriage, procreation, contraception, family relation-

ships, child rearing and education. . . .  'These matters, involving the most intimate and per-

sonal choices a person may make in a lifetime, choices central to personal dignity and auton-

omy, are central to the liberty protected by the Fourteenth Amendment.'"

84. This case involves precisely such relationships.  FLDS Church members are motivated by

religion, procreation, and family, not by sexual gratification.

85. The bigamy statute is constitutionally infirm because it targets religious polygamists, and is

not enforced in a religiously neutral manner.  It thus violates the religion and equal protection

clauses of the U.S. and Utah constitutions.  It is beyond question that the decision to crimi-

nalize simple cohabitation was targeted directly at Mormon polygamists in the late 19th cen-

tury and is directly and permanently tied to government efforts to stamp out Mormon polyg-

amy.  The State has prosecuted bigamy cases on the basis of simple cohabitation only with

respect to religious polygamists.  Despite a pool of tens of thousands of potential defendants,

both religious and non-religious, only a handful have been singled out for prosecution and all

of those have been post-Manifesto Mormon fundamentalists.

86. The bigamy statute on its face violates Plaintiff Association members' constitutional rights to

intrinsic and instrumental association.  Intrinsic association recognizes that the right to enter

and maintain certain intimate human relationships is a fundamental element of personal lib-

erty.  Instrumental association is an ancillary right necessary to make the guarantees of the

First Amendment both possible and meaningful.  Association members are free not only to

believe in plural marriage, but to live it, model it for their children, and express with partners

to the other members of the community and to the world at large the nature and meaning of

living a religious commitment.  Whatever might be the law under the Free Exercise Clause,

this is not a sufficient response to infringement on the freedom of association.  Religion involves not just belief.  It involves outward manifestation of one's faith.

87. Although challenges to laws against polygamy under the Free Exercise Clause have historically been rejected, *Reynolds v. United States*, 98 U.S. 145 (1878), the *Reynolds* Court's belief/practice dichotomy is fundamentally flawed, and cannot stand up to modern analysis. Because the laws targeting polygamy are not religiously neutral, strict scrutiny applies.  The State's demand in this case is nothing less than that Association members and their church surrender a core religious belief to state control.  To say that a person of religious conviction can believe anything, but cannot practice those beliefs, is to eviscerate the core of religion.

88. Finally, given Utah's struggle to repose as much individual and religious liberty in the people as possible in its quest for statehood, and given the expansive language of the enumerated and reserved rights in the Utah Constitution, the liberty interests and freedoms of conscience the Utah Constitution protects must be exceptional.  The private relationships in which Association members may be engaged are central to their deeply and sincerely held religious beliefs.  Any State effort to prohibit private, personal relationships that do not seek formal recognition in the law must undergo a rigorous analysis under Utah's religion clauses.  The differences in text and history between the federal Free Exercise Clause and the several pronouncements of religious freedom in the Declaration of Rights in the Utah Constitution, when considered against the backdrop of Utah's unusual struggle to preserve religious exercise and autonomy for its citizens while seeking statehood, compel the courts to use the most rigorous of scrutiny to any law that impairs, even indirectly, religious exercise.

89. The Utah bigamy statute, as authoritatively construed by the Utah Supreme Court, violates the federal criminal due process rights.  The Court's determination that the word "marriage" as used in the bigamy statute has two opposing meanings does not give a reasonable person adequate notice that the bigamy statute applies to polygamy as practiced by the FLDS Church, and thus is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

90. Association members are entitled to this Court's declaration that the basis for determining that the Restated Trust should be reformed, in that the Restated Trust could be used to advance illegal conduct, was flawed because Utah's bigamy statute is unconstitutional under both the Federal and State constitutions.

## FIFTH CLAIM FOR RELIEF

### (DECLARATORY RELIEF, UTAH CODE ANN. §§ 75-7-1001, -412(1), & -412(1)(C) ARE UNCONSTITUTIONAL AS APPLIED—ALL DEFENDANTS)

91. Plaintiff incorporates all facts set forth above as though fully set forth herein.

92. The remedial powers granted to the court to respond to a breach are extraordinarily broad and vague.  The statutory provisions do not prescribe any particular result or even lay out a menu of options.  Instead, they give the court "full power to make orders, judgments and decrees and take all other action necessary and proper to administer justice."  They permit it to "modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust."  Moreover, the court may terminate a trust or modify its substantive provisions using the *cy pres* doctrine "in a manner consistent with the settlor's charitable purposes."

93. Association members are entitled to this Court's declaration that the referenced statutes are unconstitutional as applied.

### SIXTH CLAIM FOR RELIEF

#### (INJUNCTIVE RELIEF—ALL DEFENDANTS)

94. Plaintiff incorporates all facts set forth above as though fully set forth herein.

95. The Defendants' continuing administration of the properties of the Trust constitutes an immediate, continuing, and irreparable deprivation of the constitutional rights of the Plaintiff.

96. In their day-to-day administration of the Reformed Trust, the Defendants are destroying the future ability of the Plaintiffs to rely upon the property of the Trust to support their religious beliefs and exercise.  They are doing so by, among other things, dissipating assets of the Trust, by using their control of the Trust as a weapon in their self-described "sociological and psychological war with the beneficiaries of the Trust," by using their control of the trust to attempt to destroy the Fundamentalist Church , and crippling the continuation of the religious movement by alienating the property which supports the Bishop's Storehouse.

97. The foregoing damage is irreparable.

98. The foregoing damage outweighs any harm that injunctive relief may cause the Defendants.

99. Plaintiff is entitled to a preliminary and permanent injunction enjoining the continuing violation of plaintiff's rights described herein.

100.    Injunctive relief is in the public interest.

WHEREFORE, Plaintiff prays as follows:

1.      Declaratory findings that Defendants have violated Plaintiff's First Amendment religious exercise rights and violated the First Amendment Establishment Clause;

863750.1

2.      Declaratory findings that Defendants have violated Plaintiff's rights under Article I, §§ 1 and 4 of the Utah Constitution;

3.      Declaratory findings that Defendants have violated Plaintiff's rights under the RLUIPA;

4.      Preliminary and permanent injunctive relief enjoining the continuing violation of Plaintiff's rights described herein;

5.      Reasonable and necessary attorneys' fees and expenses incurred through the trial of this cause and through any appeal of this action, including but not limited to expert witness fees and expenses, pursuant to 42 U.S.C. § 1988;

6.      Costs of suit; and

7.      Such other and further relief, both special and general, at law or in equity, to which Plaintiff may be justly entitled.

DATED:  November 5, 2008.

JONES WALDO HOLBROOK & McDONOUGH

By____/s/ Stephen C. Clark_____
     Kenneth A. Okazaki
     Stephen C. Clark
     Ryan M. Harrisn
     Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2008, I caused to be served a copy of the fore-

going **FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY AND**

**INJUNCTIVE RELIEF** upon the following in the following described manner:

VIA HAND DELIVERY and EMAIL TRANSMISSION:
Jeffrey L. Shields
Mark L. Callister
Zachary T. Shields
Michael D. Stanger
CALLISTER, NEBEKER & McCULLOUGH
Zions Bank Building, Suite 900
10 East South Temple
Salt Lake City, Utah   84133
EMAIL:  jlshields@cnmlaw.com

VIA HAND DELIVERY and EMAIL TRANSMISSION:
Timothy A. Bodily
Assistant Attorney General
160 East 300 South, Fifth Floor
P.O. Box 140874
Salt Lake City, Utah   84114-0874
EMAIL:  tbodily@utah.gov

VIA FACSIMILE TRANSMISSION and EMAIL TRANSMISSION
William A. Richards
Arizona Attorney General's Office
1275 West Washington
Phoenix, Arizona  85007-2997
Fax No. (602) 364-2214
EMAIL:  bill.richards@azag.gov

_____/s/ Stephen C. Clark_____

863750.1