JERROLD S. JENSEN (#1678)
TIMOTHY J. BODILY (#6496)
Assistants Attorney General
MARK L. SHURTLEFF (#4666)
Attorney General
Attorneys for Defendant
160 East 300 South, 5th Floor
P.O. Box 140857
Salt Lake City, Utah  84114-0857
Telephone:  (801) 366-0353
jerroldjensen@utah.gov

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE FUNDAMENTALIST CHURCH OF JESUS CRIST OF LATTER-DAY SAINTS, an Association of Individuals,<br><br>Plaintiff,<br><br>vs.<br><br>BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHURTLEFF, Attorney General of the State of Utah; TERRY GODDARD, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah.<br><br>Defendants. | **OBJECTION TO TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**<br><br><br><br>Case No. 2:08-CV-772-DB<br><br>Judge Dee Benson |

Defendant Utah Attorney General Mark Shurtleff, by and through counsel, objects to

Plaintiff's Motion for this Court to issue a Temporary Restraining Order and/or Preliminary

Injunction.

## ISSUE

The United Effort Plan ("UEP") Trust owns property known as the Berry Knoll Farm. The Fundamentalist Church of Jesus Christ of  Latter Day Saints ("FLDS Church") has never owned the farm, is not a beneficiary of the UEP Trust, yet is seeking a TRO to block the sale of the property.  Does the FLDS Church have standing to block the sale of the property?

## INTRODUCTION

Plaintiff's First Amended Complaint alleges that the Utah Attorney General and the Third District Judicial Court, Salt Lake County, State of Utah, have violated Plaintiff's association members' constitutional rights under the religion clauses of the First Amendment to the United States Constitution, the Religious Liberty and Inherent and Alienable Rights sections of the Utah Constitution, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), Pub.L. 106-274, 42 U.S.C. § 2000 cc-1.  They also allege Utah's bigamy statute, contrary to holdings of this Court, is unconstitutional; that Utah's Probate Code regarding the administration of charitable trusts is unconstitutional as applied to the UEP Trust; and either a restatement of the Reformed Trust or its termination.

What the First Amended Complaint and Motion for a Temporary Restraining Order so glaring omits is the factual background as to why the State of Utah and the Third Judicial District Court became involved in the first place.

## A.       Background to the UEP Trust and the FLDS Church

It is first of all important to understand a little of the background to the UEP Trust, along with the relationship between the UEP Trust and the FLDS Church.  Plaintiffs have set out some

of that history in their complaint.  In short, a group of Mormon fundamentalists dedicated to

preserving the practice of plural marriage, began to settle in the area known as Short Creek in

Northern Arizona, just south of the southern Utah border in the 1930s.  Called the "Priesthood

Work" they formed the UEP Trust in 1942 to further their practice of the United Order and

polygamy.  The early years of the movement were contentious and saw many different

interpretations and opinions among leaders as to how plural marriage should be practiced.  These

contentions eventually lead to a number of schisms that created multiple Mormon fundamentalist

organizations, including the FLDS Church, the Apostolic United Brethren, and the Latter Church

of Christ, with the leader of the FLDS Church gaining control of the UEP Trust.  In 1984 a

schism formed within the FLDS Church leading to claims against the UEP Trust, culminating in

a lawsuit heard by the Utah Supreme Court.  Jeffs v. Stubbs, 970 P.2d 1234 (1998).

In recent years there have become a number of dissident, or apostate, members of the

FLDS Church over the administration of the Church by Warren Jeffs.  Up until a year or so ago

Mr. Jeffs was regarded as the President of the FLDS Church.  The Deseret News reported, on

March 27, 2007, that during the trial of Mr. Jeffs in St. George, Utah, he gave the Judge a hand-

written note renouncing his role as the prophet.

At this point in time, the Attorney General's Office has no knowledge as to who the

officers of the FLDS Church are, or who is in a position to officially speak for the Church.  Is Mr.

Jeffs still the President of the Church but not the prophet?  Is Willie Jessop, who has filed an

affidavit in this case, speaking for the Warren Jeffs faction of the FLDS Church, officers of the

Church excluding Mr. Jeffs, or another faction?  The same question applies to all other spokespersons.

**B.**    **Factual Background as to Origin of Utah Attorney General's and the Court's Involvement**

In the later-half of 2004, two lawsuits were filed against Warren Jeffs, the FLDS Church and the UEP Trust, in which Rod Parker, of the law firm of Snow, Christensen & Martineau, initially entered an appearance and then filed a motion to withdraw, stating "the clients insist upon a course of conduct with which their lawyers have a fundamental disagreement [and] . . . the lawyers have been discharged from their representation of the defendants in this case."[1]  Both cases alleged tortious claims against the Defendants.

Default Certificates were taken in both cases.  Thereafter, Mr. Parker filed a Motion to Require Notice asking the Court to require Plaintiffs to give a notice of a potential default judgment to "all non-parties who would potentially be adversely affected . . . including all persons residing upon land owned by the United Effort Plan Trust and the Attorney General of the State of Utah. . . ."  Plaintiff's counsel mailed copies of the Motion to Require Notice and the Memorandum in Support of the Motion to the Attorney General's Office, by letter dated February 9, 2005.  (Motion to Require Notice, and Memorandum in Support of Motion are attached hereto as Exhibit 1.)[2]

---

[1]  Jeffs v. Jeffs, case no. 040915857 alleges child sexual abuse.  Ream v. Jeffs, case no. 040918237, is known as the "Lost Boys" lawsuit.  Both cases were filed in the Third Judicial District, Salt Lake County, State of Utah.

[2]The Notice and Memorandum in both cases are the same.

As Mr. Parker indicated, the obtaining of a judgment against the UEP Trust had the potential of putting hundreds, if not thousands, of people in the area of Hildale, Utah and Colorado City, Arizona in jeopardy of losing their homes.[3]  By failing to respond to these lawsuits, there existed the very real possibility that the UEP Trust would lose by default, judgments would be taken, and Trust property executed upon – all resulting in residents of the FLDS community in Hildale, Utah and Colorado City, Arizona being in jeopardy of losing their homes, and in some cases, their businesses.

This is the same time period in which FLDS Church leadership, along with many members from the Hildale and Colorado City area, were moving to Eldorado, Texas.

Upon investigation, it was also reported to the Attorney General that real property of the Trust was being dissipated, either through sale or gifting, for little or no consideration.

Based upon the above information the Utah Attorney General, on May 26, 2005, petitioned the Third Judicial District Court in Salt Lake County for the appointment of a Special Fiduciary to administer the affairs of the Trust to prevent Trust assets from being dissipated. (Utah Attorney General's Petition, attached hereto as Ex. 2.)  This Petition was carefully crafted to be the least restrictive means available to accomplish the Attorney General's duties under the statute.

The Utah Attorney General serves the role of protecting the public interest in a charitable trust.  Utah Code Ann. § 75-7-706 (West 2004) permits the removal of a trustee if the court finds

---

[3]Approximate value of the Trust is $111 million.  (*See* Ex. A of the Report of Special Fiduciary, attached hereto as Ex. 2.)

any one of the following circumstances: "(a) the trustee has committed a serious breach of trust;

(b) lack of cooperation among co-trustees substantially impairs the administration of the trust;

[or] (c) because of unfitness, unwillingness, or persistent failure of the trustee to administer the

trust effectively, the court determines that the removal of the trustee best serves the interest of the

beneficiaries . . .."  Utah Code Ann. § 75-7-804 (West 2004) requires a trustee to administer the

UEP Trust with "reasonable care, skill and caution."  Utah Code Ann. § 75-7-807 (West 2004)

requires a trustee to "take reasonable steps to take control of and protect the trust property."

Utah Code Ann. § 75-7-809 (West 2004) requires a trustee to "take reasonable steps to . . .

defend claims against the trust."  Utah Code Ann. § 75-7-811 (West 2004) requires a trustee to

inform and report to qualified beneficiaries on the administration of the trust.  Utah Code Ann.

§ 75-7-804 (West 2004) requires a trustee to keep adequate records of the administration of the

trust.

Notice was given of the Attorney General's Petition, as well as notice of the hearing in

the Third District Court, to Warren Jeffs, other trustees of the UEP Trust, and the FLDS

community at large.  Notice of service was accomplished by personal service where possible.

Many leaders of the FLDS Church were in hiding at the time.  Notice was also published in the

newspaper serving Hildale and Colorado City.  No trustee of the UEP Trust claiming authority

from Mr. Jeffs, officer of the FLDS Church, or even a member of the FLDS Church or

beneficiary of the Trust claiming allegiance to Mr. Jeffs ever made an appearance at the court to

object or contest the action of the Court or the Attorney General.

The Third District Court "found that the trustees had committed breaches of trust by failing to protect Trust property, to defend claims against the Trust, to administer the Trust with reasonable care and caution, to account, to segregate the assets between charitable and private beneficiaries, and to appear before the Court." (Memorandum Decision, p. 3, attached to Plaintiff's Motion as Ex. B.)  Since then the trust has been Amended and Restated to provide for the charitable needs of the beneficiaries, and remove the Special Fiduciary from any religious obligations found in the original Trust.  (Memorandum Decision, p. 28, attached to Plaintiff's Motion as Ex. B.)

The most clear picture of what was faced by the Attorney General can be found in the Attorney General's Petition attached hereto as Exhibit 2.  Grasping the complexities of the Trust and the duty facing the Special Fiduciary is best garnered by reviewing the Special Fiduciary's First Report to the Third District Court, dated November 4, 2005, attached hereto as Exhibit 3.

**B.   <u>Hearing Scheduled on Sale of Property</u>**

The proceeding before the Third Judicial District Court has been going-on for three-and-a-half years.  Not until the Special Fiduciary proposed the sale of the Berry Knoll Farm, did anyone from the FLDS community make an appearance before the Court, in spite of the repeated requests and notices to do so.  Finally, three movants, one of whom is Willie Jessop who has filed an Affidavit in this case, filed an Emergency Motion to Stay Sales of Trust Property.  The Court determined that the movants had no legal standing to challenge the anticipated sale of the property, but to afford the FLDS community an opportunity to be heard on the issue, and cross-examine the Special Fiduciaries witnesses, scheduled a hearing in St. George, Utah, for

November 14, 2008.  The FLDS community is given two hours in which to state their views

regarding the proposed sale of the Berry Knoll Farm.  (*See* Minute Entry and Order of Judge

Lindberg, dated Nov. 10, 2008, attached hereto as Ex. 4).

## ARGUMENT AGAINST TRO

Given that the State court has not yet made a decision as to whether the Berry Knoll Farm

should be sold, and is scheduling a hearing in St. George, Utah to accommodate the FLDS

community to be heard on the matter, the question arises as to whether this Court should inject

itself into the proceedings of a State court, or whether there is even a valid legal reason for doing

so.

## I.  *YOUNGER* ABSTENTION

To avoid federal courts interference with state courts, Congress, as early as 1793, passed

what has been called the Anti-Injunction Act.  As amended it states:  "A Court of the United

States may not grant an injunction to state proceedings in a State Court except as expressly

authorized by an Act of Congress, or where necessary in aid of its jurisdiction, or to protect or

effectuate its judgments."  (28 U.S.C. § 2283.)  In 1972, the United States Supreme Court held

that a Section 1983 case was an exception to the above statute inasmuch, the Court said, as it was

expressly authorized by an Act of Congress.  Mitchum v. Foster, 407 U.S. 225, 242-243 (1972).

Obviously the case filed in this Court is a Section 1983 case, but it is subject to the

*Younger* abstention doctrine.  The *Younger* doctrine, originally set forth in Younger v. Harris,

401 U.S. 37 (1971), held that the national policy prohibits federal courts from enjoining pending

state court proceedings except under unique circumstances.  If all three prongs of the *Younger*

doctrine are affirmative, then a federal court must abstain unless there is a showing of bad faith, harassment, or other extraordinary circumstances that would make abstention inappropriate.  The three prongs of the *Younger* doctrine are:  (1) there must be ongoing state proceedings that are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must afford an adequate opportunity to raise federal claims.  *See*, Anthony v. Council, 316 F.3d 412 (3d Cir. 2003); Zahl v. Harper, 282 F.3d 204 (3d Cir. 2002); Spargo v. New York State Com'n on Judicial Conduct, 244 F. Supp. 2d 72 (N.D. N.Y. 2003); Bauer v. Texas, 2003 WL 21752811 (5th Cir. 2003); Davidson v. Wall, 2002 WL 1889166 (D.R.I. 2002); Cerit v. Cerit, 188 F. Supp. 2d 1239 (D. Haw. 2002).

A more recent Supreme Court Case on the issue is Pennzoil Co. v. Texaco Inc., where the court held that even though the complaint rested on Section 1983, the lower courts should have abstained.  The Supreme Court ruled that the lower courts should abstain and set forth multiple reasons for abstention including the importance of comity and deference to State proceedings. 481 U.S. 1 (1987).

In determining whether the *Younger* abstention is appropriate, the Tenth Circuit has considered whether: "(1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies." Amanatullah v. Colorado Bd. of Med. Exam'rs, 186 F.2d 1160, 1163 (10th Cir. 1999) (internal quotations omitted.)  Once these three conditions are met, *Younger* abstention is non-discretionary and,

absent extraordinary circumstances, a district court is required to abstain.  *See* <u>Seneca-Cayuga</u>

<u>Tribe v. Oklahoma</u>, 874 F.2d 709, 711 (10th Cir. 1989).

Needless to say, the case which Plaintiff is attempting to stop is an ongoing State case,

with a hearing scheduled in St. George, Utah, for November 14, 2008.  Members of the FLDS

community are invited to attend and participate.  Their testimony is to be coordinated by Mr. Jim

Bradshaw, Plaintiff's counsel in the case herein.  State interests are involved relating to

charitable trusts governed by the Utah Probate Code and the Uniform Trust Act, and the wasting

or dissipating of UEP Trust's assets.

## II.   <u>RELIGIOUS NEUTRALITY</u>

Plaintiff's First Amended Complaint alleges a violation of the association member's

religious rights under the both the United States and Utah constitutions because the UEP Trust,

as presently administered by the Special Fiduciary, is "religiously neutral."  Essentially, the

Plaintiff asks this Court to favor their religion over that of others who may be beneficiaries or

have otherwise participated in the Trust.  In other words, Plaintiff asks this Court to disavow the

Utah State Court's principle of religious neutrality in favor of a standard that requires the Court

to choose sides based upon religious preferences.  Their argument is that the UEP Trust was

originally established to promote the religious doctrine of the FLDS Church, namely the Law of

Consecration/United Order and polygamy, and this Court should order that the UEP Trust

continue to be operated under that criteria.

As stated in the 1998 Amended and Restated Declaration Trust, church members' rights

to participate in the Trust could be revoked based upon their worthiness and adherence to church

principles.  This determination could be made by the Board of Trustees, but in practical terms

they essentially operated at the direction of the president of the FLDS Church.  Plaintiff is asking

this Court to return the UEP Trust back to that kind of administration.

What Plaintiff so glaring omits is that the State would have never become involved in

administration of the UEP Trust, had the UEP Trustees protected and safeguarded the Trust's

property.  But by dissipating its assets, and refusing to defend lawsuits against the Trust, the

Attorney General was left with no choice but to protect the FLDS community at large by

petitioning the Court for the appointment of a Special Fiduciary.

The Attorney General and the State Court could pursue no other path than "religious

neutrality."  This is Plaintiff's sole complaint.  For Plaintiff to prevail in this case, in any way,

shape or form, this Court must breach that "religious neutrality."  By blocking the actions of the

State Court or turning the Trust's Property over to the control of the FLDS Church, amounts to

this Court enforcing FLDS doctrine upon beneficiaries of the Trust.  That is not consistent with

the Reformed Declaration of Trust of 2006.

The Memorandum Decision of the Third District Court, dated December 13, 2005

(attached to Plaintiff's Memorandum as Ex. B) states that a guiding principle of the Trust, given

the Court's involvement, has to be that property disputes are not resolved on the basis of

religious doctrine or practice.  The Decision states:

> Third and final principle guiding reformation is that the Court cannot
> reform the Trust or resolve property disputes on the basis of religious doctrine or
> practice.  Courts can, without violating the First Amendment, resolve property
> disputes involving religious organizations by applying "neutral principles of

law."[4]  In doing so, however, civil courts must refrain from "resolving underlying
controversies over religious doctrine."[5]  For example, courts are prohibited by the
First Amendment from resolving "rights to the use and control of church property
on the basis of a judicial determination that one group of claimants has adhered
faithfully to the fundamental faiths, doctrines and practices of the church . . .
while the other group of claimants has departed substantially therefrom.[6]  In short,
courts must separate that which is primarily ecclesiastical from that which is
primarily secular,[7] and must defer to ecclesiastical authority for ecclesiastical
determinations.[8]

Memorandum Decision ¶ 35.

Both the Court and the Special Fiduciary have labored assiduously to follow these

principles.  No decision has been based upon one's religious worthiness, beliefs, faithfulness, or

church membership.  That is the complaint which Plaintiff has against the current administration

of the Trust, for which it seeks an order of this Court of reversing.

### III.  PLAINTIFF'S FAIL TO MEET THE REQUIREMENTS FOR A TRO

The FLDS Church has never owned the property known as the Berry Knoll Farm.  Rather,

the property is owned by the UEP Trust.  The UEP Trust was originally created by a Declaration

---

[4]  Jones v. Wolf, 443 U.S. 595, 602 (1979).

[5]  Id. See also, Presbyterian Church v. Hull Church, 393 U.S. 440, 449 (1969).

[6]  From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church,
370 Md. 152, 803 A.2d 548, 570 (2202) quoting Atkins v. Walker, 200 S.E.2d 64, 649 (1973).

[7]  Metropolitan Baptist Church of Richmond, Inc., v. Younger, 48 Cal. App. 3d 850, 858,
121 Cal. Rptr. 899, 903-04 (1975); see also id. ("Ecclesiastical matters ordinarily concern creeds
and the proper mode of exercising one's belief, considerations of faith, including questions of
what constitutes an essential of a church's faith, and matters of church discipline, tenets and
general polity") (citation omitted).

[8]  Jones, 443 U.S. at 604.

of Trust dated November 9, 1942, amended April 10, 1946, and amended and restated in 1998.

In October, 2006, the Trust was reformed by the Third Judicial District Court, Salt Lake County,

State of Utah.  (Attached to Plaintiff's Memorandum as Ex. C.)  As stated in the Trust, "Trust

Property shall be devoted to providing for the just wants and needs of the beneficiaries which

purpose is beneficial to the community."  (Reformed Trust, ¶ E.1.)  The Declaration of Trust also

states that the Trust is separate and distinct from the FLDS Church as well as any other religious

efforts objectives, doctrines or organizations.  (Reformed Trust, § 2.4.)

Article 4 of the Reformed Declaration of Trust provides for the purposes and defines who

the participants are.  It has retained the charitable nature of the Trust by stating that its purpose is

to provide for the "just wants and needs of the beneficiaries."  This is defined in Article 4 as

primarily concerning housing.  Secondarily, however, it also says that the "just wants and needs

concern education, including scholarships, occupational training and economic development.

Just wants and needs may also include food, clothing, medical needs and other items within the

discretion of the Board."  (Reformed Trust, § 4.1.)

Trust participants are defined as "individuals."  Section 4.2 states:

Trust Participants.  Individuals who may be privileged to receive benefits from the
Trust ("Trust Participants") shall be limited to those individuals (1) who can
demonstrate that they had previously made Contributions to either the Trust or the
FLDS Church; or (2) who subsequent to the date of this Agreement make
documented Contributions to the Trust which Contributions are approved by the
Board.  Trust Participant status shall not be based upon the value of the property
or services contributed and shall be interpreted liberally consistent with the
charitable purpose of the Trust.

Article 5 of the Reformed Declaration of Trust establishes a Board of Trustees to govern the Trust. The Court has provided procedures and opportunities for individuals to nominate trustees. To date, no FLDS Church members have been nominated by anyone.

## A.   Criteria Needed for the Granting of a TRO

The granting of a preliminary injunction is an equitable remedy that invokes the sound discretion of the trial court. Lindgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980). To meet the criteria for obtaining a preliminary injunction in the form of a temporary restraining order the moving party must show: (1) irreparable injury to it if the injunction is denied, (2) that the threatened injury to the movant outweighs the injury to the party opposing the preliminary injunction, (3) that the injunction would not be adverse to the public interest, and (4) a substantial likelihood of success on the merits of its claims. *See, e.g.*, Summum v. Pleasant Grove City, 483 F.2d 1044, 1048 (10th Cir. 2007), *cert. granted*, Pleasant Grove City v. Summum, 128 S.Ct. 1737 (2008); Otero Savings & Loan Ass'n v. Federal Reserve Bank, 665 F.2d 275, 278 (10th Cir. 1981).

### 1.   Plaintiff Church is Unable to Show Irreparable Harm to it if an Injunction is Denied

Plaintiff in this case is the "Fundamentalist Church of Jesus Christ of Latter-Day Saints." Nowhere does it claim to have ever owned the Berry Knoll Farm. Had the property been in the Church's name, or that of one its two corporations,[9] one could be persuaded that Church had an

---

[9] The FLDS Church has two corporations: the Corporation of the Presiding Bishop of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, and the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints. Both are registered with the

ownership interest in the property.  But it never has.  Rather, the property is owned by the UEP

Trust.  Admittedly, members of the FLDS Church are beneficiaries of the UEP Trust.  But UEP

Trust beneficiaries also include disaffected or excommunicated members of the FLDS Church.

Therefore, it is difficult to see how the FLDS Church is irreparably harmed by the sale of

Trust property.

Plaintiff states that "in the context of a preliminary injunction request, loss of property is

*per se* irreparable injury," citing Sportsman's Wildlife Defense Fund v. U.S. Dep't of Interior,

949 F.2d Supp. 1510, 1523 (D. Colorado 1996).  The irony with citing Sportsman's Wildlife

Defense Fund is that the loss of property did not refer to the sale of property, but the building

upon the property, and the preliminary injunction was denied.

Plaintiff also alleges a violation of the Religious Land Use and Institutionalized Persons

Act of 2000 ("RLUIPA"), the successor to the Religious Freedom Restoration Act ("RFRA").

They then state "courts have held that a plaintiff satisfies the irreparable harm analysis by

alleging the violation of RFRA," as if to say:  All we have to do is allege a violation of RFRA,

even if false, to satisfy the irreparable harm analysis for a TRO.

RLUIPA is a federal law that prohibits the imposition of burdens on the ability of

prisoners to worship as they please, as well making it easier for Churches and other religious

institutions to avoid state restrictions on their property's zoning laws.  There is no zoning of

property here – and the church does not own the subject property and never has.

---

State of Utah as corporations sole.

## 2.   Threatened Injury to the Movement Does Not Outweigh the Injury to the Trust

Plaintiff tries to say that the threatened injury to the FLDS Church outweighs the threatened injury to the Trust.  This is true only if one totally ignores the needs of the Trust.  Not being able to sell this property essentially shuts down the Trust – which is precisely the intent of the Church.  The Trustee and his attorneys have not been paid for their work for the Trust for over a year-and-a-half.  They cannot be expected to administer the Trust without compensation.

The Trust does not have income generating assets.  The only way for the Special Fiduciary to be compensated is by the sale of assets.  Assets of the Trust in Utah and Arizona for the most part constitute residences.  There are only three properties that do not constitute residential property:  the Harker Farm, The Gap property in Apple Valley, and the Berry Knoll Farm.  To operate and administer the Trust the Special Fiduciary has no choice but to sell one of those three properties.

## 3.   Not Adverse to Public Interest

The third criteria for maintaining a preliminary injunction is the allegation that the injunction would not be adverse to the public interest.  It depends here how the "public interest" is defined.   If it is the public at-large in the states of Utah and Arizona, the issuing of an injunction is not adverse to the public interest.  But if it is the public comprising the communities of Hildale and Colorado City the issuing of the injunction is adverse to the public interest, because the consequence of the injunction is essentially to shut down the administration and operation of the Trust.

**4.  Plaintiff Does Not have a Likelihood of Success on the Merits of its Claim**

Given all the above, Defendant Shurtleff believes Plaintiff does not stand a likelihood of success on the merits of claims.  This is because the Attorney General and the Third District Court have been very careful not violate anyone's religious rights guaranteed under the United States or Utah constitutions.  Further, for this Court to undo the Reformed Trust created by the Third Judicial District Court and transfer the property to the FLDS Church grants property to the Church which it has not previously owned.  Admittedly, leaders of the FLDS Church treat the UEP Trust as the alter-ego of the Church.  Doing so creates nothing but problems, including the way this case is presented to the Court.  The UEP Trust and the FLDS Church are not the same.  The UEP Trust includes members of the FLDS Church as beneficiaries – but it also includes members who may be seen as apostates by Warren Jeffs and/or other church leaders.  It also may include those who have been excommunicated or otherwise removed themselves from being members in good standing.  *See* Jeffs v. Stubbs, 970 P.2d 1234 (1998).

## CONCLUSION

Plaintiff's motion for a preliminary injunction in the form of temporary retraining order should be denied.

DATED this   12th   day of November, 2008.

MARK L. SHURTLEFF
Attorney General


  /s/ Jerrold S. Jensen
JERROLD S. JENSEN
Assistant Attorney General

CERTIFICATE OF SERVICE

This is to certify that copies of the foregoing **OBJECTION TO TEMPORARY**

**RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** was served by

electronically filing the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of

James C. Bradshaw
Mark R. Moffat
BROWN, BRADSHAW & MOFFAT
10 West Broadway, Suite 210
Salt Lake City, Utah 84101
kokazaki@joneswaldo.com

Kenneth A. Okazaki
Stephen C. Clark
Ryan M. Harris
JONES, WALDO, HOLBROOK & McDONOUGH
170 South Main Street, Suite 1500
P.O. Box 45444
Salt Lake City, UT 84145-0444
kokazaki@joneswaldo.com

Jeff Shields
Mark Callister
CALLISTER NEBEKER & McCULLOUGH
10 E S Temple Ste 900
Salt Lake City, Utah 84133
jlshields@cnmlaw.com

William Richards
Arizona Attorney General's Office
bill.richards@azag.gov


                                                    /s/ Amy Casterline
                                        _____

Objection to Temporary Restraining Order
    and/or Preliminary Injunction
Case No. 2:08-CV-772-DB
Page 18