CALLISTER NEBEKER & McCULLOUGH
JEFFREY L. SHIELDS (2947)
MARK L. CALLISTER (6709)
ZACHARY T. SHIELDS (6031)
MICHAEL D. STANGER (10406)
Zions Bank Building Suite 900
10 East South Temple
Salt Lake City, UT 84133
Telephone: (801) 530-7300
Facsimile: (801) 364-9127

Attorneys for Defendant Bruce R. Wisan, Court-appointed
Special Fiduciary of the United Effort Plan Trust

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

THE FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an Association of Individuals,

Plaintiff,

vs.

BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHURT-LEFF, Attorney General for the State of Utah; TERRY GODDARD, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah,

Defendants.

**MEMORANDUM IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Case No. 2:08-CV-772-DB

Judge Dee Benson

Defendant Bruce R. Wisan, as the Court-appointed Special Fiduciary of the United Effort Plan Trust ("Fiduciary"), through Counsel, hereby files this memorandum in opposition to the

MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION ("TRO Motion") filed by the Plaintiffs[1] in this civil action, as follows:

**INTRODUCTION**

The present TRO Motion is a part of a full-scale assault of abusive, vexatious litigation which the Plaintiffs have inflicted upon the Fiduciary in recent weeks. Such assault is part of an improper scheme to pound the Trust into submission with overwhelming, meritless litigation attacks, while starving the Trust of the funds which are so desperately needed in order to defend itself.

The Plaintiffs know that the Trust has no funds in which to pay the ongoing costs of Trust administration – including legal fees. The Plaintiffs know that the Fiduciary and his legal

---

[1] It is unclear who the Plaintiffs are in this case. Despite the fact that the Plaintiffs have chosen to call themselves the "Fundamentalist Church of Jesus Christ of Latter-Day Saints"(the "FLDS Church") on the pleadings of this case, it is clear that the Plaintiffs are *not* the FLDS Church. Indeed, the Plaintiffs admit that they are not the Church, but assert that they are an "informal association of members" of the Church. (*See* Willie Jessop Affidavit, at ¶ 1). The FLDS Church itself is not an informal association, but is a religious society with a designated President, Warren Jeffs. It is clear from the pleadings in this case that the FLDS Church itself is not a party to this litigation, and neither is Warren Jeffs.

It is unclear how many people are involved in the Plaintiffs' so-called "informal association." It appears that the Plaintiffs in this case are a group of members, or former members, of the FLDS Church who have rejected some of the teachings of President Warren Jeffs. It appears that this dissident group is seeking to undo certain actions taken by Warren Jeffs and the FLDS Church over the past several years in connection with the UEP Trust.

By claiming that they are the FLDS Church itself, Plaintiffs apparently hope to create standing where there is none. Knowing that they have no individual or collective rights to assert the claims in the Complaint, Plaintiffs are attempting to mislead the Court into believing that the Plaintiffs are the FLDS Church, so that they can attempt to assert any claims and rights with the FLDS Church may have.

The Plaintiffs' action in this case, in failing to identify themselves by their real names and in improperly usurping the name of another entity, are wholly improper. Such action places the Fiduciary at a distinct disadvantage. A defendant in civil litigation is certainly entitled to know the identity of those asserting claims against him. For this reason alone, the Plaintiffs' Complaint should be stricken and the TRO Motion denied.

counsel have not been paid for more than a year and a half! They know that, without a source of funds to pay ongoing legal expenses, the Fiduciary will be unable to hire additional needed legal counsel or to otherwise properly defend the Trust against the Plaintiffs' vexatious litigation attacks. Plaintiffs also know that the only reasonable way for the Trust to raise money is to sell Trust property.

Armed with such knowledge, the Plaintiffs have pursued a two-pronged approach to gain improper leverage against the Trust through abusive litigation tactics:

First, the Plaintiffs have attempted to overwhelm the Fiduciary and his lawyers with an avalanche of litigation in several different courts. Indeed, the Plaintiffs appear to now have the services of five different law firms at their disposal, while the Fiduciary is unable to pay his existing law firm, and is facing great difficulty in hiring any additional law firms, due to his lack of funds to make payment for legal services.

Second, the Plaintiffs have done all in their power to prevent the Fiduciary from selling Trust property. The Plaintiffs' efforts include attempting to intimidate potential buyers, and filing wrongful notices of interest against the property. Such efforts also include filing numerous meritless motions with various different courts seeking to stop the sale of Trust property, or even a hearing on the merits of the proposed sale, through collateral attacks, based upon erroneous, pretextual legal and factual arguments.

The present TRO Motion is part of a last-minute judge-shopping spree. In their desperate attempt to starve the Trust of needed funds, the Plaintiffs waited until the week before the scheduled sale hearing, and then hired three new law firms, who filed three separate motions for injunctive relief in three different courts in two different states, all seeking to collaterally attack

the rulings of Judge Lindberg in the Trust Probate Action. Having previously filed several meritless motions to stop the sale of Trust property before Judge Lindberg, with no apparent success,[2] the Plaintiffs are now in the search of a new judge who will aid in their effort to starve the Trust.

Within the past week, Plaintiffs' three new law firms have filed three "emergency"[3] motions to stop the sale in three different courts.[4] Thus, while the Fiduciary's counsel should be

---

[2] Prior to the recent spate of collateral judge-shopping attacks in different courts, the Plaintiffs made several meritless attempts to stop the sale before Judge Lindberg in the Trust Probate Action. Specifically, the Plaintiffs filed an Emergency Motion to enjoin the sale of Trust property in August, 2008, which motion was denied on October 8, 2008. Thereafter, the Plaintiffs filed a Motion to Continue, seeking to delay the November 14 hearing. Next, the Plaintiffs filed an Ex Parte Expedited Motion, seeking to stay all proceedings in the Trust Probate Action – including the sale of property. In addition, the Plaintiffs filed a Memorandum opposing the Fiduciary's Motion for approval to sell the Berry Knoll property. Finally, the Plaintiffs have recorded improper notices of interest against the Trust's Berry Knoll property.

[3] The Plaintiffs' so-called "emergency" is a self-created emergency caused by the Plaintiffs' deliberate failure to act until the week before the scheduled sale. The Plaintiffs have known about the pending sale of the Berry Knoll Farm since before August, 2008, when they filed their first meritless "Emergency Motion" seeking to enjoin the sale. The Plaintiffs have known about the upcoming November 14 hearing – on whether to approve the sale of the property – since October 8, 2008, when Judge Lindberg announced in open court (after clearing the date with Plaintiffs' legal counsel) that the Court would hold the November 14 hearing in St. George in order to give the Plaintiffs an opportunity to provide comment and input as to the sale proposal. *Notwithstanding such knowledge, the Plaintiffs waited until the week before the scheduled hearing before launching their all-out judge-shopping, collateral attacks.*

[4] On November 5, 2008, the law firm of Jones, Waldo, Holbrook & McDonough entered an appearance in the present case and filed the present TRO Motion, which is scheduled for hearing on Wednesday, November 12 – two days before the scheduled sale hearing.

On Monday, November 10, 2008, the law firm of Snell & Wilmer filed a RULE 8 PETITION FOR EMERGENCY RELIEF with the Utah Supreme Court, together with a motion seeking to require the Fiduciary to respond no later than Thursday, November 13 – the day before the scheduled sale hearing.

Also on Monday, November 10, 2008, the law firm of Aspey, Watkins & Diesel filed an EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER in the Superior Court of Mohave County, Arizona, seeking to enjoin the sale of the property. In such Motion,

(continued...)

spending its time in preparing for the November 14 sale hearing, it has, instead, been obliged to waste valuable time and resources in responding to the last-minute onslaught of collateral attacks filed by Plaintiffs' numerous law firms.

Plaintiffs' litigation tactics undermine the process for a fair, reasoned resolution of civil disputes. They are a violation of both the letter and spirit of the Rules of Civil Procedure and the Rules of Civility.

## RESPONSE TO PLAINTIFFS' "BACKGROUND FACTS"

Due to the shortness of time in which to respond to the Plaintiffs' TRO Motion, the Fiduciary is unable to provide a point-by-point rebuttal to the factual allegations contained in the Plaintiffs' Memorandum. Suffice it to say that the Memorandum contains numerous allegations which are false and/or misleading, and/or which mischaracterize the true facts.

Fortunately, it is not necessary for this Court to make a determination as to the accuracy of the Plaintiffs' factual allegations in order to deny the present TRO Motion. As discussed below, because the present lawsuit is an impermissible collateral attack upon a final judgment rendered by the District Court of Utah, the Complaint and TRO Motion must be dismissed as a matter of law, regardless of the parties' disputes as to the Plaintiffs' factual allegations.

## STATEMENT OF RELEVANT FACTS

Due to the shortness of time, the Fiduciary is unable to provide a detailed statement of the relevant facts in this Memorandum. Fortunately, it is not necessary for the Court to be apprised of all of the underlying facts in order to deny the present TRO Motion. Indeed, the Fiduciary

[4](...continued)
the Plaintiffs seek a hearing no later than Thursday, November 13 – the day before the scheduled sale hearing.

merely needs to establish one key fact in order to defeat the TRO Motion and the Complaint upon which it is based. Such fact is this: the present Complaint is a collateral attack upon a final judgment rendered by the Third District Court of Salt Lake County, Utah, in the Trust Probate Action for the UEP Trust. Specifically, it is a collateral attack on the Reformed Declaration of Trust, and the accompanying final Order approving the Reformed Declaration, which were entered by the Court on October 25, 2006 (collectively, the "Reformation Judgment"). (Copies of the Reformation Judgment are attached hereto as Exhibits "E" and "F" respectively).[5]

It is beyond dispute that the Reformation Judgment is final[6] and non-appealable – given that no appeal was filed as to the Reformation Judgment, and more than two years have since the Reformation Judgment was entered.

It is beyond dispute that the Plaintiffs, the FLDS Church, and the suspended trustees of the Trust were all given notice of the Trust Probate Action and the opportunity to appear and be heard with respect thereto.

It is beyond dispute that all of such parties chose not to appear or participate in the Trust Probate Action until nearly two years after the Reformation Judgment was entered.

Based upon such undisputed facts, the Court must deny the TRO Motion as an impermissible collateral attack pursuant to the doctrine of res judicata, as well as pursuant to the Federal Full Faith and Credit Statute and the Rooker-Feldman doctrine. (*See* Part I, below).

---

[5] Attached hereto as Exhibits "A" through "F" are copies of a number of Orders issued by the Court in the Trust Probate Action – including the Memorandum Decision, dated December 13, 2005, upon which the subsequent reformation of the Trust was based (Exhibit "D"), as well as the Reformation Judgment, dated October 25, 2006 (Exhibits "E" and "F").

[6] *See* Exhibit "F" at p. 5, ¶ 8 (wherein the Court certifies the approval of the Reformed Declaration as final pursuant to Rule 54(b)).

## DISCUSSION

The present TRO Motion should be denied because Plaintiffs are unable to establish any of the four elements required for injunctive relief.

### I. The TRO Motion is Defective on the Merits

First and foremost, the Plaintiffs cannot meet their obligation to show a substantial likelihood of prevailing on the merits – or even showing that there are serious questions as to the merits. This is true for several reasons, including the following:

#### A. The Complaint and TRO Motion Are Barred by the Doctrine of Res Judicata, as They Constitute an Impermissible Collateral Attack Upon the Final Reformation Judgment

Utah law is clear that a final judgment rendered by a District Court may only be challenged on appeal to a higher court. Any attack upon a final judgment outside of the appellate process is considered a "collateral attack" which is not permitted.

> The doctrine [of res judicata] renders a final judgment, on the merits, by a Court of competent jurisdiction, conclusive upon the parties and is a bar to subsequent litigation of the same issues.
>
> The general rule of law is that a judgment may not be drawn in question in a collateral proceeding and an attack upon a judgment is regarded as collateral if made when the judgment is offered as the basis of a claim in a subsequent proceeding.

Olsen v. Board of Education, 571 P.2d 1336,1338 (Utah 1977). This prohibition of collateral attacks applies even if the judgment in the prior action was a default judgment.

> With rare exception when a Court with proper jurisdiction enters a final judgment, *including a default judgment*, that judgment can only be attacked on direct appeal.

State v. Hamilton, 2003 UT 22, § 25, 70 P.3d 111 (emphasis added). *See also* Schoney v. Memorial Estates, Inc., 863 P.2d 59, 61 (Utah 1993) (default judgment is a final judgment

entitled to res judicata). "[T]he doctrine of res judicata precludes the relitigation of all issues and claims that could have been litigated as well as those that were, in fact, litigated in the prior action." State v. Garner, 2005 UT 6, 106 P.3d 729, 731 (internal quotations and punctuation omitted).

Once a final judgment in entered, the parties are entitled to rely on the validity and finality of such judgment, even if the judgment was based upon an erroneous ruling by the court. As held by the Utah Supreme Court and United States Supreme Court:

> [A]n erroneous conclusion reached by the court in the first suit does not deprive the defendants in the second action of their right to rely upon the plea of res judicata..... a judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected by a direct review and not by bringing another action upon the same cause (of action).

Collins v. Sandy City Board of Adjustment, 2002 UT 77 § 18, 52 P.3d 1267 (*quoting* Federated Department Stores, Inc v. Moite, 452 US 324, 398-99 (1981)).

> Claim preclusion, has three requirements: First, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or be one that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the merits.

State v. Garner, 2005 UT 6, ¶ 9, 106 P.3d 729, 731 (Utah) (quoting Snyder v. Murray City Corp., 2003 UT 13, ¶ 34, 73 P.3d 325) (footnote and internal quotations omitted).

Utah Courts have explained the critical importance of the doctrine of res judicata and the corresponding prohibition of collateral attacks. The Supreme Court has explained that the failure to prohibit collateral attacks "would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very

purpose of the doctrine of res judicata to avert." Collins, 2002 UT 77 § 18 (*quoting* Moitie, 452 US at 398-99). The Utah Court of Appeals has further explained:

> The doctrine of res judicata is one of the chief mechanisms by which [] equilibrium is obtained, thereby relieving parties of the cost of vexation of multiple lawsuits and preventing inconsistent decisions. Thus, *the doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, of public policy and of private peace, which should be cordially regarded and enforced by the courts.*

Nipper v. Douglas, 2004 UT App 118, ¶ 13, 90 P.3d 649 (2004) (emphasis added) (internal citations and quotations omitted). *See also* Collins, 2002 UT 77, ¶ 19 ("The interest of the state requires that there be an end to litigation – a maxim which comports with common sense as well as public policy" *(quoting* Moitie, 452 US at 401-02)).

In Collins, the trial court made a clear error of law in dismissing the plaintiffs' complaint. The plaintiff, however, elected not to pursue an appeal of the court's erroneous ruling, and the judgment became final. Shortly thereafter, the Court of Appeals issued an opinion in another case which clearly revealed that the judgment was based upon an erroneous legal ruling. The plaintiff then attempted to challenge the judgment in a new civil action. The Utah Supreme Court, however, rejected the new action as a collateral attack in violation of the doctrine of res judicata. The Court held that, notwithstanding the legal error upon which the judgment was based, the Court was powerless to remedy the error in a subsequent civil action. The Court explained that the plaintiff forfeited its right to challenge the erroneous ruling when it chose to not appeal to a higher court. (*Id.* at 1270-71).

In Thayne v. Beneficial Utah, Inc., 874 P.2d 120 (Utah 1994), the Utah Supreme Court rejected a civil rights action which sought to collaterally attack a default judgment entered in

prior litigation. The Court explained that the plaintiff could have challenged the alleged errors in the prior action, and on appeal therefrom. Having failed to do so, "he lost his opportunity to raise the issue." *Id.* at 123. The Court explained: "[Plaintiff] is improperly attempting to use a civil rights action to collaterally attack an alleged procedural error in a the default judgment entered against him." *Id.*

In applying the doctrine of res judicata to the present litigation, it is readily apparent that the present Amended Complaint, and the TRO Motion, are an impermissible collateral attack upon the final Reformation Judgment entered by the Third District Court in the Trust Probate Action. Each of the causes of action in the Amended Complaint necessarily seeks this Court to overturn the Court's Reformation Judgment. Indeed, the present Complaint reads like an appeal brief – purporting to show the errors in Judge Lindberg's ruling and seeking this Court to reverse the ruling based upon such purported errors.[7] Such arguments could have been raised in the Trust Probate Action, and on direct appeal therefrom. Having failed to do so, the Plaintiffs are prohibited from collaterally attacking the Reformation Judgment now.

Given that the Reformation Judgment is a final and non-appealable ruling on the merits,[8] given that the Plaintiffs and the FLDS Church were served with notice of the Trust Probate

---

[7] The Fiduciary strongly disputes that Judge Lindberg erred in connection with the Reformation Declaration. Rather, her opinion is well-reasoned and wholly in accordance with the law. Thus, even if the Plaintiffs had appeared in the Trust Probate Action and raised the arguments which they are now raising for the very first time, the Reformation Judgment would have been entered by the Court and sustained on any appeal.

[8] The fact that the Reformation Judgment was entered in a probate action does not weaken the preclusive effect of such judgment for purposes of res judicata. *See* In re Linford's Estate, 239 P.2d 200, 204 (Utah 1951) ("decrees of the probate court can be assailed only . . . upon the same grounds as other judgments").

Action and had every opportunity to appear and challenge the Reformation Judgment,[9] and given that each of the arguments raised in the present collateral attack could have been raised in the Trust Probate Action, the doctrine of res judicata clearly applies to bar the Plaintiffs' present belated collateral attack on the judgment.

The present case is similar to Collins and Thayne, discussed above, and numerous other res judicata cases. Even if the Reformation Judgment was erroneous (which it was not), Plaintiffs are simply not permitted to make a belated challenge by judge-shopping in a different Court more than two years after the fact.

For more than two years, the Court, the Fiduciary, and numerous other parties have acted in reliance upon the validity and finality of the Reformation Judgment. To undo the judgment two years later, based upon a collateral attack by judge-shopping Plaintiffs who consciously chose not to participate in the underlying Trust Probate Action, would undermine the validity of all judgments. Furthermore, it would unfairly prejudice the Fiduciary and other parties who have relied upon the validity of such judgment, and would encourage needless vexatious litigation by parties seeking to undermine the validity of judgments which are deemed unfavorable after the fact.

---

[9] Because the FLDS Church and the Plaintiffs were given notice and opportunity to be heard with respect to the reformation of the Trust, they are considered "parties or their privies" for purposes of res judicata. See State v. Garner, 2005 UT 6, ¶ 9.

Alternatively, to the extent the Plaintiffs were not "parties or their privies" in the prior action, they clearly lack standing to contest the final Reformation Judgment at this time. Non-parties to litigation do not have the right to go around collaterally attacking final judgments entered in such litigation with which they were not involved and with which they had no standing to appear in the first place.

**B. This Court Must Afford Full Faith and Credit to the Reformation Judgment of the Utah District Court**

Article 4, § 1 of the United States Constitution provides as follows:

> Full Faith and Credit shall be given in each state to the Public Acts, Records and Judicial Proceedings of every other State.

Similarly, the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, provides that a state's "judicial proceedings . . . shall have the same Full Faith and Credit in every court within the United States and its Territories and Possessions as they have by law or usage in the Courts of such State Territory or Possession from which they are taken." Thus, federal courts must give the same preclusive effect to a state court judgment as another court of that state would give. Parsons Steel, Inc. v. First Alabama Bank, 474 U.S. 518, 106 S. Ct. 768, 773 (1986). The Supreme Court has stated that "although the federal courts may look to the common law or to the policy supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state court judgments whenever the courts of the state from which the judgments emerge would do so . . . ." Allen v. McCurray, 449 U.S. 90, 96, 101 S. Ct. 411, 415 (1980).

Therefore, in the present case, the Reformation Judgment is entitled to full faith and credit by this Court. This Court must afford the Reformation Judgment the same respect and preclusive effect that the Courts of Utah would afford to such judgment. Because Utah law requires that the Reformation Judgment be treated as final and binding, and not subject to any collateral attack (as discussed above), this Court must do the same.

**C. This Plaintiffs' Complaint is Barred by the Rooker-Feldman Doctrine**

Even if the doctrine of res judicata did not apply in this case, the Plaintiffs' Complaint would be barred by the Rooker-Feldman doctrine as well as other principles of comity and separation of powers between the states and the federal government.

The Supreme Court has long held that federal courts are prohibited from entertaining collateral attacks from state court judgments by those who lost in the state court proceedings: "The Rooker-Feldman doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." Lance v. Dennis, 546 U.S. 459, 460 (2006) (internal quotations and citations omitted).

Such doctrine clearly applies in the present case. Here, the Plaintiffs were "losers" in the state court action – in that they failed to appear and participate after having received notice. They are now seeking to undo a two-year-old, final, non-appealable judgment of a state court, and are even requesting the federal court to enjoin the state court from conducting additional proceedings! Such a course of action is simply not permitted.

**D. The Plaintiffs Lack Standing**

Independent from the res judicata/Rooker-Feldman issues, the Complaint must be dismissed because the Plaintiffs lack standing to challenge actions with respect to the Trust. The law is clear that, with respect to a charitable trust, the members of the Trust's purported beneficiary class have no rights to the Trust's assets and have no standing to contest the actions of the trustees or the court. Thus, in the present case, only the attorney general has standing to assure that the Trust is administered in accordance with its legal purpose. The Court in the Trust

Probate Action has made it clear that the Plaintiffs have no standing with respect to the Trust. (*See* Decision and Order, dated November 10, 2008, at n.18, & ¶ 31 (attached hereto as Exhibit "G")). Indeed, the Plaintiffs themselves have admitted as much. (*See id.* at ¶ 31 ("As they themselves recognize, because of its charitable nature Movants have no legal standing to assert any claim with respect to this Trust")).

## **II. The Plaintiffs Will Not Suffer Irreparable Harm**

The assertion that the Plaintiffs will suffer irreparable harm if the Trust is permitted to sell its property is wholly without merit. The Plaintiffs do not have, and never have had, any rights or interest in the Trust's property – and therefore cannot suffer any injury if the property is sold. This is true as to the Plaintiffs' "informal association" as well as to the FLDS Church itself.

A review of the relevant facts will show that the Berry Knoll property has never been owned by the FLDS Church or the Plaintiffs. At the time the property was acquired, the trustees of the Trust, who were also leaders of the FLDS Church, could have placed the property into ownership of the Church. They did not choose to do so. Rather, they chose to place the property into ownership of the Trust. They further chose to establish the Trust as a charitable trust governed by Utah law – thereby triggering all of the applicable statutes and laws which govern charitable trusts in Utah.

As discussed above, under Utah trust law, the Plaintiffs have no rights to the Trust's property and have no standing to assert any claim against such property. (*See* Part I.D, above).

Thus, the proposed sale of the Trust's property will do nothing to injure the Plaintiffs. Having *never* owned the property, and having no legal rights or claims against it, the Plaintiffs simply cannot suffer irreparable injury from the sale of such property.[10]

**III. The Trust Will Suffer Substantial Injury if the Sale is Enjoined**

In contrast to the lack of harm to be suffered by the Plaintiffs if the TRO Motion is denied is the substantial harm to be suffered by the Trust and others if the TRO Motion is granted.

The Trust desperately needs to sell property in order to obtain funds which are necessary for its ongoing administration, and in defending against the onslaught of legal attacks which the Plaintiffs and others have inflicted upon the Trust.[11] In addition to the Trust's substantial legal

---

[10] Furthermore, Plaintiffs fail to acknowledge that the Court has scheduled the November 14 hearing for the very purpose of allowing the Plaintiffs, and others similarly situated, to be heard with respect to the proposed sale. Thus, the Plaintiffs have been granted more due process than they are legally entitled to receive. If the proposed sale is as bad as Plaintiffs allege (which it is not), then the Plaintiffs will certainly be given the opportunity to stop the sale in the Court who has proper jurisdiction over the matter – the Trust Probate Court.

Why are the Plaintiffs so afraid of a hearing to consider the merits of the proposed sale? Why do they ask this Court to take the incredible step of reaching out and enjoining a state court from conducting any proceedings in an action which is clearly within such court's jurisdiction, and which is clearly outside the jurisdiction of the federal court?

The truth is that Plaintiffs have no legitimate arguments against the proposed sale. Their belated attempts to attack the sale are based upon pretexts – and not true facts. Their true motivation is to starve the Trust of money needed to defend against the Plaintiffs' voluminous legal attacks.

[11] The recent "judge-shopping" lawsuits discussed in the Introduction, above, are not the only lawsuits which have been filed against the Trust. The Trust is involved in several other lawsuits with several different parties, all of which require significant legal resources. It is absolutely essential that the Trust obtain the funds necessary to hire and retain its legal counsel so as to prevent default in such lawsuits. In addition to the large outstanding obligation owed to its Utah legal counsel, the Trust faces the disastrous prospect of not being able to pay its legal counsel in Arizona, Texas, and Canada.

costs, the Trust has numerous other expenses in ongoing Trust administration.[12] The only reasonable method for the Trust to obtain the needed funds is to sell property.[13] If the Trust is prohibited from selling property, it will be substantially prejudiced in its ability to survive – especially in light of the avalanche of lawsuits which the Plaintiffs and others have imposed upon the Trust.

To enjoin the Trust from selling its property would be like enjoining a restaurant from selling food. It would necessarily cut off its revenues, would likely quickly lead to the lay-off of its employees, and the termination of its operations. Such an injunction would cause irreparable injury.[14]

---

[12] Without funds, the Trust will be unable to pay its property managers and engineering consultants, and will be unable to pay other ongoing costs and expenses necessary for the continued operation of the Trust.

[13] The Trust has attempted to raise funds by assessing a $100 monthly payment upon each residence upon Trust land. Such attempt, however, has not proved to be successful, as the majority of the occupants, including the Plaintiffs, are refusing to make the payments – choosing instead to defy the Fiduciary's and the Court's authority and to challenge it in litigation. Thus, the only remaining method for the Trust to raise money is to sell its property.

[14] To enjoin the scheduled November 14 hearing would cause additional injury to the Trust and others. As explained by the Court in the Trust Probate Action, significant judicial resources and efforts have gone into scheduling the November 14 hearing. (*See* Minute Entry, dated November 6, 2008 (attached hereto as Exhibit "H")). In addition, at the Court's instruction, the Fiduciary has mailed over 750 notices of the hearing to interested individuals.
   The Fiduciary and his legal counsel have expended significant time and resources in preparing for the hearing, and have arranged for numerous witnesses to appear and testify before the Court. Many persons involved in the hearing (including a witness who lives in Canada) have made travel and housing arrangements for the hearing. To delay the hearing at this point would result in a substantial waste of time and resources.

## IV. The Requested Injunction Would be Contrary to Public Policy

Finally, it is clear that enjoining the State Court and the Trust would be contrary to public policy. Public policy disfavors judge shopping. It disfavors collateral attacks. Judgments should be challenged through the appellate process – not through separate lawsuits filed in different courts filed years after the fact.

The relief requested in the present TRO Motion is particularly odious and contrary to public policy. Plaintiffs would have this Court reach out and enjoin a state court from conducting *any* proceedings in case which is properly pending before the state court – indeed, in a pending trust probate case over which the state court has specific exclusive jurisdiction and over which the federal courts have no jurisdiction. Public policy, including our federal system of separation of powers and comity, clearly disfavors such extreme abuse of judicial authority.

## CONCLUSION

For the above-stated reasons, the Fiduciary respectfully requests that the TRO Motion be denied.

DATED: November 12, 2008

CALLISTER NEBEKER & McCULLOUGH

By: /s/ Zachary T. Shields
ZACHARY T. SHIELDS
Attorney for the Special Fiduciary

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing MEMORANDUM IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION was served via the Court's CM/ECF electronic filing system, on November 12, 2008, on the following:

James C. Bradshaw
JAMES C BRADSHAW PLLC
10 W BROADWAY #210
SALT LAKE CITY, UT 84101
(801)532-5297
Email: jim@brownbradshaw.com

Kenneth A. Okazaki
Ryan M. Harris
Stephen C. Clark
JONES WALDO HOLBROOK & MCDONOUGH (SLC)
170 S MAIN ST STE 1500
SALT LAKE CITY, UT 84101
(801)521-3200
Email: kokazaki@joneswaldo.com
Email: rharris@joneswaldo.com
Email: sclark@joneswaldo.com

Richard A. Van Wagoner
Rodney R. Parker
Frederick M. Gedicks
SNOW CHRISTENSEN & MARTINEAU
10 EXCHANGE PLACE 11TH FLOOR
PO BOX 45000
SALT LAKE CITY, UT 84145-5000
(801)521-9000
Email: rvanwagoner@scmlaw.com
Email: rparker@scmlaw.com
Email: gedicksf@lawgate.byu.edu

Jerrold S. Jensen
UTAH ATTORNEY GENERAL'S OFFICE
(160-140857)
160 E 300 S
PO BOX 140857
SALT LAKE CITY, UT 84114-0857
(801)366-0350
Email: jerroldjensen@utah.gov

/s/ Zachary T. Shields

513783.1