RODNEY R. PARKER (4110)
RICHARD A. VAN WAGONER (4690)
FREDERICK MARK GEDICKS (7860)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah  84145
Telephone:  (801) 521-9000

JAMES C. BRADSHAW (3768)
MARK R. MOFFAT (5112)
BROWN, BRADSHAW & MOFFAT
10 West Broadway, Suite 210
Salt Lake City, Utah 84101
Telephone:  (801) 532-5297

KENNETH A. OKAZAKI (3844)
STEPHEN C. CLARK (4551)
JONES, WALDO, HOLBROOK & McDONOUGH
170 South Main Street, Suite 1500
Post Office Box 45444
Salt Lake City, Utah  84145-0444
Telephone:  (801) 521-3200

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an Association of Individuals, | MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| Plaintiff, | No. 2:08-CV-772-DB |
| v. | |
| BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHURTLEFF, Attorney General for the State of Utah; TERRY GODDARD, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah, | |
| Defendants. | |

Plaintiff The Fundamentalist Church of Jesus Christ of Latter-Day Saints (the "FLDS Church" or "Church") submits this memorandum in support of its Renewed Motion for Temporary Restraining Order and Preliminary Injunction.

## TABLE OF CONTENTS

PROCEDURAL STATUS.................................................................................................3

FACTS ........................................................................................................................7

    A.    Background Facts.............................................................................................7

    B.    Recent Factual Developments.......................................................................12

ARGUMENT ...............................................................................................................13

    I.    THE STATE COURT'S "REFORMATION" OF THE UEP TRUST CONSTITUTED A VIOLATION OF AN ABSOLUTE STRUCTURAL PROHIBITION IMPOSED BY THE ESTABLISHMENT CLAUSE.................13

        A.    Defendants' Direction, Control, and Enforcement of the Reformed Trust Constitute Impermissible State Administration of the Affairs of a Church...............................................................................................13

            1.    *The Establishment Clause Is an Absolute Bar to Judge Lindberg's Reformation and Defendants' Administration of a Special Fiduciary of a Religious Trust.* .....................................14

            2.    *Judge Lindberg's Reformation of the Trust Did Not Conform to Neutral Principles of Law*...........................................15

        B.    Because Defendants' Actions Violate Structural Constraints Imposed by the Establishment Clause, the Right to Challenge Them Cannot Be Waived..........................................................................19

    II.    THE REQUIREMENTS FOR ISSUANCE OF AN INJUNCTION ARE SATISFIED IN THIS CASE. ..............................................................................23

        A.    The FLDS Church Will Suffer Irreparable Harm If No Injunction Issues..........................................................................................................24

B.     The Balance of Harms Is Strongly in Favor of Issuing an
       Injunction. ..................................................................................29

C.     An Injunction Would Not Be Adverse to the Public Interest. ...................30

D.     The FLDS Church Has, At a Minimum, Raised Serious and
       Substantial Questions Going to the Merits of Its Claims, Making
       Them a Fair Ground for Further Litigation................................................32

III.   THIS COURT'S POWER TO ORDER DECLARATORY AND
       INJUNCTIVE RELIEF IN THIS CASE IS NOT BARRED OR LIMITED
       BY FEDERAL STATUTE OR JUDICIAL DOCTRINE. ...................................32

A.     Relief Is Not Barred by State Sovereign or State Official Immunity
       Because It Complies with *Ex Parte Young* and its Progeny. ....................32

       1.   *The action is directed against a state official.* ..............................33

       2.   *The action alleges ongoing violations of federal law.* ...................34

       3.   *The action seeks prospective relief.* .............................................34

       4.   *The relief sought does not excessively intrude into an area
           of special state sovereign interest.* ...............................................35

B.     Relief Is Not Barred by the Anti-Injunction Act Because Plaintiff
       Is Not A Party To The State Court Proceeding..........................................35

C.     Abstention Is Not Permitted by *Younger v. Harris*....................................37

IV.    PRIOR STATE COURT ORDERS DO NOT PRECLUDE THIS
       COURT'S ORDER OF DECLARATORY AND INJUNCTIVE RELIEF. .........38

A.     This Court Has Jurisdiction to Order Relief under the *Rooker-
       Feldman* Doctrine. ...................................................................................38

B.     Plaintiff's Federal Claims Are Not *Res Judicata* in State Court. .............40

CONCLUSION...................................................................................................44

## PROCEDURAL STATUS

This case was filed in November 2008 to challenge Defendants' actions in taking over

and administering a private religious trust known as the United Effort Plan Trust.  Plaintiff al-

leged that the UEP Trust was established for the purpose of enabling Plaintiff Association members to practice one of the central tenets of their religion—the Law of Consecration and Stewardship, also known as the Holy United Order.  Plaintiff alleged that Defendants' conduct has substantially burdened—indeed, it has rendered impossible—that religious practice, and has also dismantled a religious institution and imposed in its place a wholly secular regime ostensibly operating under "neutral principles of law."  Plaintiff argued that the State's actions are forbidden under time-honored principles forbidding the state establishment of religion and protecting the free exercise of religion.

Plaintiff Association members, acting through various representatives, previously sought to challenge Defendants' actions in state court.  Those efforts date back to the summer of 2008, when the court-appointed Special Fiduciary of the Trust first made it known that he intended to sell a particularly prized Trust asset known as the Berry Knoll Farm, which includes a temple site sacred to the FLDS faithful, ostensibly to pay his ever-escalating fees and expenses.  The state court held then and has consistently held since, however, that the FLDS representatives have no standing to object to the reformation of the Trust, and thus no remedy in state court.

Denied standing in state court, Plaintiff filed a motion for temporary restraining order asking this Court to stop the sale.  This Court held a hearing on the motion on November 12, 2008.  At that time, the state court was set to hold a hearing the following week (November 19, 2008).  It seemed clear to this Court that the threatened sale could not take place before that time, and the Fiduciary's counsel promised not to do anything that would be "hard to undo or change" until this Court had an opportunity to consider plaintiff's motion.  (Tr., Nov. 19, 2008, p. 67.)[1]

---

[1] The court has since relieved them of that promise.

On November 19, 2008, the parties agreed to a "stand down" to permit settlement nego-

tiations.  Mediation occurred in May of 2009, with former Judge Paul Cassell acting as mediator.

Although the Utah Attorney General and the FLDS agreed to the broad terms of a settlement, the

Fiduciary and the Arizona Attorney General would not agree, so the settlement did not occur.

The Fiduciary then asked the state court to hold the hearing for approval of the Berry

Knoll sale.  In response, the state court on July 29, 2009 hosted a proceeding which it nominally

called a "hearing" but which is more accurately described as an opportunity to receive public

comment.  Presenters were not sworn, and no evidence was taken.  Instead, parties were granted

severely constrained time in which to present comments concerning the sale.  The FLDS were

given 5 five-minute time slots out of 25.  (A copy of the transcript of this "public hearing" is at-

tached as Exhibit A.)  Following the "public hearing," the court issued a written decision autho-

rizing the sale of the Berry Knoll Farm to the highest bidder, giving no substantive consideration

to the FLDS's religious concerns.[2]  (A copy of the court's Ruling and Order re Motion to Au-

---

[2] The court's entire consideration of the religious concerns of the FLDS is contained in the fol-
lowing paragraph:

> Third, in prior written submissions by various FLDS movants, the Court had been
> urged to reject the proposed sale on the basis that the Property is religiously sig-
> nificant to the FLDS people as a future temple site.  In light of those contentions,
> it is notable that during the July 29 hearing only two persons referred to the Prop-
> erty as a future temple site.  One of them indicated that the Harker Farm and the
> Property were consecrated for the "Lord's storehouse."  However, others who
> commented suggested that while the Harker farm had provided for the needs of
> the community, the Property never fulfilled the community's desire that it be the
> "breadbasket of the community."  One commentator noted that the Property had
> never been economically viable and had been abandoned by prior FLDS users.
> The case record reflects the Property lay fallow for several years.  It is also nota-
> ble that when FLDS adherents were offered the opportunity to farm part of the
> Property by entering into agreements with the Special Fiduciary, those offers were
> apparently rebuffed.  However, when other individuals (not presently affiliated

thorize Sale of Berry Knoll Farm entered on August 24, 2009 is attached as Exhibit B.)  At and after the hearing, however, it became clear that there was no sale pending, and that the state court had at most approved the sale in concept, without any specific terms before it.  The property still is not sold, although Plaintiff is once again informed that sale of the Berry Knoll property, and perhaps other property, is imminent.

On October 20, 2009, Plaintiff Association sought an extraordinary writ from the Utah Supreme Court.  Plaintiff sought a declaration that the reformation and administration of the Trust violated the Religion Clauses, and other relief.  On August 27, 2010, the Utah Supreme Court denied the petition.  The court did not reach the merits, instead holding that Plaintiff's claims were barred by the equitable doctrine of laches.

Plaintiff contends that the actions of the Special Fiduciary, the Attorneys General, and the Third District Court constitute a continuing and ongoing structural violation of the Religion Clauses.  Only the most obtuse reading of the Religion Clauses, and the most overreaching view of the State as the paternal protector of religious persons from the consequences of their core beliefs, could justify what the State has done here.

Plaintiff requests that this Court enjoin Defendants from acting in any capacity with respect to the Trust and its assets and beneficiaries, pending this Court's consideration of Plaintiff's request for a declaration that the actions of Defendants in appointing Mr. Wisan, reforming the Trust, and authorizing Mr. Wisan to administer the reformed Trust violated federal law.

---

with the FLDS) entered into such agreements with the Special Fiduciary, vandalism of the Property resulted.  (Exhibit B, Ruling and Order, p. 7.)

FACTS

A.    Background Facts.

In its Memorandum in Support of Motion for Temporary Restraining Order and/or Pre-liminary Injunction (Doc. 10, Nov. 5, 2008), Plaintiff provided a detailed and lengthy back-ground of the United Effort Plan Trust and its relationship to Church members and their efforts to practice the United Order.  In summary, one of the central tenets of the FLDS Church requires the literal gathering together of the faithful Church members on consecrated and sacred lands to establish the Kingdom of God on Earth under the guidance of divinely-inspired Church leader-ship.  The FLDS Church is unusual because of the interdependence of members upon each other, and because of the role of the Bishops and other leaders in ensuring members' collective well-being.  Members are encouraged to place collective needs ahead of their own, and they achieve that ideal to a remarkable degree.

The success of the FLDS system revolves around the Bishops.  The community's land, its produce, its talents, and its surplus are all within the broad jurisdiction of each local Bishop.  In order to achieve the objectives of the United Order, it is necessary that this be so.

> Upon the basic principle that the earth and everything on it belongs to the Lord, every person who was a member of the church at the time the system was intro-duced or became a member thereafter was asked to "consecrate" or deed all his property, both real and personal, to the bishop of the church.  The bishop would then grant an "inheritance" or "stewardship" to every family out of the properties so received, the amount depending on the wants and needs of the family, as de-termined jointly by the bishop and the prospective steward. . . .  It was expected that in some cases the consecrations would considerably exceed the stewardships. Out of the surplus thus made possible the bishop would grant stewardships to the poorer and younger members of the church who had no property to consecrate.

L. Arrington, F. Fox & D. May, BUILDING THE CITY OF GOD 15 (1976) (footnote omitted).

The placing of one's just wants and needs in the hands of the Bishop was a fundamental principle of the early LDS Church.  When the pioneers began to arrive in Ohio in 1831, their settlement was placed in the hands of Bishop Edward Partridge:  "Wherefore, let my servant Edward Partridge, and those whom he has chosen, in whom I am well pleased, appoint unto this people their portions, every man equal according to his family, according to his circumstances and his wants and needs."  D&C 51:3.  "And this shall be done through the bishop or the agent, which shall be appointed by the voice of the church.  And again, let the bishop appoint a storehouse unto this church; and let all things both in money and in meat, which are more than is needful for the wants of this people, be kept in the hands of the bishop."  D&C 51:12-13.

The United Order ideal expressed in those writings is still pervasive in the FLDS communities.  The Bishops are charged with determination of the "just wants and needs" of members, and the UEP Trust provided for management "consistent with its religious purpose to provide for Church members according to their wants and their needs, insofar as their wants are just . . . ."  (Amended and Restated Declaration of Trust, attached as Exhibit C, pp. 2-3.)  This is the reason the land was placed in the United Effort Plan Trust, to be held in common and administered by the Bishop.  It is also the reason community life revolves around the Bishop's Storehouse, which organizes community improvement projects, assists the needy, and allocates the collective resources of the community in a manner which adherents believe reflects the will of God.

When the State of Utah intervened in the Trust in 2004, there was nothing to suggest that its purposes were anything other than benign.  Two lawsuits had been filed seeking substantial damages from the Trust, and the trustees had elected not to respond to those suits.  There were

also claims, which later proved to be unfounded, that the trustees had conveyed property from the Trust for their own personal gain.  When Mr. Wisan was first appointed Special Fiduciary, his charge was limited to defense of the lawsuits and recovery of any fraudulently transferred property, as well as protection of Trust assets.[3]

The limitations on the State's power to act beyond that narrow intervention should have been obvious.  It surely should have been obvious that the State could not substitute its judgment for that of the Bishops concerning "just wants," because that determination is fundamentally religious.  Yet that is precisely what is happening.

The Declaration of Trust of the 1998 Restated Trust stated that it "is a <u>religious</u> and charitable trust," and "a <u>spiritual</u> (Doctrine & Covenants, 29:34) step toward living the Holy United

---

[3] On September 2, 2005, the Court entered an Order on Procedure to Appoint Trustees and Expansion of Special Fiduciary's Authority, which expanded the special fiduciary's authority to include the following:

    (a)    file lawsuits to recover or protect Trust property as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary;

    (b)    manage, lease, or rent the property of the Trust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary;

    (c)    defend against the Tort Lawsuits which have been filed against the Trust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary;

    (d)    Work toward the payment of the Trust's property taxes;

    (e)    Request and collect money for the payment of taxes from persons residing on Trust property;

    (f)    Take action to remove persons who refuse to pay their fair share of property taxes from Trust property; and

    (g)    Delay paying property taxes for one or more parcels of Trust property if the Special Fiduciary is unable to raise sufficient funds from persons residing on such property to enable the payment of property taxes for such property.

A copy of the Order is attached as Exhibit D.

Order."  Exhibit C, p. 1 (emphasis added).  It refers to the Holy United Order as a "central prin-

ciple of the Church" that "requires the gathering together of faithful Church members on conse-

crated and sacred lands to establish as one pure people the Kingdom of God on Earth under the

guidance of Priesthood leadership."  It further states that the UEP Trust "exists <u>to preserve and

advance the religious doctrines and goals</u>" of the FLDS Church.  *Id.* (emphasis added).

> The doctrines and laws of the Priesthood and the Church are found in the Book of
> Mormon, the Doctrine and Covenants, the Pearl of Great Price, the Holy Bible,
> the sermons of the holders of the keys of priesthood authority, and present and fu-
> ture revelations received through the holder of those keys; and are the guiding te-
> nets by which the Trustees of the United Effort Plan Trust shall act." *Id.*, p. 1.

> The Board of Trustees, in their sole discretion, shall administer the Trust consis-
> tent with its religious purpose to provide for Church members, according to their
> wants and their needs, insofar as their wants are just (Doctrine and Covenants,
> Section 82:17-21)." *Id.*, p. 3 (emphasis added).

Despite the obvious facts that the United Effort Plan Trust was a creation and instrument

of religious exercise and that the religious decisions which governed the Trust could not be made

by non-religious actors, the State carried its intervention into the Trust far beyond anything that

could be justified under American constitutional law.  On December 13, 2005, the court issued a

Memorandum Decision in which it determined that the UEP Trust could properly be "reformed"

using the *cy pres* doctrine, such that the court-appointed Special Fiduciary rather than the eccle-

siastical leaders of the FLDS Church would administer the UEP Trust to meet the "just wants

and needs" of putative Trust beneficiaries in accordance with allegedly "neutral," non-religious

principles:

> This conundrum can be resolved by providing future trustees with a two-
> pronged approach to guide their discretionary decision-making.  First, the re-
> formed Trust must provide future trustees with a set of neutral criteria to apply in
> evaluating the relative needs of potential beneficiaries.  Second, representatives of
> the FLDS Church (or of local priesthood leadership) may provide <u>non-binding</u> in-

put to the trustees concerning how the faith interprets basic religious principles referenced in the Restatement (e.g., what constitutes potential beneficiaries' "just wants"). The reformed Trust must also provide potential beneficiaries with a mechanism—independent of priesthood input—for establishing their "just wants." In making decisions on these issues, trustees should be free to use their life experience, good judgment and common sense in evaluating requests for support. However, the trustees' decisions must ultimately be consistent with their fiduciary duties under the Code and the common law. (Memorandum Decision, copy attached as Exhibit E, ¶ 37 (emphasis original, footnote omitted).)

Unwittingly underscoring the unconstitutional entanglement of church and state occasioned by Judge Lindberg's reformation of the Trust, the Special Fiduciary then announced that he was the "State-Ordained Bishop" or "SOB" – a term and acronym he apparently found clever and amusing but which betrayed his disrespect and mockery of Plaintiff Association members' faith. Jessop Aff., Doc. 11, at ¶¶ 26-27. He proceeded to wage what his own attorneys called a "sociological and psychological war" against the FLDS. *See* Motion to Approve Fees dated May 23, 2008 (November 11, 2007 time entry), attached as Exhibit E. The Special Fiduciary's court filings refer to the determination of members' "just wants and needs" in accordance with Holy Scripture and divine revelation as "the whim of leadership"; to the FLDS Church's religious beliefs and practices in making such determinations as "discriminat[ing] on the basis of religion" and operating "in a religiously discriminatory manner"; and to Petitioner Association members as "saboteurs." Reply Memorandum in Support of Motion for Approval of Sale of Trust Property dated October 27, 2008, attached as Exhibit G, pp. 2, 6-7.

The ostensibly "neutral" state action of placing a religious institution under the management of a "State Ordained Bishop" had the very real effect of rendering the Petitioners' collective right to practice a core tenet of their religion impossible to achieve. In reality, the district court did not apply neutral principles to reform the Trust, but rather reformed the Trust so that it

would be religiously neutral, thus facilitating the court's assertion of control over its management.  Under the guise of "neutral principles," Plaintiff's religious exercise rights were subjugated to secularism as the state court systematically stripped all religious content from the Trust.

B.    Recent Factual Developments.

With the active support of the Attorneys General, the Special Fiduciary's powers have expanded to the point that he now has virtually dictatorial power to fundamentally remake the community.  In an impromptu telephone conference on July 22, 2010, adopting recommendations made by the Arizona Attorney General, Judge Lindberg purported to endow every action of the Special Fiduciary with the presumptive force of a court order.  (Tr. July 22, 2010, copy attached as Exhibit H, p. 31 ("Any agreement, any written agreement entered into by the special fiduciary, regardless of how denominated at this point in the—is the order of the Court and it is to be enforced and it is to be protected.").)  When the Plaintiff Association protested that the Special Fiduciary was abusing his authority and dispossessing longstanding FLDS occupants of their homes, farms, schools and, most recently, the Bishop's Storehouse, which is integral to their communal religious practices and way of life, and that giving his actions the presumptive force of court orders would without due process summarily adjudicate all pre-existing property rights Plaintiff Association members or anyone else might have in Trust property, the court purported to wipe out the rights of several hundred non-parties:  "There is no pre-existing property right.  None.  Period."  (*Id.*, p. 27.)

Following the Utah Supreme Court's refusal to reach the merits of the constitutional claims at issue, the Special Fiduciary and the Arizona Attorney General have become emboldened, apparently viewing the decision as creating a window of opportunity for them to substan-

tially increasing their pressure on the FLDS community. That pressure targets such core reli-

gious functions of the FLDS Bishop as administering the community's schools and food supply.

It increasingly is irreversibly altering the status quo, including through a renewed and accelerated

attempt to force a zoning scheme on the towns of Hildale, Utah and Colorado City, Arizona, that

would fundamentally alter Plaintiff Association members' ability to maintain their historical re-

ligious association with the land; and increasingly is seeking to deprive Plaintiff Association

members of any pre-existing property rights they have by virtue of longstanding and, until re-

cently, continuing access to and use of UEP Trust property. Some of the immediate problems

are more fully described under Point II.A., *infra*.

<u>ARGUMENT</u>

I.    THE STATE COURT'S "REFORMATION" OF THE UEP TRUST
      CONSTITUTED A VIOLATION OF AN ABSOLUTE STRUCTURAL
      PROHIBITION IMPOSED BY THE ESTABLISHMENT CLAUSE.

      A.    <u>Defendants' Direction, Control, and Enforcement of the Reformed
            Trust Constitute Impermissible State Administration of the Affairs
            of a Church</u>.

The Establishment Clause "deals with structural matters, specifically the relationships be-

tween government and religious institutions or religious movements." Rex E. Lee, A LAWYER

LOOKS AT THE CONSTITUTION 129 (1981). "Establishment Clause violations . . . are usually flat-

ly forbidden without reference to the strength of governmental purposes." *Colorado Christian

University v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2005) (McConnell, J.).

The Establishment Clause deprives government of any power to take over and operate a

church. *Everson v. Board of Educ.*, 330 U.S. 1, 15, 16 (1947) ("The 'establishment of religion'

means at least this:  Neither a state nor the Federal Government can set up a church. []  Neither a

state nor the Federal Government can, openly or secretly, participate in the affairs of any reli-

gious organizations or groups . . . .").  Yet that is precisely what Defendants have accomplished

in this case.  The original trustees were FLDS Church officials and elders charged with carrying

out the Trust's quintessentially religious purpose of implementing the United Order, the practice

of which is a fundamental tenet of the FLDS Church.  They were removed by Judge Lindberg

and replaced with secular state agents.  Judge Lindberg's attempt to reform the Trust, moreover,

by removing its religious character, did not conform to "neutral principles of secular law."  As a

consequence, Judge Lindberg's continuing management of the Trust through the Special Fidu-

ciary violates the structural limits imposed by the Establishment Clause.

> 1.  *The Establishment Clause Is an Absolute Bar to Judge Lindberg's Reformation and Defendants' Administration of a Special Fiduciary of a Religious Trust.*

There can be no serious dispute that the UEP Trust, as established by its settlors in 1942

and restated in 1998, was a religious organization.  It was clearly designed as the vehicle through

which Plaintiff Association members could organize their communal landholdings around one of

the central tenets of their religion—the Law of Consecration and Stewardship, also known as the

Holy United Order.  Because the Trust is essentially religious, the Establishment Clause deprived

Judge Lindberg of power to transform the Trust into an allegedly secular organization under the

guise of "reform."  *See Kedroff v. St. Nicholas Cathedral*, 344 U.S. 9, 110 (1952) ("Here there is

a transfer by statute of control over churches.  This violates our rule of separation between

church and state.")  The Establishment Clause requires that valid state action have a secular pur-

pose, have a primary effect of neither advancing nor inhibiting religion, and not foster "excessive

entanglement" between church and state.  *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

This is the "neutrality" demanded by the constitution. *See, e.g.*, *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government . . . effect no favoritism . . . between religion and non-religion."). The Tenth Circuit has recently reiterated the vitality of the "neutrality principle." *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1030 n.14 (10th Cir. 2008). It has also confirmed that it "interpret[s] the purpose and effect prongs of *Lemon* in light of Justice O'Connor's endorsement test," under which "government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred." *Id.*, 541 F.3d at 1030. The Tenth Circuit also fully retains the "entanglement" prong of the *Lemon* test in "cases where the government involves itself with a religious institution." *Id.*, 541 F.3d at 1031.

Consequently, every effort and action by Judge Lindberg, the Attorneys General, and Mr. Wisan with respect to the Trust constitutes a violation of the Establishment Clause.

2.      *Judge Lindberg's Reformation of the Trust Did Not Conform to Neutral Principles of Law.*

Defendants have maintained that Judge Lindberg had jurisdiction to reform the Trust under the "neutral-principles exception" of *Jones v. Wolf*, 443 U.S. 595 (1979). According to *Jones*, courts may decide church property disputes only when they can do so solely on the basis of "neutral principles of law," such as "the language of the deeds, the terms of local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." *Jones*, 443 U.S. at 599, 603.

The "neutral principles" exception finds its origin in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1968). In that case, the Georgia courts had applied a "departure from doctrine" test to sort out a property dispute between competing religious factions. In reversing, the Supreme Court opened the door to the "neutral principles" analysis:

> [T]here are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. . . . If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

393 U.S. at 449 (citation omitted).

Building on that decision, the Court in *Jones* directed religious organizations to structure their documents to cover otherwise non-justiciable contingencies:

> "Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency . . . . In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of its members."

*Jones*, 443 U.S. at 603.

The Restated UEP Trust did precisely what the *Mary Hull Church* and *Jones* cases required: It structured the Trust "so as not to require the civil courts to resolve ecclesiastical questions" by providing that in the event of failure of the Trust, it was the intention of the settlor that the Trust property would revert to the corporation sole of the FLDS Church. Instead of follow-

ing that provision, however, the Third District Court "reformed" it out of the Trust, reasoning that observing that provision would have interfered with the State's efforts to control the Trust property. Incredibly, the court characterized this decision as a "neutral" application of trust law.

Judge Lindberg's reformation of the Trust did not conform to the neutral-principles exception, for at least two reasons. First, it is not clear that the exception even applies to situations that do not involve questions of property ownership: *Presbyterian Church* identifies the "neutral principles" on which courts may permissibly rely as having been developed for resolving property disputes. 393 U.S. at 449. Here, there was never a dispute about who owned the Trust property, only a problem of administration and breach of duty caused by trustees who did not discharge their fiduciary duties. Second, even if the neutral-principles exception applies here, Judge Lindberg violated neutral principles by intentionally and consciously rewriting the Trust document so as to remove all of its religious purposes and content. The neutral-principles exception does not give courts the power to revise or otherwise to alter church documents; to the contrary, courts must take such documents as they find them.

Judge Lindberg did not apply the terms of the pre-existing Trust document, as she would have been empowered to do under the neutral principles exception. Had she done so, she would have found that the Trust had failed for lack of trustees, and then simply applied the plain language of the pre-existing Trust document providing for reversion of the corpus to the Corporation of the President. Instead, she read the Utah Trust Code as not only permitting but requiring her to troll through the language of the Trust instrument to divine whether some purpose could be found to preclude it from failing. For example, she reasoned:

> This section also provides that occupants of Trust lands must agree to live
> according to the principles of the Plan as directed by the priesthood leadership

(i.e., the President of the Church and those to whom the President has delegated authority). Specifically, individuals granted the privilege to live on Trust property must agree "to act in the spirit of charity" and "the true spirit of brotherhood," without "disputations among them." This provision must either be deleted or modified. If compliance with these principles is retained as one criterion among many to be considered by the trustees in deciding how to award Trust benefits, the priesthood leadership's input must be non-binding. Additionally, since some potential beneficiaries may no longer affiliate with the FLDS Church, if this provision is retained, then potential beneficiaries must be provided alternative means for satisfying this requirement. (Exhibit E, Memorandum Decision, ¶ 45 (footnotes omitted).)

In short, by erroneously focusing on the Supreme Court's endorsement of a limited "neutral principles" exception to the general rule respecting church autonomy, which is well rooted in First Amendment religion clause precedents, the state court has brought about the very antithesis of what the church autonomy doctrine was created and exists to guard against: a wholesale displacement by the state of ecclesiastical determinations with purely secular determinations. Stripping the theological content from a religious trust document in order to facilitate the State's takeover of religious property is not the application of a neutral principle of law—it is a gross and obvious violation of the Establishment Clause. By "reforming" the Trust and empowering the Special Fiduciary to act as a "State-ordained Bishop," Defendants plunged into a morass from which there is no constitutional way forward. The central institution of a religious community's economic and spiritual strivings for the Kingdom of God has been replaced by a secular bureaucracy focused solely on what State functionaries determine, in their unfettered discretion, to be to the material benefit of Trust beneficiaries.

Freedom requires the courts to permit citizens to organize their religious lives as they see fit, even if it is to their ultimate detriment. Not every situation demands or even justifies State intervention. The government was not required to strip the Trust of religion and reform it in or-

der to save the FLDS from the consequences of their own actions.  Indeed, enduring the conse-

quences of the Trust's failure was arguably a choice informed by religious exercise.  Instead of

allowing FLDS adherents the freedom to exercise their religion as the Restated Trust plainly de-

manded, the state secularized its religious mission, purpose, and guiding tenets.  The Reformed

Trust now operates with the clear purpose and effect of substituting what is fundamentally an

exercise and establishment of religion with a wholly secular establishment of the State, thus fun-

damentally suppressing the FLDS Church's longstanding and historical role as the spiritual and

economic center of life in the FLDS communities.  Such a wholesale violation of the Religion

Clauses cannot stand.

> B.     Because Defendants' Actions Violate Structural Constraints Im-
> posed by the Establishment Clause, the Right to Challenge Them
> Cannot Be Waived.

Defendants have argued repeatedly that the failure of the original Trustees, the Corpora-

tion of the President, or the FLDS Church to raise their Establishment Clause objections when

Defendants reformed the Trust constitutes a permanent waiver of any and all power to challenge

Defendants' actions under the Clause.  This position is utterly without merit.  A failure to object

to Defendants' actions cannot transfer to Defendants power that the Establishment Clause denies

them.  Defendants may not violate the absolute structural limitations imposed on their conduct

by the Establishment Clause, such as its prohibitions on management of religious organizations

and interpretation of church doctrine, even assuming that those affected by the conduct did not

object.

Unlike limits on government power set by constitutional rights, which may be waived by

the holders of such rights, limitations on government power set by constitutional structure are

absolute. Accordingly, it is well established that structural limitations cannot be waived by the government or private litigants. *E.g.*, *City of N.Y. v. Clinton*, 524 U.S. 417, 452 (1998) (line-item veto's violations of constitutional structure cannot be waived by Congress) (Kennedy, J., concurring); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986) (although the filing of a claim in an administrative forum normally constitutes waiver of right to file in federal court, waiver is ineffective when such filing implicates the constitutional separation of powers protected by Article III jurisdiction); *INS v. Chadha*, 462 U.S. 919, 942 n.13, 951-59 (1983) (constitutional requirements of bi-cameralism and presentment for enactment of federal legislation cannot be waived by President or Congress); *cf. Downes v. Bidwell*, 182 U.S. 244, 277 (1901) (noting such constitutional "prohibitions as go to the very root of the power of Congress to act at all, irrespective of time or place," such as prohibitions on bills of attainder, *ex post facto* laws, and titles of nobility, cannot be waived).

It is likewise well established that the Establishment Clause constrains the exercise of government power by virtue of an absolute structural limit rather than an individual right. *E.g.*, *Lee v. Weisman*, 505 U.S. 577, 589-90 (1992) ("while concern must be given to define the protection granted to an objector or a dissenting nonbeliever, [the Religion] Clauses exist to protect religion from government interference. James Madison . . . did not rest his opposition to a religious establishment on the sole ground of its effect on the minority."); *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2005) ("Establishment Clause violations . . . are usually flatly forbidden without reference to the strength of governmental purposes."); *Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir. 1991) ("The Establishment Clause, unlike the Fourth Amendment, contains no limiting language. Indeed, the basic structure of the Establishment

Clause, which imposes a restriction on Congress, differs markedly from that of the Fourth Amendment, which confers a right on the people.); *State v. Gaydos*, 81 S.W.3d 186, 192 (Mo. Ct. App. 2002) (the Religion Clauses constitute "a limitation on civil court jurisdiction over disputes which are either essentially religious in nature or are sufficiently intertwined with church polity as to constitute a threat of entanglement with religious doctrine or practice."); Carl H. Esbeck, *The Establishment Clause as a Structural Constraint on Governmental Power*, 84 Iowa L. Rev. 1, 33-60 (1998) (showing how the Court's Establishment Clause doctrines allowing permissive standing, granting non-Hohfeldian remedies, protecting church autonomy, and prohibiting religious exercise of discretionary state authority make clear the Clause's structural character); *Downes*, 182 U.S. at 277 (suggesting that the Establishment Clause is an absolute structural constraint on Congress); *see also Agostini v. Felton*, 521 U.S. 203, 243 (1997) (Souter, J., dissenting) (including the Establishment clause among the Constitution's "structural and libertarian guarantees"); John Hart Ely, Democracy and Distrust 94 (1980) (the combination of the Free Exercise and Establishment Clauses "performs a structural or separation of powers function" which ensures that "the church and the government gave each other breathing space.").

It follows that government actions that violate the Establishment Clause cannot be waived even by those who are the most directly affected by the actions. *E.g.*, *Harris v. Joint Sch. Dist. No. 241*, 41 F.3d 447, 453-55 (9th Cir. 1994) (holding that high school graduation prayer violated Establishment Clause even though majority of students voted for it and school did not require attendance at ceremony), *vacated as moot*, 515 U.S. 1154 (1995);  Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L. Rev. 1789, 1895 (Although churches might voluntarily cede ecclesiastical authority to the state to avoid civil and

criminal liability, "litigants or potential defendants may not waive violations of the Establish-

ment Clause."); Laurence Tribe, *The Abortion Funding Conundrum: Inalienable Rights, Affirma-*

*tive Duties, and the Dilemma of Dependence*, 99 HARV. L. REV. 330, 333 n.14 (1985) ("[I]t is

plain that a church or church-related school could not, for example, 'waive' the right to avoid

intrusive government entanglement in order to receive direct monetary aid from the public trea-

sury."); Kimberly A. Yuracko, *Education Off the Grid: Constitutional Constraints on Home-*

*schooling*, 96 CAL. L. REV. 123, 153-54 (2008) ("[T]he Establishment Clause of the First

Amendment ensures a government in which church and state are separate. The goals and benefits

of the Establishment Clause are primarily social and structural, not individual. As such, individu-

als may not choose to waive the protections of the Establishment Clause.").

   State governments are absolutely prohibited from composing prayers, *e.g., Engel v. Vi-*

*tale*, 370 U.S. 421 (1962), or teaching religion in the public schools, *e.g.*, *McCollum v. Board of*

*Educ.*, 333 U.S. 203 (1948), or endorsing Christianity, *e.g.*, *ACLU v. City & Cty. of Allegheny*,

492 U.S. 573 (1989), or engaging in innumerable other actions relating to religious belief and

practice, *even if no one objects*.  Likewise, Defendants are absolutely prohibited from fundame-

nally transforming and administering the Trust, the existence and operation of which lie at the

very center of FLDS religious exercise and belief, or interpreting and carrying out the theological

doctrine of consecration and stewardship, for the observance of which the Trust exists, regardless

of whether Plaintiff or anyone else objected at what Defendants deemed to be the appropriate

time.

   In sum, Defendants' exercise of jurisdiction and control over the Trust constitutes a con-

tinuing nonwaivable violation of the structural limits imposed by the Establishment Clause, a

violation that may be challenged by anyone with Article III standing.  It is beyond dispute that

the Plaintiff Association and its members, as adherents to the FLDS faith attempting to live the

United Order through the Trust and for whose special benefit the Trust was created, have suf-

fered concrete and particularized harm traceable to Defendants' actions, harm that would be re-

dressed by the declaratory and injunctive relief that Plaintiff seeks in this action.  *See American*

*Atheists, Inc. v. Duncan*, No. 08-4061 (10th Cir. Aug. 18, 2010), 2010 WL 3239486, at *3 ("'to

demonstrate standing, a plaintiff must allege actual or threatened personal injury, fairly traceable

to the defendant's unlawful conduct and likely to be redressed by a favorable decision of the

court.'") (citation omitted).  This Court, therefore, must consider the merits of Plaintiff's Estab-

lishment Clause challenges to Defendants' reformation, direction, control, administration, and

enforcement of the Trust without regard to any allegations of waiver.

    II.     THE REQUIREMENTS FOR ISSUANCE OF AN INJUNCTION ARE
              SATISFIED IN THIS CASE.

     "To prevail on a motion for a preliminary injunction, the movant must establish that four

equitable factors weigh in its favor:  (1) it is substantially likely to succeed on the merits; (2) it

will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the

injury the opposing party will suffer under the injunction; and (4) the injunction would not be

adverse to the public interest."  *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562

F.3d 1067, 1070 (10th Cir. 2009).  "[W]here the moving party has established that the three

'harm' factors tip decidedly in its favor, the probability of success requirement is somewhat re-

laxed and the movant need only show questions going to the merits so serious, substantial, diffi-

cult and doubtful, as to make them a fair ground for litigation."  *Nova Health Systems v. Ed-*

*mondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006) (internal quotation marks and citations omitted).

A.      <u>The FLDS Church Will Suffer Irreparable Harm If No Injunction Issues</u>.

Every day that the Third District Court and the Special Fiduciary manage the UEP Trust, the ongoing violation of the Religion Clauses continues. The government's takeover and management of a religious institution does not become less offensive to the Constitution by the passage of time. The court's supervision of the UEP Trust is, and always has been, illegitimate and ultra vires. Such a constitutional violation results in ongoing irreparable harm.

The U.S. Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Tenth Circuit has more recently reaffirmed these principles, reversing this Court's decision *not* to issue a preliminary injunction in favor of Summum, a religious group whose First Amendment rights had allegedly been violated. *See Summum v. Pleasant Grove City*, 483 F.3d 1044, 1055 (10th Cir. 2007) (*citing Elrod v. Burns*, and stating that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

In this case, the interference in the Plaintiff's spiritual affairs is so pervasive that it is truly incapable of comprehensive description. The injury caused by the displacement of church officials' authority cannot in fairness be reduced to simple examples. Nevertheless, the following circumstances illustrate some of the more immediate temporal harms that Plaintiff Association members will suffer if Defendants are not immediately enjoined:

Subdivision and Distribution of Hildale.  The Special Fiduciary has developed what he calls a "strategic plan to subdivide Trust property so that it can be conveyed to members of the beneficiary class in a religiously neutral manner in furtherance of the Reformed Trust's purpose to serve the 'just wants and needs' (primarily housing) of all persons who consecrated to the Trust."  Reply Memorandum in Support of Motion for Approval of Sale of Trust Property dated October 27, 2008, attached as Exhibit G, p. 2.  On June 30, 2010, in a case he instituted against the Town of Hildale, the Fiduciary asked the Fifth District Court to order the property in Short Creek immediately subdivided.  On July 19, 2010, the Fiduciary filed a Submission of Final Subdivision Plat.  A hearing has been scheduled for October 12, 2010, to consider the Fiduciary's request.

Subdivision is part of the Fiduciary's plan to force FLDS members to take back in their own names what they have given to the Lord, even though their faith prevents them from doing so and requires that they honor their consecration.  Fracturing the land ownership and then forcing FLDS believers to take back their consecrations would have substantial and irreparable impact on the religious practices of the FLDS, who would not be allowed to maintain the relationship with the land that their religion requires.

The Fiduciary dismisses the suggestion that this significant disruption of the covenant between the FLDS, God, and the land is important—a rather shocking substitution of secular for theological judgment which itself violates the Religion Clauses.  Further, while maintaining that he would not impose any religious test in deciding upon transfers of property held by the Reformed Trust, the Fiduciary candidly admitted in open court that a principal determinant of whether subdivided property will be conveyed outright to a participant or subjected to a spend-

thrift trust is whether the transferee is likely to continue to participate in the Holy United Order, resulting in a "UEP II." *See* Excerpts of Transcript and billing entries, attached as Exhibit I, pp. 64-67; Jessop Aff., ¶ 31.   The state court shared the "concern" about outright deeds, saying "what I don't what to see happen is to have us wind up in two years – [Fiduciary's counsel, inter-jecting, "UEP two," and court responding] Exactly." *Id*., Transcript, p. 64.

The Fiduciary's assumption that most FLDS will opt for private ownership reflects the paternalism of one who believes it is the government's place to "enlighten" and "liberate" those who have the courage of their religious convictions and do not abandon them for mere expedien-cy.   There is obviously a less restrictive alternative—simply enforce the Trust as written and rec-ognize that its reformation was a profound mistake and it should have instead been terminated. The government has no power to impose a subdivision whose sole purpose is to strip an entire community of its most distinctive and entirely lawful attributes.

Sale of Berry Knoll Temple Site.   The state court has now approved sale of the Berry Knoll temple site, leaving no obstacle in the way of the transaction except the Special Fiduciary locating a buyer.   Plaintiff has recently been informed that such a sale is imminent, although the Fiduciary has chosen to act in secret in order to prevent the FLDS from trying to stop any sale from taking place.   Last December, this Court relieved the fiduciary of his promise not to do any-thing that would be "hard to undo or change" before this Court could review it.

The Berry Knoll sale is part of the Fiduciary's targeting Trust properties for sale that hold special economic, social, historical and spiritual significance for the FLDS community, including the Harker Farm and the FLDS Temple in Eldorado, Texas.   See generally Report of the Special Fiduciary dated May 2, 2008, attached as Exhibit J.   His stated purpose for selling the property is

to "resolve the current cash crunch problem"—a multi-million dollar obligation owed to the Special Fiduciary's legal, accounting and other functionaries.  *See id.*, p. 30, ¶ 157.[4]

As described in more detail in Plaintiff's November 2008 motion, Berry Knoll Farm has long been of central economic, social and historical value to the FLDS Church as a part of the prophetic vision and divine command that the Short Creek area will "become a garden spot of the west" and sustain the faithful members of the community through consecration of its bounty to the Bishop's Storehouse.  *See* Jessop Aff., ¶¶ 39-40 and related exhibits.  Berry Knoll Farm also has deep religious and historical significance for Petitioner Association members.  They believe that the location of a temple site was divinely revealed to Church leaders, and that as a result of a specific prophecy Berry Knoll is a sacred site upon which a temple will be constructed, even if the Church leadership is "scattered," so long as they remain faithful.  *See id.*, ¶ 40.

<u>Leases of Bishop's Storehouse Property to Non-Members</u>.  Recently, another property issue has come to the forefront:  the Fiduciary's leasing of core Bishop's Storehouse property to persons aligned with the anti-FLDS faction of the community.  Those leases cover the Bishop's granary, which is located on the Bishop's residence property; leases of the dairy and feedlot; and efforts to enforce leases on Berry Knoll which have included impoundment of the personal prop-

---

[4] While admitting that he has not made the required quarterly accounting of fees incurred for what was then over a year and a half (now well over two years), and that he had racked up more than $1.6 million in unpaid legal fees to the Callister Nebeker & McCullough firm alone, the Fiduciary stated his intent to retain nine additional sets of lawyers (including three additional Salt Lake City firms – Parsons Behle & Latimer, Ray Quinney & Nebeker, and Richards Brandt Miller & Nelson) to pursue various kinds of initiatives, investigations and claims against the FLDS, and asked the trial court to allow liens to be applied to Trust properties to pay the associated fees and costs.  (*See* Report of the Special Fiduciary Dated December 31, 2009, attached as Exhibit K, pp. 74-78, 84-86.)  This escalating raid of the assets of the FLDS church and community is another reason the Special Fiduciary needs to be stopped.

erty of those who have previously been farming the property for the Bishop.  The leases purport to divest the Bishop of longstanding usage rights, as well as personal property rights, without due process;[5] and are for substantially less than market value—indeed, the tax burden they create by taking the property out of religious exemption likely exceeds the meagre revenue generated by the leases.

Dispossessing the Bishop of the core Storehouse properties directly and severely impacts his ability to perform his ecclesiastical duty to provide for the "just wants and needs" of Church members.  The justification of such action on the ground that it is religiously "neutral" is transparently flawed.  Deliberate ignorance of adverse religious impact is not the same thing as neutrality, and this action clearly and directly burdens the practice of religion in the FLDS community.

These examples are but the tip of the iceberg in what is increasingly becoming a state-endorsed management debacle that will impact the lives of FLDS members and their children for many years.  Those impacts stem not only from the reformation of the Trust, but also from the subsequent attempts by the State to displace its religious management.  In other words, the impacts flow from the Reformed Trust, but were not inevitable consequences of the reformation.  Nevertheless, it is now clear that the Reformed Trust and its administration constitute significant and improper violations of the Religion Clauses.  For the reasons discussed below, this Court

---

[5] For actions similar to those summarized above—dispossessing FLDS residents of their homes by changing the locks and granting possession to ex- and anti-FLDS persons without going through the necessary legal process to adjudicate the competing possessory claims—the Fiduciary currently stands charged with criminal trespass in Mohave County Superior Court, one of his associates already having been convicted of the same for acting at the Fiduciary's direction, and the Trust apparently having paid and continuing to pay for the criminal defense of both.  *See* Exhibit K, pp. 56-58.

should exercise its jurisdiction to enjoin the defendants from acting in any capacity with respect to the Trust and its assets and beneficiaries, pending this Court's consideration of Plaintiff's request for a declaration that the actions of Defendants in appointing Mr. Wisan, reforming the Trust, and authorizing Mr. Wisan to administer the reformed Trust violated federal law.

B.     <u>The Balance of Harms Is Strongly in Favor of Issuing an Injunction</u>.

The Special Fiduciary's administration is *ultra vires* and illegitimate. In numerous, obvious ways it entangles the State in the management of a religion, in the process burdening the ability of members to practice their faith. This illegitimate exercise of State power must not continue.

The balance-of-harms inquiry serves to weigh the relative cost of an error favoring one side as compared with an error favoring the other. *See, e.g.*, *Tri-State Generation & Transmission*, 805 F.2d at 358 ("In essence, it would be easier to correct a mistake in favor of Tri-State in issuing an injunction than it would be to correct a mistake in favor of Shoshone and Pacific by not issuing it.").

There is no way to measure the burden imposed by the continuing assault on the Bishop's Storehouse. They certainly are not for financial benefit—a lease covering the Berry Knoll farm, comprising several hundred acres, did not even cover 10 percent of the real estate taxes on the property, and the lease of the Bishop's granary, feedlots, and corrals for a grant total of $500 per year is obviously not in the economic interest of the Trust. Similarly, there is no urgent reason why subdivision of the property must be done immediately.

The Special Fiduciary has made it clear that the purpose of the imminent and ongoing land sales is not to provide for the immediate material needs of any Trust beneficiary for food,

clothing or shelter, but to "resolve the current cash crunch problem" of the Special Fiduciary and

his advisors.  That alleged problem is the result of the Fiduciary's violation of the state court's

order that he not incur debt—a problem which continues not just as to past debts but the ever-

escalating accrual of new debts as the Fiduciary tries to further entrench himself at the center of

FLDS life.  Temporarily enjoining further sales pending a full hearing on Plaintiff's claims

would result, at worst, in a temporary continuation of that "cash crunch" and a deferral of com-

pensation.  On the other hand, the lands targeted for sale cannot be replaced, not only because of

the status of some of the land as the subject of a revelation concerning a future temple site, but

more generally because of the shortage of large blocks of land within or adjoining the FLDS

communities.  Allowing the continued sale and subdivision of consecrated Trust properties,

without even attempting to provide for the beneficiaries' immediate and dire "just wants and

needs," continues to subject them to economic hardship as well as to the serious and substantial

burden on Plaintiff Association members' religious freedoms.  The only potential buyer identi-

fied for the Berry Knoll property, the religious significance of which the Special Fiduciary was

until recently ignorant and still seeks to disregard, is a rival sect.  Their ownership and intended

use would be tantamount to desecration and defilement of the holy site.  This only increases the

potential harm to Plaintiff Association members if the imminent sale goes forward.

C. <u>An Injunction Would Not Be Adverse to the Public Interest</u>.

The next factor requires the Court to consider whether the requested injunctive relief is

adverse to the public interest.  The Tenth Circuit has noted that this factor does not require a mo-

vant to show that the injunction "would *benefit* the public interest;" rather, all that is required is

that a movant show that the proposed injunction "would not be adverse to the public interest."

*See City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310, 312 (10th Cir. 1985). More re-cently, Judge McConnell reiterated that "courts routinely find that, in the absence of a compel-ling justification for interference, the balance of harms and public interest also favor protecting the moving party's burdened rights." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ash-croft*, 389 F.3d 973, 1027 (10th Cir. 2004) (McConnell, J., concurring). The FLDS Church can satisfy this element.

The injunctive relief requested in this case would preserve for its intended religious pur-poses consecrated land that was to be used for the benefit of a community of believers—and to that extent protect from further deprivation Plaintiff Association members' rights and freedoms under the Religion Clauses. The government cannot maintain that it is adverse to public policy that, as a matter of religious devotion, people freely give of their property for the common good, and to help provide for those with less, through a lawful program of common ownership. And the government must concede the public interest in ensuring that the donations be carefully guarded and used consistent with the donative intent of the believers. The injunction sought here seeks to preserve that goal. The competing public interest is limited to ensuring state functiona-ries are paid. But when the payment serves to facilitate conduct that creates, at a minimum, se-rious and substantial questions of ongoing constitutional violations, public policy is best served by temporarily enjoining the ongoing conduct so that the federal court can inquire into its consti-tutionality.

D.      The FLDS Church Has, At a Minimum, Raised Serious and Sub-
        stantial Questions Going to the Merits of Its Claims, Making Them
        a Fair Ground for Further Litigation.

The final requirement for injunctive relief is that the movant demonstrate a substantial li-

kelihood of success on the merits of its underlying claims.  Because they have clearly met the

other requirements, to meet this final requirement the Plaintiff Association members need only

raise "questions going to the merits so serious, substantial, difficult, and doubtful, as to make

them a fair ground for litigation and thus for more deliberate investigation."  *See Otero*, 665 F.2d

at 278.  As set forth more fully above, the reformation and administration of the Trust raise se-

rious and substantial questions under both Religion Clauses of the First Amendment to the Unit-

ed States Constitution.  Constitutional jurisprudence recognizes that certain aspects of religion

are simply outside the power of government.  Thus, for example, the courts are not competent to

adjudicate questions which are uniquely religious.  The allocation of UEP Trust benefits accord-

ing to the just wants and needs of FLDS members is an obvious example of a determination that

lies within the exclusive sovereignty of religion and outside the jurisdiction of the State.  Similar-

ly, the State's direct takeover and operation of that religious institution constituted a gross entan-

glement of the State in a religion in violation of the Establishment Clause.  Plaintiff thus has a

substantial likelihood of success on its claims for declaratory and injunctive relief.

III.    THIS COURT'S POWER TO ORDER DECLARATORY AND
        INJUNCTIVE RELIEF IN THIS CASE IS NOT BARRED OR LIMITED
        BY FEDERAL STATUTE OR JUDICIAL DOCTRINE.

A.      Relief Is Not Barred by State Sovereign or State Official Immunity
        Because It Complies with *Ex Parte Young* and its Progeny.

It is well established that federal courts can issue declaratory and injunctive relief against

state officials, even when the state itself would be immune under the Eleventh Amendment and

state sovereign immunity, so long as the relief sought is entirely prospective. *E.g.*, *Ex Parte Young*, 209 U.S. 123 (1908) (federal court could enjoin state attorney general from enforcing state regulatory statute that violated Takings Clause); *Elephant Butte Irr. Dist. v. Dept. of Interior*, 160 F.3d 602, 607-08 (10th Cir. 1998) ("[T]he Eleventh Amendment generally does not bar a suit against a state official in federal court which seeks only prospective equitable relief for violations of federal law, even if the state is immune."), *cert. denied sub nom Salisbury v. Elephant Butte Irr. Dist.*, 526 U.S. 1019 (1999).

In the Tenth Circuit, the applicability of the *Ex Parte Young* doctrine is governed by a four-part test: the federal action must (1) be directed at a state official, (2) allege ongoing violations of federal law, (3) seek prospective relief, and (4) avoid excessive intrusion upon special areas of state sovereign interest. *See Elephant Butte*, 160 F.3d at 609. This action easily satisfies each part of the test.

> 1.    *The action is directed against a state official.*

State attorneys general are "state officials" under the *Ex Parte Young* doctrine. *See* 209 U.S. at 129, 167-68. State court judges are also state officials under the doctrine. *E.g.*, *Briggman v. Virginia Dept. Soc. Servs.*, 527 F.Supp.2d 590, 602 (W.D. Va. 2007) (holding that state court judges were not immune from federal actions for prospective relief under *Ex Parte Young*); *NAACP v. State*, 511 F.Supp. 1244, 1258 (E.D. Cal. 1981) (dismissing federal action for declaratory and injunctive relief against a state court system because state courts are departments or agencies rather than officials, and observing that "[o]nly state court judges can fairly be said to be state officers"), *aff'd on other grounds*, 711 F.2d 121 (9th Cir. 1983). Finally, Mr. Wisan is a state official under the doctrine because Judge Lindberg has endowed his actions with the force

of court order, both implicitly by overseeing the Trust through him and explicitly by purporting to endow every action of the Special Fiduciary with the presumptive force of an order signed by her.  (Exhibit H, Tr. July 22, 2010, p. 31 ("Any agreement, any written agreement entered into by the special fiduciary, regardless of how denominated at this point in the—is the order of the Court and it is to be enforced and it is to be protected.").)

> 2.    *The action alleges ongoing violations of federal law.*

This action alleges that the administration of the Trust by Mr. Wisan, as authorized by Judge Lindberg and sought by Generals Shurtleff and Goddard, violates the Free Exercise and Establishment Clauses of the First Amendment (as incorporated against the States through the Due Process Clause of the Fourteenth Amendment), the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5.  Each act taken by Mr. Wisan as Special Fiduciary pursuant to the judicial authority delegated to him by Judge Lindberg is a separate violation of one or more of these provisions; similarly, each effort by the AGs to enforce any action by Mr. Wisan or Judge Lindberg is a separate violation of one or more of these provisions.  Accordingly, the violations of federal law are not confined to some act or set of acts in the past, but occur in the present and will continue to occur in the future each time Mr. Wisan acts

> 3.    *The action seeks prospective relief.*

This action does not seek monetary damages for past actions by any of the Defendants. Rather, this action seeks only (i) a declaration that the actions of the Defendants in appointing substitute trustees and Mr. Wisan as Special Fiduciary, reforming and enforcing the Trust, and authorizing Mr. Wisan to administer the reformed Trust violate federal law; and (ii) an injunction

against each of the Defendants prohibiting them from continuing to act in any capacity with respect to the Trust, its assets, and its beneficiaries.  In short, the relief sought by this action is declaratory and injunctive relief aimed at stopping ongoing wrongs.  *See Elephant Butte*, 160 F.3d at 611.

> 4.  *The relief sought does not excessively intrude into an area*
> *of special state sovereign interest.*

Each of the Defendants has acted and is acting for the protection of private persons—namely, the beneficiaries of the Trust—and not in defense of any direct or indirect claim of the State to ownership of the Trust assets.  Accordingly, the relief Plaintiff seeks does not intrude at all, let alone "excessively," into any area of special state sovereign interest.  *See, e.g., Mayweather v. Newland*, 314 F.3d 1062, 1069 (9th Cir. 2002) (holding that RLUIPA mandate that state prison officials not unduly burden prisoners' free exercise of religion does not usurp core state function of prosecuting and punishing crime); *Elephant Butte*, 160 F.3d at 612-13 (holding that federal judicial action adversely affecting state's property interest in federal lease would not constitute excessive intrusion into area of special state sovereign interest).

In sum, under applicable U.S. Supreme Court and Tenth Circuit precedent, this Court has jurisdiction and power to order the relief sought by Plaintiff against each of the Defendants.

> B.  Relief Is Not Barred by the Anti-Injunction Act Because Plaintiff
> Is Not A Party To The State Court Proceeding.

The federal Anti-Injunction Act provides that a federal court "may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283. The Act does not apply, however, when the party requesting injunctive relief in the federal court

was neither a party to nor in privity with a party to the state court proceeding sought to be enjoined. *See Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 377-78 (1939); *see also Prudential Real Estate Affiliates v. PPR Realty*, 204 F.3d 867, 880 (9th Cir. 2000) ("Binding Supreme Court and Ninth Circuit decisions, as well as the weight of recent authority from other circuits, support the continued vitality of the "strangers" exception to the Anti-Injunction Act. One who is not a party to state proceedings, nor in privity with a party, may seek a federal injunction against enforcement of a judgement obtained in those proceedings.").

In *Hale*, the State of Florida filed a petition for writ of mandamus to compel the Florida State Road Department to enforce a statute concerning imported cement. After the writ issued, Bimco Trading, Inc., a company affected by the statute, sued to enjoin enforcement of the statute on the grounds that it violated the federal constitution. The state-court plaintiff challenged the federal court's jurisdiction under the Anti-Injunction Act (then known as § 265). The United States Supreme Court rejected that challenge and held the Act cannot apply to "strangers to the state court proceedings":

> To invoke § 265 in these circumstances is to assert that a successful mandamus proceeding in a state court against state officials to enforce a challenged statute, bars injunctive relief in a United States district court against enforcement of the statute by state officials at the suit of strangers to the state court proceedings. This assumes that the mandamus proceeding bound the independent suitor in the federal court as though he were a party to the litigation in the state court. This, of course, is not so. *Chase National Bank v. Norwalk*, 291 U.S. 431, 441.

*Hale*, 306 U.S. at 377-78.

This Court likewise has judicial power and authority to enjoin Defendants from continuing to violate the federal constitution pending its final determination of the constitutionality of the state court's "reformation" of the Trust because, as discussed more fully below, Plaintiff is

neither a party to nor in privity with any party to the state court proceeding. Indeed, the Plaintiff Association, as well as all individual parties who have sought party status in that proceeding to date, have been denied standing. The only state court proceeding in which Plaintiff Association had standing has been terminated based on a determination that Plaintiff waited too long to initiate that proceeding. Therefore, there is no ongoing state court proceeding to which Plaintiff is or can become a party for this Court to enjoin, and the "stranger to the state court proceeding" exception permits this Court to address Plaintiff's claims.

C.   Abstention Is Not Permitted by <em>Younger v. Harris</em>.

Principles of federalism and comity require a federal court to abstain from granting equitable relief when (i) "there are ongoing state criminal, civil, or administrative proceedings"; (ii) the state court offers "an adequate forum to hear the federal plaintiff's claims from the federal lawsuit"; and (iii) the state proceedings "involve important state interests." *Taylor v. Jaquez*, 126 F.3d 1294, 1297 (10th Cir. 1997) (applying *Younger v. Harris*, 401 U.S. 37 (1971) and its progeny), *cert. denied*, 523 U.S. 1005 (1998). *Younger* abstention is a "narrow exception" from the general obligation of the federal courts to assume jurisdiction when they clearly have it, and is only proper in a very small number of cases. *See, e.g.*, *New Orleans Pub. Serv., Inc. (NOPSI) v. Coouncil of City of New Orleans*, 491 U.S. 350, 359, 368 (1989) (abstention is "the exception not the rule," and "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.") (internal quotation marks omitted).

This Court may not abstain under *Younger* because there is no state forum available for Plaintiff's claims of ongoing Establishment Clause and other federal constitutional and statutory violations. Both Judge Lindberg and the Utah Supreme Court have refused Plaintiff's efforts to

intervene in the state court or otherwise bring their federal constitutional claims in the Utah state

courts.  Accordingly, the merits of Plaintiff's federal claims will not be adjudicated in Utah state

court even if this Court abstains from taking jurisdiction of this lawsuit.  In this circumstance, the

narrow exception of *Younger* does not apply and federal court abstention is not permitted.  *See*

*Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14-15 (1987) (suggesting that *Younger* abstention is not

appropriate when state procedural law bars the presentation of federal plaintiff's federal claims

in state court); *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999) ("*Younger* abstention

dictates that federal courts not interfere with state court proceedings by granting equitable relief

. . . when such relief could adequately be sought before the state court.").

IV.     PRIOR STATE COURT ORDERS DO NOT PRECLUDE THIS
        COURT'S ORDER OF DECLARATORY AND INJUNCTIVE RELIEF.

The Utah state courts have issued two sets of final orders:  (i) the orders issued by Judge

Lindberg which removed the prior trustees, reformed the trust from a religious to a secular rela-

tionship, and appointed Mr. Wisan as the Special Fiduciary; and (ii) the order issued by the Utah

Supreme Court denying Plaintiff's petition for extraordinary relief on grounds of laches.  None

of these orders deprives this Court of jurisdiction or precludes this Court from addressing Plain-

tiff's claims.

A.     This Court Has Jurisdiction to Order Relief under the *Rooker-
       Feldman* Doctrine.

The *Rooker-Feldman* doctrine provides that the federal district courts lack jurisdiction to

entertain actions by "state-court losers complaining of injuries caused by state-court judgments

rendered before the district court proceedings commenced and inviting district court review and

rejection of those judgments."  *Exxon Mobile Corp. v. Saudi Basic Inds.*, 544 U.S. 280, 284

(2005) (discussing *District of Columbia Ct. App. v. Feldman*, 460 U.S. 462 (1982); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923)).  The doctrine is a consequence of the fact that Congress vests appellate jurisdiction of state court judgments solely in the Supreme Court and not in the federal district courts, which are courts of original jurisdiction.  *Exxon Mobil*, 544 U.S. at 292 (discussing 28 U.S.C § 1257(a)).

The *Rooker-Feldman* doctrine does not deprive a federal court of jurisdiction over an action brought by one who was not a party to the prior, adverse state court action.  *E.g.*, *Lance v. Dennis*, 546 U.S. 459, 465-66 (2006); *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1234 (10th Cir. 2006).  Plaintiff Association members were not parties to any of Judge Lindberg's orders, and thus *Rooker-Feldman* cannot be applied to deprive this Court of jurisdiction over their federal court action.

Plaintiff Association was the party that filed the petition for extraordinary relief denied by the Utah Supreme Court.  Even when the parties bringing a subsequent federal district court action were parties to the prior state court judgment, however, "*Rooker-Feldman* only applies when the injury alleged by plaintiffs was caused by the state-court judgment."  *Mo's Express*, 441 F.3d at 1237 (internal quotation marks, brackets, and citations omitted).  Thus, a federal district court is not deprived of jurisdiction under *Rooker-Feldman* where the federal action was filed prior to the state-court judgment, because in such circumstances it is impossible for the belated state-court judgment to have caused the injuries already alleged by plaintiffs previous to the judgment.  *See Exxon Mobil*, 544 U.S. at 292 ("[N]either *Rooker* nor *Feldman* supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court.").  Plaintiff

filed its action in this Court seeking relief from Defendants' actions in May 2008, well before it sought extraordinary relief for such actions from Utah Supreme Court.   Accordingly, *Rooker-Feldman* cannot apply to their action before this Court.

For similar reasons, *Rooker-Feldman* does not apply when the federal action seeks only declaratory and injunctive relief, because by definition prospective relief is forward-looking and thus does not reverse or undo a prior state-court judgment.  S*ee, e.g.*, *Mo's Express*, 441 F.3d at 1237 (holding that *Rooker-Feldman* did not apply to adverse party to state court judgment in favor of state public utilities commission, because such party's subsequent action in federal court challenging the commission's actions on federal constitutional grounds "requested only prospective injunctive and declaratory relief that would prevent the [commission] from exercising jurisdiction" over such party in the future).  Plaintiff is seeking solely declaratory and injunctive relief from this Court, which by definition would have only a prospective effect.  Moreover, the Utah Supreme Court did not reach the merits of any of the issues on which Plaintiff bases its federal claim for prospective relief.  There is, therefore, literally no state court judgment on the merits that prospective relief by this Court could or would reverse or undo.

### B.     Plaintiff's Federal Claims Are Not *Res Judicata* in State Court.

Even where the *Rooker-Feldman* doctrine does not apply, a defendant may assert that a federal court is precluded from hearing a federal action whose claims were decided by a prior state-court judgment that has *res judiciata* effect on the federal claims.  *Exxon Mobil*, 544 U.S. at 293.  Under the doctrine of *res judicata*, "'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 n.6 (1982) (quoting *Allen v.*

*McCurry*, 449 U.S. 90, 94 (1980)).  Thus, claims decided on the merits in state court are subject to the defense of *res judicata* when they are subsequently raised in federal court. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 n.6 (1982); *Allen*, 449 U.S. at 95.

By federal statute, state court judgments must be accorded the same preclusive effect in federal court as such judgments would have in the courts of the state from which the judgment emerged.  28 U.S.C. § 1738; *see Allen*, 449 U.S. at 96.  Accordingly, whether a state court judgment precludes a federal claim under the doctrine of *res judicata* is determined by the law of the state whose court rendered the judgment.  *Kremer*, 456 U.S. at 481 ("It has long been established that § 1738 . . . commands a federal court to accept the rules chosen by the State from which the judgment is taken.").  State law, however, is subject to an important constitutional limit:  The party against whom *res judicata* is raised must have had a "full and fair" opportunity to litigate the purportedly preclusive claim in the state action, as measured by the requirements of the Due Process Clause of the Fourteenth Amendment.  *Kremer*, 456 U.S. at 481.

Under Utah law, a party seeking dismissal of a claim on grounds of *res judicata* must prove three elements:

(i)    Both cases involved the same parties or those in privity with them;

(ii)   The claim sought to be barred must have been presented in the first case or be a claim that could have and should have been presented there; and

(iii)  The first case must have been litigated to a final judgment on the merits.

*E.g.*, *Mack v. Utah State Dept. Comm.*, 2009 UT 47 ¶ 29, 221 P.3d 194, 203; *Miller v. USAA Cas. Ins. Co.*, 2002 UT 6 ¶ 58, 44 P.3d 663, 678.

As to Judge Lindberg's orders, any *res judicata* defense necessarily fails because Plaintiff was not a party to Judge Lindberg's orders or in privity with any such parties.  The pre-existing Trustees were the original defendants in the state court proceeding.  Plaintiff, by contrast, is an Association of members of the FLDS Church.  The two actions thus involve different parties.

Moreover, Defendants cannot argue that Plaintiff is in privity with the pre-existing Trustees.  When members of Plaintiff Association sought to intervene in the state court action, Judge Lindberg ruled that they had no standing to contest her orders.  The basis for that ruling was that, unlike the beneficiaries of a non-charitable trust, who generally are considered to be in privity with the trustee, the beneficiaries of a charitable trust generally have no particularized claim apart from members of the public at large.  It would be inconsistent to conclude that, on the one hand, Plaintiff Association members have no more connection to the Trust than any member of the general public, but on the other hand they are so tightly bound to the trustees that they are in privity.  Plaintiff believes the trial court's rulings on standing are erroneous, as they have a "special interest" in this Trust and therefore have standing to intervene.  But having consistently denied any FLDS Church member standing, Judge Lindberg and the other Defendants are estopped from arguing that Plaintiff Association members are in privity with the pre-existing trustees for purposes of Utah preclusion law.

As to the Utah Supreme Court's ruling based on laches, Plaintiff has been unable to find any Utah court decision on the question whether disposition of a claim on grounds of laches constitutes a disposition on the merits of the claims for purposes of issue preclusion.  The Utah courts have consistently held, however, that disposition of a claim on the basis of a statute of limitations is wholly procedural and not a disposition on the merits. *See, e.g.*, *Lee v. Gaufin*, 867

P.2d 572, 575 (Utah 1993) ("Statutes of limitation are essentially procedural in nature . . . .  They do not abolish a substantive right to sue, but simply provide that if an action is not filed within the specified time, the remedy is deemed to have been waived . . . ."); *accord Davis v Provo City Corp.*, 2008 UT 59, at ¶ 14, 193 P.3d 86, 91; *Tolman v. Logan City*, 2007 UT App 260, at ¶ 10 n.1, 167 P.3d 489, 493 n.1; *Utah Dept. Human Servs. v. Jacoby*, 1999 UT App 52, at ¶ 12, 975 P.2d 939, 942; *Records v. Briggs*, 887 P.2d 864, 871 (Utah Ct. App. 1994); *see also Financial Bancorp, Inc. v. Pingree & Dahle, Inc.*, 880 P.2d 14, 16 (Utah Ct. App. 1994) (observing that Utah has adopted "majority position" that limitations defenses are procedural).

Utah courts have thus consistently distinguished dispositions "on the merits" from dispositions on the basis of a statute of limitations.  *See, e.g.*, *Rocket Mining Corp. v. Gill*, 25 Utah 2d 434, 483 P.2d 897, 901 n.8 (1971) (observing that court's decision for defendants "on the merits" obviated the need to consider defendants' statute of limitation defense); *Bailey v. Industrial Comm'n*, 110 Utah 395, 174 P.2d 429, (1946) (same); *In re Estate of LeFevre*, 2009 UT App 286, at ¶ 29, 220 P.3d 476, 483 (same); *cf. Velard v. Board of Rev. Utah Ind. Comm'n*, 831 P.2d 123, 130 (Utah Ct. App. 1992) (reversing commission's denial of claim on statute of repose ground and remanding claim "for a hearing of the merits").

Moreover, the Utah Supreme Court has drawn its descriptions of Utah preclusion law from California, *see Searle Bros. v. Searle*, 588 P.2d 689, 691 (Utah 1978) (defining Utah tests for *res judicata* and collateral estoppel with language from two California Supreme Court decisions), which has long held that judgments on the basis of laches or a statute of limitations are not on the merits for purposes of applying preclusion law. *See Johnson v. City of Loma Linda*, 24 Cal.4th 61, 99 Cal.Rptr.2d 316, 5 P.3d 874, 885 (2000) (judgment based on defense of laches

held not a judgment on the merits for purposes of *res judicata* because "laches has nothing to do with the merits of the cause against which it is asserted").  Utah's adoption of California law to define *res judicata* further supports the conclusion that the Utah Supreme Court would also find that a laches defense, which was the basis for the denial of Plaintiff's petition for extraordinary relief by the Utah Supreme Court, is not a decision on the merits.

CONCLUSION

No reading of the Religion Clauses justifies the State's involvement in the FLDS Church and the UEP Trust.  The State violates that clause when it takes over an institution of religion and then, by stripping the religion from the institution, claims to be able to minister to the needs of its members by applying rules of secular neutrality.  Plaintiff Association members respectfully request that this Court not allow the desecration to continue, and enjoin further cannibalization of the Trust pending full consideration of the merits of their constitutional and statutory claims.

DATED:  October 6, 2010.

SNOW, CHRISTENSEN & MARTINEAU

By____s/ Rodney R. Parker_____
     Rodney R. Parker
     Attorneys for Plaintiff

C:\NRPORTBL\IDOCS\RRP\1546657_1.DOCX:10/6/10

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2010, I electronically filed the foregoing MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAIN- ING ORDER AND PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

> JEFFREY L SHIELDS
> ZACHARY T SHIELDS
> MICHAEL D STANGER
> CALLISTER NEBEKER & McCULLOUGH
> 10 E SOUTH TEMPLE STE 900
> SALT LAKE CITY UT 84133-1115
>
> BRIDGET K ROMANO
> JERROLD S JENSEN
> PEGGY E STONE
> RANDY S HUNTER
> ASSISTANT ATTORNEY GENERAL
> PO BOX 140874
> SALT LAKE CITY UT 84114-0874
>
> WILLIAM A RICHARDS
> ASSISTANT ATTORNEY GENERAL
> 1275 WT WASHINGTON ST
> PHOENIX AZ 85007-2926

s/ Rodney R. Parker
RODNEY R. PARKER