CALLISTER NEBEKER & McCULLOUGH
JEFFREY L. SHIELDS (2947); *jlshields@cnmlaw.com*
MARK L. CALLISTER (6709); *mcallister@cnmlaw.com*
ZACHARY T. SHIELDS (6031);*zachshields@cnmlaw.com*
MICHAEL D. STANGER (10406); *mstanger@cnmlaw.com*
Zions Bank Building Suite 900
10 East South Temple
Salt Lake City, UT 84133
Telephone: (801) 530-7300
Facsimile: (801) 364-9127


Attorneys for Defendant Bruce R. Wisan, Court-appointed
Special Fiduciary of the United Effort Plan Trust


IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an Association of Individuals,<br><br>           Plaintiff,<br><br>     vs.<br><br>BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHURTLEFF, Attorney General for the State of Utah; TERRY GODDARD, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah,<br><br>           Defendants. | **OPPOSITION TO RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 2:08-CV-772-DB<br><br>Judge Dee Benson |

Defendant Bruce R. Wisan ("the Fiduciary"), as the Court-appointed Special Fiduciary of the United Effort Plan Trust (the "Trust" or "UEP Trust"), through counsel, hereby submits this memorandum in opposition to the Renewed Motion for Temporary Restraining Order and Preliminary Injunction filed by the so-called Fundamentalist Church of Jesus Christ of Latter-Day Saints, an Association of Individuals ("Plaintiff"),[1] as follows:

---

[1] It is unclear who the Plaintiff is in this case. Despite the fact that the Plaintiff has chosen to call itself the "Fundamentalist Church of Jesus Christ of Latter-Day Saints"(the "FLDS Church") on the pleadings of this case, it is clear that the Plaintiffs is *not* the FLDS Church. Indeed, the Plaintiff admits that it is not the Church, but assert that it is an "informal association of members" of the Church. (*See* Willie Jessop Affidavit, at ¶ 1). The FLDS Church itself is not an informal association, but is a religious society with a designated President, Warren Jeffs. It is clear from the pleadings in this case that the FLDS Church itself is not a party to this litigation, and neither is Warren Jeffs.

It is unclear how many people are involved in the Plaintiff's so-called "informal association." It appears that the Plaintiff's members belong to a group of people who are followers of Warren Jeffs ("Jeffs Adherents"). Plaintiff, however, has failed to reveal how many people purport to be members of its association, or the names of such persons.

By claiming that they are the FLDS Church itself, Plaintiff's members apparently hope to create standing where there is none. Knowing that they have no individual or collective rights with respect to the Trust under Trust law, such persons are apparently attempting to mislead the Court into believing that the Plaintiff is the FLDS Church, so that they can attempt to assert any claims and rights which the FLDS Church may have.

The Plaintiff's actions in this case, in failing to identify the real names of the movants and in improperly usurping the name of another entity, are wholly improper. Such actions places the Fiduciary at a distinct disadvantage.

The ambiguity as to the identify of the Plaintiff's members causes confusion and unfairness and leaves uncertainty as to the force and effect of any ruling by this Court in this case. Plaintiff's members could easily use such ambiguity to their advantage. Presumably, if Plaintiff obtains a favorable ruling in this case, many people will suddenly claim membership in Plaintiff's association and claim the benefits of such ruling. On the other hand, should Plaintiff's obtain an unfavorable ruling, how many people would admit to membership in the Plaintiff's association and to being bound by such ruling?

Clearly, the law does not allow Plaintiff to proceed in such a manner. A defendant in civil litigation is entitled to know the identity of those who are asserting claims against him. For this reason alone, the Plaintiff's pleading should be stricken and the Renewed TRO Motion denied.

## **<u>TABLE OF CONTENTS</u>**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**STATEMENT OF BACKGROUND FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    1942 to 2004:  Historical Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.    2004:  Breach of Fiduciary Duties and Fraudulent Transfers . . . . . . . . . . . . . . . . . 8

    III.    2005:  The Trust Probate Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    IV.    2005 to 2006:  Reformation of the Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    V.    2006 to 2008:  Post-Reformation Operations of the Trust  . . . . . . . . . . . . . . . . . . 26

    VI.    2008:  The Trust Comes Under Attack  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    VII.    2009: Continued Litigation Attacks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    VIII.    2010:  Continued Litigation Attacks/Judicial Rulings Rejecting the Collateral
            Attacks of the Jeffs Adherents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    IX.    Today: The Trust in Crisis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    X.    Relevant Decisions by Other Courts who Have Considered Collateral Attacks
            on the Reformation Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**STATEMENT OF REBUTTAL FACTS/RESPONSE TO PLAINTIFF'S
FACTUAL ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    I.    The UEP Trust is Not a Church or Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    II.    The Fiduciary Has Not Acted as an FLDS Bishop . . . . . . . . . . . . . . . . . . . . . . . . 44

    III.    The Actions of the Attorneys General and the Probate Court . . . . . . . . . . . . . . . . 45

    IV.    The Actions of the Fiduciary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    V.    The Misconduct of Warren Jeffs and the Trustees  . . . . . . . . . . . . . . . . . . . . . . . . 52

    VI.    The Plaintiff's Failure to Participate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    VII.    The Fiduciary's Attempt to Subdivide the Trust's Property . . . . . . . . . . . . . . . . . 57

VIII.  The Berry Knoll Farm Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IX.  Reliance on the Finality of the Reformation Judgment . . . . . . . . . . . . . . . . . . . . . . . . 61

X.  The Role of Warren Jeffs in the Present Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**SUMMARY OF LEGAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

**LEGAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

I.  PLAINTIFF WILL NOT PREVAIL ON THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . 66

   A.  There has been no Violation of Plaintiff's First Amendment Religious
       Freedoms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

       I.  *There has been no Establishment Clause Violation* . . . . . . . . . . . . . . . . 66

       ii.  *There has been no Free Exercise Clause Violation.* . . . . . . . . . . . . . . . 69

   B.  Plaintiff's Claims are Barred by Laches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

   C.  This Court Lacks Subject Matter Jurisdiction over Plaintiff's Claim. . . . . . . . . . 71

       I.  *The Barton Doctrine Deprives this Court of Subject Matter Jurisdiction* 71

       ii.  *Rooker-Feldman Deprives this Court of Subject Matter Jurisdiction* . . . 72

       iii.  *The Fiduciary is Immune from Suit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

   D.  Plaintiff and its Members Lack Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

       I.  Plaintiff's Members Lack Standing as Beneficiaries of the Trust . . . . . . 75

       ii.  Plaintiff Lacks Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

   E.  Plaintiff's Claims are Barred by the Doctrine of *Res Judicata*. . . . . . . . . . . . . . 76

       I.  *The Probate Court's Reformation Judgment is Res Judicata.* . . . . . . . . . 76

       ii.  *The Utah Supreme Court's Decision is Res Judicata on the
            Issue of Laches* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

       iii.  *Judge Waddoups Ruling is Res Judicata on the Issues of Younger Abstention
             and Rooker-Feldman, and the Cooke v. Wisan decision in Arizona Federal
             District Court is Res Judicata on the Issue of Beneficiary Standing.* . . . 79

F.    Federal Abstention Doctrine Precludes this Court from Considering Plaintiff's Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

      *I.*    *The Complaint Admits and Cites a Parallel State Court Proceeding* . . . 80

      *ii.*    *The Issues Involve Important State Matters.* . . . . . . . . . . . . . . . . . . . . . . 81

      *iii.*    *The Plaintiff's Constitutional Rights Are Adequately Protected in State Court* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

G.    This Court must Abstain under the Full Faith & Credit Clause, Affording Full Faith & Credit to both the Reformation and the Utah Supreme Court Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

II.    PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM. . . . . . . . . . . . . . . . . . . 83

III.    THE BALANCE OF HARMS FAVORS THE FIDUCIARY AND THE BROADER BENEFICIARY CLASS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

IV.    INJUNCTIVE RELIEF WOULD BE ADVERSE TO THE PUBLIC INTEREST. . . . 86

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

## <u>INTRODUCTION</u>

The present TRO Motion is but the latest in a number of belated attacks which have been brought against the Reformation Judgment of the Third District Court of Salt Lake County (the "Probate Court"). Indeed, Plaintiff and its members have gone on a forum-shopping expedition – continually searching for a judge who will undo the Reformation Judgment which became final and non-appealable in 2006.

Recently, the Utah Supreme Court considered and rejected an attack which was brought by the very same Plaintiff in the present case, which attack raised the identical claims and arguments raised by the Plaintiff in this case. (*See* <u>Fundamentalist Church of Jesus Christ of Latter-day Saints v. Lundberg</u>, 238 P.3d 1054, 61 (Utah 2010)). The Utah Supreme Court's ruling is dispositive in the present case. The Plaintiff has a right to seek review of the Utah Supreme Court's ruling. Such review, however, should be sought directly from the United States Supreme Court – not through another collateral attack in federal district court.

This Court should not consider a lawsuit collaterally attacking the rulings of the state courts of Utah. This Court is not an appellate court. It is not the role of this Court to review and second guess the rulings of the Utah courts – whether the trial courts or the Supreme Court. Rather, under a number of legal doctrines, including the Barton doctrine, Rooker-Feldman, laches, judicial immunity, standing, *res judicata*, abstention, and the Full Faith and Credit clause, this Court is prohibited from even considering the merits of the Plaintiff's claims.

The relief sought by the Plaintiff in this case is extraordinary and far-reaching. The Plaintiff would have this Court invalidate a Judgment which has been final and non-appealable for four years. It would further have this Court enjoin the Probate Court – the court with exclusive jurisdiction over Utah trusts – from taking any action with respect to the UEP Trust. In essence, Plaintiff is asking this Court to usurp

the jurisdiction of the state Probate Court, second-guess its rulings, and then overrule more than 5½ years of court administration of the Trust.

Incredibly, Plaintiff seeks such unprecedented relief while keeping this Court in ignorance of all the facts. Plaintiff's Memorandum is extremely light on the facts – as if the Plaintiff does not want the Court to know what has transpired in this case. How could this Court possibly grant the extraordinary relief requested by the Plaintiff (to enjoin the Probate Court from administering the Trust) without having reviewed the record in the Probate Action[2] and without having gained an understanding as to the underlying facts and circumstances which formed the foundation for the rulings of the Probate Court?

The few facts which are alleged in the Plaintiff's Memorandum are taken out of context, twisted, and distorted so as to present a wholly false and misleading picture as to the Probate Court Action. Plaintiff is trying to re-write history. Plaintiff would have the Court believe that the Attorneys General and Probate Court took over a church and seized its assets. This is simply not true. When the true facts are known, it becomes readily apparent that the Attorneys General and the Probate Court did not violate the Constitution, but acted properly and in accordance with its duties under the law.

The facts underlying the Trust Probate Case are truly unique and unusual. A review of such facts shows that state court intervention was necessary and proper under the law, in order to protect the Trust and preserve the homes of the people residing on Trust land. Intervention was necessary because of the misconduct of Warren Jeffs who engaged in criminal activity – sex crimes with children – and refused to appear or defend the Trust against tort lawsuit plaintiffs who threatened to expose his criminal activity. Warren Jeffs deliberately chose to sacrifice the Trust's assets (including the homes of the people) so that he would not be called upon to explain his actions. He did so knowing that he was breaching his legal duties to the Trust and that such breach would oblige the government to intervene. Indeed, it was Warren

---

[2] Such record consists of well over 60 volumes, plus the recording and transcripts of numerous court hearings.

Jeffs' desire and intent that the government take over the Trust and drive his people from their homes! He desired such result so that his self-fulfilling prophesies of government persecution would be fulfilled, and so that he could gather his favorite, chosen followers to new lands in Texas and elsewhere.

The facts show that Warren Jeffs' followers, including the Plaintiff, knowingly and voluntarily refused to appear or be heard in the Trust Probate Case for more than three years. They sat back and allowed the Court to reform the Trust, and allowed the Reformation Judgment to become final and non-appealable, without providing any input whatsoever.

The facts show that Warren Jeffs later changed his strategy and that, two years after the Reformation Judgment became final, his followers then began to attack the Reformation Judgment in multiple courts. They did so at the behest of Warren Jeffs – seeking that the Trust be returned to the control of Warren Jeffs.[3]

Now, the Plaintiff is attacking the Reformation Judgment in this Court – accusing the Attorneys General, the Probate Court, and the Fiduciary of wrongdoing. In so doing, they fail to acknowledge that the Attorneys General, Probate Court, and Fiduciary actually saved the Trust. But for their actions – in preventing Warren Jeffs from looting the Trust, in defending the Trust in litigation, and in managing and protecting the Trust – there would be nothing of substance left in the Trust and nothing for the Plaintiff to fight over.

---

[3] The relief requested by the Plaintiff in this case reveals that the Plaintiff is acting at the direction of Warren Jeffs. The Fiduciary desires to distribute Trust assets to the deserving members of the beneficiary class who reside upon Trust land – the large majority of whom would presumably be members of the Plaintiff's association. Once they receive ownership of property from the Trust, such members would then be free to use such property in any manner they desire, including donating it to a church leader for whatever purposes. Yet, the Plaintiff opposes the Fiduciary's efforts to distribute the property to the people. Rather, it insists that the property be placed directly under the control of Warren Jeffs – such that the people would never be given the choice whether to keep the property for themselves or donate it for other purposes.

Plaintiff argues that the Probate Court was required under the Constitution to terminate the Trust and turn its assets over to the control of Warren Jeffs.  Plaintiff fails to reveal, however, that such action would have resulted in a loss of the Trust's assets – as Warren Jeffs and the FLDS Church were both in default in the same tort lawsuits which required the intervention of the Court in the first place.  Plaintiff further fails to reveal Warren Jeffs' involvement in underage sex crimes and his utter refusal to defend the Trust in lawsuits which would expose such crimes.  *Surely, the Constitution does not require the return of charitable trust property to the control of a person who facilitates sex crimes against children and then deliberately abandons charitable property in order to avoid disclosure of such crimes.*

Finally, Plaintiff fails to reveal the far-reaching consequences of Plaintiff's requested relief and the repercussions it would have on numerous innocent people.  The facts show that many people relied upon the finality of the Reformation Judgment.  Showing respect for the authority of the Probate Court and the rule of law, such people made numerous decisions and otherwise ordered their lives based upon the understanding and expectation that Reformation Judgment was final and non-appealable.

The circumstances of such innocent people is in stark contrast to the circumstances of the Plaintiff's members – who knowingly and willingly chose to abstain from the Probate Action for more than three years.  It is also in stark contrast to the circumstances of Warren Jeffs – who caused the need for court intervention in the first place (through his criminal conduct and breach of fiduciary duty) and still refuses to account or make amends for his misconduct.

Now, Plaintiff would have this Court invalidate the entire Trust Probate Action and hand the assets of the Trust to the control of Warren Jeffs   To do so would be to reward Warren Jeffs for his misconduct while punishing the innocent people who have shown respect for the rule of law and relied upon rulings of the Trust Probate Court.  Surely the law would not allow such an extraordinary and perverse result.

**STATEMENT OF ISSUES**

1.  Has the Plaintiff met its burden to show that it is likely to prevail on the merits of the claims in the Amended Complaint?

2.  Has the Plaintiff met its burden to show that it will suffer irreparable injury if it is denied injunctive relief?

3.  Has the Plaintiff met its burden to show that the threatened injury to the Plaintiff outweighs the harm to be suffered by other parties if the injunction is issued?

4.  Has the Plaintiff met its burden to show that the requested injunction is not adverse to the public interest?

**STATEMENT OF BACKGROUND FACTS**

**I.  1942 to 2004: Historical Background**

1.  The United Effort Plan Trust (the "Trust" or "UEP Trust") is a Utah trust created in 1942 pursuant to a DECLARATION OF TRUST, dated November 9, 1942 (the "Original Trust Declaration") by certain members of a religious movement which was known as the "Priesthood Work."(*See* Trust Probate Court Record ("R.") at R.29)[4] .

2.  The Original Trust Declaration provided that the Trust is to be "charitable and philanthropic in its operations [and] to be governed in a true spirit of brotherhood." It provided that the "trustees may make a distribution of the trust fund or property as may by [the trustees] be deemed advisable to individual members of the trust, or all of them, strictly in accordance with their just wants and needs; provided

---

[4] Many of the facts relevant to the present case can be found in the files of the Third District Court of Salt Lake County, Utah, Case No. 053900848 (the "Probate Court"). As Plaintiff is seeking to stay the administration of the Probate Court and effectively undo 5 plus years of the Probate Court administration, it would be inappropriate for this Court to grant the Plaintiff's requested relief without first reviewing and becoming familiar with the files of the Probate Court. Such files are extremely voluminous (well over 60 volumes), and it would be wholly impracticable to attach such files (or even the critical portions such files) to the present memorandum.

   However, all of the Probate Court's files from May, 2005 through February, 2010 have been copied and recorded in digital format on a compact disc. (Such disc was filed with the Utah Supreme Court in Appeal No. 20090691). Accordingly, to aid in the Court's understanding of the relevant facts in this case, the Fiduciary will provide a copy of such compact disc to the Court and opposing counsel.

   For purposes of this memorandum, citations to the Trust Probate Court record (as found on the compact disc) will be indicated with an "R." followed by the page number of the record.

further, that the trustees may render needed assistance to non-members of the trust when deemed wise by them."  (R. 29 - R. 38).

3.      Through the years, numerous people donated land to the Trust and/or constructed housing and improvements upon the Trust's land.[5]  As the years went by, religious disputes arose among those who had founded and/or donated property to the Trust, and the parties split into different religious factions.

4.      In the 1980s and 1990s, the religious disputes resulted in extensive litigation, in federal and state court, regarding the control and operations of the property of the UEP Trust.  During this time period, one of the religious factions (those who were followers of Rulon Jeffs) began to call themselves the Fundamentalist Church of Jesus Christ of Latter Day Saints (the "FLDS Church").  In 1990s, Rulon Jeffs organized a corporation sole under Utah law, which was named "the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter Day Saints (the "Corporation Sole").

5.  In 1998, the Utah Supreme Court issued an opinion in the UEP Trust litigation, wherein the Court determined, among other things, that the Trust was a private trust. (*See* Jeffs v. Stubbs, 970 P.2d 1234 (Utah 1998)).

6.      In response to the Supreme Court's opinion, the trustees of the Trust (including Rulon Jeffs, who was the sole surviving original member of the Trust), executed an AMENDED AND RESTATED DECLARATION OF TRUST OF THE UNITED EFFORT PLAN TRUST, dated November 3, 1998 (the "Restated Trust Declaration"), which purported to replace the Original Trust Declaration.  (R. 21).

7.      The Restated Trust Declaration, among other things, converted the Trust to a charitable trust with two purposes: (I) promoting the doctrines and goals of the FLDS Church; and (ii) providing for the just wants and needs of FLDS members.  (R. 22-23).

---

[5]  Today, the property of the Trust consists almost entirely of land and improvements.  The Trust owns approximately 5,000 acres of property with over 700 homes located in Hildale, Utah and Colorado City, Arizona, an area known as Short Creek, as well as in British Columbia, Canada.  (R. 3037-3039, 3070).  Virtually all of the Trust's property was donated to the Trust prior to 1998.

8.  The Restated Trust Declaration stated that the Trust was to be "of perpetual duration" and that it was to be "governed by the laws of the State of Utah in effect from time to time." (R. 24).

9.   The Restated Trust Declaration purported to effectuate a substantial change in the purposes and usage of the Trust.  As the FLDS Church did not come into existence until 50 years after the founding of the UEP Trust, and as the newly-established FLDS Church did not include a large number of people who were involved in the Priesthood Work, the Restated Trust Declaration would exclude many people who had donated property to the Trust and who had resided upon Trust property or otherwise receive benefits from the Trust.

10.   As a general rule, the UEP Trust was used as a landholding trust only, in that the assets titled in the name of the Trust consisted almost exclusively of real property and improvements.  The trustees of the Trust and the leaders of the FLDS Church owned and controlled substantial other property, including real property, personal property, vehicles, equipment, stocks, cash, etc., which was never titled in the name of the UEP Trust.  For example, the FLDS meetinghouse in Short Creek was titled in the name of the FLDS Church.  Similarly, the Harker dairy farm in Iron County, Utah, was owned by the FLDS Corporation Sole.  Other property controlled by the leaders of the FLDS Church was titled in the names of individuals, who held such property for the benefit of the church leaders.  Furthermore, the FLDS church leaders created other trusts, in addition to the UEP Trust, for the purpose of holding title to property used by the church.

11.   In 2002, Rulon Jeffs died and was replaced by his son Warren Jeffs.  Warren Jeffs became the president of the FLDS Church, the corporation sole of the FLDS Corporation Sole, and the president of the board of trustees of the UEP Trust.

## II.  2004: Breach of Fiduciary Duties and Fraudulent Transfers

*The Trustees Fail to Defend the Trust in Tort Litigation*

12.   In July and August, 2004, a number of litigants initiated two tort lawsuits seeking large damage awards against the Trust, Warren Jeffs, the FLDS Church and other defendants in the Third District Court of Salt Lake County: Case Nos. 040915857 and 040918237 (Such cases are hereinafter referred to as the "Tort Lawsuits").  (R. 7-8, 1133, 3049-3050).  The claims in the Tort Lawsuits were based upon various allegations of misconduct by Warren Jeffs – including sexual abuse of a child.

13.   After the Tort Lawsuits were filed, Jeffs and the other trustees failed to defend the Trust in the Tort Lawsuits.  Notwithstanding their fiduciary duties to the Trust, the trustees dismissed the Trust's legal counsel and refused to appear or defend the Tort Lawsuits.  Such conduct exposed the Trust to the entry of default in the Tort Lawsuits, with potential multi-million dollar damages awards.  (R. 8-9).

*Fraudulent Transfers of Trust Property*

14.   Within days after the filing of the Tort Lawsuits, the trustees of the Trust transferred valuable Trust property away from the Trust. Specifically, in September, 2004, the trustees transferred 1,311 acres of Trust property, as well as a large state-of-the-art manufacturing building, to entities who were affiliated with and/or controlled by Jeffs.  Although the transferred-property was worth several millions of dollars, the Trust received no consideration in exchange for such transfers.  (R. 14-15, 80-89, 91-99, 179-200).

15.   Such transfers met nearly all of the characteristic "badges of fraud" set forth in the Utah Uniform Fraudulent Transfer Act.  (*See* UTAH CODE ANN. § 25-6-5(2)).

16.   The transferred property was the most valuable non-residential property of the Trust.  After the transfers, the only remaining property with significant value was the improved property  – containing hundreds of houses occupied by thousands of people.  (R. 15, 3037, 3039, 3070).  Thus, after the transfers,

the only significant property remaining to satisfy any default judgment awards in the Tort Lawsuits was the homes of the people.

*The Knowledge and Intent of Warren Jeffs and the Trustees*

17.   Although Warren Jeffs and the trustees have never explained the motivation for their actions in 2004 – in defaulting on the Tort Lawsuits and transferring key Trust assets out of the Trust – such motivation is revealed in evidence which has subsequently come to light.   In particular, the Fiduciary has obtained copies of a portion of a record made by Warren Jeffs which reveals his thoughts, intentions, and actions with respect to the UEP Trust.   Such documents, and other evidence,  shows the following:

A.   Warren Jeffs was involved in criminal conduct – which included having sexual relations with very young girls.  (*See* Exhibit "A" (attached hereto)[6] at 11/26/03 p. 179).[7]

B.   Jeffs caused his followers to engage in criminal conduct by performing a number of "marriages" of young girls to older men. (*See* id. at 11/24/03 p. 163; 11/26/03 p. 179; 7/2/04 p. 22).

C.   Jeffs desired that the government would come against his people in order to fulfill a "directive of the Lord."  (*See* id. at 11/26/03 p. 179; 1/10/05 p. 9).

D.   Jeffs believed that the Lord had directed that the FLDS people "be driven from Short Creek."  (*See* id. at 1/10/05 p. 9).

---

[6] Exhibit "A" consists of copies of documents which were obtained from the search of the YFZ Ranch in Texas in 2008.  The authenticity of such documents were confirmed in the Affidavit of Nick Hanna, a Texas Ranger, filed in the Probate Action (See R 19567).  As discussed below, Warren Jeffs responded to the filing of the Tort Lawsuits by seizing the UEP Trust records and hiding them.  (*See* ¶ 17 R), below).  He further destroyed many records and caused others to be hidden in a vault at the YFZ Ranch in Texas.  (*See* ¶ 39(G), below).

[7] In addition to Exhibit "A", other evidence which has come to light confirms that Warren Jeffs and his followers were engaged in the practice of having sexual relations with young girls.  (*See* Guiora, *Protecting the Unprotected: Religious Extremism and Child Endangerment*, J. Law & Family Studies, Vol. 12 No. 2, at 399 (Texas state authorities who investigated Warren Jeffs' YFZ Ranch "determined that, of fifty-three girls aged fourteen to seventeen, thirty-one have children or are pregnant.")).  (*See also* United Effort Plan Trust v. Holm, 209 Ariz. 347, 101 P.3d 641, 643 (Ariz. App. 2004) (discussing attempt by Warren Jeffs to evict a family from their home on Trust property within 10 minutes after the mother withdrew her consent for her 15-year old daughter to marry a 39-year old man)).

In addition, the Court can take judicial notice of the fact that numerous FLDS men have been indicted on underage sex charges in Texas and that, to date, eight out of eight FLDS defendants have been convicted or have pled guilty.  Several other men are awaiting trial.  This includes Warren Jeffs who has been accused of fathering children with underage girls, and of being illegally married to girls as young as twelve years of age.

E.    Jeffs taught that "we will be scattered as a people and then the faithful will be gathered."   (*See* <u>id.</u> at 8/6/05 p.418).

F.    Jeffs taught that the UEP Trust land was "rejected of God, and is not the gathering place.". (*See* <u>id.</u>).

G.    Jeffs taught that the people would be rejected unless they moved away from the Trust's land and qualified for relocation to new "lands of refuge" (located in Texas and elsewhere) (*See* <u>id.</u>).

H.    Jeffs accelerated the practice of marrying "very young girls" at a "younger age" for the purpose of inducing the government to act against his people:

> The Lord will have me do more marriages of very young girls.  This will make the government rage and come against us stronger than ever.

(<u>Id.</u> at 7/2/04 p. 22).

> [T]he Lord wanted me to receive this thirteen-year-old bride . . . for her deliverance as well as the Lord allowing this to be a reason in the government's eyes to come stronger against this people. . . . [B]y me performing these works that would bring the wicked against us to justify the Lord in destroying them, at a quicker pace.

(<u>Id.</u> at 11/26/03 p. 179).

> The Lord is showing me the young girls of this community . . . will be taken care of at a younger age.  As the government finds out about this, it will bring such great pressure upon us . . . .   The Lord will have me do this, get more young girls married, not only as a test to the parents, but also to test this people . . . .

(<u>Id.</u> at 11/24/03 p. 163).

I.    After the Tort Lawsuits were filed, Jeffs willfully chose to default in such litigation for the purpose of inducing the government to take over the Trust and drive his people from the Short Creek area. (*See* <u>id.</u> at 9/1/04 pp.6-8; 1/10/05 p. 9).

J.    Jeffs believed that the Tort Lawsuits would cause his followers to lose their "lands and houses." (*See* <u>id.</u> at 2/21/05 p. 30).

K.    Jeffs forbade his followers from becoming involved in the Tort Lawsuits.  Jeffs told his followers that "the Lord has rejected Short Creek," and he and instructed them:  "Answer them nothing and don't give them any testimony or witness".  (*See* <u>id.</u>).

L.    Jeffs believed that his refusal to defend the Trust in the Tort Lawsuits would cause the government to intervene and would put the Trust's land "under government control."  (*See* <u>id.</u> at 9/1/04 p. 7).

M.   Jeffs believed that in causing the government to intervene he was "fulfilling the directive of the Lord" that the people be driven from the Short Creek area. (*See* id. at 1/10/05 p. 9).

N.   Jeffs knew that the decision to default in the Tort Lawsuits would be viewed by the courts as a breach of the trustees' fiduciary duties. (*See* Exhibit "B" (attached hereto), at 11/20/04 p. 119-20).[8]

O.   Jeffs instructed the trustees that "our fiduciary duty is to God and Priesthood not to the courts." (*See* Exhibit "A" at 9/1/04 p. 8).

P.   Shortly after the Tort Lawsuits were filed, Jeffs called an official meeting of the trustees of the UEP Trust. At such meeting, Jeffs and the trustees made the unanimous decision to default in the Tort Lawsuits. (*See* id. at 9/1/04 pp. 6-8).

Q.   At the same meeting, the trustees unanimously agreed to transfer certain valuable non-residential property out of the Trust. At the meeting, Warren Jeffs indicated that he recognized that, as a result of his decision to default in the Tort Lawsuits, the "courts could freeze the UEP assets." While Jeffs had no qualms about losing the homes of the people, and even desires such result (*see* ¶ 17(c) through 17(H), above), he desired to retain certain income-producing assets which were a source of cash. Accordingly, Jeffs and the trustees made the decision to transfer such income-producing property "before the assets are frozen." He stated that, by transferring such assets, they would "be a strength to us still and not get into the courts." (*See* id. at 9/1/04 p.7).

R.   At the same time, Jeffs made arrangements to gather and hide the UEP Trust records before a subpoena could be issued as to such records. Acting in his capacity as president of the Trust, he instructed his assistant to gather all of the records, place them in boxes, place the boxes in the middle of the office floor, and then leave the office at a pre-determined time with the door unlocked. Such instructions were made so that, in the event of a subpoena, the assistant would not be a witness as to what happened to the documents. Jeffs also forbade his assistant from providing any testimony in response to a subpoena, and commanded him to "answer them nothing." (*See* id. at 9/1/2004, pp. 2-3).

## III.  2005: The Trust Probate Action

### *The Trust's Legal Counsel's Request for Notice to the Attorney General*

18.   After Jeffs' decision to default in the Tort Lawsuits, the Trust's legal counsel, Rodney Parker of

the law firm of Snow Christensen & Martineau, filed a motion to withdraw as counsel in the Tort

Lawsuits. At the same time, Mr. Parker filed a Motion to Require Notice and a supporting memorandum,

---

[8] Exhibit "B" consists of redacted copies of portions of the record of Warren Jeffs obtained from the YFZ Ranch in Texas.

wherein Mr. Parker requested that notice of the pendency of the Tort Lawsuits be given to the Utah

Attorney General and to all persons residing upon the Trust's land.  (A copy of the Motion and Memo is

attached hereto as Exhibit "C").   Therein, Mr. Parker stated, among other things, that:

> No court has yet ruled on the character of the Trust as charitable or private following the amendment, or who the beneficiaries might be if the Trust is not deemed to be a charitable trust.
>
> . . .  No court has yet determined whether or not an occupant of the land would stand in the position of "beneficiary" of the Trust.
>
> . . . [If] the trustees do not defend the interests of the Trust, the occupants should be given notice, be advised to obtain counsel, and be given an opportunity to protect their own interests, to the extent they have such interests, prior to the entry of any default judgment against the Trust.  In addition, to the extent the Trust is deemed to be a charitable trust, an appropriate representative of the beneficial interest, such as the Utah Attorney General, should be notified as well.

Memorandum in Support of Motion to Require Notice (Exhibit "C"), at pp. 2-3.

*The Attorneys General Become Involved*

19.   In harmony with Mr. Parker's request, the Attorney Generals of Utah and Arizona  received

notice of the pendency of the Tort Lawsuits and of the failure of the trustees to defend the Trust in such

lawsuits.  The Attorneys General also received notice that the trustees of the Trust had transferred the

Trust's  manufacturing building and 1,311 acres of Trust land away from the Trust (as discussed in ¶¶ 14-

16, above).

20.   Under the law, the Attorneys General had the authority *and the duty* to intervene to protect the

assets of the Trust.  (*See* Hooker v. Edes Home, 579 A.2d 608, 611-12 (D.C. Ct. App. 1990) (the Attorney

General has primary, and nearly exclusive, standing to enforce a charitable trust); 15 Am. Jur. 2d Charities

§ 136 (Attorney General has duty to institute proceedings to stop or redress wrongful conduct of trustees

of charitable trust).

21.   After learning about the actions of the trustees, the Attorneys General became concerned that the trustees were breaching their fiduciary duties to the Trust.  In particular, the Attorneys General became concerned that the trustees' actions placed the homes of the people residing upon Trust land at a risk.

22.   Accordingly, given their authority and duties under the law, the Attorneys General made the decision to initiate a trust probate action in order to preserve and protect the assets of the Trust  from the malfeasance of its trustees.

*The Trust Probate Action*

23.   On May 26, 2005, the Attorneys General initiated a trust probate action (the "Probate Action") in the Third District Court of Salt Lake County, Utah, Case No. 053900848 (the "Probate Court").  Acting pursuant to their authority and obligations under the Utah Uniform Trust Code and the common law, the Attorneys General filed a petition with the Court seeking to suspend the trustees and appoint a special fiduciary.  The petition also sought other relief, including reformation of the trust at the request of interested parties.  (R. 1).

24.   Under the law, the Probate Court has "exclusive jurisdiction of proceedings initiated by interested parties concerning the internal affairs of trusts."  Utah Code Ann. § 75-7-201(1).

25.   In connection with the filing of the Probate Action, the Attorneys General contacted Bruce R. Wisan, a certified public accountant in Salt Lake City, and requested him to serve as special fiduciary for the Trust in accordance with UTAH CODE ANN. § 75-7-1001(2)(e).  (R. 16-17).

26.   The breaching trustees refused to appear in the Probate Action.  Indeed, no person or entity, whether trustee, beneficiary, occupant, or otherwise, appeared or spoke in opposition to the petition of the Attorneys General.  (R. 511, 547).

27.   Having received no opposition to the petition, the Court entered Orders suspending the trustees and ordering them to provide an inventory, accounting, and final report; to deliver Trust documents,

records, and property; and to cooperate in providing information regarding the Trust.  The Court also appointed Mr. Wisan (the "Fiduciary") to serve as a special fiduciary of the Trust. (R. 220, 548, 1996).[9]

*The Suspended Trustees' Disobedience of Court Orders*

28.   The suspended trustees received actual notice of the Probate Action *(see* ¶¶ 24 & 64(p), below). Nevertheless, they  failed to appear in the Probate Action or  to otherwise communicate with the Court or the Fiduciary.

29.   The suspended trustees failed to comply with any aspect of the Orders of the Court.  (R. 3028). They failed to provide an inventory, accounting, or final report.  They failed to provide any documents, records, or property to the Fiduciary, or otherwise cooperate in providing information to the Trust.

30.   On the contrary, the suspended trustees acted to oppose the Fiduciary and to interfere with his management of the Trust.  Notwithstanding the orders of the Court, Jeffs and the suspended trustees continued to attempt to assert control over the assets of the Trust.  Furthermore, they directed the removal of buildings and other fixtures from Trust property, acted to sabotage the Fiduciary's efforts to accomplish the payment of the Trust's property taxes, and took other acts to interfere and frustrate the Fiduciary's efforts to fulfill his Court-appointed duties.

31.   Jeffs and the trustees also took action to prohibit their followers from cooperating with the Court or the Fiduciary.  Upon being appointed by the Court, the Fiduciary attempted to reach out to FLDS persons and was initially optimistic that he could develop a positive working relationship.  Shortly thereafter, however, all of the Fiduciary's efforts were abruptly rejected.

---

[9] As soon as the Probate Action was commenced, there arose a number of disputes regarding the management and use of Trust property.  One day after the Court suspended the trustees, a large group of people dismantled an 18,000 square foot building on Trust land and hauled it away.  In the ensuing weeks, numerous other assets were taken off of Trust land, and there arose a number of disputes, some threatening to erupt in violence, regarding the use and occupancy of Trust land – including occupancy of homes and use of the Trust's cemetery.

32.  The Fiduciary was advised that Church leaders/trustees had instructed their followers to not cooperate with the Court or the Fiduciary and had forbidden them from acknowledging or honoring the authority of the Court with respect to the Trust.  (R. 3028, 3694-95).[10]

*Notice to the Trustees and the Beneficiary Class*

33.  From the beginning of the Probate Action through the completion of the reformation process, the Court allowed and encouraged the members of the beneficiary class to participate and be heard with respect to the Trust. While charitable trust beneficiaries do not have formal legal standing, the Court nevertheless provided that such members would be given notice and an opportunity to participate and provide input.  (R. 549-550, 895, 1996).

34.  The Court, the Attorneys General, and the Fiduciary went to great lengths to provide notice to the beneficiary class and to keep them informed of the Trust Probate process.  Formal service of process was accomplished upon the FLDS Church and the trustees of the Trust, through personal and substitute service.  (*See generally* R. 285, 299, 350-546).  Furthermore, Rodney Parker of Snow Christensen & Martineau (former and current legal counsel to the FLDS Church, its leadership and many of its members, including the present Plaintiff) was on the case service list from the beginning and received regular notice of filings.  (*See e.g.* R. 228, 424, 3766, 4001).  Moreover, notices regarding the Probate Action were published in newspapers in Utah, Colorado, Texas, and British Columbia. (R. 539-545).   In addition, the Fiduciary served multiple notices by mail to every single post office box in Hildale, Utah and Colorado City, Arizona, and by hand delivery to every residence on Trust land in Canada.  On other occasions, the Fiduciary served notices by hand delivery to every residence on Trust land.  Moreover, the Fiduciary held

---

[10] In the month following the commencement of the Probate Action, criminal charges were filed against Warren Jeffs for his involvement in performing the "marriage" of a young girl.   Warren Jeffs avoided arrest for more than a year.  He was caught and arrested in August, 2006, but he has nevertheless continued his wholesale refusal to communicate with the Fiduciary or otherwise abide by the orders of the Probate Court.

public information meetings in Short Creek and in Canada. (For a detailed summary of the many attempts to provide notice, *see* R. 13373-13375).

*The Court Seeks Input as to the Future of the Trust*

35.   With the trustees' abandonment of the Trust, and their refusal to participate in the Probate Action, the Court reached out to all interested individuals for guidance and input as to the future of the Trust. To that end, the Court invited interested individuals to submit proposals to the Court. Specifically, the Court declared that it would consider proposals from the Attorneys General, the suspended trustees, the FLDS Church, and the members of the Trust's beneficiary class (which the Court defined to mean any person who had contributed property, time, talents, or resources to the Trust). (R. 895).

*The Jeffs Adherents' Refusal to Participate*

36.   Notwithstanding the Courts' invitation, the Jeffs Adherents (including Plaintiff) chose to abstain from appearing or participating in the Probate Action. In addition, such persons refused to cooperate with the Fiduciary in his efforts to administer the Trust. (R. 1130). Despite the Fiduciary's attempts to reach out to the Jeffs Adherents for input and guidance as to how the Trust should be administered, the Jeffs Adherents, for the most part, refused to even communicate with the Fiduciary. (R. 13249-13250, 3694-3695).

37.   Moreover, the Jeffs Adherents took a number of actions to damage the Trust, to increase the costs and burdens of the Trust, and to interfere with the Fiduciary's administration of the Trust. Such actions include the destruction and removal of substantial property from Trust land. (R. 3059, 3581-3588, 16488, at p. 47). The Jeffs Adherents refused to acknowledge the authority of the Court or the Fiduciary, and continued to act as if the suspended trustees were still in control of the Trust. (R. 3694, 13695).

_Participation by Other Members of the Beneficiary Class_

38.  In stark contrast to the actions of the Jeffs Adherents, a significant number of members of the beneficiary class chose to acknowledge the authority of the Court and to respect the rule of law.  Such persons respond to the invitation of the Court and the Fiduciary to participate in the Probate Action, and provided input to the Fiduciary and the Court with respect to the future of the Trust.[11]

_The Motivation of the Jeffs Adherents_

39.  Although the Jeffs Adherents have never explained the motivation for their actions in 2005 and 2006 – in refusing to participate in the Probate Action and refusing to acknowledge the authority of the Court – such motivation is revealed in evidence which has subsequently come to light.  Such evidence shows the following:

A.  Shortly after the commencement of the Probate Action, Jeffs received favorable reports about Judge Lindberg and the Fiduciary.  He was told that the Judge and the Fiduciary "want[ed] to be friendly to our people" and that "our people feel like he and this judge will be kind and will allow us our rights and protect us."   (_See_ Exhibit "A" at 8/6/05 p. 418).

B.  Using racist imagery, Jeffs told his people that Judge Lindberg and the Fiduciary were "of the devil" and that their friendliness was "flattery." (_See_ id.).

C.  Jeffs instructed his followers that they must "continue to answer them nothing and not give into their proposals and ways." (_See_ id.).

D.  Jeffs stated that "we will not work out our differences so called with this judge and the government." (_See_ id.).

E.  Jeffs received regular updates as to the actions of the Court and the Fiduciary in the Probate Action.  (_See e.g._ id. at 7/29/05 p. 402 & 8/5/05 p. 415).

F.  Notwithstanding their being suspended as trustees, Jeffs and other trustees continued to exercise control and management over Trust property.  (_See_ id. at 7/28/05 p. 394).

---

[11]  In addition to participating in the Probate Action, such persons paid their share of property taxes, entered into occupancy agreements with the Trust, paid monthly occupancy fees, filed petitions for benefits with the Trust, and/or otherwise cooperated with the Fiduciary in administering the Trust.  (For a general description of activities taken by people in connection with the Fiduciary's administration of the Trust, see the Fiduciary's Reports, at Reports, at R. 1122, 3024, 3690, 4424, 5704, 6858, 7805, 8390, 9261, 10585, 11145, 12557, 17593).

G.    Shortly after the commencement of the Probate Action, Jeffs made arrangements for the destruction of many documents and for the sequestering of other documents into a vault in Texas. (*See* Exhibit "B" at 6/13/05 pp. 320-21).

## IV.  2005 to 2006:  Reformation of the Trust

*The Court Faces a Decision as to the Future of the Trust*

40.    With the trustees' breach of their fiduciary duties and wholesale abandonment of the Trust, the Court then faced an important decision as to what to do with the Trust.

41.    In the initial months after the commencement of the Probate Action, the Trust faced a number of crises with respect to control and management of the assets of the Trust.  For example, the Fiduciary received several reports of people dismantling buildings and other fixtures and removing them from Trust property.  There also arose disputes as to opposing claims as to the right to occupy certain residences upon Trust property, which included confrontational stand-offs involving the opposing claimants and the police. In addition, the Trust's assets were placed at risk due to the failure of many occupants to pay the property taxes owing with respect to Trust land.

42.    Thus, it was important for the Court to do something to preserve and protect the Trust.  To that end, the Court requested any and all interested persons, including the suspended trustees, the FLDS Church, and members of the beneficiary class, to provide input to the Court as to the future of the Trust. (*See* ¶ 35, above).

43.    Many members of the beneficiary class responded to the Court by providing recommendations to the Court.  All of the persons and entities who responded agreed that the Court should appoint new leadership for the Trust. (*See e.g.* R. 937, 1195, 1213, 2091).

44.    At this point, the Court basically had three options:  The Court could: (I) do nothing; (ii) terminate the Trust; or (iii) appoint new leadership to administer the Trust.

45. The Court concluded that doing nothing was not appropriate. To do nothing would be to violate a probate court's obligations to administer and protect the trust estate. Doing nothing would leave a void in leadership and cause chaos with respect to disputes as to the occupancy and use of Trust property and as to the payment of property taxes. It would also leave the Trust unprotected from those who would wrongfully usurp Trust property, including dismantling and removing buildings and fixtures.

46. Furthermore, doing nothing would result in the loss of the homes of the Trust beneficiaries – both FLDS and non-FLDS. Without intervention and the appointment of new leadership, the Trust would be left defenseless in the Tort Lawsuits (and yet-to-be filed lawsuits)[12] and would be subjected to large default judgment awards, resulting in the ultimate loss of the Trust's assets.

47. Next, the Court concluded that terminating the Trust was not appropriate. This was true for many reasons. If the Court were to terminate the Trust, the likely result would be the same as if the Court did nothing: a loss of the Trust's property in the Tort Lawsuits. The then-governing 1998 Restated Trust Declaration provided that if the Trust were ever terminated the property of the Trust would go to Warren Jeffs, as the FLDS corporation sole. At the time the Probate Action was filed, both Jeffs and the FLDS Church were defendants in the same Tort Lawsuits which had been filed against the Trust. Both of these defendants had defaulted in such lawsuits and default had been entered as to such defendants. Thus, terminating the Trust and transferring its property to Warren Jeffs would have made such property, once again, subject to the execution of default judgments in the Tort Lawsuits (and yet-to-be filed lawsuits). The Probate Action was commenced for the purpose of protecting the Trust's property from loss through default in the Tort Lawsuits by trustees who were breaching their fiduciary duties. It would be utterly senseless for the Court in such Probate Action to turn around and hand such property over to one of the selfsame breaching trustees who was also in default in the very same litigation.

---

[12] After the commencement of the Probate Action, the Trust was named as a defendant two additional lawsuits alleging claims based upon the conduct of the former trustees. (*See* n. 16, below).

48.   Furthermore, terminating the Trust and awarding its assets to Warren Jeffs (and/or the corporation sole he controlled) would be contrary to well-established principles of equity.  Warren Jeffs was the very man who was in breach of his fiduciary duties to the Trust.  His conduct subjected the Trust to potential liability (as asserted in the two Tort Lawsuits seeking large monetary damage awards and other lawsuits which were filed later), yet he refused to defend the Trust.  Warren Jeffs was also the man who had transferred Trust property away from the Trust as soon as the Tort Lawsuits were filed.  In addition, he had disobeyed the Court's Order to provide records and an accounting regarding the Trust.  Moreover, he had utterly refused to appear in the Probate Action to explain or justify his actions.

49.   To terminate the Trust and turn its assets over the corporation sole would be to reward Warren Jeffs for his misconduct.  As trustee of the UEP Trust, Jeffs held the assets of the Trust in trust only, and he was subject to the limitations of the 1998 Restated Declaration which provided that the assets be used for specific charitable purposes for members of a specified beneficiary class.  To terminate the Trust would be to place the Trust's assets under the control of Warren Jeffs with no restrictions as to his use of the assets and no requirement that they be used for charitable purposes.  This would destroy any charitable purpose for which the assets were pledged and would be to the detriment of the members of the Trust's beneficiary class.  Under such circumstances, the doctrines of equity, including unclean hands, prohibit termination of the Trust.

50.   In addition, terminating the Trust was contrary to the express language of the 1998 Restated Trust Declaration which provided that the Trust was to intended to have perpetual duration. Moreover, terminating the Trust was contrary to well-established legal principles, under the common law and Utah Trust Code, which disfavor the forfeiture of a charitable trust and favor, instead, reformation under the doctrine of *cy pres*.

51.   Thus, the Court chose to follow its third option: to appoint new leadership.  This option would provide the best chance for saving the homes of the people.  Newly-appointed leadership would be under a fiduciary duty to appear in the Tort Lawsuits and defend the Trust.  It would also manage the Trust's property, pursue the payment of the Trust's property taxes, and otherwise protect and defend the Trust.

52.   This third option was the choice of all persons who responded to the Court's invitation to provide input as to the future of the Trust.  Not a single person argued in favor of the first two options.  Rather, every person who appeared on the matter urged the Court to appoint new leadership in order to protect Trust property.

### _The Court Applies the Doctrine of_ Cy Pres

53.   The Court recognized that the appointment of new leadership would require reformation of the Trust.  The Court determined that such reformation could be accomplished through the doctrine of _cy pres_ (which doctrine is incorporated into Section 75-7-413 of the Utah Trust Code).  Such doctrine is based upon the premise that the law does not favor termination of a charitable trust, as it disfavors the forfeiture of property which has been pledged toward a charitable purpose.  Accordingly, where it becomes impossible or unfeasible for a charitable trust to continue under its existing charter, a trust charter should be reformed under the doctrine of _cy pres_, such that the charitable purpose of the trust is modified so as to render the trust feasible.  (_See e.g._ Matter of Gerber, 652 P.2d 937, 939-40 (Utah 1982)).

54.   In the present case, reformation of the UEP Trust was needed for at least two reasons.

55.   First, the Court determined that reformation of the Trust would be necessary to assure that the Trust not be used to promote illegal activity.  The Court was concerned that the Trust may be used to promote the unlawful practice of polygamy and/or the unlawful practice of sexual abuse of underage minors.[13]

---

[13] There was evidence to suggest that the Trust had been used for such unlawful purposes in the past.  For example, in the case of  United Effort Plan Trust v. Holm, 209 Ariz. 347, 101 P.3d 641, 643 (Ariz. App. 2004), the court

56.   Second, reformation was needed in order to appoint new leadership to manage the Trust.  As it stood,  any new leadership would have to come from outside the FLDS Church.  The FLDS had completely abandoned the Trust, and no FLDS adherent was willing to defend or administer the Trust. The Court recognized that the Trust would need to be reformed in order to allow for non-FLDS leadership. As the 1998 Restated Trust Declaration was written, it would be inappropriate for non-FLDS leadership to attempt to administer the Trust in accordance with one of its stated purposes.

57.   Specifically, the Court found that the Trust had two stated purposes under the Restated Trust Declaration: (I) to promote the doctrines and goals of the FLDS Church; and (ii) to provide for the just wants and needs of the beneficiary class.  The Court determined that because no FLDS person was willing to serve as new leadership for the Trust, the Trust could not appropriately be administered in a manner to promote the doctrines of the FLDS Church.  Thus, it was necessary to reform the trust instrument to focus exclusively on the second purpose of the Trust – to provide for the just wants and needs of the beneficiary class.  The religious purposes of the Trust were necessarily reformed because, under the law, it would not be appropriate for the Court, or any non-FLDS leadership, to make determinations as to what would, or would not, promote the doctrines of the FLDS Church.

58.   By reforming the Trust, the Court saved the Trust's property and assured that it would continue to be used toward one of the charitable purposes of the Trust.  Although such reformed purpose was not exactly the same as the original purposes stated in the Restated Trust Declaration, it was as close to such purposes as was reasonably possible under the circumstances. Without reforming the Trust to modify its impossible, impracticable and/or illegal purposes, the Trust would have failed and its assets would have been lost.

---

addressed a situation where Warren Jeffs attempted to evict a family from their home on Trust property within 10 minutes after the mother withdrew her consent for her 15-year old daughter to "marry" a 39-year old man.

*The Process of Reforming the Trust*

59.   On December 13, 2005, the Court issued a 28-page Memorandum Decision setting forth its findings and analysis with respect to the reformation of the Trust.  (R. 3452).  The Memorandum Decision sets forth the framework for a the creation of a reformed trust instrument which would allow the Trust to survive despite FLDS leadership's abandonment of the Trust.  (*Id.*).

60.   Thereafter, the Fiduciary, the Attorneys General, and some of the members of the Trust's beneficiary class cooperated in preparing a proposed reformed trust declaration in accordance with the Memorandum Decision.  (*See e.g.* R. 937, 1195, 1213, 2091).  The parties published broad notice of the proposed reformation and invited interested individuals to appear and be heard with respect to such matter. Not a single person or entity submitted any objection to the Court's Memorandum Decision, or to the specific proposals for reformation of the Trust.  (*See* docket).

61.   On October 25, 2006 (more than four years ago), the Court completed the formal reformation of the Trust pursuant to the execution of the Reformed Declaration of Trust of the United Effort Plan Trust Dated October 25, 2006 (the "Reformed Trust Declaration").  (R. 6537 (copy in Plaintiff's Appendix)). At the same time, the Court executed an Order formally removing the trustees of the Trust and certifying the trust reformation as a final judgment under Rule 54(b) of the Utah Rules of Civil Procedure.  (R. 6538).  (The Reformed Trust Declaration and accompanying Order are hereinafter collectively referred to as the "Reformation Judgment").

62.   No party or individual filed any appeal or other opposition with respect to the Reformation Judgment.  Accordingly, 30 days later, on November 25, 2006, the Reformation Judgment became final and non-appealable.

*Reliance Upon the Validity of the Reformation of the Trust*

63.   Subsequent to the Court's ruling in the Probate Action, numerous people changed their lives in reliance upon the Court's final and non-appealable Reformation Judgment. Indeed, The Fiduciary is aware of many actions taken by many people in relying upon the validity of the rulings of the Court.

64.   Such actions include uprooting families and relocating to housing upon Trust property; devoting time and effort to improving homes upon Trust property; settling legal claims against the Trust; entering into occupancy agreements and/or leases with the Trust; making personal religious beliefs publicly known (in reliance on the Court's assurance of religious neutrality in the management of the Trust); paying property taxes for Trust property; submitting petitions for benefits to the Trust; devoting time and resources in assisting the Trust and the Fiduciary; entering into contracts with the Trust through the Fiduciary; and purchasing property from the Trust. (For a general description of activities taken by people in connection with the Fiduciary's administration of the Trust, see the Fiduciary's Reports, at R. 1122, 3024, 3690, 4424, 5704, 6858, 7805, 8390, 9261, 10585, 11145, 12557, 17593).

65.   With the Court's suspension and removal of the former trustees, people reasonably expected to be able to reside upon Trust property, and to freely make improvements to such property, without the threat of losing their homes and improvements based upon their religious beliefs – as had happened under the administration of the former trustees. (*See* Jeffs v. Stubbs, 970 P.2d 1234 (Utah 1998)).

66.   Similarly, they also expected that they would not be subjected to an eviction action for refusing to support the "marriage" of young girls to much older men – as had happened under the administration of the former trustees.  (*See* United Effort Plan Trust v. Holm, 209 Ariz. 347, 101 P.3d 641, 643 (Ariz. App. 2004) (Warren Jeffs' attempt to evict family from home on Trust property within 10 minutes after mother withdrew her consent for 15-year old daughter to marry 39-year old man)).

67.   Those who have taken action in reliance upon the Court's orders include members of the Trust's beneficiary class as well as third parties who are not eligible for benefits under the Trust.  This includes a number of professionals – legal, engineering, and accounting – who have rendered professional services to the Trust in accordance with the rulings of the Probate Court and in reliance upon the validity of the same.   Many of such professionals have continued to render services without receiving immediate payment from the Trust in reliance upon the Court's rulings that, when liquid funds become available, the Trust will pay its debts to its professionals.

68.   A number of people have settled, waived, and/or otherwise forborne from pursuing legal claims in reliance upon the final Reformation Judgment and other rulings of the Probate Court.

69.   At the time the Probate Action was commenced, a number of people claimed that the 1998 restatement of the Trust was improper and invalid.  They asserted that the Restatement was in improper and illegal attempt by the Rulon Jeffs faction to usurp the assets of the Trust, to the exclusion of numerous other people who were members of the Priesthood Work and who had donated property to the Trust.  Such people chose to forebear from challenging the validity of the 1998 Restated Trust Declaration in reliance upon the validity of the Court's rulings in the Probate Action – in removing the former trustees and reforming the Trust.

70.   After the Fiduciary was appointed, a number of people alleged legal claims against the Trust as a result of the conduct of Warren Jeffs and the former trustees.  Most were dissuaded from filing legal actions against the Trust based upon the fact that Warren Jeffs and the other trustees had been suspended, that the abuses which had occurred under the former trustees had stopped, and that the Trust would be reformed.  (R. 8410; 3708-3709).

71.   Similarly, the plaintiffs in the Tort Lawsuits substantially changed their position in reliance upon the reformation of the Trust.  At the time the Probate Action was commenced, such plaintiffs were on the

cusp of obtaining default against the Trust.  However, after the Court entered its ruling with respect to reformation of the Trust, such plaintiffs agreed to settle their claims against the Trust on terms which were favorable to the Trust.  Such plaintiffs did so in reliance upon the rulings of the Court.  They did so in reliance upon the fact that Warren Jeffs, whose conduct formed the basis for their complaints, was permanently barred from asserting control over the Trust, and that the abuses which had occurred under Warren Jeffs would not continue.  (R. 8026).

72.   Those who acted in reliance upon the orders of the Probate Court have one thing in common.  They all showed respect for the rule of law and the authority of the Court.  Knowing that the Reformation Judgment was final and non-appealable, they chose to respect such judgment and order their lives in reliance upon it.

## V.  2006 to 2008:  Post-Reformation Operations of the Trust

*The Fiduciary's Administration of the Trust*

73.   In fulfilling his Court-appointed duties, the Fiduciary was guided in all things by the rulings of the Court – particularly the Memorandum Decision and the Reformation Judgment.  The Reformed Trust Declaration is the Trust's "constitution" which has governed the Fiduciary's administration of the Trust.  The Fiduciary takes very seriously his obligations under the Reformed Trust Declaration to protect the assets of the Trust and to provide for the just wants and needs of the beneficiary class in a religiously-neutral manner.   (R. 13257, 17659).

74.   In fulfilling his duties, the Fiduciary has undertaken myriad difficult and complex tasks on behalf of the Trust.[14] Such tasks involved significant time and effort on the part of the Fiduciary, his assistants,

---

[14]  Such tasks included, but are not limited to: (1) pursuing fraudulent transfer litigation for the recovery of property transferred away from the Trust; (2) investigating and inventorying the assets of the Trust; (3) pursuing claims for breach of trust against the suspended trustees, the FLDS Church, and those acting with them; (4) participating in the Trust reformation process; (5) managing the assets of the Trust; (6) protecting the property of the Trust; (7) investigating the theft of property attached to Trust lands; (9) obtaining injunctive relief to help stop the theft of Trust property; (9) attempting to achieve payment of the Trust's property taxes; (10) establishing a process for

engineers, and legal counsel – and necessarily resulted in the Trust's incurrence of costs and expenses. Among numerous other things, the Fiduciary defended the Trust against lawsuits which have been filed against it.[15]   Notwithstanding the fact that the prior trustees had defaulted in the Tort Lawsuits, the Fiduciary was able to make an appearance and defend the interests of the Trust in such litigation. Eventually, the Fiduciary was successful in reaching a settlement agreement as to both lawsuits on terms which were favorable to the Trust.

75.   In addition, the Fiduciary reached successful settlement agreements in the fraudulent-transfer lawsuit which resulted in the Trust receiving (1) a return of the manufacturing building, valued at approximately $1,600,000; (2) a return of 715 acres of land; and (3) approximately $1,600,000 in cash.[16]

76.   The Fiduciary's primary goal is to provide for the housing of the beneficiary class by transfer of deeds of outright ownership to individual members.  To that end, the Fiduciary has sought to subdivide the Trust's property and has established a process for the submission of petitions for benefits by members of the beneficiary class.  The Fiduciary desires to distribute deeds of outright ownership without regard

_____

members of the beneficiary class to submit petitions for benefits from the Trust; (11) considering petitions for benefits received from members of the beneficiary class; (12) seeking to meet the housing needs of Trust beneficiaries; (13) seeking to accomplish the survey and subdivision of the Trust's residential property; (14) seeking governmental approval for the subdivision of the property; (15) enforcing the Trust's legal rights through mandamus litigation; (16) resolving disputes as to the use of Trust property; (17) overseeing litigation involving the Trust; and (18) seeking a source of funding for the Trust's financial obligations; and (19) submitting regular reports to the Court.  (For further details as to the actions of the Fiduciary, see the Fiduciary's Reports, at R. 1122, 3024, 3690, 4424, 5704, 6858, 7805, 8390, 9261, 10585, 11145, 12557, 17593).

[15] This included the two Tort Lawsuits which were filed prior to the appointment of the Fiduciary.  It also includes two additional lawsuits which were filed after the Fiduciary was appointed, but which were based upon the conduct of the trustees prior to their suspension:  (1) M.J. v. Jeffs, et al., Case No. 070916524 in the Third District Court of Salt Lake County, Utah (asserting a multi-million dollar claim against the Trust on the grounds that Warren Jeffs caused the rape of an underage "bride"); and (2) Commercial Services of Perry v Wisan,  Case No. 080500593 in the Fifth District Court of Washington County, Utah (alleging the existence of a creditor's lien upon Trust property).  (R. 17612-17613).

[16] Later, the Fiduciary was successful in obtaining a default judgment in the Trust's lawsuit against the former trustees and the FLDS Church.  Through judgment collection efforts, the Trust  obtained ownership of the companies which own the Harker dairy farm in Beryl, Utah  – which was then valued at approximately $5 million. Thus, the Fiduciary has brought property into the Trust valued at approximately $10 million.

for the religion of the petitioning beneficiaries.  Such distributions would be without restriction or limitation, such that the recipients would be free to transfer the property to any person or entity of their liking – including Warren Jeffs and/or the FLDS Church.[17]  (R. 17675-17678).

*The Fiduciary's Attempt to Subdivide the Trust's Property*

77.  One of the initial problems identified by the Fiduciary is the fact that the Trust's property is not adequately subdivided into separate legal parcels with respect to the residences which are situated on Trust property.   At present, the Trust's real property (which consists of approximately 5,000 acres) is divided into approximately 175 legal parcels.   Many of the Trust's legal parcels contain a large number of different residences.  This has caused a number of problems for the Trust.  It has greatly complicated the collection and payment of the Trust's property taxes and has threatened the security of those residents who have paid their fair share of property taxes.[18]  Furthermore, the lack of adequate subdivision has restricted the Trust's ability to sell Trust property and/or to distribute residences to qualifying beneficiaries.

78.  Thus, from early on, the Fiduciary recognized that it would be necessary and appropriate to subdivide the Trust's property such that each residence would be situated on its own legal parcel.  To this end, the Fiduciary engaged the services of an engineering firm to survey the property and prepare plat

_____

[17]Alternatively, should a beneficiary desire to not receive an outright deed, the Fiduciary is willing to accommodate such desires.  The Fiduciary will not force anyone to accept a deed.  As to those beneficiaries who would otherwise be granted a deed, the Fiduciary is willing to maintain the status quo and allow rightful beneficiaries to reside on Trust property (so long as they abide by the minimum occupancy requirements approved by the Court).

[18] For example, consider a situation where ten residences are situated on a single legal parcel.  For tax purposes, the property is treated as a single parcel with a single property tax obligation.  Assume that five of the residents pay their fair share of the property tax obligation, and that five others fail to do so.  In such circumstances, the amount of the tax payments made by the paying residents would be insufficient to meet the tax obligation for the parcel.  Thus, the paying residents would be obliged to come up with more money to pay the unpaid portion of the tax obligation (to make up for those freeloading residents who failed to pay their share of taxes), or else they would risk losing their homes at a tax foreclosure sale.  By subdividing the parcel, such that each residence is placed into a separate legal parcel, this problem would be avoided, and the people would be rendered more secure in their homes.  They could pay their property taxes with the knowledge and confidence that they would not be subject to foreclosure based upon their neighbors' failure to pay.

maps.  After great effort, the engineers completed a survey of all of the Trust's property in Hildale and Colorado City, at a cost of hundreds of thousands of dollars.

79.  However, when the proposed subdivision plats were submitted to the City of Hildale, the Fiduciary was unable to obtain approval from the City.[19]  The City informed the Fiduciary that it would not approve or deny the subdivision application, but that it had elected to "abstain" from even considering the Fiduciary's application.  The City further stated that it would not oppose a mandamus action filed for the purpose of compelling approval of the subdivision plats.

80.  Accordingly, in January 2007, the Fiduciary was obliged to incur time and expense in filing a mandamus action against the City of Hildale seeking to compel the recording of the Trust's subdivision plats.[20]

_The Trust's Liquidity Problems_

81.  One of the problems which has beset the Trust from the beginning of the Probate Action has been a lack of liquid funds to meet the expenses of the Trust.  While the Trust has many assets, such assets consist almost exclusively of illiquid assets – land and improvements. (R. 1130, 3037-3039, 3070). Thus, the Trust is obliged to liquidate assets and/or find alternative sources of funding in order to meet its ongoing expenses.  (R. 13261, 17627-17631).

82.  After the commencement of the Probate Action, the Trust incurred substantial expenses and attorney's fees (_see e.g._ R. 3216A, 3367, 3768, 3937, 7566, 7766), most of which were caused and/or

---

[19] Likewise, the Fiduciary was unable to obtain approval from Colorado City.  Shortly after the application was filed, the City quickly enacted a restrictive subdivision ordinance (when it had had no subdivision ordinance in the past) and attempted to create a number of roadblocks to stop subdivision of the Trust's property.

[20] Unfortunately, the Fiduciary has still not accomplished a recording of the Hildale subdivision plats.  Although Hildale City defaulted in the litigation, a number of other Jeffs Adherents, who are wholly hostile to the Fiduciary, subsequently got involved and attempted to stop the approval of the subdivision plat.

exacerbated by the actions (and inactions) of the former trustees and the Jeffs Adherents.  (R. 17604-17605).

83.    Initially, the Fiduciary was able to obtain liquid funds sufficient to meet the ongoing obligations and attorneys' fees of the Trust.  However, as time went on, and as the costs and expenses of the Trust increased, the Trust found itself unable to meet its financial obligations. (R. 10624, 11180).

84.    After consultation with the Court, the Fiduciary devised two methods to raise liquid funds: (I) collect assessments from the occupants of Trust property; and/or (ii) sell Trust property. (R. 17627-17631).

85.    The Fiduciary first attempted to raise funds by assessing each residence on Trust land in Colorado City and Hildale a modest $100 monthly occupancy fee.[21]  Unfortunately, this method proved to be inadequate because a majority of occupants joined together in refusing to make their monthly assessment payments. Thus, the assessment payment funds received by the Fiduciary were not sufficient to satisfy the expenses of the Trust. (R. 10608-10610, 17632-17634).

86.    Next, the Fiduciary determined that it would be necessary to sell property in order to meet the financial obligations of the Trust.  In choosing which property to sell, the Fiduciary sought to avoid selling residential property or other property which would be disruptive to those residing on Trust property.

87.    The Fiduciary first desired to sell certain non-residential property located outside of the Short Creek community which the Fiduciary had recovered for the Trust in litigation in 2005.  Unfortunately, the Fiduciary was unable find a willing buyer for such property.

88.    The Fiduciary then attempted to sell a dairy farm located in Iron County, Utah.  Such dairy farm was not originally an asset of the Trust, but the Trust had obtained ownership of the companies which

---

[21] The raising of funds through collecting payments from the residents of Trust property is consistent with how the Trust historically raised funds prior to the appointment of the Fiduciary.  Indeed, under the administration of the former trustees, the Trust incurred millions of dollars in attorneys' fees expenses, which expenses were funded through payments received from the residents.

owned the dairy farm in litigation commenced by the Fiduciary in 2006.  Unfortunately, the Fiduciary's attempt to sell the dairy farm was prevented by certain Jeffs Adherents' recording of encumbrances against the property and filing of two separate lawsuits seeking to stop the sale. (R. 11176, 12579-12582, 17614-17616).

89.   Next, with no other viable alternatives, the Fiduciary determined to sell certain farm property known as the Berry Knoll farm.

*The Berry Knoll Farm*

90.   The Berry Knoll property consists of vacant farm ground situated in the southwest portion of Colorado City.  The farm has never been a financially-viable endeavor for the community.  Despite the fact that machinery, labor, etc., have been donated, the farm was never a economically-viable source of food for the community or the community's cattle.

91.   In the past, the property was farmed by Merlin Jessop (a member of the Plaintiff Association) acting at the direction of a former trustee of the Trust.  Under Merlin Jessop, the farming operations were never profitable and were heavily subsidized by the trustees of the Trust.  By 2004, Merlin Jessop had stopped farming the property, and irrigation equipment has been removed from the property.  When the Fiduciary was appointed in 2005, the property has been abandoned for some time.  (R. 13891-13892*, 16448, at pp. 22-23, 47, 53-56).

92.   In 2007, the Fiduciary received a number of complaints about the condition of the property.  People complained that the property had become a dustbowl and that blowing sand was causing a nuisance in the community.  Accordingly, the Fiduciary made efforts to find someone who would be willing to farm the property. (R. 16488, at pp. 55-56).

93.   The Fiduciary first sought to have Merlin Jessop return to the property and resume his farming operations.  On multiple occasions, the Fiduciary's assistant contacted Merlin Jessop and asked him to

farm the property.  Each time, however, Merlin Jessop declined – stating that he was not interested in farming the property or entering into any kind of lease or agreement with the Fiduciary.  After several attempts, the Fiduciary was finally successful in finding a willing lessee, Shane Stubbs, who entered into a lease agreement with the Trust in April, 2008.  (R. 16488, at pp. 50-51, 53-56).  As Mr. Stubbs farming needs changed, the lease agreement was subsequently amended on occasion by agreement of the parties.

94.    Later, when the Fiduciary's liquidity problems became severe, the Fiduciary determined that it would be necessary to sell a portion of the Berry Knoll farm property.  (R. 13556).  After initial inquiries and marketing efforts, the Fiduciary located a potential buyer who made an offer for a portion of the property.  Such offer was subject to (I) approval of the Court; and (ii) better offers.  (R. 13556, 16785, 16796).  To date, however, the Trust has been unable to complete the sale of the Berry Knoll property as a result of the Jeffs Adherents' voluminous litigation attacks.  (*See* ¶ 97, below).

## VI.  2008:  The Trust Comes Under Attack

*The Jeffs Adherents' Change of Tactics*

95.    After refusing to participate in the Probate Action for more than three years, in August 2008, the Jeffs Adherents suddenly changed their tactics and began a rampage of vexatious litigation against the Trust.  The Jeffs Adherents engaged the Trust's former legal counsel, and numerous other law firms, and lodged an all-out litigation assault designed to collaterally attack the Court's reformation of the Trust, to cripple the Fiduciary's ability to administer the Trust in accordance with the Reformed Declaration of Trust, and/or to starve the Trust of funds needed to defend itself in litigation.  (R. 17603-17606).

96.    In all, the Jeffs Adherent (including the present Plaintiff) employed the services of eight different law firms to attack the Fiduciary, the Trust, and the Court in several different courts.  Underlying each of Jeffs Adherents' various attacks was a refusal to accept the fact that the Trust has been reformed.   (R. 13243, 13253-13258).

*Numerous Attempts to Stop the Sale of the Berry Knoll Property*

97.   Initially, the focus of Jeffs Adherents' litigation attacks was to prevent the sale of the Berry Knoll

property. This included litigation attacks in four different Courts seeking to stop the Court from even

holding a hearing on the proposed sale:

A.   The Jeffs Adherents filed at least six different filings in the Probate Court designed to stop the sale of the property.  (R. 13193, 13826, 13940, 13965, 14582, 14624.)

B.   In October, 2008, Plaintiff's counsel filed the present lawsuit against the Fiduciary, the Attorneys General, and Judge Lindberg in the United States District Court for the District of Utah, Case No. 2:08-CV-772.  On November 5, 2008, the plaintiffs filed a Motion for Temporary Restraining Order in such lawsuit – seeking to enjoin the Probate Court from holding the scheduled hearing on the sale of the Berry Knoll property. (R. 17618-17620).

C.   On November 7, 2008, The Jeffs Adherents filed a lawsuit in Arizona State Court, together with an Emergency Application for Temporary Restraining Order, again seeking to enjoin the sale of the property.  Case No. CV2008-2047 in the Superior Court of Mohave County, Arizona.  (R. 17620-17621).

D.   On November 10, 2008, The Jeffs Adherents filed a Rule 8 Petition for Emergency Relief in the Supreme Court seeking to enjoin the Probate Court from holding a hearing on the sale of the property.  Case No. 20080928-SC.  (R. 17621-17622).

E.   The Jeffs Adherents also attempted to stop the sale by recording improper notices of interest as encumbrances against the property.  (R. 17629).

*Other Vexatious Litigation*

98.   In addition to the above-stated attacks, the Trust was subjected to many other vexatious lawsuits

and litigation attacks in 2008 – all by Jeffs Adherents.

A.   In March, 2008, the Trust was sued by Sterling Harker and William Harker (a Jeffs Adherent) in an effort to prevent the sale of the Trust's dairy farm, Case No. 080500225 in the Fifth District Court of Iron County, Utah.   (R. 17614).

B.   In July, 2008, a law firm (representing the cities of Hildale and Colorado City and their citizens) issued a press release stating that "the days of the FLDS not defending themselves in Court is over." (R. 12573, 12937).  Thereafter, the law firm initiated a number of litigation attacks against the Fiduciary – in the Probate Action and elsewhere – including attacks on the proposed sale of the Berry Knoll farm property.  (*See e.g.* R. 11961, 14098)

C.   In July, 2008, a lawsuit was filed by Ammon Harker and a number of other Jeffs Adherents asserting claims to the Trust's dairy property. Case No. 080500538 in the Fifth District Court, Iron County, Utah.  (R. 17615-17616).

D.   On August 29, 2008, the former trustees and the FLDS Church filed a lawsuit against the Fiduciary alleging fraud upon the court in connection with the Trust's obtaining default judgment in its 2006 lawsuit, Case No. 080918199 in the Third Judicial District Court of Salt Lake County, Utah. (R. 17617).

E.   On September 10, 2008, a Trust beneficiary, Guy Steed, filed a lawsuit against the Trust challenging the Fiduciary's ability to control the property of the Trust,  Case No. 080502450 in the Fifth District Court of Washington County, Utah.  (R. 17617-17618).

*The Motivation of the Jeffs Adherents*

99.   Although the Jeffs Adherents have never adequately explained the motivation for their actions in 2008 – in suddenly attacking the Fiduciary after years of silence – such motivation is revealed in evidence which has subsequently come to light.

100.   Such evidence shows that, while incarcerated in the Washington County Jail, Jeffs modified his "answer them nothing" command and issued a new instruction to some of his followers.  Specifically, Jeffs instructed Willie Jessop to lead a coalition of followers, hire legal counsel, become involved in the Probate Action, and "demand[] to have their rights protected concerning their homes."  (R. 19571 & 19572).  Willie Jessop was further told to conceal Warren Jeffs' role in the new litigation strategy, as Jeffs instructed the so-called "coalition" to appear "as a group of individuals . . . without bringing in the authorities of the Church."  (*Id.*).

*The Litigation Stay*

101.   On November 14, 2008, the Court in the Probate Action ordered that it would delay ruling on the proposed sale of the Berry Knoll farm in order to give the parties an opportunity to pursue settlement negotiations.  In so doing, the Court recognized that the stay of the sale would prevent the Trust from receiving the badly-needed funds from the sale of the property, and would accordingly hinder the Trust's

ability to defend itself in litigation.  Accordingly, the Court entered a litigation stay enjoining any and all

parties from pursuing litigation against the Trust without obtaining leave of the Probate Court. (R. 14707).

## VII.   2009: Continued Litigation Attacks

*Continued Litigation Attacks After the Entry of the Litigation Stay*

102.  In violation of the litigation stay, the Plaintiff continued to pursue legal attacks against the Trust

in 2009.  ( R. 15229, 15283, 15324, 15244, 19027, 19611, 19648.)

103.  In addition to the above-reference attacks, the Plaintiff filed a frivolous, misleading attack on the

Fiduciary related to the sale of some cattle by the Trust's dairy farm.  (R. 14754.)

104.  Furthermore, in 2009, the Plaintiff was involved in the filing of four appeals/petitions with the

Supreme Court: (I) Case No. 20090691-SC; (ii) Case No. 20090859-SC; (iii) Case No. 20091006-SC; and

(iv) a petition for emergency relief, dated December 29, 2009 (filed in Case No. 20090859-SC).  (R.

17623, 17626-17627).

105.  In addition to Plaintiff's attacks, a number of other Jeffs Adherents violated the litigation stay by

initiating additional legal proceedings against the Trust in 2009 – without obtaining relief from the

litigation stay, as follows:

A.   In the Probate Action, numerous motions were filed in violation of the litigation stay.  (R. 16506,
19830A, 16870, 16892, 19513.)

B.   On September 4, 2009, a lawsuit was filed against the Fiduciary and his accounting firm by
Roland Cooke in the United States District Court for the District of Arizona, Case No. 3:09-CV-
8152.  (R. 17624).

C.   On September 23, 2009, a lawsuit was filed by Guy Ream, purportedly acting on behalf of the
UEP Trust and FLDS Church, against Judge Lindberg, the Utah Attorney General, the Fiduciary,
and the State of Utah in the United States District Court for the District of Utah, Case No. 2:09-
CV-856, attacking, among other things, the reformation of the Trust. (R. 17624-17625).

D.   On September 23, 2009, the municipalities of Hildale and Colorado City filed a Petition for
Extraordinary Relief with the Supreme Court seeking to enjoin the Probate Court from
authorizing the sale of the Berry Knoll property, Case No. 20090781-SC. (R. 1762-17626).

106.  Thus, despite the litigation stay, the Trust continued to face an onslaught of litigation attacks and has continued to incur legal fees – thereby worsening its liquidity crisis.

*Plaintiff Usurps Control Over the Berry Knoll Property*

107.  In connection with their change of litigation tactics, the Jeffs Adherents also changed its position with respect to the use of the Berry Knoll farm property.  Having refused to farm the property for several years, and having allowed the Fiduciary to lease the property to someone else, the Jeffs Adherents suddenly decided to claim the property for themselves through self-help – without obtaining the consent of the Fiduciary or the Court and knowing that the property had been leased to someone else.  (JR. 16488, at pp. 50-51, 55-56; R. 17642-17644).

108.  The Jeffs Adherents placed sheep and cattle on the property, destroyed crops planted by Shane Stubbs, the rightful lessee, and planted their own crops on the property.  The Fiduciary attempted to have the trespassers removed from the property, but the Colorado City police officers refused to do anything. To this day, the Jeffs Adherents continue to usurp control over the property, in violation of the instructions of the Fiduciary and the rights of Shane Stubbs.  (R. 16488, at pp. 50-51, 55-56; R. 17642-17644)

**VIII.  2010: Continued Litigation Attacks/Judicial Rulings Rejecting the Collateral Attacks of the Jeffs Adherents**

109.  In 2010, the Fiduciary was again obliged to defend the Trust in litigation on numerous fronts without receiving funding necessary to pay ongoing expenses or past obligations.

110.  Not only was the Fiduciary required to defend against attacks in the previously-filed lawsuits which were still pending against the Trust, he was also obliged to defend the interests of the Trust in new lawsuits filed in other jurisdictions which sought to collaterally attack the rulings of the Probate Court:

A.  Jeffs v. Stubbs, Case No. CV2010-02219 in the Mohave County Superior Court, State of Arizona; and

B.  Jeffs v. Stubbs, Case No. 100502422 in the Fifth Judicial District Court of Washington County, Utah.

111.  Furthermore, the Jeffs Adherents raised new litigation against the Fiduciary by filing a Motion to Intervene in the Trust's pending mandamus action for the subdivision of the Trust's Property (Case No. 070500105 in the Fifth District Court of Washington County).  Therein, the Jeffs Adherents sought to file a counterclaim against the Fiduciary, which counterclaim sought the same remedies previously sought in the Utah Supreme Court and which included a Section 1983 action against the Fiduciary.

112.  To date, the Fiduciary has been successful in obtaining the dismissal of three collateral attacks which have been filed against the 2006 Reformation Judgment in courts outside the Probate Action. (discussed in Part IX, below).

113.  The Fiduciary has continued his attempts to complete the sale of the Berry Knoll farm property. The Fiduciary has proposed a sales procedure which provides that the property be sold to the best bidder after providing notice and opportunity for an auction sale.   The Fiduciary has filed a motion with the Probate Court seeking approval of such proposed sales procedure, which motion has been fully briefed and is under advisement by the Court.  To date, all attempts to sell the property have been met with hostile resistance by the Jeffs Adherents.  Furthermore, given that the Jeffs Adherents have filed encumbrances against the property in Arizona, there may remain significant litigation yet before the sale is completed. Nevertheless, the Fiduciary is optimistic that  all obstacles may be overcome, and that the Fiduciary may be successful in completing a sale to the  the best bidder, whomever that may be.

114.  The Fiduciary has continued his efforts to accomplish a subdivision of the Trust's property.  There has been significant action in the Trust's mandamus action litigation in the Fifth District Court of Washington County.  In October, 2010, the court denied a number attacks filed by  the Jeffs Adherents. However, a judgment has not yet been entered because of the filing of the Plaintiff's Renewed Motion for Temporary Restraining Order in the present case, and the Fiduciary's subsequent agreement to not submit the subdivision plats for recording until this Court's December 3rd  hearing on the present Motion.

## IX.  Today:  The Trust in Crisis

115.  Today, the Trust faces a serious liquidity crisis and litigation crisis.

116.  The Trust is in a liquidity crisis because it has incurred in excess of $4 million in unpaid professional fees going back to 2007 without being able to raise the funds needed to pay such fees.  (R. 17627-17629, 17669-17675).  The Trust's efforts to generate funds for the payment of expenses has been stymied at every turn by the Jeffs Adherents (despite the Trust's repeated victories in Court against the Jeffs Adherents).  The Trust's inability to pay its financial obligations has placed a serious burden upon the Trust, the Fiduciary, as well as its legal counsel and engineers.[22] (R. 17672-17675).

117.  The Trust is in a litigation crisis due to the bombardment of legal attacks.  Since 2008, the Trust has been a party in 25 different civil actions and appeals, most of which are still pending.  (R. 17602-17626).  The Trust's ability to defend itself in such litigation has been severely compromised because of its inability to pay its financial obligations.  During much of the time that the Jeffs Adherents have used the services of eight different law firms in attacking the Trust, the Trust has had only one primary law firm to defend its interests.[23]  (R. 17669-17673).

118.  Plaintiff has effectively employed a two-pronged approach in attacking the Trust: (I) inundate the Trust with overwhelming litigation; while (ii) starve the Trust of desperately-needed funds.  (R. 17627-17631).  The combination of the liquidity crisis and litigation crisis threatens the very survival of the

---

[22]  The Trust's financial obligations were reasonably and necessarily incurred by the Trust in the course of the Fiduciary's fulfillment of his Court-appointed duties.  The substantial legal fee obligations were caused primarily by the overwhelming amount of litigation facing the Trust.  (R. 17602-17627, 17669-17675).  Even so, the total amount of the Trust's debt is only a small fraction of the value of the Trust's assets, and is less than the value of the property which the Fiduciary has brought into the Trust since his appointment.

[23]  The Trust's lack of funding has made it difficult for the Trust to find other counsel willing to represent the Trust. Fortunately, the Fiduciary has been successful in obtaining the services of some additional law firms, who have been willing to represent the Trust in certain areas on a delayed-payment basis. This, along with the litigation stay, has saved the Trust from defaulting in the many lawsuits filed against it, and has allowed the Trust to survive for the time being. However, without a source of funding in the near future, it will be extremely difficult for the Fiduciary and legal counsel to continue to defend the interests of the Trust beyond the beginning of the new year. (R. 17680-17681).

Trust. The Trust faces a serious risk that it may be unable to defend itself in litigation, and may be forced to default in one or more of the lawsuits filed against it.  It is critical that the Plaintiff's multiple collateral attacks on the Reformation Judgment be summarily rejected, and that the Trust be permitted to raise the funds necessary for the preservation of the Trust.

**X.      Relevant Decisions by Other Courts who Have Considered Collateral Attacks on the Reformation Judgment**

119.  Over the past several months, three courts have had occasion to rule with respect to collateral attacks which have been brought against the Reformation Judgment by various Jeffs Adherents:

*The Decision of the Utah Supreme Court*

120.  On August 27, 2010, the Utah Supreme Court entered its opinion with respect to the Petition for Extraordinary Writ filed by the Plaintiff in Case No. 20090859. (*See* Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg, 238 P.3d 1054 (Utah 2010)).  That case was filed by the same Plaintiff who filed the present case in this Court.  In that case, the Plaintiff asserted virtually-identical claims and arguments as the Plaintiff has asserted in the present case.  (*See* id. at 1062  (noting that "The FLDS Association has also filed a substantially similar lawsuit along with a substantially similar affidavit by Willie Jessop in federal district court.")).

121.  In dismissing Plaintiff's Petition for Extraordinary Writ, the Utah Supreme Court relied primarily on the doctrine of laches to determine that Plaintiff was too late to challenge the reformation of the Trust. (*See id.*, at 1062-64).  The Court noted that the reformation of the Trust was finalized in 2006, and that the Plaintiff had failed to provide any reason for its failure to challenge the Trust in a timely fashion.  (*Id*. at 1064 ("the FLDS Association has given no adequate explanation for its delay in appealing or otherwise petitioning for relief.")).

122. The Court further found that the Plaintiff's delay had caused injury to those who relied upon the validity of the Reformation Judgment. In describing the prejudice that had resulted from Plaintiff's lack of diligence, the Court stated as follows:

> This lack of diligence has caused injury to those who relied on the Trust's modification during the FLDS Association's delay. The Utah AG aptly describes how the FLDS Association's delay has worked to the disadvantage of others:
>
>> In the meantime, the Special Fiduciary reasonably relied on the presumptively valid appointment and reformation orders. He has made choices over the years, many expressly approved by Judge Lindberg, that cannot be undone. He has incurred irrevocable obligations and expenses for the Trust during the last four years. Other interested persons, including Trust Participants who are not members of the Petitioner association, have also made irreversible decisions and changed their positions based on these unappealed and heretofore unchallenged final orders.
>
> Further, the Original Interested Individuals, whose looming default judgments led to the district court's reformation of the Trust, have expressed that their settlements with the Trust were predicated upon the Trust's reformation. That is, "[h]ad it not been for the UEP Trust's reformation, the Original Interested Individuals would never have settled their lawsuits against the Trust." The FLDS Association's delay in filing this petition has injured the Original Interested Individuals because it has caused the Individuals to change positions on their own claims, and any relief we granted the FLDS Association would operate against the interests of the Original Interested Individuals.
>
> In sum, many individuals have relied upon the district court's final order from over three years ago, and the FLDS Association has given no adequate explanation for its delay in appealing or otherwise petitioning for relief. The FLDS Association has shown a lack of diligence in challenging the modification of the Trust, and this lack of diligence has operated to the detriment of others. The FLDS Association offers no adequate explanation for its delay and no other circumstances exist that might make us otherwise hesitant to apply laches. Accordingly, we dismiss the FLDS Association's Trust modification claims pursuant to the doctrine of laches.

Id. at 1064.

123. The Utah Supreme Court accordingly dismissed the Plaintiff's untimely attack on the validity of the Reformation Judgment.[24]  Id. at 1066.

---

[24] The Court further held that any claims that the Fiduciary was being discriminatory in the distribution of property were not ripe.  (Id. at 1066).

*The Decision of Judge Waddoups in* Ream v. Lindberg

124.  In September, 2009, Guy Ream (a Jeffs Adherent) filed a lawsuit attacking the validity of the Reformation Judgment on constitutional grounds.  The case was brought under 42 U.S.C. § 1983 against Judge Lindberg, the Fiduciary, the State of Utah and Attorney General Mark Shurtleff in United States District Court for the District of Utah, Case No. 2:09-CV-00856.

125.  The case was referred to Magistrate Judge Brooke C. Wells, who issued her Report and Recommendations on November 10, 2009.  Judge Wells found that the Court was required to abstain under Younger v. Harris, 401 U.S. 37 (1971) because the state proceedings were ongoing and at least certain of the officials sued were immune from suit under the 11th Amendment.  Judge Wells further found that if the state action had not been pending, the Rooker-Feldman doctrine would preclude the federal court from hearing the claims.

126.  On December 9, 2009, Judge Waddoups entered an order adopting Judge Wells Report and Recommendations and dismissing the complaint for failure to state a claim.

*The Decision of the United States District Court for the District or Arizona in* Cooke v. Wisan

127.  On September 4, 2009, Roland Cooke filed a Complaint against the Fiduciary and his accounting firm in United States District Court for the District of Arizona, Case No. 3:09-CV-08152-JAT, which sought to collaterally attack the rulings of the Probate Court on constitutional grounds. In such Complaint, Mr. Cooke alleged that the Fiduciary had violated the Constitution and had "cooberated [sic] with the Mormon Church to confiscate, steal and sell hundreds of millions of dollars of our homes and property…."

128.  In an order issued April 22, 2010, the Arizona Court dismissed Mr. Cooke's Amended Complaint for lack of standing, finding that Mr. Cooke lacked standing to sue to enforce a charitable trust.  The Court specifically found that Mr. Cooke had no special interest that would give him standing, and that the

Attorney General of Arizona, who is a party to the Probate Action, was in the best position to protect the interests of Trust beneficiaries.

**STATEMENT OF REBUTTAL FACTS/RESPONSE TO**
**PLAINTIFF'S FACTUAL ALLEGATIONS**

The Plaintiff's memorandum, complaint, and affidavit contain a number of incomplete, false and erroneous factual allegations.  Through such allegations, and through the failure to reveal important relevant facts, the Plaintiff has presented a wholly misleading and false picture as to what has transpired in this case.  While it is beyond the scope of this memorandum to provide a rebuttal to every false and misleading allegation, the following factual points are important for this Court's understanding of the true facts.

**I.  The UEP Trust is Not a Church or Religion**

In an attempt to make it appear as if the Probate Court has violated the Establishment Cause, the Plaintiff tries to make it appear as if the UEP Trust is a church or a religion.  It is not.  It is a trust. Specifically, it is a land-holding trust organized as a charitable trust under Utah law.  The UEP Trust is certainly not the same as the FLDS Church.  The FLDS Church is a separate entity, which was organized 50 years after the Trust was established, with its own leadership structure.  (*See* Affidavit of Winston Blackmore ("Blackmore Aff".).

The FLDS Church has owned and controlled substantial property separate and apart from the property of the UEP Trust.  This includes a meetinghouse, real property, personal property, vehicles, equipment, stocks, cash, etc.  In addition, church leaders have created other trusts – separate and distinct from the UEP Trust – for the purpose of holding property.

For most of its existence, more than 50 years, the Trust was a private trust with secular economic purposes largely outweighing any religious purposes.  This is shown from a review of the Original Trust

Declaration.[25]  Although the Trust was restated in 1998, such action did not convert the Trust into a church or religion.  Rather, it merely changed the Trust to a charitable trust with a religious purpose, in addition to its long-standing secular purpose of providing for the just wants and needs of those residing on Trust property.[26]

Thus, when the Attorneys General and the Probate Court intervened to protect the assets of the Trust and then to reform the trust, they were not taking over a church or a religious entity.  Rather, they were merely following well-established legal principles under common law and statutory law, of preserving the assets of a trust and preventing it from being terminated.  Such actions do not constitute a violation of the Establishment Clause.[27]

Contrary to the allegations, the Court did not take any assets away from the FLDS Church when it reformed the Trust.  The assets of the Trust were never assets of the FLDS Church. Those who created the Trust, and those who contributed to it, could have donated such property to the FLDS Church had they so desired.  They did not.  Instead, they chose to create the Trust, and donate property to it. They further chose to make it a charitable trust.  They further chose to make it a Utah trust, subject to all of the laws of charitable trusts in Utah – including the doctrine of *cy pres*.

---

[25] For more facts regarding the secular purposes of the UEP Trust, see the Blackmore Affidavit.

[26] This is confirmed by the testimony of Winston Blackmore who, unlike the Plaintiff's affiant in this case, was a trustee of the Trust and actually signed the 1998 Restated Trust Declaration.  Mr. Blackmore has testified that:
> The 1998 Restatement of Trust was not intended to: (a) unify or merge the Trust and the FLDS Church; (b) make the Trust and the FLDS Church synonymous or co-extensive; or (3) eliminate the secular purposes of the Trust.

Blackmore Aff. at ¶ 10.

[27] Plaintiff suggests that when a trust has a religious purpose, such trust can never be reformed and the religious purpose may never be modified – even under the doctrine of *cy pres*.  Not surprisingly, Plaintiff has cited to no legal authority to support such an argument.  Plaintiff's memorandum is lacking in any legal precedent holding that trusts with religious purposes are exempt from the doctrine of *cy pres*.  A charitable trust is not a religion.  It is a way of holding property and devoting it to a charitable purpose, which may include a religious purpose.  When the ongoing maintenance of a charitable trust becomes impossible, illegal, or impracticable, the law provides that the court may reform the trust under the doctrine of *cy pres* so as modify the purpose to be as close to the original as reasonably possible.  Such law does not violate the Establishment Clause

Thus, the present dispute is not about religion.  It is about property.  The Jeffs Adherents are free to practice their religion as they please, and they have done so for the past five years while the Trust has been under the supervision of the Probate Court.  What they cannot do is use religion as an excuse to evade the operations of the law.  They may not use religion to assert control over property which they do not own.

## II.  The Fiduciary Has Not Acted as an FLDS Bishop

Plaintiff falsely accuses the Fiduciary of attempting to usurp the role of the FLDS Bishop in his administration of the Trust.  In fact, the Fiduciary has never purported to act as a FLDS Bishop or to fulfill any of the functions of such an office.  The Trust's charters – whether the Original Trust Declaration, the 1998 Restated Trust Declaration , or the Reformed Trust Declaration – have never granted Bishops any rights or authorities with respect to the Trust.  Rather, under all three documents, all management and control is vested in the trustees.  If any FLDS Bishop has possessed authority or control over the Trust in the past, it is because such person was a also trustee of the Trust – not because of his position as Bishop. (*See also* Blackmore Aff.).

A review of the Reformed Trust Declaration makes it abundantly clear that the Fiduciary cannot act in any religious capacity in administering the Trust.  Indeed, the Trust was reformed so as to make it perfectly clear that the Fiduciary would not be not acting in a religious role in administering the Trust.

Contrary to the Plaintiff's false allegations, the Fiduciary has never called himself a State Ordained Bishop or SOB.  Rather, this title is a derogatory term given to the Fiduciary by the Jeffs Adherents.  The Fiduciary has acknowledged that the Jeffs Adherents have used such term to refer to him, but he obviously does not think the term is accurate, and has not used it to describe himself.  Why would the Fiduciary seek to be known as an SOB?  The concept of a "state-ordained bishop" is foreign to the Fiduciary, and he has never perceived his appointment in such terms.  Rather, he has merely sought to fulfill his duties as a court-appointed receiver in a religiously neutral manner, as mandated by the Reformed Trust Declaration.

### III.  The Actions of the Attorneys General and the Probate Court

Plaintiff has besmirched the Attorneys General and the Court with a number of false and misleading accusations attacking their motives and actions.

In initiating the Probate Action, the Attorneys General did not have any ill will or improper motives. They were not attempting to take over the Trust, or to harm the FLDS people.  Rather, they were merely complying with their legal duties to protect the Trust from the malfeasance of its breaching trustees, and in so doing protect the homes of the people.  (*See* 15 Am. Jur. 2d Charities § 136 (Attorney General has duty to institute proceedings to stop or redress wrongful conduct of trustees of charitable trust)).

Similarly, the Court was not operating under any improper motive in granting the petition of the Attorney General.  Rather, it was merely fulfilling its legal responsibilities.  Given the unrefuted evidence before the Court – of the trustees' abandonment, breach of fiduciary duties, and fraudulent transfers – and given the trustees' refusal to even appear and account for their conduct, the Court had no choice but to grant the petition of the Attorneys General.

Neither the Court nor the Attorneys General asked to be placed into such positions.   The problem was dumped in their laps by the breaching trustees.  They nevertheless responded in good faith by following the law and protecting the assets of the Trust for the entire beneficiary class.

Next, the Plaintiff accuses the Court of acting with religious discrimination when it chose to reform the Trust, rather than to terminate it.  Such criticism is unfounded.  As discussed above, (*see* ¶¶ 53-58), the Court property applied the doctrine of *cy pres* to reform the Trust rather than to allow it to fail.

The Plaintiff asserts that the 1998 Restated Trust Declaration required the Court to convey the assets of the Trust to the FLDS Corporation Sole.  This is not true. The Restated Trust Declaration provides that the Trust was to be of perpetual duration.  Clearly, the intent of the document was that the Trust *not* be terminated.  The remainder provision, which provided for conveyance of Trust assets to the FLDS

Corporation Sole in the event of termination was a contingent provision which would only come into effect as a last resort in the event the Trust were termination – an event which was disfavored.  Thus, when the Probate Court faced the question whether to terminate the Trust or allow it to survive through reformation, the Restated Trust Declaration answered such question loud and clear.  The Court was to keep the Trust alive so that it could continue in perpetuity.

If the signers of the Restated Trust Declaration intended the outcome which is now urged by the Plaintiff – that the Trust be terminated rather than reformed under the doctrine of *cy pres* – they certainly could have drafted the document to show such intent.  They could have stated in the document that termination was favored over reformation.  Instead, they stated just the opposite – that the Trust was to be perpetual.  They could have stated in the document that the religious purpose of the Trust could never be modified.  Instead, they stated that the Trust was a charitable trust governed by Utah law – which law expressly provided for reformation of trusts in the event of illegality, impossibility, or impracticability.

Having stated that the Trust shall have perpetual duration, having expressly adopted Utah law to govern the Trust, and having said nothing that would limit or prohibit application of Utah's *cy pres* doctrine, it is clear that the signers did not intend to prohibit reformation of the Trust.[28]

Next, Plaintiff raises outrageous and false allegations regarding the Probate Court's recent ruling as to the property rights of Plaintiff's members.  (*See* Plaintiff's Memo. at p. 12 (claiming, among other things, that Judge Lindberg has granted the Fiduciary "virtually dictatorial power"; has "wipe[d] out the rights of several hundred non-parties" without due process; and was causing "longstanding FLDS occupants" to be dispossessed of "their homes, farms, schools, and . . . Bishop's Storehouse")).  In order

---

[28] The intent of the signers of the 1998 Restated Trust Declaration can be seen from reviewing the document itself.  Furthermore, the Court should note that one of the signers of the document, Winston Blackmore, has submitted an affidavit in this case which is contrary to the assertions of the Plaintiff and its affiant Willie Jessop.  Certainly Mr. Blackmore, who was a trustee of the Trust and signed the 1998 Restated Trust Declaration, has knowledge of the intent of the signers whereas Mr. Jessop, who did not sign the document and has never had any position with respect to the Trust, does not.

to support its false allegations, the Plaintiff deliberately misstates the rulings of the Probate Court at a

hearing held on July 22, 2010.  In a glaring lack of candor, Plaintiff takes a statement of the Court out of

context to falsely accuse the Court of wrongfully denying FLDS members an opportunity to assert

ownership claims to Trust property, when in fact the Court ruled just the opposite.  Indeed, the ultimate

ruling of the Court at the July 22 hearing was that the Court would establish a process so that persons

claiming ownership interests in Trust land would have a method to have such claims adjudicated.[29]  When

the entirety of the July 22 hearing is considered (and not the one-liner on which the Plaintiff relies), it is

_____

[29] At the hearing, the parties discussed the problems which had arisen as a result of occupants of Trust land refusing to recognize the authority of the Court and the Fiduciary.  Certain Jeffs Adherents have claimed to have rights in certain Trust property pursuant to "stewardships" received from FLDS leaders and have proceeded to interfere with the rights of occupants who have entered into leases with the Fiduciary for the same property.  The issue was presented to the Court by William A. Richards of the Arizona Attorney General's office:

> The dispute that is alleged there is that members of the FLDS have a– some sort of a preexisting religious stewardship, not as we understand evidenced by any sort of actual conveyance. . . But these folks have taken it upon themselves to simply go out and assume the property and to interfere with the use of that property by those who have been granted an occupancy agreement or a lease by the special fiduciary.  We're also concerned that there has been issues involving removal of property...all of which would be a violation the Court's pending injunction order.

(*See* Transcript of July 22, 2010 hearing, attached to Plaintiff's Memorandum as Exhibit "H", at 8: 13 - 9:8).  Mr. Richards then requested that the Court clarify that it stands behind the leases from the Fiduciary, whereupon Counsel for the Plaintiff declared that the Probate Court should not "take away the existing property rights of somebody else, whether it's real property or personal property by fiat like that." (Exh. "H" at 26:13 - 27: 12). The Probate Court responded that "There is no preexisting property rights of any alleged beneficiary to any land or to anything in the UEP"– a statement consistent with established rule of law that in a charitable trust the beneficial rights to Trust property "are not given to individual beneficiaries but the property is devoted to the accomplishment of purposes beneficial to the community." (Id. at 27:13-15; Jeffs v. Stubbs, 970 P.2d 1234, ¶ 41 (1998)).  Counsel for Plaintiff countered that there may be persons with "unjust enrichment claims . . . in the real property; and . . . food and personal property down there that UEP does not own."   (Exh. "H" at  27: 18 - 23).  The Court then expressly acknowledged that "if there are legitimate competing claims by anyone who believes that he or she has a claim to any particular property, that can certainly be addressed in court on a full trial on the merits."  (Id. at 29: 8 - 12).  The hearing participants then discussed the proper methodology for resolution of such disputes, whereupon the Court stated:

> ...I'm going to have to think through how to create a process so that those concerns and those counter positions and other documentation can be presented to the Court and adjudicated. And I'm going to need the assistance of counsel in – in fashioning a proper process so that if there are challenges to [the Fiduciary's] agreements, then those can be properly documented and presented to the Court and addressed.

(Id. at 37:20 - 3).  Thus, contrary to the assertion of the Petition, the Court has not "prejudged" any rights in Trust property and has not denied any person due process.  Instead, the court has recognized that legitimate competing claims to Trust property will be adjudicated by the Court.  Contrary to Plaintiff's absurd accusations, not a single piece of property has been lost by Plaintiff as a result of the Court's July 22, 2010 hearing.

clear that the Probate Court has done nothing improper, but has acted consistent with her duties under the Trust Code.

## IV.  The Actions of the Fiduciary

Plaintiff has raised a host of false and frivolous allegations against the Fiduciary – wrongfully accusing the Fiduciary of abusing his authority, acting with religious discrimination, and of numerous acts of malfeasance and misconduct.  It is well beyond the scope of this memorandum to respond to all of the numerous unfounded accusations which Plaintiff has raised against the Fiduciary, but a few examples are illustrative:

The Plaintiff accuses the Fiduciary of "abusing his authority and dispossessing longstanding FLDS occupants of their homes, farms, schools, and . . . Bishop's Storehouse."  (Plaintiff's Memo, at p. 12). Even more startling is Willie Jessop's blaming the state and the Fiduciary for decimating "farms, ranches, businesses, and communities" and for depriving the people of homes, jobs, food, and power.  Jessop Aff.[30] at 10 ("The people are destitute, without homes, without livelihoods, without property, without food, having their power cut off.  Daily I hear the pleas of my brother and sisters, because they've lost their homes and their jobs….")).  The truth is that the Fiduciary has never legally evicted anybody from Trust land – whether from a home, farm, or school.[31]  The accusations as to jobs, food, and power are baffling, as the Fiduciary is not involved in such matters and has not done anything which would deprive a person of such items.

-------------------------------------

[30] Willie Jessop's affidavit suffers from a number of problems, including improper hearsay and argument and numerous other defects.

[31] On rare occasions, the Fiduciary has directed the occupants of a specific residences to vacate the premises so as to allow others, who have stronger ties and claims to the residence, to occupy the same.  On each occasion, the Fiduciary offered to find substitute housing for the vacating occupants.  At no time has the Fiduciary ever compelled any person to vacate any home on Trust property.

The Fiduciary has leased certain portions of Trust property (a farm and four granary silos) to a man named Shane Stubbs.  (See P – above),  At the time the Fiduciary entered into such lease, such properties were vacant and had been abandoned.  Indeed, before entering into the lease with Mr. Stubbs, the Fiduciary pleaded with the former occupants of such property (who were Jeffs Adherents) to farm the property, but they refused. (*See* ¶ 93, above).  It was not until after the Fiduciary entered the lease with Mr. Stubbs that the Jeffs Adherents suddenly sought to re-occupy the property which they had previously abandoned.[32]  Now, the Plaintiff distorts such facts to accuse the Fiduciary of "dispossessing" the FLDS people from their farms and "Bishop's Storehouse."[33]

The story is similar with respect to the school.  Today the Jeffs Adherents have the use of twelve (12) school buildings on Trust land.  The one school building that they don't occupy  was  promised to another entity at a time when it had been abandoned and was vacant.  Such building is the oldest of the Trust's school buildings, and the Jeffs Adherents did not express any interest in such vacant building until after the Fiduciary had agreed to lease it to someone else.  From such fact, the Plaintiff now accuses the Fiduciary of dispossessing the FLDS from their schools.

In fact, the Fiduciary has not done anything to dispossess any FLDS person from the farms, granaries, or schools.  He has merely leased vacant properties to willing lessees after the prior occupants had vacated and abandoned the property.

---

[32] Unfortunately, Mr. Stubbs has been the object of numerous acts of trespass, vandalism, and harassment by Jeffs Adherents who oppose his leasing of the abandoned farm property.  More recently, he has been the object of two harassing lawsuits seeking to oust him from the property and enjoin his use thereof – all based upon a collateral attack of the Reformation Judgment.  The plaintiffs did not seek such relief in the appropriate court – the Probate Court.  Instead, they went on a judge-shopping spree and filed their lawsuits in state court in Washington County, Utah and Mohave County, Arizona.

[33] What the Plaintiff calls the "Bishop's Storehouse" is in fact 12 granary silos which were empty and abandoned at the time of the lease to Shane Stubbs.  The Plaintiff further fails to reveal that Mr. Stubbs is only using 2 of the granaries, and that the remaining granaries are more than adequate to meet the alleged needs of the Jeffs Adherents.

Next, the Plaintiff accuses the Fiduciary of having a "plan to force FLDS members to take back in their own names what they have given to the Lord, even though their faith prevents them from doing so . . . ." (Plaintiff's Memo, at p. 25). This accusation is similarly false. The Fiduciary has no such plan. He will not force anyone to accept ownership of Trust property. While his ultimate goal is to distribute outright ownership of property to members of the beneficiary class who desire such ownership, he will not force anyone. As to those beneficiaries who are eligible to receive ownership of property but who will not accept it, the Fiduciary is willing to maintain the status quo and allow such beneficiaries to reside on Trust property as they have done in the past (so long as they abide by the minimum occupancy requirements approved by the Court).

The Jeffs Adherents repeatedly accuse the Fiduciary of acting with discrimination against the FLDS people, when in fact, the Fiduciary has acted with religious neutrality to neither favor nor disfavor any person on the basis of religion. The core problem underlying Plaintiff's claims of discrimination is a refusal to accept or acknowledge the Court's reformation of the Trust and its requirement of religious neutrality. Plaintiff clings to the superseded 1998 Restated Trust Declaration and demands that the Fiduciary administer the Trust in a manner which will discriminate in favor of FLDS beneficiaries and against non-FLDS beneficiaries. (*See* R. 13243, 13253-13258). Thus, Plaintiff mischaracterizes religious neutrality as religious discrimination. Expecting discriminatory treatment in their favor, they misperceive religious neutrality as religious discrimination against them.

Next, Plaintiff falsely accuses the Fiduciary of wreaking financial devastation on the Trust when, in fact, the net assets of the Trust have actually increased under the leadership of the Fiduciary. It is true that the Trust has incurred substantial costs and professional fees since 2005.[34]   However, the total costs

---

[34] This is not surprising given the multitude of tasks facing the Fiduciary, and the constant hostility, obstruction, and litigation attacks which have been directed toward the Trust. Given that the Trust has been involved in 25 different civil actions and appeals since 2008, it is to be expected that the Trust would have substantial professional fee obligations. Such obligations are consistent with the prior history of the Trust before to the appointment of the

incurred by the Trust under the Fiduciary's administration are more than offset by the value of the property which the Fiduciary has brought into the Trust since his appointment.  (*See* ¶ 75, above. )  Thus, contrary to Plaintiff's allegations, the Trust's balance sheet is in a better position today than it was on the day the Fiduciary was appointed in 2005.[35]

Furthermore, the Plaintiff fails to acknowledge that the Fiduciary has prevented the loss of Trust property to litigants who have filed lawsuits against the Trust.  Not only did the Fiduciary prevent the entry of default judgments in the two Tort Lawsuits, he has also defended the Trust in other lawsuits which have been filed against the Trust – including the MJ lawsuit seeking large monetary damages against the Trust by a young woman alleging she was raped by a cousin at the insistence of Warren Jeffs. (*See* n. 15, above).   The Fiduciary also protected the Trust through his efforts to stop the looting of fixtures on Trust property and through his efforts to accomplish the payment of the Trust's property taxes. Thus, rather than decimating the Trust, the Fiduciary has saved it from numerous attacks while improving its financial position.

The above-stated examples address but a few of the false accusations of misconduct and malfeasance which the Jeffs Adherents have raised against the Fiduciary.   The other accusations are similarly without merit.

From the beginning of his appointment, the Fiduciary has acted in good faith in all things to faithfully fulfill his duties as a court-appointed officer in accordance with the rule of law.  Nevertheless, for nearly as long, the Fiduciary has been the object of hostility and has been the brunt of numerous false and

---

Fiduciary, when the Trust regularly paid more than $1 million in attorneys fees each year.   (*See* Blackmore Aff.).

[35] This is not to minimize the serious cash crunch crisis which faces the Trust.  The improved balance sheet is important, but unless assets can be liquidated into cash funds needed to pay outstanding debts and pay ongoing expenses, the Trust faces potentially serious consequences.

defamatory accusations.[36]   Perhaps the most telling manifestation of the invalidity of the such accusations is the confidence shown in the Fiduciary by the Probate Court.   The Probate Court is the court most familiar with the facts.   Having heard the numerous accusations of misconduct by the Jeffs Adherents, the Probate Court has not found any to be valid, and has continued to retain the Fiduciary as its appointed receiver for the Trust.

## V.   The Misconduct of Warren Jeffs and the Trustees

Plaintiff's Memorandum is misleading, both through omission and deliberate mischaracterization, as to the misconduct of the breaching trustees which necessitated the commencement of the Probate Action in the first place.

For the most part, Plaintiff's Memorandum is silent as to the misconduct of the trustees.   Plaintiff seeks to gloss over, or totally ignore, the serious acts of misconduct which placed the homes of the people at risk and which imposed a legal duty upon the Attorneys General and the Court to intervene and protect the assets of the Trust.   Plaintiff's silence it telling.   It shows that there is no justification for the actions of the trustees.

It cannot be disputed that the trustees breached their legal fiduciary duties by failing to defend the Trust in the Tort Lawsuits.   The court files in the Tort Lawsuits speak for themselves.   Such files constitute irrefutable proof of default by the trustees.   Such filings also show that, back in 2004, there was a clear knowledge of the likely consequences of the trustees' default.   In particular, it was clearly understood that the trustees' default could result in the loss of the homes of the people.   Indeed, the Motion filed by the Trust's outgoing legal counsel, Rod Parker, is essentially a plea that somebody else

---

[36] The source of hostility against the Fiduciary can be traced directly to Warren Jeffs.   As discussed in ¶ 39, above, in the first few months after the appointment of the Fiduciary, Warren Jeffs received favorable reports from his people as to both the Fiduciary and Judge Lindberg.   Jeffs quickly put a stop to such thinking by his people. Instead, he told his people that the Fiduciary and the Judge were "of the devil" and he caused them to wage a 5-year war of hostility – which has included numerous unfounded accusations against on both the Fiduciary and Judge Lindberg.

step in and do what the trustees had failed to do – to protect the people from losing their homes.   (*See* ¶ 18, above).   By seeking to provide notice of the trustees' default to the occupants of Trust land and to the Attorney General, Mr. Parker clearly acknowledged the serious consequences of the trustees' default, and the role of the Attorney General in stepping in to defend the Trust.

That the conduct of the trustees was deliberate and willful is shown by Warren Jeff's own records. The evidence shows that, at an official meeting of the UEP trustees in the summer of 2004, Warren Jeffs and the other trustees made the unanimous decision to default in the Tort Lawsuits. They did so knowing that such conduct would be viewed under the law as a breach of their fiduciary duties to the Trust. They did so knowing that their breach would oblige the government to intervene and place the Trust "under government control." They knew that their decision would result in the loss of the Trust's "land and houses." Yet, they unanimously agreed to breach their legal duties to the Trust.  (*See* ¶ 17, above).

Some have operated under the misperception that Warren Jeffs defaulted in the Tort Lawsuits and the Probate Action because of the filing of criminal charges against him.  There is a misperception that the state of Utah caused Warren Jeffs to go into hiding by filing criminal charges against him, and then took advantage of the situation by obtaining default judgments in civil court while he was on the run.  This is simply not the case.  No criminal charges were filed against Warren Jeffs until the summer of 2005. This was nearly one year after Warren Jeffs made the deliberate decision to default in the Tort Lawsuits. This was also after the time that Warren Jeffs had defaulted in the Probate Action.  Clearly, the criminal charges were not the cause of Warren Jeffs' decision to default in either case.[37]

Next, the Plaintiff's Memorandum seeks to mislead the Court as to the trustees' misconduct in the fraudulent transfers of valuable Trust property shortly after the filing of the Tort Lawsuits.  With no support or explanation, Plaintiff makes the incredible assertion that the allegations of fraudulent transfer

_____

[37] This is confirmed by the fact that, even after Warren Jeffs' capture and incarceration, he has continued to default in the pending civil actions – including continuing his refusal to comply with the orders of the court.

against the trustee were "later proved to be unfounded." (Plaintiff's Memorandum, at p.9). Such assertion is simply wrong. At no time have such allegations been proven to be unfounded. Indeed, none of the trustees has ever come forward to even attempt to disprove such allegations – let alone been successful in doing so.

Rather than being disproven, the allegations of fraudulent transfer have been strongly confirmed by the newer evidence which has come to light subsequent to the commencement of the Probate Action. Indeed, the record of Warren Jeffs contains "smoking gun" evidence as to the fraudulent transfers. It makes it clear that the property transfers were made as a direct response to the Tort Lawsuits and were made with the actual intent to hinder, delay, and defraud the creditors of the Trust, and the Trust itself. Among other things, the record shows that, at the time he made the decision to default on the Tort Lawsuits, Warren Jeffs recognized that the courts would view such decision as a breach of the trustees' fiduciary duties (*see* ¶ 17(N), above), and that the "courts could freeze the UEP assets" as a result. (*See* ¶ 17(Q), above). He therefore made the decision to transfer the Trust's income-producing properties "before the assets are frozen" so that they would "be a strength to us still and not get into the courts." (*See* id.).

As discussed at ¶ 17, above, the Warren Jeffs record shows that Jeffs knew that his default in the Tort Lawsuits would result in the loss of the Trust's houses. This was acceptable to Jeffs – indeed he desired such a result. He did not, however, desire to lose the valuable non-residential property and the valuable manufacturing building. Such property was a source of ready cash for Warren Jeffs' personal/non-Trust use. The 1,311 acres of non-residential property could be sold for millions of dollars. The business occupying the manufacturing building, Western Precision, was making regular donations to Warren Jeffs for hundreds of thousands of dollars on an ongoing basis. Thus, it was to Warren Jeffs' personal advantage to transfer such properties out of the Trust. By transferring the property, Warren Jeffs hoped

to shield such property from being lost in the Tort Lawsuits.  He would also remove such property from being subject to the restrictions of the UEP Trust.  After the transfer, he could use such property for his own non-Trust projects free of the restrictions of the Trust's charter and free from the claims of the Trust's creditors. (*See* ¶ 17(Q), above).[38]

Finally, the Plaintiff is tellingly silent as to the misconduct of the trustees subsequent to the commencement of the Probate Action.  The trustees brazenly violated the Court's Orders to produce documents and information regarding the Trust and, more than five years later, they still remain in violation of such Orders.

To this day, Warren Jeffs and the trustees have never made amends for their misconduct.  Indeed, they have never even attempted to explain or account for their actions.  They have never explained their breach of fiduciary duties and fraudulent transfers.  Warren Jeffs has never responded to the serious allegations of sexual misconduct and the detrimental impact which has befallen the Trust as a result.  Yet, the Plaintiff would have this Court turn the entire Trust over to the control of Warren Jeffs.  Such a result would reward misconduct and violate basic notions of fairness and justice.

## VI.  The Plaintiff's Failure to Participate

The Plaintiff's filings are tellingly silent as to the facts regarding the Plaintiff's failure to participate in the Trust  Probate Action for over 3 ½ years.  Plaintiff fails to explain or justify why its members failed to respond to the Court's 2005 invitation to appear and be heard with respect to the Trust; why they failed

---

[38] Even without the new evidence obtained from the Warren Jeffs record, it is clear that the transfers were fraudulent as to the Trust's creditors and as to the Trust itself.  Such transfers meet nearly every one of the characteristic "badges of fraud" set forth in the Utah Uniform Fraudulent Transfer Act.  (*See* UTAH CODE ANN. § 25-6-5(2)).  The transfers were made to insiders shortly after lawsuits were filed against the Trust.  The Trust did not receive reasonably equivalent value in consideration for the transfers.  Warren Jeffs retained control over the property after it was transferred.  The transfers were not publicly disclosed and those participating in the transfers were in hiding.  Any one of these badges, standing alone, may be enough to establish fraudulent transfer under the Act.  When considered together, however, the conclusion is inescapable that the transfers were fraudulent under the Act – even without the new evidence found in the Warren Jeffs record.

to be heard with respect to the 2005/2006 reformation of the Trust; or why they failed to object to or appeal from the final Reformation Judgment.  Plaintiff fails to explain why its members waited until late 2008 before challenging the validity of the Reformation Judgment, which had been final and non-appealable for two years.

In an apparent attempt to excuse its multi-year absence, the Plaintiff now asserts that: "When the State of Utah intervened in the Trust in 2004 [sic], there was nothing to suggest that its purposes were anything other than benign."  (Plaintiff's Memo, at p. 8).  This assertion is bogus.  Reformation of the Trust was on the table from the beginning.  The Petition filed by the Attorneys General at the commencement of the Probate Action listed reformation as a potential remedy in its prayer for relief (R. 19).  Furthermore, even if Plaintiff's members were not aware that reformation was on the table out the outset, they were certainly made aware of such fact within the first few months of the Probate Action when it became very apparent that the Court intended to reform the Trust.  Notice of the reformation process was given to the Jeffs Adherents on an ongoing basis.[39]  It cannot reasonably be disputed that the Plaintiff's members received notice of the Probate Action and of the ongoing reformation process in 2005 and 2006.  Yet, Plaintiff provides no explanation or excuse as to why the Plaintiff waited until late 2008 to challenge the reformation.  As found by the Utah Supreme Court, "the FLDS Association has given no adequate explanation for its delay in appealing or otherwise petitioning for relief."  (238 P.2d at 1064).

The Plaintiff's members are loathe to admit the real reason for their failure to participate – that they made a knowing willful decision to abstain based upon the instruction of Warren Jeffs.[40]  Yet, such is the

_____

[39] This includes regular service on the very attorney who now suggests that reformation came as a shock and surprise to Plaintiff.

[40] Plaintiff's legal counsel, Rod Parker, finally admitted as much in oral argument before the Utah Supreme Court: ". . . [T]he answer to that question lies inside the religious box. . . . [T]here was a religious decision being made. It was a test of faith . . . ."  (Digital Court Recording: Oral Argument by Rodney R. Parker, Esq., before the Utah Supreme Court in FLDS v. Lindberg, No. 20090859-SC, (Feb. 17, 2010) available at http://www.utcourts.gov/courts/sup/streams/index.cgi?mon=20102 (session I 22:42-25:08) (last visited July 3,

truth and it is fatal to Plaintiff's complaint.  Having made the conscious decision to abstain over a period

of years, the Plaintiffs are now barred from collaterally attacking the Reformation Judgment at this late

date – especially when so many others have changed their lives in reliance upon the finality of such

judgment.[41]

## VII.  The Fiduciary's Attempt to Subdivide the Trust's Property

The Plaintiff has grossly misstated and mischaracterized the Fiduciary's actions with respect to

seeking to subdivide the Trust's property.   Plaintiff falsely characterizes the subdivision efforts as a

"zoning scheme" and a "fracture" of the land.[42]  In truth, there is nothing sinister or  improper with the

subdividing efforts.  The facts and circumstances relevant to the Trust's need to subdivide its property are

set forth in ¶¶ 77-80, above.  Such facts show that there is a valid and legitimate need for subdividing

the Trust's property.  Subdividing would not be a change of the ownership or control of property.  It would

merely change the legal parcel descriptions.  Rather than the having the Trust's 5,000 acres divided into

175 large legal parcels, such land would be divided into many more, but smaller, parcels – such that there

would not be multiple residences on the same parcel for tax purposes.

--------------------------------

2010)).

[41] In an argument, which can only be interpreted as an admission that the Plaintiff's members willfully chose to abstain, the Plaintiff accuses the Probate Court or reforming the Trust "in order to save the FLDS from the consequences of their own actions"; and then asserts: "[E]nduring the consequences of the Trust's failure was arguably a choice informed by religious exercise."  Plaintiff is correct in his admission that the Jeffs Adherents' decision to abstain from the Probate Action was a willful choice informed by religious exercise.  Plaintiff is further correct in admitting that the Jeffs Adherents should endure the consequences of such choice.  What Plaintiff fails to realize, however, is *that is exactly what happened.*  Under the law, the natural flowing consequences of the trustees' breach (and of the Jeffs Adherents' refusal to participate) was the intervention of the Attorneys General and the reformation of the Trust by the Probate Court under the doctrine of *cy pres*.  Plaintiff's members are therefore obliged to endure the consequences of such choice.  Plaintiff erroneously assumes that the consequence of their actions should have been to terminate the Trust and place it back under the control of the breaching Warren Jeffs.  As discussed above, such is not the law.

[42] Indeed, the Plaintiff asserts an absurd RLUIPA claim (*see* 42 U.S.C. § 2000cc) based upon the ridiculous premise that the Fiduciary is acting as the government and is seeking to impose a land use regulation in a discriminatory manner.  In fact, the Fiduciary is not acting as the government with respect to the subdivision.  Rather, he is the applicant who is facing religious discrimination from the cities of Hildale and Colorado City.

Contrary to Plaintiff's assertion, there is an urgent need to complete the subdivision process as soon as possible.  Subdividing will resolve many problems associated with the occupants' failure to pay property taxes.  It will also enable the Trust to generate badly-needed funding through the sale and distribution of property.

This Court should not be swayed by Plaintiff's erroneous arguments at to the Fiduciary's subdividing efforts.  Subdividing would not cause the Plaintiff any harm – let alone irreparable harm.  There is simply no reason for this Court to enjoin the Fiduciary from completing a subdividing of the property – regardless of the merits of the Plaintiff's underlying claims.

## VIII.  The Berry Knoll Farm Sale

The Plaintiff has greatly mischaracterized the Fiduciary's proposal to sell the Berry Knoll farm property.  Plaintiff suggests that the proposal is intended to harm the FLDS people when, in reality, the Fiduciary is simply trying to resolve the Trust's liquidity crisis.  After considering numerous alternatives, the Fiduciary has determined that selling non-residential property is the best (and possibly the only) feasible method for raising badly-needed funds.

When the Fiduciary determined to sell the Berry Knoll property, he did not believe (and still does not believe today) that the property had economic or religious significance which would preclude the Trust from selling it.  The property had been abandoned for years and been allowed to become a dustbowl by the Jeffs Adherents.  None of their actions gave any indication that the property had special significance, whether economically or religiously.

Even now, Plaintiff's argument that the property has economic and religious significance to the FLDS people is not credible.  Such claims are pretexts.  It is apparent that the real motive of Plaintiff is to stop the Trust from selling any property at all – such that the Trust will be starved of funds needed for its survival.  It is telling that, every time the Fiduciary has tried to sell property, the Plaintiff has sought to

sabotage the sale by alleging that such property has special economic or religious significance. This includes the Berry Knoll farm, the Beryl dairy farm, and even ordinary cows on the farm.[43]  In each instance, the Plaintiff's allegations have been exposed as falsehoods and pretexts.

In the case of the Fiduciary's proposal to sell the Berry Knoll farm, Plaintiff first claimed that the farm had special economic significance – alleging that the property is the "breadbasket" of the community and a major contributor to the FLDS storehouse in 2008. (R. 13826.)  Such allegations were disproven when it was revealed that the ground is poor, that the farming operations on the property had never been profitable, that the farm had historically required heavy subsidies from the Trust, that the Trust had stopped subsidizing the farm, that the farming of the property had ceased by 2004, and that the former farmers of the property had abandoned the property.  (R. 13891-13892; R. 16488, at pp. 22-23; Blackmore Aff.)

Next, after the weaknesses of their "economic" allegations were exposed, Plaintiff suddenly began alleging that the property held special religious significance – that it was a prophesied future temple site of the FLDS Church.  Such allegations are suspect due to their late timing.  Plaintiff filed a verified motion and memorandum seeking to stop the sale which never once mentioned that the property was a future temple site.  Similarly, in two days of deposition testimony regarding the Berry Knoll property, Plaintiff never once raised the "temple site" allegation. It was only after their original "economic significance" allegations were discredited that they first raised the allegation of "religious significance."  (R. 13880*).

---

[43] In 2009, a number of non-milking Harker dairy farm cattle, which were indirectly owned by the Trust (through the Trust's ownership of the companies that own and operate the dairy), were sold.  The Jeffs Adherents reacted to such sale by filing frivolous legal attacks both in the Probate Court and in the Utah Supreme Court.  In such attacks, the Jeffs Adherents made a number of false and frivolous claims as to the nature of the cows sold – including a false allegation that the cows were special cows which were sacred.  In truth, the cows were very ordinary.  All of the sold cows were born after the Fiduciary gained control over the dairy operation, and none had been bred or raised in accordance with alleged FLDS cattle raising protocols. (*See* R. 16354 - 16374).  Fortunately, the Jeffs Adherents did not succeed on the merits of either of their frivolous legal attacks.  Nevertheless, they forced the Fiduciary to incur significant time and expenses in responding to such attacks.

The Fiduciary has investigated Plaintiff's "temple site" allegations and has confirmed his conclusion that they are a pretext.  The FLDS Church long ago rejected the leadership of Joseph W. Musser, the man who made the temple site prophesy.  (Blackmore Aff.).  The conduct of FLDS Church leaders since that time is not consistent with a belief in the "temple site" allegations.  For example, Warren Jeffs revealed his intent to abandon the Trust, and the entire Short Creek area, without his making any provision to protect the Berry Knoll property.  (R. 13887-13889*; R. 16448, at pp. 22-23).  (*See also* ¶ 64(c), above).

Even if the Berry Knoll property had special economic or religious significance to Plaintiff, it would not change the fact that it is in the best interests of the Trust to sell such property.  Due to the Trust's severe liquidity crisis, it is critical that the Trust sell property.  After extensive consideration, it has been determined that the Berry Knoll farm is the best-suited property to be sold by the Trust.  While the Fiduciary would like to accommodate Plaintiff's concerns, his duty is to the Trust – not Plaintiff.  The Fiduciary cannot sacrifice the interests of the Trust in order to satisfy Plaintiff's desires.

The Fiduciary is not aware of any feasible alternative to selling the Berry Knoll farm that would adequately reddress the Trust's liquidity crisis.  Plaintiff has certainly not identified any alternative.

Next, Plaintiff complains that the Fiduciary is proposing to sell the property to a "competing religious group".  Jessop Aff. at 42-43.  In truth, the proposed buyer is not a religious group, but a limited liability company.  The Fiduciary has not inquired as to the religion of the owners of the company – as it would be inappropriate to do so.  It would not be proper for the Fiduciary to sell, or refuse to sell, based upon religion.

Plaintiff intimates that the Trust should refuse to sell the property to the proposed buyer because Plaintiff find its owners' religion distasteful.  This the Fiduciary cannot do.  The Fiduciary's willingness to sell the property to this particular buyer is not based upon religion. Rather, such willingness is based

upon one reason: the buyer is willing to buy the property. No one else has made an offer to buy the property from the Trust.

Moreover, if the property is so important to the Plaintiff, there is nothing stopping Plaintiff from obtaining the property.  The proposed sale is **subject to better offers**.  If the Jeffs Adherents truly desire to own the Berry Knoll farm property, they may purchase it by offering more money at the sale.

Indeed, if it is true that the property has religious significance to competing religious groups, there is no better way for the Trust to resolve such matter than to sell it to the highest bidder at an auction sale. The Fiduciary may not take sides in a religious dispute.  He may not favor one side or the other.  By selling the property the highest bidder, the Fiduciary can protect the best interests of the Trust while remaining in compliance with his duty of religious neutrality.

## IX.  Reliance on the Finality of the Reformation Judgment

Plaintiff's statement of facts is silent as the actions taken by numerous people over the past five years in reliance upon the authority of the Court and the finality if the Reformation Judgment.  As discussed above (*see* ¶¶ 63-72), hundreds of people have ordered their lives in good faith reliance upon the validity and finality of actions of the Court.  They have done so with respect for the rule of law and for the authority of the judicial system of the State of Utah.

In contrast, Plaintiff's members knew about the Probate Action from the beginning, yet they willfully failed to appear or be heard.  Under such circumstances, there is neither a legal or equitable case for undoing the reformation of the Trust.  To do so would violate the legitimate expectations of hundreds of people, reward dilatory and inequitable behavior, and make a mockery of the rule of law.  The Court should not reward scofflaws and punish those who show respect for the rule of law.

Plaintiff cavalierly asserts that everything that has happened over the past 5 years is void and ultra vires. Such assertion does violence to the reasonable expectations of the many people who showed confidence in the final, non-appealable judgment of the Probate Court.

Thus, even if the Probate Court erred in reforming the Trust (which it did not), it is now too late to undo such reformation. You cannot unscramble the egg. To attempt do so would be to cause enormous harm to those have played by the rules and changed their lives in reliance upon the law.

## X.  The Role of Warren Jeffs in the Present Lawsuit

Plaintiff would have this Court believe that Plaintiff is an association of people who have voluntarily joined together as individuals to pursue their individual rights independent from Warren Jeffs or church leadership. In fact, the evidence shows that Warren Jeffs is behind the present lawsuit, and is seeking to use the individual members to claim the assets of the Trust for himself.

Although Warren Jeffs' attorneys announced Jeffs' purported resignation from the FLDS Corporation Sole in late 2007, they never indicated that Jeffs has resigned from the presidency of the FLDS Church itself. In fact, he has not. The FLDS people have never repudiated Warren Jeffs. He is still the prophet and president of the FLDS Church, and as the spiritual priesthood leader of the FLDS people, including the Plaintiff's members. This is confirmed by the FLDS Church Proclamation (dated October 2009 with a 2010 copyright) which has recently come to light. (A copy of which is attached hereto as Exhibit "D"). The Proclamation is signed by Warren Jeffs as president of the Church, and by Wendell S. Nielsen (the purported new president of the Corporation Sole), as first counselor to Warren Jeffs.

That Warren Jeffs is behind the present lawsuit is confirmed by the letter which Warren Jeffs sent to Willie Jessop while he was incarcerated, instructing him to form of coalition of followers, hire legal counsel, and appear in court as a group of individuals without including the leaders of the church. (*See*

¶¶ 99-100, above).[44]  That is exactly what Willie Jessop has done in this case.  The so-called Plaintiff Association is nothing but a group of individuals who are doing the bidding of Warren Jeffs and FLDS leaders.

This is confirmed by reviewing the relief requested by the Plaintiff members in this case.  They do not seek relief on their own behalf.  Rather, they request that the assets of the Trust be given the FLDS Corporation Sole – which is nominally controlled by Wendell S. Nielsen, but is actually controlled by Warren Jeffs (as Wendell Nielsen is Warren Jeffs' counselor).

If the Plaintiff members truly sought to use the property of the Trust for purposes of the United Order, it would be easy to do so.  They could simply obtain ownership from the Trust,[45] and then turn around and transfer it any entity of their choosing – whether it be Warren Jeffs, the FLDS Church, one of the other trusts controlled by the FLDS Church, or someone else.  That the Plaintiff members are unwilling to do so indicates that this lawsuit not about the members' choosing to live the United Order.  It is about Warren Jeffs' seeking to regain control over the property without giving individual Trust Participants a choice in the matter.  Apparently, Jeffs is afraid that if the individuals were to receive ownership of their homes, they may choose to keep the same, rather than turn ownership over to him.  Accordingly, he has instructed his followers to oppose the Fiduciary's efforts to convey ownership to the people, and has sought to grab the entire Trust for himself.

_____

[44] This letter was sent at approximately the same time of Warren Jeffs' purported resignation as president of the FLDS Corporation Sole.  The letter and the resignation indicate that Warren Jeffs had changes his strategy, such that his people would now become involved in litigation without revealing Warren Jeffs' involvement in such matters.  Jeffs would direct affairs from the background – while his name would not appear on the Corporation Sole or in the coalition of individual litigants.  This did not mean that Jeffs was any less involved or in control.

[45] The Fiduciary has made very clear his desire to convey ownership of Trust's property to the qualified members of the beneficiary class.  He has further made clear his willingness to transfer deeds of outright ownership without any restrictions.  Thus, any Plaintiff member who receives property from the Trust would be free to transfer such property to any entity of its choosing – including for the purpose of living the United Order.

Warren Jeffs' plan – to have a coalition appear as individuals seeking to have the Trust turned over to the control of Warren Jeffs – is actually quite clever.  It would allow Jeffs to regain control over the Trust without ever appearing or providing an accounting for his actions.  Indeed, the relief requested by Plaintiff in this case would be the ultimate coup for Warren Jeffs.  It would be to reward Warren Jeffs for serious misconduct while never requiring him to explain or make amends for such conduct.

From the beginning, Warren Jeffs has refused to respond to allegations of misconduct which have been raised against him.  Indeed, the entire Probate Action was made necessary by Warren Jeffs' refusal to respond to allegations of serious misconduct in the Tort Lawsuits.  Jeffs knowingly and willingly sacrificed the Trust.  He would rather lose the Trust than be called upon to account for his actions.  He furthermore desired that his people would lose their homes in Short Creek so that his prophesies of persecution would be fulfilled and so that he could gather his chosen favorites to new lands in Texas and elsewhere.  He accordingly abandoned the Trust and forced the Attorneys General, the Court, and the Fiduciary to spend more than five years in trying to clean up his mess.  He sought to use the Attorneys General as his unwitting tools to accomplish his designs – to take over the Trust and force the people from their homes.

Warren Jeffs miscalculated in one respect, however.  Contrary to his expectation, the people did not lose their homes.  Due to the tireless efforts of the Fiduciary, the Court, and the Attorneys General, the Tort Lawsuits have been resolved, the homes have been protected, and his people have not been driven from Short Creek.  Accordingly, Warren Jeffs later changed his tactics and directed his people to seek a return of the Trust by appearing as individuals – such that he would not be required to appear or account for his misconduct.

Now, the Plaintiff in the present case would have this Court reward Warren Jeffs without making him account or make amends for his misconduct.  After years of refusing to participate, the Plaintiff now

appears and demands that Warren Jeffs be given the Trust – which Trust would not even be here but for the efforts of the Probate Court and the Fiduciary.  Now that the Trust has been preserved, and has been cleansed from the claims of the plaintiffs in the Tort Lawsuits, the Plaintiff would have this Court ignore everything that has happened over the past five years and simply hand the Trust over to the control of Warren Jeffs.  Plaintiff would do so at the expense and detriment of hundreds of people who have relied upon the finality of the Reformation Judgment in respect for the rule of law, while Warren Jeffs remains in his state of disobedience, breach of duty, contempt of court, and utter defiance of the rule of law.

*The law cannot be so unjust.*  It would be immoral and repugnant to give the Trust to Warren Jeffs under such circumstances.

## SUMMARY OF LEGAL ARGUMENT

Plaintiff cannot meet its burden to show it is likely to prevail on the merits of this case because there has been no violation of the Constitution, and because Plaintiff's claims are barred by a number of legal doctrines –  including laches, the Barton doctrine, the Rooker-Feldman doctrine, judicial immunity, standing, *res judicata*, abstention, and the Full Faith and Credit clause.  Plaintiff cannot meet its burden to show irreparable harm as it has no property interests or standing with respect to the Trust, and the alleged harm has been ongoing for 5 ½ years.  Furthermore, any harm to be suffered by Plaintiff in this matter is vastly outweighed by the substantial harm to be suffered by the Trust and many others if an injunction is issued.   Finally, the issuance of an injunction in this matter would be adverse to public policy.

## LEGAL ARGUMENT

Plaintiff fails to meet any of the four required elements for injunctive relief under Rule 65.

# I.   PLAINTIFF WILL NOT PREVAIL ON THE MERITS.

## A.   There has been no Violation of Plaintiff's First Amendment Religious Freedoms.

### I.   There has been no Establishment Clause Violation.

Plaintiff asserts that the Trust Reformation transgressed the Establishment Clause's prohibition of a government attempt "to take over and operate a church."  (Plaintiff's Memo. at 13).  This argument is factually and legally erroneous.  As discussed above, the UEP Trust is not a church, and there has been no government take-over of the same.

The Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971), laid down the test for determining whether government action violates the Establishment Clause: (1) it must have a secular purpose; (2) its principal effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive governmental entanglement with religion.

> *a.    The Trust reformation promoted secular purposes.*

In reforming the Trust, the Probate Court was motivated by a legitimate secular purpose.  The reformation allowed the Trust to survive and be protected – while remaining out of the hands of defaulting tort defendants who had knowingly and voluntarily abandoned the Trust, thereby exposing the homes of Trust beneficiaries, regardless of religious persuasion, to potentially massive default judgments.  Protection of the beneficial interests of trust beneficiaries is a process in which the state has a clear interest, per the Trust Code, and which the Probate Court made clear created the need for reformation.  (*See* Memorandum Decision of December 13, 2005 at ¶¶ 17, 22-23).  The doctrine of *cy pres* is religiously neutral.  The Court's use of such doctrine in the present case served the secular purpose of preserving the charitable trust for charitable uses, and preventing a forfeiture to the very person who breached his duties and placed the Trust at risk.

The reformation of the Trust was also necessary to prevent crime.  The Tort Lawsuits against the Trust, that Warren Jeffs failed to defend, alleged that he used the Trust to facilitate crimes against children.  Prevention of crime is clearly a secular purpose sufficient to withstand an Establishment Clause challenge.[46]  The secular purpose is heightened when the crime in question involves sex with a child.[47]

The law abhors termination of a charitable trust.  It would therefore be particularly offensive to allow the trustee of such a trust who is also the remainder beneficiary in the case of termination (as was the case with Warren Jeffs, who was both Trustee and remainder beneficiary by virtue of his status as the corporation sole of the FLDS Corporation Sole) to criminally cause the trust's failure to the detriment of the beneficiaries and to his own gain.

> b.     *The Reformation of the Trust Neither Advances nor Inhibits Religion.*

Plaintiff's chief argument regarding the offense to their religion caused by the reformation is the factual fallacy that the Fiduciary has usurped the role of FLDS Bishops.  Plaintiff argues that the Fiduciary seized control of Church property, ousted the FLDS from their homes and schools, and now rules with an iron fist from the pulpit he now occupies in Short Creek.  Nothing could be further from reality.  Under the Reformed Declaration of Trust, the Fiduciary was duty-bound to *not* exercise a religious role and he has been faithful to his obligation to act with religious neutrality.

Plaintiff's real gripe is that both the Probate Court and the Fiduciary have observed the basic prohibition expressed by the Court in Zorach v. Clauson, 343 U.S. 306, 314 (1952):

---

[46] *See e.g,* American Family Assoc. v. City and County of San Francisco, 277 F.3d 1114, 1121-23 (9th Cir. 2002) (endorsing secular purpose of discouraging hate crimes as basis for denial of establishment clause claim against City's resolutions denouncing religious advertisements regarding homosexuality); Roach v. Quarterman, 220 Fed. Appx. 270 (5th Cir. 2007) (upholding death penalty against establishment clause claim, despite evidence that bill's sponsor had made religious arguments in advancing legislation, where other testimony on deterrence of crime demonstrated a secular purpose).

[47] *See* Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244 (2002) ("The sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people."); New York v. Ferber, 458 U.S. 747, 756-57 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling").

The government must be neutral when it comes to competition between sects.  It may not thrust any sect on any person. It may not make a religious observance compulsory. It may not coerce anyone to attend church, to observe a religious holiday, or to take religious instruction.

The Court and the Fiduciary have administered the Trust according to neutral principles, thereby neither advancing nor inhibiting religion.  Plaintiff asserts that under Jones v. Wolf, 443 U.S. 595 (1979), the Probate Court's application of neutral principles should have led to termination and therefore reverted to the Corporation of the President.  However, such an argument misreads the 1998 Restated Trust Declaration itself.  The Declaration makes clear that the Corporation Sole is to receive Trust property ONLY if the Trust fails.  The Declaration expressly incorporates Utah law by reference, including the law of *cy pres*, which teaches that termination is heavily disfavored.

Plaintiff claims that the lands owned by the Trust were so unique they could not be divorced from a Bishop's administration without causing the Trust to fail, yet the word "Bishop" appears nowhere in the 1998 Restated Trust Declaration, a telling omission considering Plaintiff's emphasis on the alleged importance of such individuals to Trust administration.

The reality is that the Trust is not now and has never been devoid of secular purposes.  The only evidence from a former trustee of the Trust (and a fundamentalist Bishop), Winston Blackmore, is that the Trust is and was separate from the FLDS Church, had and has secular purposes, and has been administered by the Fiduciary without interfering in any way with Mr. Blackmore's and other fundamentalists efforts to live their religion.

c. <i>There has not been excessive entanglement with religion.</i>

The reformation of the Trust did not cause excessive entanglement with religion – it did just the opposite.  To have a non-FLDS judge or fiduciary administer the Trust under the language of the 1998 Restated Trust Declaration (which required that the Trust be administered in accordance with FLDS religious principles) would have entangled the court with religion.  The act of reforming the Trust allowed

for the Trust to be administered under neutral principles.  Through reformation, the Court avoided entanglement and allowed the Trust to survive in accordance with its purpose of providing for the just wants and needs of the people.

Plaintiffs' argument that the Court should have simply defended the Trust against lawsuits without reformation ignores the reality what was facing the Court and the Fiduciary at the time.  The Trust was in desperate need of management and no FLDS person was willing to step forward and administer the Trust, and there was no indication that they would do so at any time in the future.  This left the Trust and its beneficiaries in a dangerous position.  Soon after the appointment of the Fiduciary, disputes over the removal of large buildings and fixtures from Trust land.  In addition, disputes arose as to the right to occupy Trust homes which threatened to explode into violence.  Competing claimants each asserted to be faithful FLDS members, while accusing their adversaries of apostasy.  Similarly, a request to bury a deceased infant next to his grandparents in the Trust cemetery was opposed by other Trust beneficiaries on the ground that the infant failed to qualify for burial on sacred ground.  Resolution of such disputes by the Probate Court or Fiduciary was impossible without treading on hallowed First Amendment ground, if the decision were to be made according to the terms of the 1998 Restated Trust Declaration. Reformation allowed the competing claims to be resolved based on neutral principles using objective criteria (i.e., who had built the home, did the family of the deceased contribute to the Trust), and thus prevented the very "excessive entanglement" of which Plaintiff now complains.

### ii.     There has been no Free Exercise Clause Violation.

To prevail on a free exercise claim, Plaintiff must show that government action has created a coercive burden with respect to its members' exercise of their religion.  *See e.g.* U.S. v. Lee, 455 U.S. 252, 256-57 (1997).  As is the case with each of Plaintiff's claims, this one is grounded in false facts, namely the assertion that the Fiduciary plans to force deeds upon those who don't want them.  The record, however,

is clear in this regard:  the Fiduciary will never force any Trust beneficiary to take title to a home if they do not want it.  They can choose for themselves.  Where Plaintiff's members will have the right to choose for themselves, no Free Exercise violation can be found. [48] Moreover, the neutral criteria of the Reformed Trust are such that FLDS members can petition for benefits and request reasonable accommodations as to the manner in which Trust property is transferred and titled.

**B.  Plaintiff's Claims are Barred by Laches.**

As the Utah Supreme Court has already held, Plaintiff's Amended Complaint is barred by the equitable doctrine of laches as a result of the years of delay before Plaintiff challenged the reformation, and the countless transactions that took place in reliance on the Trust's modification.  FLDS v. Lindberg, 238 P.3d at 1062.  Noting that laches is defined as "delay that works a disadvantage to another,"  the Supreme Court found that the two elements of laches:  (1) a party's lack of diligence and (2) an injury resulting from that lack of diligence, had both been met.  Id. at 1062-64.

Of particular interest to the Utah Supreme Court was the fact that the FLDS had offered no explanation for their delay, or why such delay was reasonable.  Id. at 1063.  Plaintiff's claims here suffer from the same defect.  They attempt to argue that the possibility of reformation was not immediately clear to them, but that argument fails in light of the fact that the first pleading filed by the Attorney General of Utah in petitions to the Court for removal of the former trustees anticipated that reformation would be necessary and expressly referenced reformation in its prayer for relief.  Further, Warren Jeffs' records make clear that he received copies of the Probate Court pleadings, and made the deliberate decision not

---

[48] *See e.g.* Bauchman for Bauchman v. West High School, 132 F.3d 542, 557 (10th Cir. 1997) (concluding that where student had a choice whether or not to sing songs she believed infringed upon her exercise of religious freedom, with no adverse impact on her academic record, the element of coercion was negated, defeating Free Exercise claim); Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1533 (9th Cir. 1985) (finding no Free Exercise violation where student was given permission to avoid classroom discussion of book).

to participate so that he would not be required to answer for his crimes. In addition, the Plaintiff's affiant, Willie Jessop, admits that he was aware of the Probate Action in 2005. (*See* Willie Jessop Aff. at ¶ 26).

This Court should join with the Utah Supreme Court in holding that Plaintiff's claims are barred by laches.

**C. This Court Lacks Subject Matter Jurisdiction over Plaintiff's Claim.**

**I.     The *Barton* Doctrine Deprives this Court of Subject Matter Jurisdiction.**

In Barton v.Barbour, 104 U.S. 126 (1881) and Porter v. Sabin, 149 U.S. 473 (1893), the United States Supreme Court explained the extent of the exclusive jurisdictional authority of courts presiding over receivership[49] estates.   In discussing what became known as the "Barton doctrine", the Court held that a receiver may not be sued in *any* court without first receiving permission from the court that appointed the receiver.  The Court held that "no suit, unless expressly authorized by statute, can be brought against the receiver without the permission of the court which appointed him." Porter, 149 U.S. at 479.  The Court explained:

> It is for [the receivership] court, in its discretion, to decide whether it will determine for itself all claims of or against the receiver, or will allow them to be litigated elsewhere. It may direct claims in favor of the corporation to be sued on by the receiver in other tribunals, or may leave him to adjust and settle them without suit, as in its judgment may be most beneficial to those interested in the estate. Any claim against the receiver or the corporation the court may permit to be put in suit in another tribunal against the receiver, or may reserve to itself the determination of; . . .

Id.  The Barton Court further explained that, without leave of the receivership court, the courts of other jurisdictions have "no jurisdiction to entertain a suit." Barton, 104 U.S. at 131.  The jurisdictional restrictions imposed by the Barton doctrine apply to any and all courts other than the receivership court,

---

[49] The Uniform Law Comments to UTAH CODE ANN. § 75-7-1001 provide that a special fiduciary is "also sometimes referred to as a receiver." The Comments further provide that Section 75-7-1001 of the Trust Code is derived from Section 199 of the Restatement (Second) of Trusts, which provides for the appointment of a "receiver" who shall "take possession of the trust property and administer the trust." Restatement (Second) of Trusts, § 199(d).

including federal courts and courts outside the territorial jurisdiction of the receivership court.  Barton, 104 U.S. at 128; Porter, 149 U.S. at 480.

Although it has been well over one hundred years since the Barton doctrine was first articulated, the essence of the doctrine remains valid and effective to this day.[50]  Because the Fiduciary is a receiver within the meaning of the Barton doctrine, this Court is divested of subject matter jurisdiction over the Fiduciary unless and until Plaintiff obtains permission from the Probate Court.[51]

### ii.   *Rooker-Feldman* Deprives this Court of Subject Matter Jurisdiction.

The Supreme Court has long held that federal courts are prohibited from entertaining collateral attacks from state court judgments by those who lost in the state court proceedings:  "The Rooker-Feldman doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced."  Lance v. Dennis, 546 U.S. 459, 460 (2006) (internal quotations and citations omitted).

Such doctrine clearly applies in the present case.  Here, the Plaintiffs were "losers" in the state court action – in that they voluntarily failed to appear and participate after having received notice.[52]  They are

---

[50] See e.g., In re Kashani, 190 B.R. 875, 884 (9th Cir. BAP 1995) ("Courts have long held that the nonappointing court may not entertain suits against the trustee for acts done in the trustee's official capacity without leave from the appointing court because the other court lacks subject matter jurisdiction."); In re Crown Vantage, Inc., 421 F.3d 963, 970-71 (9th Cir. 2005) (applying the Barton doctrine to a bankruptcy trustee, and explaining that "before suit can be brought against a court-appointed receiver, leave of the court by which he was appointed must be obtained" (citations and quotations omitted)); Carter v. Rodgers, 220 F.3d 1249, 1252 (11th Cir. 2000) (applying the Barton doctrine and holding that federal district court lacked subject matter jurisdiction over cause of action which was filed against bankruptcy trustee without obtaining leave of the court that appointed the trustee).  See also, Strand v. Loveridge, 2008 WL 893004 (D. Utah 2008) (applying the Barton doctrine to prohibit the filing of a state court lawsuit against a bankruptcy trustee).

[51] Many years ago, Congress enacted a statute which establishes a limited exception to the Barton doctrine – in cases where a receiver carries on the business operations of the entity in receivership.  See U.S.C. § 959(a).  Such exception does not apply in the present case, as the Trust is a charitable trust and not a business trust and had no business operations, and the Fiduciary has not carried on any business with respect to Trust Property.

[52] Plaintiff implies that parties in privity with state court losers are no longer bound by the rule of *Rooker-Feldman* after Lance v. Dennis, 546 U.S. 459 (2006) and Mo's Express LLC v. Sopkin, 441 F.3d 1229 (10th Cir. 2006).  See Plaintiff's Memorandum at 39.  To the contrary, Lance v. Dennis merely clarified the test for privity, and rejected

now seeking to undo a four-year-old, final, non-appealable judgment of a state court, and are even requesting the federal court to enjoin the state court from conducting additional proceedings!  Such a course of action is simply not permitted.

The record in the Trust Probate Case confirms that extensive notice was received by the Plaintiff's members as to the appointment of the Fiduciary the reformation of the Trust.  No members opposed or attempted to appeal the reformation. The Amended Complaint leaves no doubt that Plaintiff rests its claims on the very conduct that led to the state court litigation and final judgment. They now seek to undo a non-appealable judgment of a state court. The *Rooker-Feldman* doctrine bars such review. Thus, this court should properly find that it lacks subject matter jurisdiction.

### iii.    The Fiduciary is Immune from Suit.

The Fiduciary is entitled to absolute immunity from suit as a quasi-judicial officer. It is well established that judges are immune from liability for acts performed in their judicial capacities. *(See e.g.* Stump v. Sparkman, 435 U.S. 349, 355-56 (1978); Pierson v. Ray, 386 U.S. 547, 553-55 (1967); Forrester v. White, 484 U.S. 219, 225-29 (1988); Bradley v. Fisher, 80 U.S. 335, 347 (1871)). Judicial immunity includes not only immunity from damages but immunity from suit itself. (*See e.g.* Mireles v. Waco, 502 U.S. 9, 11 (1991).  Similar to a judge, a court-appointed officer performing acts under a court order that requires that individual to exercise their discretion in an integral part of the judicial process is granted quasi-judicial immunity. (*See e.g.* T&W Investment Co., v. Kurtz, 588 F.2d 801, 802 (10th Cir. 1978) (granting a court-appointed receiver immunity for selling personal property of a corporation he was appointed to help administer);  Parker v. Dodgion, 971 P.2d 496, 498 (Utah 1998) (granting a court-

---

the contention that a State legislature is in privity with the State's citizens.  It did not overturn the general rule that the officers, agents, servants, employees, attorneys or representatives of a "state court loser" within the meaning of *Rooker-Feldman* are similarly barred from bringing suit to challenge the state court ruling.  *See* Mo's Express, 441 F.3d at 1235, n. 2.  Where Willie Jessop is acting on explicit directions of Warren Jeffs in leading the charge for Plaintiff, Plaintiff is a state court loser that is precluded from challenging the Trust reformation in federal Court under Rooker-Feldman.

appointed psychologist immunity)). The immunity is extended because the officers judgments are "function[ly] comparab[le] to those of judges-that is, because they, too, 'exercise a discretionary judgment' as part of their function." (Parker 971 P.2d at 498 (citing Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993))).

All of the Fiduciary's actions that Plaintiff's complain about were taken by the Fiduciary in an effort to satisfy his court-appointed duties.[53] All actions of the Fiduciary complained of in the Amended Complaint were taken while performing discretionary acts and, as such, are therefore barred from any action for damages or suit by quasi-judicial immunity.

Further, strong public policy reasons which gave rise to the doctrine of quasi-judicial immunity compel its application here.  Immunity is extended to court-appointed officers, receivers, special masters, etc., in order to ensure that there will not be a lack of qualified individuals willing to serve. If such individuals were routinely subject to suit, they would be less willing to make necessary judgments, even if objectively based, for fear of liability. (See Parker, 971 P.2d at 499).

**D.  Plaintiff and its Members Lack Standing.**

"In every federal case, the party bringing the suit must establish standing to prosecute the action." (Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004)). Yet, neither the Plaintiff association nor its members can establish standing under the claims plead here.

_____

[53] The Fiduciary's authority was expanded in September of 2005 to include, among other things:
　　　(a) file lawsuits to recover or protect Trust property as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary;
　　　(b) **manage, lease, or rent the property of the Trust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary**;
　　　….
　　　(d) Work toward the payment of the Trust's property taxes;
　　　(e) Request and collect money for the payment of taxes from persons residing on Trust property; [and]
　　　(f) Take action to remove persons who refuse to pay their fair share of property taxes from Trust property . . . .
Order on Procedure to Appoint Trustees and Expansion of Special Fiduciary's Authority, Sept. 2, 2005 (emphasis added).   The Fiduciary's duties were further expanded when the Trust was reformed.

## I.  Plaintiff's Members Lack Standing as Beneficiaries of the Trust

The Complaint must be dismissed because the Plaintiffs, as beneficiaries, lack standing to challenge the actions with respect to the Trust.  The law is clear that members of a charitable trust's beneficiary class have no standing to contest the actions of the trustees or the court.  In the present case, only the Attorneys General have standing to assure that the Trust is administered in accordance with its legal purpose.  (*See e.g.* Gredig v. Sterling, 47 F.2d 832 (5th Cir. 1931)).  The Attorney General appears in a suit involving the enforcement of a charitable trust not only as a party litigant but as attorney for the public beneficiaries. (*See e.g.* Thatcher v. St. Louis, 122 S.W. 2d 915 (Mo. 1938)).  Therefore, because the interests of the plaintiff's are already represented by the Attorneys

General in this suit they lack standing and their claims should be dismissed.

## ii.  Plaintiff Lacks Standing.

To the extent the unincorporated association seeks to make claims on behalf of individual members without naming them, it must establish standing to do so.  Only a "person" has a standing under 42 U.S.C. § 1983 (the basis of Plaintiff's First Cause of Action).  An unincorporated association is not a "person" and therefore has no standing to bring Section 1983 Claims. (*See* Lippoldt v. Cole, 468 F.3d 1204, 1212-16 (10th Cir. 2006)).

Plaintiff appears to use the ambiguity as to its identity to its advantage.[54]  It appears to want the best of both worlds.  When it comes to being subjected to *res judicata* and laches for failing to participate in the Probate Action for over three years, Plaintiff acts as if its members were strangers to the Probate Action with no standing to appear – such that they are not bound by the Probate Court's rulings.  Yet, in this case, Plaintiff purports to have standing sufficient to allow it to collaterally attack the actions of the Probate Court.  Plaintiff cannot have it both ways.  Either it lacks standing with respect to the reformation

---

[54] As discussed in Footnote no.1, above, Plaintiff has failed to even provide the names of the members of the Plaintiff's so-called "informal association".

of the Trust (in which case it lacks standing to attack it in this Court), or it has standing as to such matters

(in which case it is subject to *res judicata* and laches with respect to the Probate Court's rulings).  Either

way, Plaintiff's claim should be denied.[55]

**E.  Plaintiff's Claims are Barred by the Doctrine of *Res Judicata*.**

**I.    The Probate Court's Reformation Judgment is *Res Judicata*.**

Utah law is clear that a final judgment rendered by a district court may only be challenged on appeal

to a higher court.  Any attack upon a final judgment outside of the appellate process is considered a

"collateral attack" which is not permitted.

> The doctrine [of *res judicata*] renders a final judgment, on the merits, by a Court of competent
> jurisdiction, conclusive upon the parties and is a bar to subsequent litigation of the same issues.

> The general rule of law is that a judgment may not be drawn in question in a collateral
> proceeding and an attack upon a judgment is regarded as collateral if made when the judgment
> is offered as the basis of a claim in a subsequent proceeding.

Olsen v. Board of Education, 571 P.2d 1336,1338 (Utah 1977).  This prohibition of collateral attacks

applies even if the judgment in the prior action was a default judgment:

> With rare exception when a Court with proper jurisdiction enters a final judgment, *including a*
> *default judgment*, that judgment can only be attacked on direct appeal.

State v. Hamilton, 2003 UT 22, § 25, 70 P.3d 111 (emphasis added).  *(See also* Schoney v. Memorial

Estates, Inc., 863 P.2d 59, 61 (Utah 1993) (default judgment is a final judgment entitled to *res judicata*)).

"[T]he doctrine of res judicata precludes the relitigation of all issues and claims that ***could have been***

***litigated*** as well as those that were, in fact, litigated in the prior action."  State v. Garner, 2005 UT 6, 106

P.3d 729, 731 (internal quotations and punctuation omitted) (emphasis added).

---

[55] In actuality, the Plaintiff's members lacked formal standing in the Probate Action under charitable trust law.
Nevertheless, the Probate Court invited their participation and allowed them to appear and be heard with respect to
the reformation of the Trust.  Thus, in the present case, Plaintiff's claims are barred because of Plaintiff's lack
of standing and they are also barred by laches and *res judicata* for failing to participate in the Probate Court when
they had the opportunity to do so.

Once a final judgment is entered, the parties are entitled to rely on the validity and finality of such judgment, *even if the judgment was based upon an erroneous ruling by the court*.  As held by the Utah Supreme Court and United States Supreme Court:

> [A]n erroneous conclusion reached by the court in the first suit does not deprive the defendants in the second action of their right to rely upon the plea of res judicata..... a judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected by a direct review and not by bringing another action upon the same cause (of action).

Collins v. Sandy City Board of Adjustment, 2002 UT 77 § 18, 52 P.3d 1267 (*quoting* Federated Department Stores, Inc v. Moite, 452 US 324, 398-99 (1981)).

In applying the doctrine of *res judicata* to the present litigation, it is readily apparent that the Amended Complaint, and the request for injunctive relief, are an impermissible collateral attack upon the final Reformation Judgment entered by the Third District Court in the Probate Action.  Each of the causes of action in the Amended Complaint necessarily seeks this Court to overturn the Court's Reformation Judgment.  Indeed, The Amended Complaint reads like an appeal brief – purporting to show the errors in Judge Lindberg's ruling and seeking this Court to reverse the ruling based upon such purported errors.[56]  Such arguments could have been raised in the Probate Action, and on direct appeal therefrom.  Having failed to do so, the Plaintiffs are prohibited from collaterally attacking the Reformation Judgment now.

Given that the Reformation Judgment is a final and non-appealable ruling on the merits,[57] given that the Plaintiff's members and the FLDS Church were served with notice of the Probate Action and had every opportunity to appear and challenge the Reformation Judgment, and given that each of the

---

[56] The Fiduciary strongly disputes that Judge Lindberg erred in connection with the Reformation Declaration. Rather, her opinion is well-reasoned and wholly in accordance with the law.  Thus, even if the Plaintiffs had appeared in the Probate Action and raised the arguments which they are now raising for the very first time, the Reformation Judgment would have been entered by the Court and sustained on any appeal.

[57] The fact that the Reformation Judgment was entered in a probate action does not weaken the preclusive effect of such judgment for purposes of *res judicata*.  *See* In re Linford's Estate, 239 P.2d 200, 204 (Utah 1951) ("decrees of the probate court can be assailed only . . .  upon the same grounds as other judgments").

arguments raised in the present collateral attack could have been raised in the Probate Action, the doctrine of *res judicata* clearly applies to bar the Plaintiffs' present belated collateral attack on the judgment.

Contrary to Plaintiff's assertion that they are not bound by the Reformation Judgment because they were not parties, they are considered "parties or their privies" for purposes of *res judicata*. (*See* Taylor v. Sturgell, 553 U.S. 880, 893–94 (2008) (explaining that *res judicata* may be properly applied where a party to the first action controls the party to the second action)). There is no dispute that Warren Jeffs, the prophet of the FLDS Church, was a party to the Probate Action in his capacity as a former Trustee of the Trust. It is he who commanded Willie Jessop and the current Plaintiff to reclaim the Trust on his behalf – but in their individual names without revealing that they were acting on his behalf. Plaintiff and Mr. Jessop are acting as agents of Jeffs on his explicit directions in attacking the Trust reformation and seeking to regain control of the Trust for Jeffs. As such, they are in privity with a party to the Reformation Judgment for purposes of *res judicata*.

For more than four years, the Court, the Fiduciary, and numerous other parties have acted in reliance upon the validity and finality of the Reformation Judgment. To undo the judgment four years later, based upon a collateral attack by a judge-shopping Plaintiff who deliberately chose not to participate in the underlying Probate Action, would undermine the validity of all judgments. Furthermore, it would unfairly prejudice the Fiduciary and other parties who have relied upon the validity of such judgment, and would encourage needless vexatious litigation by parties seeking to undermine the validity of judgments which are deemed unfavorable after the fact.

Plaintiff's members willfully complied with Warren Jeffs' instructions to abstain from participation in the Probate Action. There is no exception to the application of *res judicata* for willful failure to appear based on religious principles. The Complaint should be dismissed as an impermissible collateral attack upon the final judgment entered by the Probate Court.

ii. **The Utah Supreme Court's Decision is *Res Judicata* on the Issue of Laches.**

Knowing the fatal nature of the Utah Supreme Court's decision to its claims, Plaintiff argues that such ruling should not be given *res judicata* effect in federal court. A federal court applies the law of the state whose courts issued the judgment in determining its preclusive effect. <u>Migra v. Warren City Scho. Dist. Bd. Educ.</u>, 465, U.S.75, 81 (1984). As previously discussed, a Utah state court would give preclusive effect to a finding of laches by the Utah Supreme Court. This court should do the same.

iii. **Judge Waddoups Ruling is *Res Judicata* on the Issues of *Younger* Abstention and *Rooker-Feldman*, and the <u>Cooke v. Wisan</u> decision in Arizona Federal District Court is *Res Judicata* on the Issue of Beneficiary Standing.**

Federal courts in both Utah and Arizona have already dismissed litigation filed by and on behalf of members of the FLDS Church, complaining that the reformation was unlawful and that the Fiduciary had illegally seized control of FLDS homes. In Utah, Judge Waddoups dismissed those claims on the basis of *Younger* abstention and the *Rooker-Feldman* doctrine. In Arizona, the case was dismissed because the Trust beneficiaries lacked standing to enforce the charitable trust. Both rulings are entitled to preclusive effect here.

F. **<u>Federal Abstention Doctrine Precludes this Court from Considering Plaintiff's Claims.</u>**

Under the *Younger* Abstention doctrine a federal court must abstain and dismiss a Complaint if: (1) there exists an ongoing state judicial proceeding; that (2) implicates important state interests on matters traditionally resolved by state law; and that (3) offers an adequate opportunity for the plaintiffs to raise a constitutional challenge. (*See e.g.* <u>Younger v. Harris</u>, 401 U.S. 37 (1971); <u>Middlesex County Ethics Comm. V. Garden State Bar Ass'n</u>, 457 U.S. 423, 431 (1982)). If these three conditions are met then abstention is mandatory. (*See e.g.* <u>Crown Point I, LLC v. Intermountain Rural Elec. Ass'n</u>, 319 F.3d 1211, 1215 (10th Cir. 2006); <u>Seneca-Cayuga Tribe v. Oklahoma</u>, 874 F.2d 709, 711 (10th Cir. 1989)). In the

present case, the Amended Complaint must be dismissed by this Court because all three requirements are met.

## I.   The Complaint Admits and Cites a Parallel State Court Proceeding

There are at least two parallel state court proceedings which Plaintiff admits are relevant for *Younger* analysis – the Probate Action and the Extraordinary Writ proceedings before the Supreme Court of Utah. Plaintiff's members were given the opportunity to appear and be heard in the Probate Action prior to the reformation of the Trust, but they declined to do so and allowed the Reformation Judgment to become final and non-appealable.   In the Extraordinary Writ proceedings, the Plaintiff raised the identical arguments raised in the Plaintiff's Amended Complaint in the present case.   There, Plaintiff cited the religious history and purposes of the Trust and specifically complained about the reformation of the Trust and its impact on the efforts of Plaintiff's members to live their faith.   The Supreme Court's ruling on the Petition for Extraordinary Writ made clear that Plaintiff's constitutional attack on the Reformation Judgment is barred by laches.

As an additional part of the Probate Court proceedings, several of the Jeffs Adherents, including Willie Jessop, Merlin Jessop, Dan Johnson, Bishop Lyle Jeffs, Bishop James Oler, and the Corporation Sole have moved to intervene to challenge the sale of Berry Knoll farm as a violation of constitutional rights.   Those motions to intervene were denied, and the rulings denying intervention timely appealed, in Utah Supreme Court Case No. 20090691.   The appeal is set for hearing on November 30, 2010.

Thus, pending in state court are proceedings on behalf of FLDS members claiming that allowing the sale of the Berry Knoll Farm will be a violation of Church members' religious freedoms. The underlying claims in the state court proceedings are based on the same claims of an allegedly unconstitutional reformation of the Trust and the corresponding harm which will allegedly result from the sale of the farm.

There is clearly sufficient duplication between the parties and claims raised in this case and the claims and parties in parallel state court proceedings to mandate abstention.[58]

**ii.  The Issues Involve Important State Matters.**

Several important state matters are involved in the ongoing Probate Action, and justify abstention. First, the implementation and administration of trust and probate codes are traditionally left to the states, with the Attorney General of the State tasked with enforcing a charitable trust.  See, e.g., Zschernig v. Miller, 389 U.S. 429, 440 (1968) ("The several States, of course, have traditionally regulated the descent and distribution of estates).  Utah has a particular interest in protecting and in adjudicating the interests of its charitable trusts.  Indeed, under the Utah Trust Code, the Probate Court has exclusive jurisdiction with respect to reformation of the Trust.  (See Utah Code Ann. § 75-7-201(1)).  Second, Utah has a strong interest in enforcement of and finality of judgments.  See e.g. Day v. McDonough, 547 U.S. 198, 208 n. 8 (2006) (discussing "the well-recognized interest in the finality of state court judgments").  Third, Utah has a strong interest in the interpretation of its own State constitution by its own appellate courts.  See, Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 432-33 (finding an important state interest and applying Younger where state constitution governed attorney discipline and licensing).  Fourth, Utah has a strong interest in maintaining the immunity of its judges and judicial appointees like the Fiduciary.  And fifth, Utah has an interest in assuring the charitable trusts are not used to further criminal conduct.

_____

[58] See D.L. v. Unified School Dist. No. 497, 392 F.3d 1223, 1231 (10th Cir. 2004) (finding that complete overlap of claims and parties is unnecessary for application of Younger abstention, only a "close connection" is necessary, especially when the party to the federal proceedings is "merely an alter ego of a party in state court"); Cedar Rapids Cellular Tel., L.P. v. Miller, 280 F.3d 874, 882 (8th Cir. 2002) (corporation cannot avoid Younger by having subsidiaries sue in federal court when federal relief could obstruct enforcement of any state-court remedy); Spargo v. N.Y. State Com'n on Jud. Conduct, 351 F.3d 65, 81-84 (2d Cir. 2003) (Younger applies to persons not parties in state proceeding when free-speech right asserted is purely derivative of free-speech rights of defendant in state proceeding).

### iii.    The Plaintiff's Constitutional Rights Are Adequately Protected in State Court

The Utah Supreme Court heard and considered the same constitutional arguments that Plaintiffs asserts here.  The Court expressly recognized the Plaintiff's right on remand to raise future claims that the Fiduciary is discriminating in the distribution of Trust property in the event that such discrimination occurs.  Plaintiffs' constitutional rights are adequately protected in State Court.

### G.    This Court must Abstain under the Full Faith & Credit Clause, Affording Full Faith & Credit to both the Reformation and the Utah Supreme Court Decision.

Article 4, § 1 of the United States Constitution provides as follows:

> Full Faith and Credit shall be given in each state to the Public Acts, Records and Judicial Proceedings of every other State.

Similarly, the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, provides that a state's "judicial proceedings . . . shall have the same Full Faith and Credit in every court within the United States and its Territories and Possessions as they have by law or usage in the Courts of such State Territory or Possession from which they are taken."  Thus, federal courts must give the same preclusive effect to a state court judgment as another court of that state would give.  Parsons Steel, Inc. v. First Alabama Bank, 106 S. Ct. 768, 773 (1986).  The Supreme Court has stated that "although the federal courts may look to the common law or to the policy supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state court judgments whenever the courts of the state from which the judgments emerge would do so . . . ."  Allen v. McCurray, 449 U.S. 90, 961 (1980).

In the present case, the Reformation Judgment and the Utah Supreme Court decision regarding laches are entitled to full faith and credit by this Court.  Because Utah law requires that the Reformation Judgment and the Utah Supreme Court decision be treated as final and binding, and not subject to any collateral attack, this Court must do the same.

## II.   **PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM.**

The assertion that Plaintiff will suffer irreparable harm if the Trust is permitted to sell Trust property that Plaintiff has never owned is wholly without merit.  Plaintiff does not have rights or interest in the Trust's property – and therefore cannot suffer any injury if the property is sold or subdivided.  This is true as to the Plaintiffs' "informal association" as well as to the FLDS Church itself.

A review of the relevant facts shows that the Berry Knoll property has never been owned by the FLDS Church or the Plaintiffs.  Under Utah trust law, the members of a beneficiary class of a charitable trust have no rights to the Trust's property and have no standing to assert any claim against such property.  Having *never* owned the property, and having no legal rights or claims against it, the Plaintiff simply cannot suffer irreparable injury from the sale or subdivision of such property.[59]

Furthermore, the actions of the Plaintiff's members in this case belie their claim to irreparable harm.  The alleged harm began in May, 2005, when the Court appointed the Fiduciary to administer the Trust.  Yet, Plaintiff waited more than three years to seek injunctive relief.  Thereafter, even after filing the present lawsuit, the Plaintiff waited an additional two years to file the present renewed Motion for TRO.  If the harm were so great or irreparable, why did the Plaintiff wait until October 2010 to seek relief?  What is there about this case now that is different from the past year, when the Plaintiff was content to not seek

---

[59] Furthermore, Plaintiff fails to acknowledge that its members submitted evidence and argument against the proposed sell of the Berry Knoll farm in the Probate Action, and that the Probate Court and held a July 2009 hearing for the very purpose of allowing Plaintiff, and others similarly situated, to be heard with respect to the proposed sale.  Thus, Plaintiff has been granted more due process than it is legally entitled to receive. If the proposed sale is as bad as Plaintiffs allege (which it is not), then Plaintiff should have presented sufficient evidence to convince the Court who has proper jurisdiction over the matter – the Probate Court.  The truth is that Plaintiffs have no legitimate arguments against the proposed sale.  Their belated attempts to attack the sale are based upon pretexts – and not true facts.  Their true motivation is to starve the Trust of money needed to defend against the Plaintiffs' voluminous legal attacks.

relief from this Court?[60]  Clearly, having waited years to seek injunctive relief, it cannot be said that the Plaintiff will suffer irreparable harm while the Court is allowed to adjudicate this case on the merits.

## III.   <u>THE BALANCE OF HARMS FAVORS THE FIDUCIARY AND THE BROADER BENEFICIARY CLASS.</u>

In contrast to the lack of harm to be suffered by the Plaintiffs if an injunction is denied, substantial harm will be suffered by the Trust and by the numerous others if an injunction is granted.

As to the Trust, the entry of an injunction could threaten its very survival.  As discussed above, the Trust is suffering a serious liquidity crisis and is in desperate need of cash to fund its ongoing expenses.  The Trust needs cash to defend against the onslaught of legal attacks which the Plaintiffs and others have inflicted upon it.  It is essential that the Trust obtain the funds necessary to hire and retain its legal counsel so as to prevent default in such lawsuits.[61]

In addition to the Trust's substantial legal costs, the Trust has numerous other expenses in ongoing Trust administration.   Without funds, the Trust will be unable to pay its property managers and engineering consultants, and will be unable to pay other ongoing costs and expenses necessary for the continued operation of the Trust.

---

[60] In December, 2008, the parties agreed to a stay of this litigation, but provided that any party could end the stay and re-commence the litigation at any time.  At a hearing in December 2009, this Court made it clear that there was no type of injunction in place and that the Fiduciary was freed from any promises made at the November 2008 hearing.  Nevertheless, the Plaintiff waited ten more months before seeking injunctive relief.  Yet it now states that its harm is irreparable and that it needs immediate relief before the Court can even rule on the merits of the case.

[61] Plaintiff minimizes the harms suffered by the Trust and its professionals as a result of the Trust's inability to pay professional fees.  In fact, the Trust's failure to pay has caused significant harm and it seriously threatens the Trust's ability to retain its present counsel and to hire new counsel.  The professional fees incurred by the Trust have been reasonable and necessary in defending the interests of the Trust.  The amount of such fees has been consistent with the fees incurred by the Trust prior to the appointment of the Fiduciary.

As a land-holding trust, the only reasonable method for the Trust to obtain the needed funds is to sell property.[62] To enjoin this Trust from selling property would be akin to enjoining a restaurant from selling food.  It would cut off its only means of funding, and threaten its very existence.

Furthermore, an injunction against Trust administration would leave the Trust without leadership and would result in utter chaos on the ground.  There would be inevitable conflicts and disputes as to use and occupancy of Trust property with no means of resolving such disputes.  The  problems of non-payment of property taxes would be exacerbated, and the Trust would default on its commitment and obligations.  Furthermore, the Trust would not be defended in the numerous lawsuits in which it has become embroiled, and it would sustain irreparable damage in such cases.

In addition to the irreparable harm to be suffered by the Trust, an injunction would also harm the many people who have relied upon the reformation of the Trust.  As recognized by the Utah Supreme Court, there are many people who have made decisions in good faith reliance upon the rule of law who would be harmed by an injunction.  This includes the people who have entered into leases and occupancy agreements with the Fiduciary.  Such people have suffered numerous acts of harassment and intimidation in the past, while the Probate Court and the Fiduciary have been in place.  They would suffer inestimable greater harm if Trust administration is enjoined and the Fiduciary and Probate Court are rendered powerless to enforce leases and occupancy agreements.[63]

---

[62] The Trust has attempted to raise funds by assessing a $100 monthly payment upon each residence upon Trust land.  Such attempt, however, has not proved to be successful, as the majority of the occupants, including the Plaintiff's members, are refusing to make the payments.

[63]   The uncertainty created by this and other legal attacks against the Fiduciary and the Trust has already emboldened Willie Jessop and his followers to brazenly defy the orders of the Probate Court and oppress the residents who have entered into leases with the Fiduciary.  Crops planted by a lessee of the Trust have been plowed under and destroyed, and his harvested grain taken from Trust silos and dumped into the street.  A family who signed an Occupancy Agreement with the Fiduciary has been denied water and power by FLDS city officials – forcing the disabled father to use a generator to operate his respirator.  After the State of Arizona found good cause to commence a discrimination action against the city, city officials showed up with a backhoe to plow up the family's front yard based on unfounded accustions.  Other members of the beneficiary class have been refused access to the cemetery when seeking to bury their deceased family members in family plots located on Trust land,

Although the Plaintiff exhibits cavalier disregard for the many people who have relied upon the validity of the Reformation Judgment, this Court should not. Before issuing any injunction in this matter, the Court must consider the great harms to be suffered by the many people who have shown respect for the rule of law.

## IV.  <u>INJUNCTIVE RELIEF WOULD BE ADVERSE TO THE PUBLIC INTEREST</u>.

Finally, it is clear that enjoining the State Court and the Trust would be contrary to public policy. Public policy disfavors judge shopping.  It disfavors collateral attacks.  Judgments should be challenged through the appellate process – not through separate lawsuits filed in different courts, years after the fact.

The relief requested in the present TRO Motion is contrary to public policy.  Plaintiffs would have this Court reach out and enjoin a state court from conducting *any* proceedings in a case which is properly pending before the state court – indeed, in a pending trust probate case over which the state court has specific exclusive jurisdiction. (*See* Utah Code Ann. § 75-7-201(1)). Public policy, including our federal system of separation of powers and comity, clearly disfavors the exercise of this Court's jurisdiction to enjoin the State from administering the Trust and enforcing the lawful orders of the Probate Court.

More importantly, the public interest favors keeping charitable trust assets out of the control of those who have used Trust assets in the past to further illegal ends, including crimes against children (thereby exposing homes of trust beneficiaries on trust lands to liability for such acts).  Despite its denials to the contrary, the evidence proves that Plaintiff is acting on behalf of the man who ordered his followers to abandon the Trust and move to Texas where eight FLDS men have been convicted of or plead guilty to sex crimes against children.  That the FLDS elite have spent millions of dollars in legal fees to oppose the

---

despite the Fiduciary's approval of their requests.

    If Plaintiff members are willing to defy the law and intimidate residents while their attempts to enjoin the Fiduciary are only pending, one can only imagine what will happen to the rights of residents if the Fiduciary and the Probate court are enjoined from defending and administering the Trust.  Termination of the Probate Court's administration of the Trust is likely to unleash retaliation and abuse far beyond what the residents in the community have already suffered.

Fiduciary's efforts to distribute Trust property to members of the beneficiary class (the large majority of which would go to FLDS members), proves that this motion has nothing to do with Constitutional freedoms and everything to do with the FLDS elite's desire to regain **absolute** control over the Trust so they can "cleanse" the community of any "apostates" who might question their authority or report unlawful activities to outside law enforcement. The protections of the Constitution should not be used as a pretext to harass the weak and facilitate crimes against the innocent.

## **CONCLUSION**

For all of the foregoing reasons, the Fiduciary respectfully requests that the Plaintiff's Renewed Motion for Temporary Restraining Order and Preliminary Injunction be denied.

DATED: November 9, 2010          CALLISTER NEBEKER & McCULLOUGH


                                 By:   /s/  Jeffrey L. Shields
                                    JEFFREY L. SHIELDS
                                    Attorneys for the Special Fiduciary

550955.1

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **OPPOSITION TO RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served via the Court's CM/ECF electronic filing system, on November 9, 2010.  A copy of the Court's Electronic Mail Notice List is attached.


_/s/ Jeffrey L. Shields_

550955.1

# Mailing Information for a Case 2:08-cv-00772-DB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James C. Bradshaw**
  jim@brownbradshaw.com,carol@brownbradshaw.com,michelle@brownbradshaw.com

- **Stephen C. Clark**
  sclark@joneswaldo.com,msorenson@joneswaldo.com,aarmstrong@joneswaldo.com

- **Frederick M. Gedicks**
  gedicksf@lawgate.byu.edu,intakeclerk@scmlaw.com

- **Ryan M. Harris**
  rharris@joneswaldo.com,khess@joneswaldo.com

- **Randy S. Hunter**
  randyhunter@utah.gov

- **Jerrold S. Jensen**
  jerroldjensen@utah.gov,scornell@utah.gov

- **Kenneth A. Okazaki**
  kokazaki@joneswaldo.com

- **Rodney R. Parker**
  rparker@scmlaw.com,intakeclerk@scmlaw.com

- **William A. Richards**
  bill.richards@azag.gov,connie.lopez@azag.gov,charlotte.haught@azag.gov

- **Bridget K. Romano**
  bromano@utah.gov,peggywheeler@utah.gov,federalcourt@utah.gov

- **Jeffrey L. Shields**
  jlshields@cnmlaw.com,njpotter@cnmlaw.com

- **Zachary T. Shields**
  zachshields@cnmlaw.com,alambert@cnmlaw.com

- **Michael D. Stanger**
  mstanger@cnmlaw.com,kspencer@cnmlaw.com

- **Peggy E. Stone**
  pstone@utah.gov,federalcourt@utah.gov,shaunallen@utah.gov

- **Richard A. Van Wagoner**
  rvanwagoner@scmlaw.com,intakeclerk@scmlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore

require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

**Comma delimited list of email addresses that may be used for copying and pasting into your own email program:**

jim@brownbradshaw.com,carol@brownbradshaw.com,michelle@brownbradshaw.com,sclark@joneswaldo.com, msorenson@joneswaldo.com,aarmstrong@joneswaldo.com,gedicksf@lawgate.byu.edu,intakeclerk@scmlaw.com, rharris@joneswaldo.com,khess@joneswaldo.com,randyhunter@utah.gov,jerroldjensen@utah.gov, scornell@utah.gov,kokazaki@joneswaldo.com,rparker@scmlaw.com,bill.richards@azag.gov, connie.lopez@azag.gov,charlotte.haught@azag.gov,bromano@utah.gov,peggywheeler@utah.gov, federalcourt@utah.gov,jlshields@cnmlaw.com,njpotter@cnmlaw.com,zachshields@cnmlaw.com, alambert@cnmlaw.com,mstanger@cnmlaw.com,kspencer@cnmlaw.com,pstone@utah.gov, shaunallen@utah.gov,rvanwagoner@scmlaw.com

(Too many email addresses to create a "mailto" link - more than 256 characters.)

INDEX OF EXHIBITS

A.    Record of Warren Jeffs attached to the Affidavit of Nick Hanna dated February 15, 2010

B.    Record of Warren Jeffs

C.    Motion to Require Notice and Memorandum in Support of Motion to Require Notice dated December 16, 2004

D.    A Proclamation to the Government Officials of the United States of America and to the Government Officials of Canada