FILED
U.S. DISTRICT COURT

2010 NOV -9  P 4: 38

DISTRICT OF UTAH

1  TERRY GODDARD
   ARIZONA ATTORNEY GENERAL
2  William A. Richards, Arizona Bar No.  013381
   Assistant Attorney General
3  1275 W. Washington St., Phoenix, AZ  85007
   Tel: (602) 542-8355; Fax: (602) 364-2214
4  Bill.Richards@azag.gov
   *Admitted Pro Hac Vice*
5

6
   Randy S. Hunter, Utah Bar No. 09084
7  Assistant Attorney General
   P.O. Box 140857, Salt Lake City, UT  84114
8  Tel (801) 366-0238; Fax: (801) 366-0352
   RandyHunter@utah.gov
9  *Attorneys for Defendant Terry Goddard*

10
              IN THE UNITED STATES DISTRICT COURT
11
              DISTRICT OF UTAH, CENTRAL DIVISION
12

13 THE FUNDAMENTALIST CHURCH OF
   JESUS CHRIST OF LATTER-DAY SAINTS,
14 an Association of Individuals,

15
                  Plaintiffs,              **ARIZONA ATTORNEY GENERAL
16                                         TERRY GODDARD'S RESPONSE AND
           vs.                             OBJECTION TO RENEWED MOTION
17                                         FOR TEMPORARY RESTRAINING
   BRUCE R. WISAN, Special Fiduciary of the ORDER AND PRELIMINARY
18 United Effort Plan Trust; MARK SHURTLEFF, INJUNCTION**
   Attorney General for the State of Utah; TERRY
19 GODDARD, Attorney General for the State of
   Arizona; DENISE POSSE LINDBERG, Judge of
20 the Third Judicial District Court of Salt Lake
   County, State of Utah,                  No. 2:08CV00772 DB
21
22                Defendants.

23                                         (Assigned to the
                                            Honorable Dee Benson)
24

25

26      The Plaintiffs ask that the Court halt all ongoing proceedings in the five-year-old state

27 court trust administration case for the United Effort Plan Trust ("Trust"), including any further

28
   1296417                        1

sales or subdivision needed to protect Trust properties or pay Trust debts.[1]   Their request is improper because 1) it is barred by multiple jurisdictional and abstention rules; 2) it seeks use of injunctive powers to upset the status quo, impose mandatory relief, and immediately grant the Plaintiffs virtually all the relief they seek; 3) the Plaintiffs' claims are barred by *res judicata* and collateral estoppel; and 4) the Plaintiffs' claims have no legal merit.

## I.   The Plaintiffs Must Prove Entitlement to Injunctive Relief By Clear and Unequivocal Evidence.

To obtain a preliminary injunction, the Plaintiffs must establish that: (1) they will suffer irreparable injury unless the injunction issues; (2) the threatened injury to them outweighs whatever damage the proposed injunction may cause the United Effort Plan Trust or persons interested in its ongoing administration and enforcement; (3) their proposed injunction would not be adverse to the public interest; and (4) they have a substantial likelihood of success on the merits.[2]   *See Schrier v. University of Colo.*, 427 F.3d 1253, 1258 (10th Cir.2005); *Seroctin Research & Technologies, Inc.*, 541 F.Supp.2d at 1242-43.   "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion" on all these elements. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted) (emphasis in original); *O Centro*, 389 F.3d at 976-80; *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir.1989) (preliminary injunction should be granted only where necessity is "clearly established."). The Plaintiffs cannot meet this burden.

---

[1]   This case was filed by a Plaintiff calling itself by a church name, followed by the phrase "an Association of Individuals."   Thus, the Plaintiff is a group of undetermined number of individuals. They are properly characterized herein in the plural sense as "Plaintiffs".

[2]   Given that the type of injunction sought here is disfavored (*see* discussion *infra* at 11-13), the Plaintiff "must 'make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on [the Tenth Circuit's] modified likelihood-of-success-on-the-merits standard.'" *Seroctin Research & Technologies, Inc. v. Unigen Pharmaceuticals, Inc.*, 541 F.Supp.2d 1238, 1242 -1243 (D.Utah 2008) (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976-80 (10th Cir. 2004) ("*O Centro*")).

II.    **Multiple Jurisdictional and Abstention Doctrines Preclude the Court from Interfering with the State Court's Trust Administration Case.**

A.    **The Plaintiff Seeks Injunctive Relief Stopping Ongoing, Previously Court-Approved and Court-Directed Trust Administration Activities.**

The Plaintiffs ask the Court to enjoin "all proceedings in the action pending in" the Utah trust administration case before the Third Judicial District Court of the State of Utah (the "Third District Court"). Renewed Motion for Temporary Restraining Order and Preliminary Injunction at 2. The motion also asks the Court to enjoin the Defendants "from selling or in any other manner conveying any property owned or controlled by the United Effort Plan Trust," and from subdividing property of the Trust. *Id.* These orders, which would interfere with ongoing proceedings that were long ago approved by a state court having custody of all the Trust property, are barred by: 1) the federal *Barton* Doctrine; 2) the doctrine of *in custodia legis*; and 3) various federal abstention doctrines.

1.    **The Trust's Assets Have Been Under the Active Custody and Management of the Utah Courts for Over Five Years.**

The Third District Court assumed jurisdiction over all assets of the UEP Trust in May, 2005. It still maintains jurisdiction over those assets. *See The Fundamentalist Church of Jesus Christ of Latter-Day Saints,* 238 P.3d 1054, 1057-58 ¶ 6 (Utah 2010) (hereafter "*FLDS*"). (*See also* Exhibits "1" – "8" hereto). The Third District Court has placed those assets under active management by a Special Fiduciary, who is a court-appointed agent authorized specifically by Utah trust law at Utah Code § 75-7-1001(e). (*See* Exhibit "A" of Motion to Dismiss Terry Goddard, Attorney General of Arizona [filed 12/8/08] at 5-6, ¶ 2; *id.* at 6, ¶ 7; Exhibit "F" to Special Fiduciary's Memorandum In Opposition to Motion for Temporary Restraining Order and/or Preliminary Injunction [filed 11/12/08] at 5, ¶ 6; Exhibit "D" to Memorandum in Support of Renewed Motion for TRO and Preliminary Injunction ["Renewed Motion"] at 2-4). The Court has issued orders delegating exclusive Trust property management authorities and duties to the Special Fiduciary. (*See, e.g.,* Exhibit "D" to Renewed Motion at 2-4) (granting Special Fiduciary exclusive authority to "manage, lease, or rent property of the Trust".) The Third

District Court has empowered the Special Fiduciary top sell properties[3] to satisfy considerable debts of administering the Trust.[4]   The court also approved the Special Fiduciary's efforts to subdivide the Trust property to address multiple administrative problems created by the Trust's historic use of large, unsubdivided parcels on which multiple homes sit.[5]   (*See* Exhibit "1" hereto at 13 n. 5 and Exhibit "C").   The Special Fiduciary made a recommendation for subdivision to the Third District Court over five years ago.   (*See* Exhibit "3" to Utah Attorney General's

---

[3]   In September, 2005, the Third District Court authorized the Special Fiduciary to "sell assets of the trust" that might be needed to pay 2005 tax liabilities. (*See* Exhibit "D" to Renewed Motion at 3-4, ¶2).   Thereafter, the Special Fiduciary has negotiated sale of properties and sold Trust properties using his Court-delegated powers. (*See* Exhibit "8" hereto at 32, ¶ 174; Exhibit "7" hereto at 41-43]; Exhibit "6" hereto at 20).   This includes the "Western Precision" property which the Trust sold in 2007 with court authorization for over $1.5 million. (*See* Exhibit "5" hereto at 23-25, ¶¶'s 137-145; Exhibit "6" hereto at 20 [6/7/07]).   After a hearing on July 29, 2009 at which counsel for the Plaintiff's appeared and argued, the Third District Court granted the Special Fiduciary authority to sell property that is part of the Berry Knoll Farm pursuant to an auction process at which the Plaintiffs and others would be allowed to bid. (*See, e.g.,* Exhibit "A" to Renewed Motion; Exhibit "B" of Renewed Motion).   Though the Special Fiduciary has submitted a proposed procedure for that auction (*see* Exhibit "9" hereto), no auction has yet been scheduled.

[4]   The Trust has incurred debts in pursuing subdivision issues, defending the Trust from lawsuits, protecting and pursuing assets for the Trust, and defending against litigation filed by persons claiming association with the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS") to disrupt the trust administration and overturn the judicial reformation of the Trust that occurred in 2006. (*See* Exhibits "1" hereto; Exhibit "3" to Utah AG's Objection [filed 11/12/08], "2"-"8" hereto; *see also* Exhibit "K" of Renewed Motion at 74-80).   The Trust continues to incur debts. (*See id.* at 74-80).

[5]   This approach creates administrative because government tax officials must issue single tax notices for multiple housing sites and that they must lien all housing or commercial buildings on a single parcel for unpaid taxes, even though portions of the tax related to particular homes or building may have been paid. (*See* Exhibit "3" to Utah AG's Objection at 19-21, ¶¶ 108-123). This in turn discourages those residing in Trust homes from paying a pro rata share of property taxes because they have no guarantees that all their neighbors on the same parcel will pay a similar share.   The unsubdivided parcels also increase the likelihood of trespassing disputes by neighbors dealing with informal and uncertain property divisions.   It makes adding improvements to any particular residence or commercial building problematic as competing neighbors may claim a right to access or use the same property being improved and municipal officials could be asked to grant building permits and utility connections of uncertain scope.

1296417

4

1 | Objection to TRO and/or Preliminary Injunction [filed 11/12/08] ["Utah AG's Objection"] at 21-

2 | 22, ¶¶ 123-128). He commenced the process in early 2006, has since submitted subdivision

3 | proposals in both Arizona and Utah, and has pursued a mandamus lawsuit (Case No. 070500105

4 | – the "Subdivision Action") in the Fifth Judicial District Court of the State of Utah ("Fifth

5 | District Court") to force approval of the subdivision of Trust properties within Hildale, Utah's

6 | boundaries. (*See* Exhibit "2" hereto at 12-14, ¶¶'s 70-80; Exhibit "3" hereto at 9-11, ¶¶'s 49-57;

7 | Exhibit "4" hereto at 10-13, ¶¶'s 68-69; Exhibit "5" hereto at 8-10, ¶¶'s 42-57; Exhibit "8"

8 | hereto at 5-6, ¶¶'s 24-36; Exhibit "G" of Memorandum in Support of Motion for TRO and/or

9 | Preliminary Injunction [filed 11/05/08] at 13-14, ¶¶'s 13-19; Exhibit "K" of Renewed Motion at

10 | 16-17, ¶¶'s 59-63; Exhibit "11" hereto; Exhibit "12" hereto). The Plaintiffs sought recently to

11 | intervene in the Subdivision Action and to assert essentially the same claims filed in this case.

12 | (*See* Exhibit "20" hereto). The Fifth District Court has denied the FLDS motion, and the Trust

13 | has filed a proposed order directing Hildale, Utah to enter the subdivision of the Trust properties.

14 | (*See* Exhibit "21" hereto). Thus, the injunctive relief sought here would stop the sale and

15 | subdivision processes authorized by the Third District Court and stop the enforcement of the

16 | forthcoming judgment ordering subdivision of Trust properties.

17 | **2.   Discovery is Ongoing.**

18 | By order dated July 27, 2010, the Third District Court ordered that discovery proceed on

19 | numerous issues critical to administration of the Trust and protection of its assets. (*See* Exhibit

20 | "21" hereto). These include, among many other items, investigation of the possibility that

21 | persons have improperly failed to pay the Trust millions of dollars for groundwater belong to the

22 | Trust being used by the local municipalities, the possibility that Trust surface water rights are

23 | being usurped, questions regarding the unauthorized uses of Trust property, and questions

24 | regarding potential lack of cooperation by local government and police officials. (*See id.*) Local

25 | government officials have attempted through multiple filings to stop depositions of police and

26 | other government officials. The only deposition concluded so far resulted in the local police

27 | officer and his counsel walking out when the Third District Court judge was called to explain

28

1296417                                    5

1   whether her discovery order contemplated the officer answering questions about whether his

2   religious leaders had indicated people should not acknowledge the court's orders or Special

3   Fiduciary's powers. (*See* Exhibit "24" hereto). He had refused to answer the questions, though

4   the judge confirmed he was expected to do so. (*See id.*).    The desire to avoid shedding light on

5   these types of issues concerning administration of the Trust is likely a primary motivating factor

6   for the FLDS Plaintiffs to ask this Court to stop the ongoing administration.

7   **B.    The *Barton* Doctrine Prohibits the Interference the Plaintiffs Seek.**

8   "It is well settled that leave of the appointing forum must be obtained by any party

9   wishing to institute an action in a non-appointing forum against a trustee, for acts done in the

10  trustee's official capacity and within the trustee's authority as an officer of the court." *In re*

11  *DeLorean Motor Co.*, 991 F.2d 1236, 1240 -1241 (6th Cir. 1993); *see also Barton v. Barbour*,

12  104 U.S. 126, 26 L.Ed. 672 (1881); *Leonard v. Vrooman*, 383 F.2d 556, 560 (9th Cir.1967), *cert.*

13  *denied,* 390 U.S. 925 (1968).  This rule, known as the *Barton* Doctrine, arises from the fact that

14  the court appointing a receiver or trustee has exclusive jurisdiction over the property of the entity

15  they are appointed to administer. *See* 16 Fletcher Cyc. Corp. § 7855.  "The primary purpose for

16  this rule is to promote judicial economy by protecting the receiver and receivership estate from a

17  multiplicity of lawsuits," and "[t]he necessity for leave from the appointing court cannot be

18  avoided by seeking relief from another court." *Id.*

19  The *Barton* Doctrine bar applies to claims brought against any court-appointed trustee or

20  receiver under 42 U.S.C. § 1983 or any other state and federal statutory theories that are related

21  to the administration of the trust.[6]  *See Lawrence*, 573 F.3d at 1268-71.  To be barred, the claims

22

23  _____

24  [6]  Court-appointed officials like the Special Fiduciary sued here are agents of the court. *Liberte*
    *Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); *Sherrets v. Tuscarawas*

25  *Savings & Loan Co.*, 70 NE2d 127, 129-30 (Ohio App. 1945). The fact that Utah statutes (Utah

26  Code § 75-7-1001(e)) grant Mr. Wisan the title "Special Fiduciary" rather than "trustee" or
    "receiver" is irrelevant. The *Barton* Doctrine also precludes suits against individuals acting "'as

27  the equivalent of court appointed officers'". *See Lawrence v. Goldberg*, 573 F.3d 1265, 1269-70
    (11th Cir. 2009); *Carter v. Rodgers*, 220 F.3d 1249, 1252 n. 3 (11th Cir. 2000). A suit against any

28  such officers "is really a suit against the appointing court . . .." *Sherrets*, 70 N.E.2d at 129. The
    1296417                                                 6

1  need not necessarily be against the Trust or the Trust's property.  *Id.* at 1270.  Instead, the

2  question is whether the claims could impact administration of the trust, and claims are barred "if

3  the outcome could alter the [trust's] rights, liabilities, options, or freedom of action (either

4  positively or negatively) and which in any way impacts upon the handling and administration of

5  the . . . estate."  *Lawrence*, 573 F.3d at 1270-71 (citing *Miller v. Kemira, Inc.* (*In re Lemco*

6  *Gypsum, Inc.*), 910 F.2d 784, 788 (11th Cir. 1990)).

7       In *Lawrence*, 573 F.3d at 1270-71, the plaintiff "raise[d] claims under a variety of state

8  and federal laws [including 42 U.S.C. § 1983], [and] the essence of [the plaintiff's] complaint

9  [was] that the Trustee and the other defendants colluded to enforce [a] Turn Over Order, an order

10  of the bankruptcy court, and otherwise unlawfully attempted to bring assets into the bankruptcy

11  estate."  The court held that the outcome of the plaintiff's claims "clearly could have an effect

12  on the handling and administration of" the bankruptcy estate, and thus the claims were all barred

13  by the *Barton* Doctrine.  *Id.* at 1271.  The Plaintiffs' claims here are analogous.  They allege

14  unlawful attempts to use the Trust administration and reformation process to keep trust assets

15  from their exclusive use.  Most recently, they have assailed leases of Trust property to non-FLDS

16  members that the Plaintiff group claims violates their religions interests.  (*See* Exhibit "22"

17  hereto).  Should they prevail here, this Court would declare that the administration of the Trust is

18  illegal, and that the reformation of the Trust was unlawful.  Such rulings would "clearly have an

19  effect on the handling and administration of" the Trust, and thus the claims are subject to the

20  *Barton* Doctrine.  As the Plaintiffs had no leave to file these claims, they are barred.[7]

21

22  Plaintiffs here have also sued the state court judge.  *See* First Amended Complaint.

23  [7]   The limited exception to *Barton* in 28 U.S.C. § 959(a) applies only to claims arising out of a
trust's "carrying on business."  "This exception does not apply to suits against the trustee for

24  actions taken while administering the estate."  *In re DeLorean Motor Co.*, 991 F.2d at 1240-41

25  (citing *In re Campbell*, 13 B.R. at 976); *see Diners Club, Inc. v. Bumb*, 421 F.2d 396, 399-
400 (9th Cir. 1970); *see also Ex parte Tyler*, 149 U.S. 164, 182-83 (1893); *Liberte Capital*

26  *Group, LLC*, 462 F.3d at 551-52; *In re Campbell*, 13 B.R. 974, 976 (Bankr.D.Idaho 1981).

27  Collecting assets, taking steps to preserve and hold assets, fraudulent conveyance lawsuits
against those taking assets of the Trust, "as well as other aspects of administering and liquidating

28  the estate, do not constitute 'carrying on business' as that term has been judicially interpreted." *In*

C.     **The Doctrine of *In Custodia Legis* Prohibits the Court from Interfering With the Trust Administration Decisions.**

Property under court administration and assigned to management by a court-appointed fiduciary is also considered *in custodia legis*, meaning it is considered to be in the physical possession of the court.   *See, e.g.,* C.J.S., <u>Receivers</u>, §.99; *Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader,* 294 U.S. 189, 196-97 (1935) (court first invoking control over property *in rem* or *quasi in rem* are in constructive possession of the property and authorized to proceed as against other later acting courts with concurrent jurisdiction); *Kunselman v. Kaser,* 41 Ariz. 219, 226-27, 17 P.2d 327, 329-30 (1932).

Once property is placed under the control of a state court for trust administration purposes, it is removed from the jurisdiction of all other courts, including the federal courts. *See, e.g., U.S. v. Bank of New York & Trust Co.,* 296 U.S. 463, 477-78 (1936); *Gillis v. Keystone Mut. Cas. Co.,* 172 F.2d 826, 828-30 (6th Cir. 1949); *Continental Bank and Trust Company v. Apodaca,* 239 F.2d 295, 297-98 (10th Cir. 1956) (jurisdictional priority goes to court which must control property to give effect to its jurisdiction in such things as administering trusts); *In re Amwest Sur. Ins. Co.,* 245 F.Supp. 2d 1038, 1046-47 (D.Neb. 2002); *Quirollo v. Fifth Third Union Trust Co., Cincinnati, Ohio,* 41 F.Supp. 891, 893 (S.D. Ohio 1941); *see also Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader,* 294 U.S. 189, 195-96 (1935); *Covell v. Heyman,* 111 U.S. 176, 179-184 (1884); *State Engineer of State of Nevada v. South Fork Bank of Te-Moak Tribe of Western Shoshone Indians of Nevada*, 339 F.3d 804, 809-10 (9th Cir. 2003); *Key v. Wise,* 629 F.2d 1049, 1059 (5th Cir. 1980).    Moreover, exclusive jurisdiction to construe a trust is vested in the first court acquiring jurisdiction over the issue. *See In re Franz' Estate,* 145 S.W.2d 400, 403 (Mo. 1940).

Other similar jurisdictional policies require the federal courts to defer deciding a case that would impact decisions about reformation and operation of the Trust already made or being

_____

*re DeLorean Motor Co.,* 991 F.2d at 1240-41.  The claims here arise out of administration of the Trust.

1   made by the state courts.  Under the federal first filed or prior pending action doctrines, absent

2   compelling circumstances, a state court initially seizing a controversy should be allowed to

3   decide the case and federal courts should defer or abate their jurisdiction.  *See Wilson v.*

4   *Schnettler, 365* U.S. 381, 284-85 (1961) (court whose jurisdiction first attached retains

5   jurisdiction to exclusion of all other courts until its duties are fully performed); *Merrill, Lynch,*

6   *Pierce, Fenner & Smith, Inc. v. Haydu,* 675 F.2d 1169, 1173-74 (11th Cir. 1982); *In re*

7   *Liberatore,* 574 F.2d 78, 88-89 (2nd Cir. 1978); *Butler v. Judge of U.S. Dist Ct. In and For*

8   *Northern Dist. of Cal., Northern Division,* 116 F.3d 1013, 1015-16 (9th Cir. 1941); *Cupe v.*

9   *Lantz,* 470 F.Supp. 2d 128, 132 (D.Conn. 2007); *Perry v. Del Rio,* 66 S.W.2d 239, 242-443 (Tex.

10  2001). There is no question that the trust administration case, started in May, 2005, was pending

11  years before this action was filed, and that the reformation the Plaintiffs reject was completed

12  long before this action was filed.

13      Here, the Plaintiffs are seeking to have this Court override by preliminary injunction all

14  aspects of the administration of the Trust in the state courts.  For instance, while the Plaintiffs

15  seek to have the Third District Court enjoined from enforcing the reformation of the Trust, the

16  reformation undeniably involved questions of trust construction, invocation of state statutory and

17  common law *cy pres* powers, and resolution of practical trust administration issues. (*See* Exhibit

18  "E" of Renewed Motion).  These are questions whose jurisdiction is vested exclusively in the

19  state court, and this Court may not disturb those decisions.

20      The Plaintiffs are also seeking to enjoin enforcement of leases entered into with non-

21  FLDS individuals on the Third District Court's authority.  Again, whether leasing of Trust

22  property is a wise decision in the interest of the Trust is a trust administration issue left

23  exclusively to the state court.   There are a myriad of other day-to-day trust administration

24  decisions the Plaintiffs ask this Court to wrest from the state court, such as how to handle non-

25  payment by those using Trust property of occupancy fees and property taxes, competing claims

26  to exclusive use of various Trust properties by FLDS Church members and non-members, and

27  water rights issues impacting Trust property.   As all the Trust property and the trust

28

1  administration issues reside exclusively with the Third District Court, however, this Court
2  cannot, and should not, invade those decisions.

3      Also, the interests claimed by the Plaintiffs in Trust property are not legally enforceable.
4  They claim to have non-documented "stewardships" granted by religious leaders (who were not
5  necessarily trustees). (*See, e.g.,* Exhibit "19" hereto at ¶ 4 and Exhibit "20" hereto at ¶ 4).   The
6  Arizona statute of frauds would prevent the Plaintiffs from establishing any enforceable interest
7  to use real property of the Trust in Arizona through such alleged verbal commitments. *See*
8  A.R.S. § 44-101. Moreover, even if the Plaintiffs could state a colorable theory entitling them to
9  some rights to use of the Trust property, the *in custodia legis* nature of the Trust proceeding
10  terminated any claims the Plaintiffs' might have had. *See McKinnon-Young Co. v. Stockton,* 53
11  Fla. 734, 44 So. 237 (Fla. 1907).[8]

12      The Plaintiffs can make no claim to any current enforceable legal interest that is being
13  impacted by the state court administration of the Trust. They cannot succeed on the merits.

14      **D.    Federal Abstention Doctrines Apply.**

15      Federal abstention doctrines also apply and weigh against the relief sought here.   The
16  Arizona AG has previously briefed some of the relevant abstention issues in its Motion to
17  Dismiss, and incorporates those arguments here.[9]

18

19  [8]    In *McKinnon-Young Co.,* a state court placed real property of a corporation under
20  receivership.   The plaintiff claimed to have had a verbal agreement from the corporation's
    president allowing the plaintiff to use the corporation's property and trees to gather turpentine.
21  The court concluded that even if the plaintiff had such a verbal agreement, "such verbal
22  agreement amounted to nothing more than a license, which license was terminated and expired at
    the time the court took charge of the properties" and the corporation and its former officers could
23  not overcome the court's custody of the property and execute any valid conveyance or transfer of
    any right or interest in the properties. *Id.,* 44 So. at 247.
24

25  [9]    Abstention under the factors identified in *Colo. River Water Conservation Dist. v. United*
    *States,* 424 U.S. 800, 817 (1976) and its progeny is also warranted. *See, e.g., Sierra Club v. City*
26  *of San Antonio,* 112 F.3d 789, 797 (5th Cir.1997). First, the claims all implicate issues of state
    law, including:  1) whether Utah and Arizona law would even recognize any enforceable legal
27  interest in undocumented religious "stewardships" over properties of a charitable Trust,
28  particularly where the same religious leaders had taken extreme measures after their loss in *Jeffs*

1296417                                            10

III.   **The Preliminary Injunctive Improperly Upsets the Status Quo, Issues Mandatory Relief, and Grants the Plaintiff Group Virtually All the Relief They Seek in this Case.**

The Tenth Circuit "has identified the following three types of disfavored preliminary injunction and concluded that a movant must make a heightened showing to demonstrate entitlement to preliminary relief: (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *O Centro*, 389 F.3d at 976 (internal quotation omitted). Because these types of injunctions contradict the historic purpose of the preliminary injunction to preserve the status quo pending a trial "the movant must demonstrate that 'on balance, the four [preliminary injunction] factors weigh heavily and compellingly in his favor.'" *Id.; see also Schrier*, 427 F.3d at 1259.

   A.   **The Injunction Requested Upsets the Status Quo.**

The "limited purpose" of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The "status quo" is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Schrier*, 427 F.3d at 1260 (citations and internal quotation marks omitted); *Seroctin Research & Technologies, Inc.*, 541 F.Supp.2d at 1242-43. Here, the order sought would upset the status quo and inflict injury. The

*v. Stubbs,* 907 P.2d 1234 (Utah 1998) to ensure no such enforceable interests could be claimed; and 2) the scope of the Third District Court's trust administration authorities under the Utah trust statutes and common law, including its *cy pres* powers. Moreover, the state interests in deciding charitable trust administration issues are compelling. This is doubly so where the Plaintiffs waited to launch any challenges to the Trust administration until years after it started, and long after even the reformation of the Trust was complete. The State of Utah also has a compelling interest in ensuring that those who respect the courts' authority and obtain lease or occupancy rights through the state judicial process are not subjected to untimely claims seeking to upend their reliance and remove them. Therefore, matters of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition'" justify abstention. *See Colorado River Water Conservation Dist.,* 424 U.S. at 817.

1  Trust has been under judicial administration for over five years.  The Third District Court has
2  delegated authority in the interest of maximizing beneficial use of Trust resources that has
3  created leases and occupancy agreements among non-FLDS members (along with occupancy
4  agreements among FLDS members, as well).  The ongoing administration allows tax issues to be
5  addressed, applications for beneficial use of Trust property to be addressed, lease and occupancy
6  agreements issued with the court's authority to be enforced, revenues to be raised to pay the
7  Trust's debts, subdivision issues to be pursued, and the Trust to be defended in ongoing
8  litigation.  Suspending the ongoing administration would frustrate all these efforts.  It would
9  alsobar access to the administering court for those who came through the front door of the Court
10  and entered binding agreements with the Trust, allow disputes with those using Trust property
11  under the Third District Court's authority to escalate, and facilitate "self-help" remedies that
12  have already included the running off of livestock and removal of fencing and other property.
13  (*See* Exhibit "14" hereto; Exhibit "15" hereto).

14       Now, those who have leases or occupancy agreements with the Trust can apply for
15  enforcement of the rights conveyed to them through the Third District Court against anyone who
16  is also subject to the Utah court's jurisdiction.  The Plaintiff group is all subject to the Utah
17  court's jurisdiction as they have filed multiple matters in the Utah state courts and many have
18  accepted benefits under the Trust being administered by the Utah court.  The order sought here
19  would immediately remove those rights, thus injuring the status quo, perhaps irreparably for
20  those who are trying to lawfully use properties leased to them.

21       The status quo also includes prior approval of the Third District Court of the auctioning
22  of some Berry Knoll Farm land.  The injunction sought would upset this process, as well.

23       **B.      The Injunction is an Improper Mandatory Order.**

24       Where the requested injunction would require the Court to supervise compliance with an
25  order that some ongoing process or operations be shut down, the injunction is considered
26  "mandatory."  *Seroctin Research & Technologies, Inc.,* 541 F.Supp.2d at 1242-43; *see also*
27
28

1    *Schrier*, 427 F.3d at 1260.    Here, the requested relief would shut down a state court's

2    administration of a trust under state law.  The injunction sought is mandatory.

3            Such mandatory relief is actually harmful to the Trust.  For example, the administering

4    court would have no way to monitor or ensure that taxes on Trust properties are timely paid, or

5    that the considerable number of fixtures or improvements on Trust property are maintained in

6    place and not removed or damaged as has happened in the past.  The sweeping mandatory relief

7    cannot be justified.

8            **C.     The Injunction Would Grant the Plaintiff Group Full Relief.**

9            Other than attorneys' fees and costs, the First Amended Complaint seeks as relief only a

10   declaration that the reformation of the Trust violates Utah and federal law, and an injunction

11   against continuing violations of the Plaintiff's claimed rights.  First Amended Complaint, at 23-

12   33.   The Plaintiffs have not plead any legal basis for shutting down the entire Trust

13   administration, however.  Given that the Trust's former trustees violated their fiduciary duties

14   and abandoned the Trust in litigation, *see FLDS,* 238 P.3d at 1057-58, the Plaintiff cannot claim

15   that the Third District Court never had a legal basis for taking on administration of the Trust.

16   Thus, prohibiting now any sales or subdivision of property and shutting down all judicial

17   administration of the Trust in the Third Judicial District would grant the Plaintiffs even more

18   relief than asked for in their complaint.  This is an unjustified extension of equitable relief. .

19   **IV.     Preclusion Doctrines Prohibit the Relief Sought Here.**

20           **A.     This Utah Supreme Court Has Already Rejected the Claims the Plaintiffs**
21           **Rely on Here.**

22           The claims here challenge the state court's judicial administration and reformation of the

23   Trust.  They claim, and seek a declaration that, the ongoing administration and the reformation

24   violate the Establishment Clause and Free Exercise Clause of the First Amendment to the United

25   States Constitution.  Plaintiff's First Amended Complaint and Request for Declaratory and

26   Injunctive Relief filed November 5, 2008, at 2.   The Plaintiff asks the Court to issue an order

27   "staying all proceedings in the action pending in Case No. 053900848, Third Judicial District

28

1   Court of Salt Lake County, Utah," because the Utah court's continuing reformation of the Trust

2   and ongoing administration of the Trust allegedly violate the "absolute bar" created by the

3   Establishment Clause of the Federal First Amendment.  *See* Renewed Motion for Temporary

4   Restraining Order and Preliminary Injunction at 2; Memorandum in Support of Renewed Motion

5   for Temporary Restraining Order and Preliminary Injunction ["Plaintiff's Memorandum"] at 13-

6   23.  However, the Plaintiffs already asserted these very same claims and sought the same relief

7   from the Utah Supreme Court in *FLDS*, 238 P.3d 1054.

8        In *FLDS*, the Plaintiffs asserted that the Utah Third Judicial District Court had

9   "unlawfully 'reformed' a religious charitable trust . . . and continues unlawfully to administer the

10  UEP Trust contrary to its express purpose." (*See* Exhibit "16" hereto).  They alleged the

11  reformation and ongoing administration violated the "constitutional rights" of the Plaintiffs, and

12  prayed for relief:  1) declaring that the Third District Court's actions had violated the FLDS

13  Church members' constitutional rights under the Religion Clauses of the First Amendment to the

14  United States Constitution and under Article 1, §§ 1 and 4, Utah Constitution; 2) declaring that

15  Utah Code Ann. §§ 75-7-1001, -412(1), and -413(1)(c) were unconstitutional as applied by the

16  Third District Court; 3) enjoining the Third District Court from taking further action in the

17  underlying administration case; 4) declaring the reformation of the Trust unconstitutional and

18  terminating it; 5) terminating the Special Fiduciary; and 6) overturning the Third District Court's

19  authorization of the sale of Berry Knoll Farm property.  (*Id.*)  *See also*, *FLDS*, 238 P.3d at 1062

20  Thus, the Plaintiffs pursued the same federal constitutional claims and sought the same relief in

21  *FLDS* that they pursue here and that they use to justify preliminary injunctive relief.[10]

22        The Utah Supreme Court denied the Plaintiff any relief under these theories.  The Court

23  analyzed in detail the claims and the factual circumstances of the case, and it analyzed and made

24  _____

25  [10]   The Plaintiff even filed on August 19, 2010, another petition for emergency relief in the

26  *FLDS* case "asking th[e Utah Supreme C]ourt to enjoin the Third District Court from
    administering the UEP Trust until [it] render[ed] its decision" in the *FLDS* case. *FLDS*, 238 P.3d

27  at  1061 n. 8.   The court found it unnecessary to issue a ruling on that request given its

28  determination that the constitutional claims of the Plaintiff were barred by laches. *Id.*

findings regarding the "countless transactions" that had taken place during the Plaintiff group's nearly three year delay, the question of the relative harm to the Plaintiff, and whether or not the respondent court had acted in good faith. *FLDS*, 238 P.3d at 1062-64. The court made findings, for example, that "many individuals have relied upon the district court's final order from over three years ago, and the [Plaintiff] has given no adequate explanation for its delay in appealing or otherwise petitioning for relief." *Id.* at 1064. The court further found that the Plaintiff "has shown a lack of diligence in challenging the modification of the Trust, and this lack of diligence has operated to the detriment of others." *Id.* The court then held that "we dismiss the FLDS Association's Trust modification claims pursuant to the doctrine of laches." *Id.*

The Utah Supreme Court also dismissed the Plaintiff's claims "that the continuing administration of the Trust violates its members' constitutional rights." *Id.* at 1065-66. The court found one of the Plaintiff's allegations about continuing administration unripe because it had not occurred, and found all the Plaintiff's other allegations barred by the doctrine of laches.[11] *Id.* It found that these claims "suffer[ed] from the same defects as the FLDS Association's first claims: a lack of diligence and prejudice resulting from that lack of diligence." *Id.* at 1065. The court again reiterated its findings that "the FLDS Association could have brought these claims at least three years earlier," and that "[i]n the interim, parties have changed their positions, Trust participants have made irreversible decisions, and the special fiduciary has entered into irrevocable transactions and obligations." *Id.* Thus, the Utah Supreme Court has already made factual determinations, reached final legal conclusions, and held that the constitutional claims raised in this case are barred by laches.

**B.**   **Rules of Federal/State Comity Preclude Plaintiffs from Re-litigating Federal Claims They Freely Submitted for Decision to the State Courts.**

---

[11]   The *FLDS* court found any claims that the state trial court had "endorsed a religious test that would give former FLDS members outright deeds to Trust property but would relegate current and practicing FLDS members to receiving spendthrift trusts . . ." unripe because the Plaintiff had not alleged or cited evidence that the trial court or Special Fiduciary had actually used religion as a factor in parsing out property. *Id.* at 1065.

1    When a person freely submits their federal claims to a state court for decision, and

2  litigates them there, they may not return to federal court to re-litigate the claims.  *See, e.g.,*

3  *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411 (1964) ("[I]f a party freely

4  and without reservation submits his federal claims for decision by the state courts, litigates them

5  there, and has them decided there, then-whether or not he seeks direct review of the state

6  decision in this Court-he has elected to forego his right to return to the District Court."); *Wicker*

7  *v. Board of Educ. of Knott County, Ky*, 826 F.2d 442, (6th Cir. 1987); *Spence v. Latting*, 512 F.2d

8  93, 99 (10th Cir. 1975).  Here, the Plaintiffs freely and without any reservation of the issues

9  submitted their federal claims for consideration by the Utah Supreme Court.  This Court must

10  decline to reconsider the Utah Supreme Court's final judgment as a function of "the comity

11  between state and federal courts that has been recognized as a bulwark of the federal system."[12]

12  *Allen v. McCurry,* 449 U.S. 90, 96 (1980).

13    The decision in *Atchison v. State of Wyo*, 763 F.2d 388 (10th Cir. 1985) illustrates how

14  these rules operate here.  There, the plaintiff sought through a federal action to sue the State of

15  Wyoming and various state employees alleging discharge in violation of federal First

16  Amendment and due process rights.  The Tenth Circuit rejected the plaintiff's argument that his

17  federal claims were not barred because he had brought a federal claim before resorting to

18  litigation at the state level, and because he did not actually litigate the federal claims in state

19  court.   Even though the plaintiff did not submit his federal claims to the state court for

20  determination, he had voluntarily submitted to the state court "the issues underlying his federal

---

23  [12]  The Plaintiffs' exclusive federal option is to seek review by certiorari at the U.S. Supreme

24  Court, even if the Plaintiffs contend that the state court proceedings violated their federal constitutional rights, like due process or equal protection.  *See District of Columbia Court of*

25  *Appeals v. Feldman,* 460 U.S. 462, 476, 476 (1985); 28 U.S.C. § 1257.  The Plaintiffs cannot ask this Court to sit as an appellate court for judgments of the Utah Supreme Court. *SeeDistrict of*

26  *Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476 (1985).   Moreover, they cannot

27  complain that they were denied the guarantees of the Constitution of the United States simply because the state court litigation did not resolve successfully. *Remington Paper Company v.*

28  *Watson,* 173 U.S. 443, 451 (1899).

1  claims" which were "identical with those now raised" in federal court. *Id.* at 391. The state

2  court resolution of those "underlying" issues was enough to bar the claims in federal court. *Id.*

3      Thus, the fact that this action was pending when the Plaintiffs fully pursued their federal

4  claims before the Utah Supreme Court is immaterial. Moreover, unlike in *Atchison*, the

5  Plaintiffs here did pursue identical federal constitutional claims in the state court. The preclusive

6  bar under the *England* doctrine more conclusively prevents the Plaintiffs here from relitigating

7  either their federal constitutional claims, and the corollary claim under 42 U.S.C. § 2000cc.

8     **C.**   **The Full Faith and Credit Requirements of 28 U.S.C. § 1783 Prevent the**
9         **Court from Granting any Relief to the Plaintiff Group Because its Claims Are Barred by *Res Judicata* (Claim Preclusion).**

10      The Plaintiff bases its preliminary injunction request on federal constitutional claims that

11  are barred by *res judicata* or claims preclusion. The very same claims by the very same parties

12  were already rejected by the final decision in *FLDS*, 238 P.3d 1054. The full faith and credit

13  requirements of 28 U.S.C. § 1738 require this Court to give full effect to the *res judicata* or

14  claims preclusion impacts of the Utah Supreme Court decision. *See Migra v. Warren City Sch.*

15  *Dist. Bd. Of Educ.*, 465 U.S. 75, 81 (1984) (federal courts are required to "give to a state-court

16  judgment the same preclusive effect as would be given that judgment under the law of the State

17  in which the judgment was rendered."); *Kremer v. Chemical Construction Corp.*, 456 U.S. 461,

18  466 (1982) (same); *Allen v. McCurry*, 449 U.S. 90, 96 (1980) (same).

19      "The preclusive effect of a state court judgment in a subsequent federal lawsuit is

20  governed by the full faith and credit statute, 28 U.S.C. § 1738, which provides that state judicial

21  proceedings 'shall have the same full faith and credit in every court within the United States ... as

22  they have by law or usage in the courts of such State ... from which they are taken.'" *See Reeder*

23  *v. Kermit Johnson, Alphagraphics, Inc.*, 723 F.Supp. 1428, 1431-32 (D.Utah 1989) (citing

24  *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, (1985)). Thus, "[a]

25  federal court asked to determine whether a claim before it is precluded by a previous state court

26  decision must look first to preclusion principles of the state wherein the rendering state court

27  resides, in this case Utah." *Id.* at 1431 (citing *Marrese*, at 380-83, 105 S.Ct. at 1331-33; *Gates*

28        17

1    *Learjet Corp. v. Duncan Aviation,* 851 F.2d 303 (10th Cir.1988); *Vance v. Utah,* 744 F.2d 750

2    (10th Cir.1984); *Braselton v. Clearfield State Bank,* 606 F.2d 285 (10th Cir.1979))  Once the

3    Court identifies state law indicating a particular claim would be barred, then the court must

4    determine whether the full faith and credit statute applies to the federal statute that the plaintiffs

5    are relying on, or decide if Congress created an applicable exception. *See id.* at 1432.

6           **1.    Relitigation of the Constitutional Claims Asserted Here Would Be
                    Barred Under Utah Law of *Res Judicata.***
7

8           Utah precedent confirms that the doctrine of *res judicata* or claim preclusion applies if:

9    "[1] both cases . . . involve the same parties or their privies"; "[2] the claim that is alleged to be

10   barred [was] presented in the first suit or [was] one that could and should have been raised in the

11   first action"; and "[3] the fist suit . . . resulted in a final judgment on the merits." *American*

12   *Estate Management Corp. v. International Inv. and Development Corp.,* 986 P.2d 765, 766-67

13   (Utah Ct. App. 1999) (citing *Madsen v. Borthick,* 769 P.2d 245,  247 (Utah 1988); *Estate of*

14   *Covington v. Josephson,* 888 P.2d 675, 677 (Utah Ct.App.1994), *cert. denied,* 910 P.2d 425

15   (Utah 1995)).

16          **2.    This Case and the Utah Supreme Court Decision Involve the Same
                    Parties and Their Privies.**
17

18          The Plaintiff and the record confirm that the *FLDS* case and this one involve the exact

19   same parties seeking relief, who have referred to themselves in both instances as "The

20   Fundamentalist Church of Jesus Christ of Latter-Day Saints, an association of individuals." *See*

21   *FLDS,* 238 P.3d at 1056, 1061. (*See* First Amended Complaint, at 1; Exhibit "16" hereto at 1).

22   The Plaintiffs here admit they were the petitioners in the Utah Supreme Court, acknowledging

23   that that the state court proceeding "has been terminated based on a determination that ***Plaintiff***

24   waited too long to initiate that proceeding."  Memorandum In Support of Renewed Motion for

25   Temporary Restraining Order and Preliminary Injunction, at 37, lines 3-5 (emphasis added).[13]

26   _____

27   [13]   Moreover, the petition filed in the Utah Supreme Court identified this federal action and
     stated: "Nearly a year ago, Petitioner Association members initiated a federal court action to
28   vindicate their rights, only to be met with the argument that the federal court should abstain or

Thus, the Plaintiffs here are identical to the petitioners who asserted claims in the *FLDS* case.

### 2. This Action Presents Constitutional Claims Already Rejected by the Utah Supreme Court.

As discussed above, the federal constitutional claims the Plaintiffs rely on here were asserted in the Plaintiffs' case with the Utah Supreme Court. That court made made factual determinations, final legal conclusions, and held the claims barred by laches. The Fifth District Court's recent ruling against the Plaintiffs' attempts to assert the same claims in the subdivision lawsuit provides a double layer of preclusive effect for the constitutional claims used here. (*See* Exhibits "22" hereto).

### 3. The Utah Supreme Court Decision is a Final Judgment on the Merits.

The Utah Supreme Court's decision was a final judgment on the petition seeking reversal of the reformation of the Trust and termination of the state court trust administration. The court concluded:

> . . . the FLDS Association's Trust modification claims are barred by the equitable doctrine of laches. The FLDS Association's remaining Trust administration claims suffer from the same lack of diligence and resultant prejudice and are similarly barred by laches, except for one claim that is barred because it is unripe for adjudication.

*FLDS Church,* 238 P.3d at 1066.

The decision also operates as a judgment "on the merits." Utah law confirms that generally those dismissals that were not merely voluntary dismissals without prejudice meet the requirement for an adjudication on the merits. *American Estate Management Corp.,* 986 P.2d at

---

otherwise refrain form interfering with ongoing state court proceedings." (Exhibit "16" hereto at 5, lines 2-4). The Plaintiff also filed affidavits in both cases that identically describe the Plaintiff here and the petitioner in the state court. (*See* Exhibit "17" hereto [Affidavit of Willie Jessop] hereto at 2, ¶ 4; Affidavit of Willie Jessop In Support of Motion for Temporary Restraining Order and Preliminary Injunction dated November 2, 2009 and filed in this action at 2, ¶ 4). Recognizing that the parties in the two cases were the same, the Utah Supreme Court explained that "[t]he FLDS Association has also filed a substantially similar lawsuit along with a substantially similar affidavit by Willie Jessop in federal district court." *FLDS,* 238 P.3d at 1061; *see id.* at 1056-57 n. 1.

1    769-70.    The Utah Supreme Court denied the Plaintiffs' request for relief outright with

2    prejudice.  It was a decision on the merits.

3           The Plaintiff tries to analogize the *FLDS* decision to a ruling based on a statute of

4    limitations bar that may not qualify as a judgment "on the merits" for *res judicata* purposes.  *See*

5    Plaintiff's Memorandum, at 42-43.  However, a statute of limitations defense is very different

6    from a laches defense.  A statute of limitations bar looks only to the timing of the filing of the

7    earlier action, whereas laches requires inquiry into the merits of the claim.

8           The Utah precedent on laches follows precisely this analysis.  In *FLDS,* 238 P.3d at

9    1062-63, the Utah Supreme Court explained that laches "has two elements: (1) a party's lack of

10   diligence and (2) an injury resulting from that lack of diligence."  It confirmed that deciding

11   whether a sufficient lack of diligence exists requires the court to inquire into "'the circumstances

12   of each case,' because 'the propriety of refusing a claim is equally predicated upon the gravity of

13   the prejudice suffered . . . and the length of [the] delay.'"  *Id.* at 1063 (quoting *Papanikolas Bros.*

14   *Enters. v. Sugarhouse Shopping Ctr. Assocs.,* 535 P.2d 1256, 1260 (Utah 1975)).  Thus, before

15   finding a laches bar that court must "consider the relative harm caused by the petitioner's delay,

16   the relative harm to the petitioner, and whether or not the respondent acted in good faith."  *Id.*  A

17   statute of limitations decision involves no similar consideration of facts.  Therefore, as noted in

18   *Day v. Wiswall's Estate,* 93 Ariz. 400, 403-04, 381 P.2d 217, 220 (Ariz. 1963), the laches

19   decision is a decision on the merits for *res judicata* analysis.

20          Plaintiff argues that Utah law will likely follow California law, and that California courts

21   do not consider laches rulings to be "on the merits" for *res judicata* purposes.  They cite a single

22   Utah decision that cites to California decisions defining the elements of *res judicata* as support.

23   Utah courts have equally looked to precedent from other states, including Arizona, in

24   establishing the Utah standard for *res judicata*.  In fact, this Court's precedent confirms that

25   "Arizona's claim preclusion law appears similar to Utah's in all significant respects." *See Reeder*

26   *v. Kermit Johnson, Alphagraphics, Inc.,* 723 F.Supp. 1428, 1432 (D.Utah 1989) (citing *Red Bluff*

27   *Mines v. Industrial Comm'n,* 144 Ariz. 199, 696 P.2d 1348, 1352 (Ct.App.1984); *Weller v.*

28

1296417                                              20

1   *Weller,* 14 Ariz.App. 42, 480 P.2d 379, 383 (1971)). Thus, Arizona law is a better reflection of

2   Utah's on the claim preclusion issue.

3        Also, more important than whose law Utah parallels for *res judicata* elements is whose law

4   Utah parallels for the application of the laches defense. The Utah courts have repeatedly looked

5   to Arizona law as support for implementation of laches issues. *See, e.g., Sandy City v. Salt Lake

6   County,* 827 P.2d 227, 229 -230 (Utah,1992); *Papanikolas Bros. Enterprises v. Sugarhouse

7   Shopping Center Associates,* 535 P.2d 1256, 1260 (Utah 1975); *Mawhinney v. Jensen,* 120 Utah

8   142, 148-149, 232 P.2d 769, 773 (1951). Arizona's courts have confirmed that a decision of a

9   court dismissing a suit on the basis of laches has *res judicata* impacts on the claims dismissed for

10  laches.[14] *Day,* 93 Ariz. at 403-04, 381 P.2d at 220. This parallels the rule recognized by the

11  Tenth Circuit and elsewhere that dismissal for laches creates a final decision "on the merits" for

12  *res judicata* purposes. *See, e.g.,* Paxton v. Ward, 199 F.3d 1197, 1207 (10th Cir. 1999)("We

13  note that dismissals on the basis of laches are considered decisions on the merits."); *Smith v. City

14  of Chicago,* 820 F.2d 916, 918-19 (7th Cir.1987); *Cannon v. Loyola Univ. of Chicago,* 784 F.2d

15  777, 781 (7th Cir.1986), *cert. denied,* 479 U.S. 1033, (1987).

16          **4.      42 U.S.C. § 1983 Provides No Exception to the Full and Credit
                      Statute.**
17

18          The Plaintiffs' First Amendment violation claims here are all brought under the

19  jurisdictional grant of 42 U.S.C. § 1983. However, Section 1983 does not create any exception

20  to the Full Faith and Credit requirements of 28 U.S.C. § 1738. *See Allen v. McCurry,* 449 U.S.

21  90 (1980); *Spence v. Latting,* 512 F.2d 93 (10th Cir. 1975), *cert. denied,* 423 U.S. 896 (1975); 30

22

23  _____

24  [14]    Though the Arizona Attorney General asserts that the relevant Utah law is sufficiently clear
        that laches decisions like the one here operate "on the merits," if the Court remains uncertain, the
25      proper response would not be to grant any motion for preliminary injunctive relief. At a
        minimum, this issue would preclude the Plaintiff from showing the certainty of prevailing
26      needed to justify such drastic relief. Instead, the Court should deny the motion for preliminary
        injunction and certify the question of whether its laches decision should be considered "on the
27      merits" for preclusion purposes to the Utah Supreme Court.

28

Am. Jur. 2d Executions § 697. Thus, the *FLDS* decision must be enforced as a bar here.[15]

Of course, even if claims preclusion does not apply, the rulings in the state courts create issue preclusion impacts that equally bar the Plaintiffs' claims.[16]

## V.    The Request for Injunctive Relief Violates the Public Interest and the Balance of Hardships Runs Against the Plaintiffs.

The injunction request here violates the public interest and threatens harm to the judicial system, the applicable state law of trusts, and the individuals who have relied upon the Trust administration proceeding, Trust reformation, and Trust leases or occupancy agreements.

### A.    The Plaintiffs Have "Unclean Hands".

Preliminary injunctive relief invokes the Court's equity powers. One who invokes equity

---

[15]    The law that the Court must apply also precludes litigation of claims the plaintiffs "*could have brought . . . in state court*" and for which they present no "compelling reason explaining why they did not bring the action there . . .." *Reeder,* 723 F.Supp. at 1433-34 (emphasis in original); *see also Migra v. Warren City School Dist. Bd. Of Educ.,* 465 U.S. 75, 81-85, 104 S.Ct. 892, 896-98 (1984). The Plaintiffs could have made their additional claim that the administration and subdivision of the Trust violate 42 U.S.C. § 2000cc in the state court proceeding, judicial economy would have been served thereby, and they present no compelling reasons why they did not do so. Thus, the Court should find that the Plaintiffs "*should have brought the . . . action in state court,*" and that, therefore, *res judicata* bars any such claims in this action. *Reeder,* 723 F.Supp. at 1433-34 (emphasis in original).

[16]    Even rulings that are not "on the merits" include underlying determinations that are binding through collateral estoppel, or issue preclusion. *See, e.g., Okoro v. Bohman,* 164 F.3d 1059, 1062–1063 (7th Cir. 1999). For instance, federal law embraces laches, as well, and it can bar First Amendment religion claims. *See, e.g., Southside Fair Housing Committee v. City of New York,* 928 F.2d 1336, 1354-55 (2nd Cir. 1991) (finding laches justified denial of injunction to plaintiff claiming violation of First Amendment prohibitions on establishment of religion or excessive religious entanglement). Laches also justifies denying preliminary injunctive relief in First Amendment cases. *See National Council of Arab Americans v. City of New York,* 331 F.Supp.2d 258, 265-66 (S.D.N.Y. 2004); *see also City of Sherrill, N.Y. v. Oneida Indian Nation of NY,* 544 U.S. 197, 217(2005). The elements of the federal defense of laches, lack of reasonable diligence by the plaintiff and material prejudice to others, are established here by the ruling in *FLDS,* 238 P.3d at 1062-66. *See, Southside Fair Housing Committee,* 928 F.2d at 1354; *Potash Co. of Amer. v. International Minerals & Chem. Corp.,* 213 F.2d 153, 154 (10th Cir.1954). A similar bar would be created by the findings in the Third Judicial District, now on appeal before the Utah Supreme Court in Case No. 20090691-SC, that various members of the FLDS Church had no sufficient interest in Trust property to create standing to intervene.

1   must appear with "clean hands," and the Plaintiffs' "unclean hands" are enough to deny an

2   injunction. *See Coastal Corp. v. Texas Eastern Corp.*, 869 F.2d 817, 822 (5th Cir. 1989); *Aurora*

3   *Bancshares Corp. v. Weston*, 777 F.2d 385, 387 (7th Cir. 1985) ("Not only is the doctrine of

4   unclean hands a possible defense to a request for a preliminary injunction . . .."); *Stokley-Van*

5   *Camp, Inc. v. Coca-Cola Co.*, 646 F.Supp.2d 510, 533 (S.D.N.Y. 2009). The "unclean hands"

6   doctrine "expresses the principle that when a plaintiff seeks equitable relief, the plaintiff must

7   show that his or her conduct has been fair, equitable and honest, and free of wrongdoing in the

8   matter before the court." C.J.S., Equity, § 109.   The record here reflects that the Plaintiffs'

9   leaders have refused to comply with fundamental orders of the Third District Court requiring the

10  former trustees, including the Corporate Sole of the Corporation of the President of the

11  Fundamentalist Church of Jesus Christ of Latter-Day Saints, Warren S. Jeffs, to appear and

12  provide a Trust accounting.[17]

13       Instead, the church leaders have hired multiple law firms and engaged in repetitive filings

14  seeking to frustrate the Third District Court, the Special Fiduciary, and those non-FLDS

15  members leasing from the Trust. (*See, e.g.* Exhibit "22" hereto). A party whose leadership

16  refuses to comply with proper court orders in the underlying state case should not be rewarded

17  here with an order terminating proceedings in that case.

18       Also, in recent months, non-FLDS members who are attempting to use Trust property

19  under court-delegated authority have faced harassment and interference, including the plowing

20  under of leased fields, removal of fencing, well equipment, and locks, and the running off of

21  livestock. (*See* Exhibits "14" and "15" hereto).   Resort to local police has proven frustrating,

22  with evidence mounting of disparate treatment of the police of those cooperating with the Third

23  District Court or its Special Fiduciary.

24       For example, a police officer working jointly for Colorado City, Arizona and Hildale,

25  Utah testified in February, 2006, that he was a member of the FLDS Church, testified he did not

---

[17] The former trustees were properly served, and one of them, Leroy Jeffs, is even attempting to intervene in the Third Judicial District as representative of the Estate of Rulon Jeffs, Warren's deceased father. (*See* Exhibit "23" hereto).

1   agree with the Third District Court order that suspended all the former trustees. (Exhibit "10"

2   hereto at 20, lns. 16-19). He also testified that he had been told several times not to honor or

3   recognize the suspension of trustees, indicated it was church leaders who provided the direction,

4   and admitted he had been told not to acknowledge the Special Fiduciary's appointment and not

5   to acknowledge that he has any authority over the Trust. (Exhibit "10" hereto at 27, ln. 23-28, ln.

6   7; at 29, ln. 12 – 31, ln. 16). This complements a letter to FLDS leader Warren Jeffs while he

7   was a fugitive offering statements of support and fidelity from the town Marshal. (*See* Exhibit

8   "15" hereto). The state court record also contains evidence of purported dictations of Warren

9   Jeffs giving personal direction to Mayors and city council members. (*See id.*)

10       Just a few weeks ago, another local police officer who admits he belongs to the FLDS

11   Church provided testimony showing that he failed to stop individuals plowing up a field despite

12   complaints from the non-FLDS lessees of the field after learning that the individuals were

13   working for the town Mayor and speaking to the town prosecutor who "told [him] to leave the

14   case alone" which "meant stop any investigation and only keep the peace." (*See* Exhibit "24"

15   hereto at 116, ln. 15 – 117, ln. 25; at 118, lns. 2-14; at 121, ln. 18 – 124, ln. 18; at 126, lns. 5-10;

16   at 120, lns. 8-11; at 126, lns. 5-10; at 127, ln. 17 – 128, ln. 1; at 129, lns. 1-4). This, combined

17   with his admission that he could not think of *any* incidents where he had told or recommended or

18   asked a member of the FLDS Church to stop doing whatever the Special Fiduciary's lessee was

19   complaining about, stood in contrast to his admissions that another local police officer had asked

20   the same non-FLDS lessee to stop putting wheat into grain bins he had leased from the Trust

21   when representatives of the FLDS Church's Bishop's Storehouse complained. (Exhibit "24"

22   hereto at 185, ln. 9 – 1887, ln. 11; at 191 - 192, ln. 6). Given this, suspending the administration

23   of the Trust violates public policy and creates undue hardships for those the Plaintiffs dislike.

24   **II.    The First Amendment Claims are Meritless.**

25       The Plaintiffs rely on their First Amendment religion claims to support an injunction.

26   Their claims are really free exercise claims, as the Third District Court actually reformed the

27   Trust to be religiously neutral, not to establish support for some form of religion. The Plaintiffs

28

1  cannot establish a likelihood of success on any free exercise claims.

2  The First Amendment provides only a limited freedom to act upon religious beliefs. *See,*

3  *e.g., General Council on Finance and Administration of United Methodist Church v. Superior*

4  *Court of California, San Diego County*, 439 U.S. 1355, 1369 (1978) ("*Methodist Church*");

5  *Cantwell v. State of Connecticutt*, 310 U.S. 296, 303-04 (1940). Thus, the Plaintiffs can state no

6  absolute religious freedom to behave however they want with respect to the Trust or to avoid any

7  government interaction with the Trust.[18]

8  Instead, the line the courts may not cross is drawn at deciding questions of ecclesiastical

9  policy. *See, e.g., Methodist Church*, 439 U.S. at 1369. Here, there is no evidence the Third

10  District Court has made any decisions regarding religious doctrine or policy. Instead, the Court

11  went to lengths to avoid making any such decisions, and removed them from the administration

12  proceedings by reforming the Trust to apply neutral, non-religious principles.[19] *See FLDS*, 238

13  P.3d at 1064-65.

14  At a minimum, if the Court is not otherwise convinced that injunctive relief is not

15  appropriate, the Court should order a full evidentiary hearing, preceded by appropriate discovery,

16  to address these merits issues.

17  **VII.   Conclusion.**

18  For the foregoing reasons, the Court should deny preliminary injunctive relief.

19

---

20  [18]   Finally, the facts here show the Third District Court's actions meet the constitutional
standards for even conduct that burdens expression of religious belief. *See, e.g., Lee v. Weisman,*

21  505 U.S. 577 (1992); *Larson v. Valente,* 456 U.S. 228 (1982). Here, judicial administration of
the Trust was vitally important to protect the Trust and those benefiting from it from default

22  judgment in tort lawsuits, and the minimal means were used to grant such protection.

23

24  [19]   Moreover, a person claiming unconstitutional interference with their practice of religion
must show the government had a coercive effect on their practices. *See, e.g., School Dist. of*

25  *Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 223 (1963). Here, the Plaintiffs' attorney
suggested before the Utah Supreme Court that the Plaintiffs were observing a religious test when

26  they refused to appear or participate in the trust administration proceedings for more than three
years. (Audio Recording of Oral Argument in *FLDS* Case, at 22:46). If so, then the waiver they

27  worked by abandoning the Trust and the Trust proceedings was actually consistent with their
religious beliefs, not a violation or coercion of them.

28

Filed this 9th day of November, 2010.

Randy S. Hunter
Utah Assistant Attorney General

TERRY GODDARD
Attorney General

William A. Richards
Assistant Attorney General
1275 W. Washington
Phoenix, Arizona  85007

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 2010, the Original was filed with the Clerk of the Court and a courtesy copy was delivered to: I caused the foregoing document to be hand-delivered to:

Judge Dee Benson
United States District Court
District of Utah
350 South Main Street, Room 253
Salt Lake City, UT  84101-2180

I hereby certify that on the 9th day of November, 2010, a copy was mailed via U.S. Mail to the following:

James C. Bradshaw
Brown, Bradshaw & Moffat
10 West Broadway, Suite 210, Salt Lake City, UT  84101

Kenneth A. Okazaki
Stephen C. Clark
Jones Waldo Holbrook & McDonough SLC
170 S. Main Street, Suite 1500, Salt Lake City, UT  84101

Richard A. Van Wagoner

1296417                            26

1   Rodney R. Parker
    Snow Christensen & Martineau
2   10 Exchange Place, 11th Floor, PO Box 45000, Salt Lake City, UT  84145-5000
3   *Attorneys for Plaintiff*

4   Jerrold Jensen
    Bridget K. Romano
5   Peggy E. Stone
6   Utah Attorney General's Office
    160 East 300 South, P.O. Box 140857, Salt Lake City, UT  84114-0874
7   *Attorney for Defendant Mark Shurtleff*

8
    Jeffrey L. Shields
9   Zachary T. Shields
    Michael D. Stanger
10  Callister, Nebeker & McCullough
    10 East South Temple, Suite 900, Salt Lake City, Utah  84133
11  *Attorney for Defendant Bruce Wisan*

12

13  Judge Denise Posse Lindberg
    Third Judicial District Court
14  458 S. State
15  PO Box 1860
    Salt Lake City, UT  84114-1860
16

17  /s/Charlotte L. Haught
18

19

20

21

22

23

24

25

26

27

28
    1296417                              27