IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, an Association of Individuals, <br><br>     Plaintiffs, <br><br><br>         vs. <br><br><br> BRUCE R. WISAN, Special Fiduciary of the United Effort Plan Trust; MARK SHURTLEFF, Attorney General for the State of Utah; THOMAS C. HORNE, Attorney General for the State of Arizona; and DENISE POSSE LINDBERG, Judge of the Third Judicial District Court of Salt Lake County, State of Utah, <br><br>     Defendants. | **MEMORANDUM OPINION AND ORDER** <br><br><br><br><br><br> Case No. 2:08-cv-772 <br><br> Judge Dee Benson |

Before the court is the plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction. The issue presented by the motion and the case itself is straightforward: Are the defendants' actions in reforming and administering the United Effort Plan Trust ("UEP Trust" or the "Trust") in violation of the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution?

## HISTORY

The plaintiffs are approximately 5,000 members of the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS"). The FLDS church has its origins in the teachings of Joseph Smith, Jr. who, after publishing The Book of Mormon in 1829, organized the Church of Christ with 6 original members in upstate New York in 1830. The Church of Christ later became known as The Church of Jesus Christ of Latter-day Saints, often identified as the Mormon church. The church left New York shortly after its founding, and after failed efforts at settlements in Kirtland, Ohio, Jackson County, Missouri, and Nauvoo, Illinois, eventually established itself in Salt Lake City, Utah Territory, in 1847.

Among the Mormon church's earliest tenets was a belief in the commingling of assets. This practice is described in a book of revelations received by Joseph Smith called The Doctrine and Covenants, which the Mormons regard as holy scripture. Section 42, verses 30-34 of The Doctrine and Covenants read as follows:

> 30   And behold, thou wilt remember the poor, and consecrate of thy properties for their support that which thou has to impart unto them, with a covenant and a deed which cannot be broken.
> 31   And inasmuch as ye impart of your substance unto the poor, ye will do it unto me; and they shall be laid before the bishop of my church and his counselors, two of the elders, or high priests, such as he shall appoint or has appointed and set apart for that purpose.
> 32   And it shall come to pass, that after they are laid before the bishop of my church, and after that he has received these testimonies concerning the consecration of the properties of my church, that they cannot be taken from the church, agreeable to my commandments, every man shall be made accountable unto me, a steward over his own property, or that which he has received by consecration, as much as is sufficient for himself and family.
> 33   And again, if there shall be properties in the hands of the church, or any individuals of it, more than is necessary for their support after this first consecration, which is a residue to be consecrated unto the bishop, it shall be kept to administer to

those who have not, from time to time, that every man who has need may be amply supplied and receive according to his wants.

34  Therefore, the residue shall be kept in my storehouse, to administer to the poor and the needy, as shall be appointed by the high council of the church, and the bishop and his council;

This practice of community property sharing was generally referred to as the United Order or the Law of Consecration and was attempted with various amounts of sporadic success by the early Mormons in Ohio, Missouri, Illinois, and Utah. The southern Utah city of Orderville was originally settled by Mormon pioneers for the purpose of practicing strict adherence to the United Order. Orderville (population 608) is still a functioning city but any efforts to practice the United Order there were abandoned long ago.

One of the other 19th century characteristics of the Mormon church was the practice of polygamy. Much has been written about this aspect of early Mormonism and how it influenced the political and social aspects of the growth and development of the Territory of Utah in the second half of the 19th century. *See* Shayna M. Sigman, *Everything Lawyers Know About Polygamy is Wrong*, 16 CORNELL J.L. & PUB. POL'Y 101 (2006); Rex Sears, *Punishing the Saints for their "Peculiar Institution": Congress on the Constitutional Dilemmas*, 2001 UTAH L. REV. 581 (2001). Polygamy was, and remains, against federal law. Eventually, the Mormon church eliminated polygamy from its practices and in 1890 officially declared that its members were to no longer engage in polygamous relationships. Utah was thereafter granted statehood in 1896. Polygamy has been against the law in Utah ever since. The abandonment of the practice of polygamy by the mainstream Mormon church did not rest well with all people, leading some to continue the practice of polygamy, even though it was in violation of both federal and state law,

and in some instances to form splinter groups of like-minded practitioners. The FLDS church is one of these.

According to the plaintiffs, they and their church have always believed in and attempted to practice the United Order or the Law of Consecration, as outlined in The Doctrine and Covenants. The fundamentalist movement that led to the creation of the FLDS church was formerly known as the "Priesthood Work." Its leaders (called the "Priesthood Council") formed a trust in 1942 in order to live the United Order. The trust was called the United Effort Plan and declared that its "purpose and object . . . shall first be charitable and philanthropic" and its operations were to be "governed by the true spirit of brotherhood." Declaration of Trust, dated November 9, 1942, at 4. Membership in the 1942 trust was based on "the consecration of such property, real, personal or mixed, to the trust in such amounts as shall be deemed sufficient by the Board of Trustees." *Id.* at 7.

In the early 1990s, the trustees of the 1942 trust were sued by a group of trust residents who alleged breach of fiduciary duties and other claims. The state district court found the trust to be charitable in nature, which ruling was reversed by the Utah Supreme Court on Sept. 1, 1998. The Utah Supreme Court held that the 1942 trust was not "charitable" because it "benefitted specific individuals" and because "beneficiaries must consecrate property to benefit from the trust." *Jeffs v. Stubbs*, 970 P.2d 1234, 1252 (Utah 1998). At the time of this pronouncement in 1998, there was apparently only one remaining founder of the 1942 trust, Rulon T. Jeffs, who was at that time also serving as the President of the FLDS church.

In response to the 1998 decision of the Utah Supreme Court, Rulon Jeffs took steps to

amend the trust to "ensure that his beneficial interest in the [trust] property be devoted to its intended charitable purpose." *FLDS v. Lindberg*, Memorandum of Points and Authorities in Support of Petition for Extraordinary Writ at 9. Hence, on November 3, 1998, Rulon T. Jeffs, Fred M. Jessop, LeRoy S. Jeffs, Warren S. Jeffs, Truman I. Barlow, Winston K. Blackmore, James K. Zitting, as Trustees, and Rulon T. Jeffs, President and Corporation Sole, for the FLDS church, executed the "Amended and Restated Declaration of Trust and the United Effort Plan."

The purpose for amending the trust was to make sure it qualified as a charitable trust under Utah law. Accordingly, its beneficiary class was expanded to include not just those who founded the trust, but all FLDS church members who "consecrate their lives, times, talents, and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the [FLDS] church." Amended and Restated Declaration of Trust of the United Effort Plan Trust, dated November 3, 1998, at 3. The "Declaration of Trust" of the 1998 Restated Trust states that it "is a religious and charitable trust" and "a spiritual (Doctrine and Covenants 29:34) step toward living the Holy United Order." *Id.* at 1.

Prior to 1942, and continually to 1998, the Priesthood Work (the FLDS church) was headquartered in a community straddling the border of Utah and Arizona known originally as Short Creek. Today, although it still operates generally as one community, the section located in Arizona is known as Colorado City, Arizona and the section located in Utah is known as Hildale, Utah. The community presently consists of some 5,000 acres of land, comprising approximately 700 houses, and various farms, dairies, and other businesses and operations. Virtually all of this property is within the UEP Trust. By some estimates, it has a value of $100,000,000.00. Eric G.

Andersen, *Protecting Religious Liberty Through the Establishment Clause: The Case of the United Effort Plan Trust Litigation*, 2008 UTAH L. REV. 739, 742 (2008).

The 1998 Amended UEP Trust is a relatively brief (4 page) document. The Trust specifically declares that it "exists to preserve and advance the religious doctrine and goals of the Fundamentalist Church of Jesus Christ of Latter Day Saints, previously known as 'The Priesthood Work' and refers to the Holy United Order as a 'central principle of the church.'" It further states that "the doctrines and laws of the Priesthood and the [FLDS] Church . . . are the guiding tenets by which the Trustees of the United Effort Plan Trust shall act." *Id.* The Trust also declares that the trustees are to "administer the Trust consistent with its religious purpose to provide for Church members, according to their wants and needs, insofar as their wants are just (Doctrine and Covenants 82:17-21)." *Id.* at 3.

The plaintiffs claim in this lawsuit that the Trust is an important part of their religion and that all decisions regarding their "just wants and needs" are fundamentally religious determinations. (Willie Jessop Aff. ¶ 23.) They cite to the Trust itself as evidence that continued enjoyment of Trust participation is conditioned on living in accordance with the principles of the United Order as determined by those in ecclesiastical leadership. In the event of termination of the Trust, the Trust provides that "the assets of the Trust Estate at that time shall become the property of the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, corporation sole." Amended and Restated Declaration of Trust at 4.

**Warren Jeffs and State Action**

In 2002, Rulon Jeffs died. His son, Warren, replaced him as prophet and president of the FLDS church and as president of the board of trustees of the UEP Trust. Under its new leader, the FLDS church began moving some of its followers to a new site near Eldorado, Texas. As the first decade of the 21st century progressed, the church, its president and its members became embroiled in many legal disputes, both civil and criminal. In one of the most publicized of these, Warren Jeffs was charged with aiding and abetting rape, a first-degree felony, in Utah's Fifth District Court in 2005. This criminal charge stemmed from Jeffs' involvement in an arranged marriage between two members of the FLDS church, one of whom was a 14-year-old girl at the time, and who has since left the church.

In July and August of 2004, two tort lawsuits were filed against Warren Jeffs, the Trust, the FLDS church, and other defendants in Utah's Third District Court in Salt Lake County. The claims included allegations of child sexual abuse. Jeffs and the other trustees failed to defend these lawsuits, which exposed the Trust to possible default judgments. During this time, there is evidence to suggest Jeffs' decision to do nothing in defense of the lawsuits against the Trust was deliberate, possibly motivated by his belief that his followers should leave the Short Creek area and relocate to Texas. Whatever his motivation, however, it appears undisputed that he instructed his followers to "answer them (the state authorities) nothing and don't give them any testimony or witness." (Def. Wisan's Mem. Opp. at 10.)

In May, 2005, as a result of Mr. Jeffs' and the other trustees' actions in failing to defend against the tort lawsuits, the Utah and Arizona Attorneys General filed a petition in Utah's Third

District Court seeking the removal or suspension of the trustees of the Trust.  The Attorneys

General based their decision to file the action on the belief that the trustees of the Trust,

particularly Warren Jeffs, were violating their fiduciary duties by not appropriately responding to

the tort lawsuits, which placed the beneficiaries of the charitable Trust at risk of being evicted

from the Trust's homes and property.  The petition was in the nature of a probate action pursuant

to the Utah Uniform Trust Code and requested "an immediate order suspending the authority and

power of the current trustees pending a final decision by the Court on their removal and

appointing an interim special fiduciary for the limited purpose of preserving the assets of the

trust," along with other relief.  *In the Matter of the United Effort Plan Trust*, Case No.

053900848, Utah Attorney General's Petition at 2.

      Just as with the tort lawsuits, the trustees did not respond in any fashion to the probate

action.  Thereafter, the Third District Court granted relief.  First, on June 16, 2005, Judge Deno

Himonas entered an order suspending the trustees and appointing Mr. Bruce Wisan as a Special

Fiduciary, as requested by the Utah Attorney General.  Then, on September 2, 2005, Judge

Denise Lindberg entered an "order on Procedure to Appoint Trustees and Expansion of Special

Fiduciary's Authority."  This order generally authorized Mr. Wisan to do what he deemed

prudent and reasonable to manage the Trust property, to defend against the tort lawsuits and to

see that property and other taxes were paid.  *See In the Matter of the United Effort Plan Trust*,

Case No. 053900848, Order on Procedure to Appoint Trustees and Expansion of Special

Fiduciary's Authority at 2-4.

      During the next three months, various proposals were made to the state court seeking the

appointment of substitute trustees and reformation of the Trust. These proposals came exclusively from persons who had sued the Trust, including former members of the FLDS church.

As these activities were taking place, and after having been criminally charged with aiding and abetting rape, Warren Jeffs' whereabouts were unknown. He was eventually found on August 28, 2006, in a Cadillac Escalade which was stopped on a Nevada highway for a traffic violation. He has been incarcerated on one charge or another ever since. During 2005 and throughout 2006, his followers, including the plaintiffs here, continued to do nothing to respond to either the tort lawsuits against the Trust or the probate action because that was what their prophet told them to do. As a result, it appears the only people the court was hearing from were the state Attorneys General and those who opposed the regime of Warren Jeffs.

After considering the various reform proposals, Judge Lindberg issued a rather lengthy Memorandum Decision on December 13, 2005, in which she determined that because of the malfeasance of its trustees, the UEP Trust should be reformed. At this point, the court clearly had three options pursuant to the Utah Uniform Trust Code. The district judge could (1) do nothing, (2) allow the Trust to be terminated pursuant to its own terms, or (3) reform the Trust and appoint new leadership to administer the Trust. She chose the last of these, apparently in an effort to protect the property and its beneficiaries.

In her Memorandum Decision, Judge Lindberg concluded that the 1998 Trust document is the "operative instrument" for the court to consider, and that it qualifies as a charitable trust. She further determined that the Trust should be modified "in a manner consistent with the

settlor's charitable purposes."

The court also determined, consistent with its understanding of the United States Constitution, that it could not reform the Trust on the basis of religious doctrine or principles. The judge therefore stated that the reformation would avoid constitutional problems by applying "neutral principles of law" as explained in *Jones v. Wolf*, 443 U.S. 595 (1979), and other United States Supreme court precedent. She stated: "courts must separate that which is primarily ecclesiastical from that which is primarily secular," and not enter the discussion of the former. *In the Matter of the United Effort Plan Trust*, Case No. 053900848, dated December 13, 2005 at ¶ 35. She read the 1998 Trust as having a religious part (she called it "the Plan," which was essentially a reference to the United Order concept) and a secular part (which she called "the Trust"), and declared that the goal of the reformation process was to "create a clear division between the two." *Id.* at ¶ 39. Finally, in her Memorandum Decision, Judge Lindberg invited proposals for the final reformation of the Trust. *Id.* at ¶ 56.

On October 25, 2006, nearly a year later, the court created the Reformed Trust, replacing the original 4-page document, with its 17 paragraphs, with a new version of 175 paragraphs. The reformation significantly expanded the powers of the Special Fiduciary. Under his new authority, Mr. Wisan was to implement a "strategic plan to subdivide Trust property so that it can be conveyed to members of the beneficiary class in a religiously neutral manner in furtherance of the Reformed Trust's purpose to serve the 'just wants and needs' (primarily housing) of all persons who consecrated to the Trust." (Def. Wisan's Reply Memorandum in Support of Motion for Approval of Sale of Trust Property dated October 27, 2008 at 2.)

Under the Reformed Trust, it became the responsibility of the state appointed Special Fiduciary to determine the "just wants and needs" of the people who live and depend on the Trust property. It is up to the Special Fiduciary and the "Advisory Board" of the Reformed Trust to decide who is entitled to live in which homes and when they need to move. Apparently in an attempt at humor, the Special Fiduciary initially introduced himself to the members of the FLDS church as the "State-ordained Bishop." (Willie Jessop Aff. ¶¶ 26-27.) What the members of the FLDS church formerly took to their church leaders regarding administration of Trust assets they are now supposed to take to the Special Fiduciary who is under order of the state court to decide such matters by "neutral principles" and may not rely on matters of faith or religion.

After the state court's reformation of the UEP Trust in December 2006, the Special Fiduciary assembled a team of people, including accountants, lawyers, and other professionals to administer the Trust property and determine the wants and needs of the people. With dozens, if not hundreds, of properties to manage, and a considerable number of disputes over who was entitled to what, the Special Fiduciary's expenses mounted. During 2007 and into 2008, the former trustees, and the members of the FLDS church, including the present plaintiffs, continued to remain largely uninvolved in the probate action in state court. In mid-2008, however, that changed for what appear to be 2 reasons. First, Warren Jeffs apparently had a change of opinion about asserting his and his church members' legal rights in court, and second, the Special Fiduciary announced an intention to sell certain Trust property that held special economic, historical and spiritual significance to the FLDS community, including, notably, the Berry Knoll Farm, which, according to the plaintiffs, is "a part of the prophetic vision and divine command

that the Short Creek area will become a garden spot of the west, and is the location of a temple site as divinely revealed to church leaders."  (Willie Jessop Aff. ¶ 39.)

The Special Fiduciary told the state court he needed to sell Trust property, including specifically the Berry Knoll Farm, to "resolve the current cash crunch problems," which referred to the multimillion dollar obligations owed to the Special Fiduciary's legal, accounting, and other functionaries.

This request by the Special Fiduciary caused the plaintiffs to do two things.  First, they sought to intervene in the probate action for the purpose of asserting their rights.  This was denied by Judge Lindberg on the ground that the plaintiffs did not have standing as parties in the probate action.  Second, they filed this federal lawsuit on October 6, 2008, seeking a declaration that the state actors' conduct violates the United States Constitution.

At the outset of this federal case, the plaintiffs sought a Temporary Restraining Order halting the sale of the Berry Knoll Farm and all other actions of the Special Fiduciary.  A hearing on the matter was held on November 12, 2008, with all parties present and represented.  After a lengthy hearing, it was determined that the parties were willing to mutually agree that nothing would be done to proceed with the property sale or to otherwise affect the Trust property until the parties either reached a settlement or resumed the matter in court.  Accordingly, this action was stayed pending further action of the parties.

During 2009, while this action was stayed, the parties engaged in extensive settlement efforts with former United States District Judge Paul Cassel, but were unable to reach a final settlement.  Thereafter, the state court issued a decision authorizing the sale of the Berry Knoll

Farm to the highest bidder. This caused the plaintiffs to file an action in the Utah Supreme

Court, styled as a Petition for Extraordinary Writ, in which they sought virtually the same relief

sought in this action: a declaration that the state district court's reformation and administration of

the UEP Trust is a violation of the Constitution.

The Utah Supreme Court issued its decision on August 27, 2010, finding the action

barred by laches. At that point, the plaintiffs renewed their motion for injunctive relief before

this court. After briefing, a hearing was held on December 3, 2010, with Rodney Parker,

Frederick Gedicks, and Stephen Clark representing the plaintiffs and Jeffrey Shields, William

Richards, and Jerrold Jensen representing the defendants. At the conclusion of the hearing, the

court asked the parties to attempt to mutually agree on a preservation of the status quo pending a

decision on the motion. They later reported to the court that they could not agree. Accordingly,

this court entered a Temporary Restraining Order as of December 13, 2010, generally preserving

the status quo until a decision can be rendered on the motion. Among other things, the Order

prohibits any action on the sale of the Berry Knoll Farm and stays further action on any plans to

subdivide the Trust property.

## DISCUSSION

**The Establishment Clause**

The First Amendment declares that "Congress shall make no law respecting an

establishment of religion . . . ." U.S. CONST. amend. I. From its passage by the First Congress in

1791, this clause, popularly known as the Establishment Clause, has been consistently

interpreted as prohibiting the federal government from establishing a national church and, in

more general terms, as keeping separate the spheres of church and state.  The framers of the Constitution sought to keep the government out of the affairs of the churches of America, and vice versa.  After the passage of the Fourteenth Amendment following the Civil War, the United States Supreme Court determined that the Establishment Clause is applicable to the states.  *See Everson v. Board of Education*, 330 U.S. 1, 15-16 (1947).

*Everson v. Board of Education* was the first major Establishment Clause case.  It involved a New Jersey state law that provided for the parents of students who attended private and Catholic schools in Ewing, New Jersey to be repaid for the bus fares they paid to get their children to and from school.  A taxpayer challenged the law as unconstitutional because it benefitted the Catholic Church.

In an 18-page opinion for the 5-justice majority, Justice Hugo Black took considerable effort to explain the historical underpinnings of the Establishment Clause.  After quoting from a letter Thomas Jefferson wrote to the Danbury Baptist Church, he wrote: "The First Amendment has erected a wall between church and state.  That wall must be kept high and impregnable.  We could not approve the slightest breach." *Id.* at 18.

After such strict wording, one may have thought the New Jersey bus fare law was doomed, but it was deemed not to violate the Constitution because the state involvement was so minimal.  The Court found that "the State contributes no money to the schools.  It does not support them.  Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." *Id.* at 19.

The next year in *McCollum v. Board of Education*, 333 U.S. 203 (1948), the Supreme

Court repeated its *Everson* Establishment Clause analysis in a case involving a program in the

public schools of Illinois that allowed for release time for students to receive religious

instruction. The Court, this time unanimously, found the Illinois practice in violation of the

Establishment Clause, stating:

> This is beyond all question a utilization of the tax-established and tax-supported
> public school system to aid religious groups to spread their faith. And it falls
> squarely under the ban of the First Amendment (made applicable to the states by the
> Fourteenth) as we interpreted it in *Everson v. Board of Education*. There we said:
> 'Neither a state nor the Federal Government can set up a church. Neither can pass
> laws which aid one religion, aid all religions, or prefer one religion over another.'

*Id.* at 6.

The Supreme Court's Establishment Clause caseload increased significantly after

*McCollum*, and as those two pioneering cases illustrated, the result depended on the unique facts

of each case. Notable Establishment Clause cases followed including: *Engel v. Vitale*, 370 U.S.

421 (1962), where the Court struck down as unconstitutional a state-written prayer required to be

said at the beginning of the school day in the public schools in the state of New York; *Lynch v.

Donnelly*, 465 U.S. 668 (1984), in which a creche display was found to violate the Establishment

Clause because of its primarily religious nature; and *Wolman v. Walter*, 433 U.S. 229 (1977), in

which the Court found that it was constitutionally permissible for a state to provide, among other

things, funds to nonpublic schools including those operated by religious institutions to purchase

secular textbooks for use by their students.[1]

---

[1]Other important Establishment Clause cases include: *Wallace v. Jaffree,* 472 U.S. 38
(1985) (holding that mandatory moment of silence in schools for the purpose of private prayer
violated the Establishment Clause); *Allegheny County v. American Civil Liberties Union Greater*

After a number of these fact-intensive inquiries, the United States Supreme Court

announced a three-part test in what has become perhaps the most cited Supreme Court

Establishment Clause case, *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  There the Court stated

that for state action to pass constitutional muster it must meet each of the following three

requirements:

> (1) it must have a secular purpose,
>
> (2) its principal or primary effect must be one that neither advances nor inhibits religion,
>
> and
>
> (3) it must not foster excessive government entanglement with religion.

*Lemon*, 403 U.S. at 612-13.

The Tenth Circuit Court of Appeals recently confirmed that the "purpose and effect

prongs" of *Lemon* are to be interpreted "in light of Justice O'Connor's endorsement test."

---

*Pittsburgh Chapter*, 492 U.S. 573 (1989) (striking down a creche display in a county courthouse which contained the phrase Gloria in Excelsis Deo while upholding the display of a nearby menorah, which appeared with a Christmas tree and a sign saluting liberty); *Lee v. Weisman*, 505 U.S. 577 (1992) (holding that offering of prayer before a voluntarily attended graduation was unconstitutional); *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000) (holding that a vote of the student body could not authorize student-led prayer prior to school events); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (upholding the constitutionality of private school vouchers); *Van Orden v. Perry*, 545 U.S. 677 (2005) (holding that a Ten Commandments display at the Texas state capital capitol did not violate the Establishment Clause because of its secular purpose); *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) (striking down a Ten Commandments display in several courthouses because it was not integrated with a secular purpose); *O'Connor v. Washburn University*, 416 F.3d 1216 (10th Cir. 2005) (recognizing that the Tenth Circuit uses Justice O'Connor's endorsement test to interpret the purpose and effect prongs of *Lemon* for Establishment Clause analysis); *American Atheists, Inc. v. Davenport*, 2010 WL 5151630 (10th Cir. 2010) (striking down the use of  memorial crosses to commemorate fallen highway troopers in Utah); *Trunk v. City of San Diego*, — F.3d —, 2011 WL 9636 (9th Cir. 2011) (holding that a large Latin cross located on city property on top of Mount Soledad in San Diego violates the Establishment Clause).

*Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1030 (10th Cir. 2008). "Under the 'endorsement test,' the 'government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred.'" *Id.* (quoting *Bauchman v. West High School*, 132 F.3d 542, 551 (10th Cir. 1997)).

Against this established Supreme Court and Tenth Circuit precedent, we turn to the question whether the states' actions in this case violate the Establishment Clause. The answer is an unqualified "yes." A better question would be how do they not? Virtually from its first step after it decided to reform the Trust, the state court was in forbidden territory. It not only had no authority to determine the "just wants and needs" of the members of the FLDS church, but it had no authority to interpret or reform the Trust at all.

In fairness to the state district court, it did not have anyone initially presenting an Establishment Clause challenge, but it is still difficult with the benefit of hindsight to see how the court that was in one respect so mindful of using "neutral principles" to avoid unconstitutional behavior could at the same time fail to recognize that in reforming the Trust as it did it was essentially taking over one of the central tenets of the FLDS religion. In so doing it violated the Establishment Clause. By reforming a religious trust and managing it without regard to religion, the state actors became impermissibly entangled with religion. While it is accurate to say the states' actions did not establish a religion, their actions certainly went a long way toward disestablishing one. No matter how one analyzes the states' action against the second and third prongs of the *Lemon* test, they come up lacking. The primary effect of the state

court's decision to rewrite the Trust and administer it as a secular instrument was to inhibit religion. The resulting intrusion into the everyday life of the FLDS church and its members fostered not only "excessive government entanglement with religion," but was a virtual takeover by the state.

The court finds it interesting, and somewhat telling, that the defendants' responses to the plaintiffs' constitutional challenges are so tepid as to be nearly nonexistent. In extensive briefing in this case, the defendants cite no case that is even suggested to be remotely similar enough to the instant case to support their defense. This is because there isn't one. The defense amounts to nothing more than a repeat of why the state actors felt it was so important for them to take the action they took, as opposed to why it was constitutionally justified. The defendants speak at long length about how bad–even criminal–Warren Jeffs' behavior was, but they say little that is relevant to defend their own wholesale interference with an established church. The Arizona Attorney General's response to the plaintiffs' constitutional arguments is less than one-half of one page (*see* Arizona Attorney General's Opp. Mem. at p.24-25) and cites no cases or other authority in support of its position.

The plainness of the state court's breaching of the wall of separation between church and state is found in an objective reading of the 4-page 1998 UEP Trust itself. One simply cannot read that document and fail to see that it is a religious document. As stated earlier, this document consists of only 17 paragraphs. It is straightforward and uncomplicated. Because a correct understanding of what it says is so important to a full appreciation of its religious nature, representative sections are reprinted below:

The United Effort Plan Trust is a religious and charitable trust. It is the legal entity of the United effort Plan. The Trust was created by Declaration of trust dated November 9, 1942, and was amended April 10, 1946.

The United Effort Plan Trust is a spiritual (Doctrine & Covenants 29:34) step toward living the Holy United Order. It exists to preserve and advance the religious doctrines and goals of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, previously known as "The Priesthood Work," or "The Work" (the "Church"). The United Effort Plan is under the direction of the President of the Church, who holds the keys of Priesthood authority (which keys have continued from Joseph Smith, Jr. To Brigham Young, John Taylor, John W. Woolley, Lorin c. Woolley, John Y. Barlow, Leroy S. Johnson, and Rulon T. Jeffs). The doctrines and laws of the Priesthood and the Church are found in the Book of Mormon, the Doctrine and Covenants, the Pearl of Great Price, the Holyl Bible, the sermons of the holders of the keys of Priesthood authority, and present and future revelations received through the holder of those keys; and are the guiding tenets by which the Trustees of the United Effort Plan Trust shall act.

*** 

Rulon T. Jeffs holds the keys of Priesthood authority and so serves as the President of the Church. President Jeffs is also the sole remaining original Trustee and subscriber of the United Effort Plan Trust, and President of the Board of Trustees of the United Effort Plan Trust. In those capacities he, and Fred M. Jessop, LeRoy S. Jeffs, Warren S. Jeffs, Truman I. Barlow, Winston K. Blackmore and James K. Zitting, as Trustees, hereby amend and restate the Declaration of Trust to more clearly set out its purposes and manner of operation. This document is a total restatement and amendment of the Declaration of Trust. It supersedes all previous documents, including all documents filed of public record in Utah and Arizona and with various courts. The Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, a corporation sole, hereby ratifies this amendment. This Amended and restated Declaration of Trust has also been approved by the Priesthood and sustained by the Church membership. Because the Trust is a charitable trust, this Amended and Restated Declaration of Trust will be recorded in the public record but no future affidavits of disclosure will be recorded.

*** 

Since the original conveyance substantial additional real estate has been added as consecrations to the Trust Estate, and parcels have been purchased, traded, subjected to rights-of-way, and dedicated as roads and streets. It is anticipated that property will continue to be added as consecrations to the Trust Estate. Property has

been conveyed as consecrations to the United Effort Plan Trust in the name of the United Effort Plan; as well as in the names of Trustees or of a single Trustee such as in the name of Fred M. Jessop, as Trustee. All properties now included or hereafter added to the Trust Estate are consecrated and sacred lands, dedicated to the United Effort Plan's religious purpose.

The United Effort Plan is the effort and striving on the part of Church members toward the Holy United Order. This central principle of the church requires the gathering together of faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership. The Board of Trustees, in their sole discretion, shall administer the Trust consistent with its religious pupose to provide for Church members according to their wants and their needs, insofar as their wants are just (Doctrine and Covenants, Section 82:17-21).

A consecration is an unconditional dedication to a sacred purpose. Consecration of real estate to the United Effort Plan Trust is accomplished by a deed of conveyance. Church members also consecrate their time, talents, money, and materials to the Lord's storehouse, to become the property of the Church and, where appropriate, the United Effort Plan Trust. All consecrations made to or for the benefit of the United Effort Plan Trust are dedicated to the sacred purpose of the United Effort Plan and without any reservation or claim of right and/or ownership. Improvements made by persons living on United Effort Plan Trust property become the property of the Trust and are consecrations to the Trust.

The privilege to participate in the united Effort Plan and live upon the lands and in the buildings of the United Effort Plan Trust is granted, and may be revoked, by the Board of Trustees. Those who seek that privilege commit themselves and their families to live their lives according to the principles of the United Effort Plan and the Church, and they and their families consent to be governed by the Priesthood leadership and the Board of Trustees. They must consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the Church and his appointed officers. All participants living on United Effort Plan Trust property must act in the spirit of charity (Moroni 7:6-10, 45-48). They must live in the true spirit of brotherhood (Matthew 22:36-40) and there shall be no disputations among them (3 Nephi 18:34). The Trust is most firmly committed to these goals. People who are granted the privilege to live on United Effort Plan Trust property acknowledge by their presence upon the land their acceptance of the terms of this Trust.

Participation in the United Effort Plan and use of property owned by the United Effort Plan Trust is not and does not become a right or claim of anyone who

may benefit in any way from the Trust. Use of Trust property must be within rules and standards set by the Board of Trustees. The Board of Trustees may require individuals and their families to relocate to different locations on United Effort Plan Trust property or to share a location with others. Participants who, in the opinion of the Presidency of the Church, do not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church shall remove themselves from the Trust property and, if they do not, the Board of Trustees may in its discretion cause their removal. At such time as they reform their lives and the lives of their family members and are again approved by the Priesthood and the Board of Trustees they may again be permitted to participate in the United Effort Plan. The Board of Trustees shall have no obligation whatsoever to return all or any part of consecrated property back to a consecrator or to his or her descendants.

To carry out its religious mission and charitable purpose, the Trust shall be administered by a Board of Trustees consisting of not less than three nor more than nine Trustees appointed in writing by the President of the Church. Trustees shall serve at the pleasure of the President of the Church and may be removed or replaced at any time by the President. Dismissal of a Trustee shall be by a written notice, effective on the date the notice is executed. A trustee m ay resign by written notice to the President of the Church. Each successor Trustee shall have the same powers and authority, and shall be subject to the same duties and restrictions, as predecessor Trustees.

*** 

This Declaration of Trust may be amended at any time and from time to time by the President of the Church and a majority of the Trustees. The Trust is intended to be a charitable trust of perpetual duration; however, in the event of termination of this Trust, whether by the board of Trustees or by reason of law, the assets of the Trust Estate at that time shall become the property of the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, corporation sole.

Amended and Restated Declaration of Trust at 1-4.

As noted above, the state court found this 1998 Trust to be the "governing instrument" and that it constitutes a charitable trust. The state court judge then decided that in order to "protect and maintain the charitable nature of the trust," that the Trust needed to be reformed employing "neutral principles of law." The problem with this approach at the outset is that it

involved the state court in the business of interpreting (that is, defining) a self-styled "religious" and "spiritual" Trust that by its own language "exists to preserve and advance the religious doctrines and goals of the Fundamentalist Church of Jesus Christ of Latter-Day Saints . . . ." *Id.* at 1. This is forbidden by the Establishment Clause. *See Everson*, 330 U.S. at 16. To put it plainly, once the state court read the 1998 Trust it should have recognized that it is a religious document and done nothing further with it. Pursuant to the Establishment Clause, the court had no business doing anything at all with or to the 1998 Trust once it was recognized as a religious trust that is based on a fundamental tenet of the FLDS church. After reading it, the only thing the court could do with this Trust was to leave it alone. Due to the malfeasance of the trustees in not responding to the tort lawsuits, the court could revoke the Trust (as would be the case with any failed charitable trust, religious or otherwise) and allow the trust property to be distributed in accordance with the Trust's own terms, but the court was barred by the First Amendment from doing anything more than that.

Nevertheless, the state court judge decided she could reform the document by seperating the religious parts of the text from the secular parts of the text, an act which, even if it wasn't forbidden, this court finds to be impossible. One may as well attempt to make Deuteronomy secular, or the Koran, or to eliminate football from the Super Bowl. The religious nature of the Trust is plain and obvious. To the extent there are aspects of the Trust that can be called secular, they are unquestionably inextricably intertwined with the religious.

Next, after the court's impermissible behavior in construing and reforming the Trust, the court continued its unconstitutional march into the realm of the religious by appointing a non-

religious state functionary to manage and administer the newly interpreted trust in a new secular way which forbids any religious reasons from informing his decisions. This activity goes far beyond a government sponsored prayer (*Engel*), a state textbook program for religious-school students (*Wolman*), a graduation prayer at a public school (*Lee*), a stand-alone creche on government property (*Lynch*), or any other example of impermissible state behavior found in the growing body of Establishment Clause precedents.

Looking at this situation through the eyes of the plaintiffs, it is not difficult to see what happened and its obvious enormous impact on the religious lives of the members of the FLDS church. Before the court's reformation of the 1998 UEP Trust, before the appointment of the Special Fiduciary, the plaintiffs, 5,000 or so in number, resided in homes belonging to the Trust, worked in fields and factories and dairies belonging to the Trust, and had many of their personal wants and needs involving food and shelter provided by the Trust; and all decisions about these matters were made by their FLDS church leaders. And all of these decisions were based, consistent with the Trust's language, on a large number of factors including whether they had "commit[ted] themselves and their families to live" the United Order and the extent to which they "act[ed] in the spirit of charity," "live[d] in the true spirit of brotherhood," and had "no disputations among them." Amended and Restated Declaration of Trust at 3. In other words, factors based on their religion and their faithfulness to it.

For bad or good, anyone who had agreed to the plan was subject to these same rules and was bound to accept the decisions made by his or her religious leaders. There is no question plaintiffs' religious faithfulness played a significant role in the administration of the Trust.

The day the Special Fiduciary began his job, however, that was gone, replaced by a secular authority who decided the same matters of Trust property distribution not only based on an entirely new regime of secular criteria, but also on the express condition that religious reasons could not be controlling. One's faithfulness to the principles of the church was replaced by purely secular criteria such as caloric intake needs and whether more heat was needed for warmth in the winter.

The state court's reliance on *Jones v. Wolf*, 443 U.S. 595 (1979), is wholly misplaced. *Jones* followed *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1968), which recognized that neutral principles of law may be employed by courts to resolve church property disputes without running afoul of the Establishment Clause if such principles are the type "for use in all property disputes" and do not in any way require the court to interpret ecclesiastical questions. *Id.* at 449.

Indeed, as plaintiffs point out, in *Jones* the Supreme Court actually gave guidance to religious organizations about how to structure their property documents to cover otherwise non-justiciable contingencies:

> Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency . . . . In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of its members.

*Jones*, 443 U.S. at 603.

The 1998 Trust was structured in just this fashion by providing that in the event the Trust failed, the Trust property would revert to the FLDS church. This would avoid the possibility of a

non-justiciable contingency.  But, rather than allow such a result, the state actors sought and obtained a reformation of the Trust, which required disregarding all religious aspects of the Trust and inventing what they called a secular instrument.  Nothing about that process employed the neutral principles referred to in *Jones v. Wolf*.  First of all, the case before the state court did not present a property dispute at all; it was occasioned by an alleged breach of fiduciary duty by its trustees, not because of any property dispute over the property itself.  Furthermore, even if the case involved that type of internal church property dispute and neutral principles were applicable, the practice did not give the state court the authority to revise or alter religious church documents.  Yet that is precisely what the state court did.

No matter how much the state court attempts to label its actions as applying neutral principles and thereby avoid constitutional problems, what it did was an impermissible rewriting of the Trust document, where the religious and secular are inextricably intertwined.  There was no proper use of the so-called "neutral principles."

In sum, from the unique facts of this case and consistent with the Establishment Clause and its interpretation by the United States Supreme Court and the Tenth Circuit Court of Appeals, the state actors had no authority to act as they did.  Under the circumstances, given the trustees' failure to defend the trust against the tort lawsuits and their failure to defend against the claims of malfeasance against them in the probate court, the state court could have allowed the Trust to be revoked, but they had no authority, consistent with the United States Constitution, to redefine the Trust, reform the Trust, or administer the Trust.  Such state action constitutes excessive involvement with religion in violation of the First Amendment.  Accordingly, the

plaintiffs have established that they are substantially likely to succeed on their Establishment

Clause claims for purposes of the requested preliminary injunction.

**Free Exercise Clause**

In addition to declaring that "Congress shall make no law respecting an establishment of

religion," the First Amendment forbids Congress from "prohibiting the free exercise thereof."

Through the Fourteenth Amendment, the Free Exercise Clause is applicable to the states.

*Cantwell v. Connecticut*, 310 U.S. 296, 303-304 (1940).

The plaintiffs claim the defendants' actions violate their free exercise rights as well as the

Establishment Clause.  This aspect of their case has not been the plaintiffs' primary focus either

in the written briefs or during oral argument.  For purposes of the present motion for preliminary

injunctive relief, the plaintiffs' emphasis has in the main rested on their claim that the

Establishment Clause's structural bar has been violated.

The history of the Free Exercise Clause differs significantly from the Establishment

Clause.  The most recent seismic shift in Free Exercise jurisprudence occurred in 1990 with

*Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which

the United States Supreme Court held that state laws of general application may be applied to

churches and their members even if the consequences of such application interferes to some

extent with a persons's exercise of religion.  The *Smith* case dealt with the state of Oregon's law

against the use of peyote.  Several members of the Native American Church claimed that peyote

use was a necessary part of their religious ceremonies and that enforcement of the peyote law

against them would prevent their freedom to fully practice their religion.  The Court disagreed

and announced the holding stated above.

In accordance with *Smith*, in the instant case it appears that the state Attorneys Generals' petitions to the Third District Court alleging malfeasance on the part of the UEP Trust's trustees was a proper application of a Utah law.  The trustees had chosen not to respond to two tort lawsuits which put the Trust property in jeopardy.  But that state action was not directed at the plaintiffs.  Quite to the contrary, the state action was designed to protect the Trust property for the benefit of its beneficiaries, which included the plaintiffs.

The state action that did affect the plaintiffs was the decision to reform the Trust and turn over management of the Trust property to the state's Special Fiduciary.  As explained above, this change in management completely altered the former way of dealing with the property, stripping away any and all matters of religion and faith, which had previously been an important and essential aspect of the property management system.  The court recognizes there are differences between the two religion clauses and there may be defenses available to the state actors in relation to the plaintiffs' Free Exercise claims that are not available with respect to the Establishment Clause claims.  Because the Free Exercise clause has not yet received the detailed attention of the parties, the court will at this point find only that under the present state of the record the plaintiffs' Free Exercise claims appear substantially likely to succeed, and therefore serve as additional support for preliminary injunctive relief to the plaintiffs.  On the present state of the record it is difficult for this court to see how the states' action is not as violative of the plaintiffs' Free Exercise rights as it is of the Establishment Clause.  Simply put, the plaintiffs' freedom to practice an important tenet of their religion (i.e. the sharing of their property on

religious grounds under the direction of their religious leaders) was not only eliminated but was replaced by a state-run secular program. If desired, however, the parties will be afforded an opportunity to further develop the Free Exercise issues pending a final resolution of this case.

**Jurisdictional and Preclusive Defenses**

The defendants' primary defense is that this federal court either lacks jurisdiction or is precluded from exercising its jurisdiction because of any or all of a wide-ranging variety of legal doctrines that include (1) waiver, (2) res judicata, (3) the Full Faith and Credit Clause, (4) laches, (5) unclean hands, (6) in custodia legis, (7) the Barton-Porter doctrine, (8) *Younger* abstention, (9) absolute immunity, (10) qualified immunity, (11) standing and (12) the Rooker-Feldman doctrine. The court finds each of these to be either entirely inapplicable to the present case or sufficiently lacking as a defense to provide merit for defendants' position and to prevent this court from granting the plaintiffs' requested injunctive relief.

Most importantly, the majority of these doctrines are inapplicable because they depend upon an underlying activity by the state where the state had jurisdiction and the authority to act. As explained above, the plaintiffs' Establishment Clause claim is simply that the state court had no authority to reform the 1998 Trust and thereafter take over its management. This court agrees. The Constitution does not allow the state court of Utah or any other state into the realm of religion. Once that boundary is crossed, the court is in forbidden territory and must leave. Viewed in this way it is obvious the various preclusive doctrines mentioned above are not applicable here. Waiver is not at issue because the structural limitation set by the Establishment Clause cannot be waived. Such structural limitations cannot be waived by the government or

private litigants.  *See e.g., INS v. Chadha*, 462 U.S. 919 (1985) (re: legislative veto); *Lee v. Weisman*, 505 U.S. 577 (1992).

The In Custodia Legis, Barton-Porter, and Rooker-Feldman doctrines are inapplicable because each presupposes that the state court in a civil lawsuit has jurisdiction and authority over the matter at issue, including trusts (in custodia legis), the behavior of a fiduciary (Barton-Porter), or some other aspect of state court litigation (Rooker-Feldman).  As explained above, due to its religious character, the state had no authority over the Trust, other than to allow it to be terminated.  Furthermore, the Rooker-Feldman doctrine is inapplicable here because the plaintiffs were not parties to the state proceedings and because this action was commenced prior to the resolution of the state cases.

*Younger* abstention does not pertain to this case because the state court action in question not only was without authority but also because it could hardly be said that the state courts of Utah have an important state interest in enforcing their orders and judgments that are in violation of the United States Constitution.  *Younger* abstention is not applicable to a federal court injunction suit involving allegations of state court proceedings in violation of the Bill of Rights. *Walck v. Edmondson*, 472 F.3d 1227 (10th Cir. 2007).

With the exception of the state court judge's immunity, the immunity doctrines presented by the defendants have no relevance at this stage of the case where only declaratory and injunctive relief are sought.  Under *Ex Parte Young*, all of the defendants are subject to such prospective relief.

As for standing, the plaintiffs have the right to bring and prosecute this action pursuant to

Article III of the United States Constitution and, more specifically, Rule 17(b)(3)(A) of the

Federal Rules of Civil Procedure.  The plaintiffs clearly have presented facts sufficient to present

a justifiable controversy that directly affects them in the conduct of their daily lives.

**Laches and Res Judicata**

With regard to laches and res judicata, the defendants claim the recent opinion of the

Utah Supreme Court which dismissed plaintiffs' case on the ground of laches bars this court

from further action.  As an alternative, they claim that even if this court is not barred from

addressing plaintiffs' case by the doctrine of res judicata, this court should nonetheless dismiss

the case on the basis of its own independent finding of laches.

The court will first address whether it finds, independently, whether this action should be

dismissed on the basis of laches.  Laches is an equitable doctrine that essentially focuses on a

party's untimeliness in bringing a claim and any injury that the delay caused to the other side.

*Angelos v. First Interstate Bank*, 671 P.2d 772, 777 (Utah 1983).  By its very nature, the inquiry

is fact intensive and depends on the unique circumstance of each case.  The doctrine is invoked

relatively seldomly, primarily because of the existence of codified statutes of limitation, statutes

of repose, and the like, all of which also deal in large part with the issues of timeliness and

prejudice.  In the end, basic fairness is the goal.  If too many plans, decisions, contracts,

adjustments, and changes have been reasonably made on a party's failure to challenge a certain

action, at some point in time it is only fair and equitable to disallow the claim.

Although the doctrine focuses on lack of diligence, and the prejudice it causes, it is

apparent that the nature and quality of the alleged violation of law also play a part in the laches

analysis.  The gravity of the offense, and the extent to which it was obvious or should have been obvious, to the alleged wrongdoer, are also considerations.  As a practical matter a lesser slight may be dismissed more easily on laches than a greater one even if the delay and prejudice to others are the same in both cases.  This is only right because the inquiry is one in equity, seeking to balance the various consequences felt by the affected parties.  As the Utah Supreme Court stated in *FLDS v. Lindberg*, 2010 UT 51, ¶ 28, 238 P.3d 1054: "In determining whether to apply the doctrine of laches, we consider the relative harm caused by the petitioner's delay, the relative harm to the petitioner, and whether or not the respondent acted in good faith."

In the instant case, when these three factors are fully considered, there is on the present state of the record no basis for a finding of laches, especially with respect to the state's continuing administration of the Trust.  As for the first consideration, the length of the delay, the plaintiffs' first filing asserting their constitutional claims was in October, 2008 before this court. That was shortly after the plaintiffs had been denied standing to intervene in the state probate action, approximately four years after the Utah Attorney General petitioned the state court and three years after the district court reformed the Trust.  All of the reasons for the plaintiffs' delay until 2008 to assert their constitutional rights are not known but some of them have been asserted as part of the record in this case.  They include: (1) after Warren Jeffs declared in 2004 "to answer them nothing," the members of his church (the plaintiffs here) took no legal action in response to the Attorney General's petition; (2) a belief at some point in that earlier period that the FLDS members, again following their prophet, might be abandoning their homes and property in Southern Utah and relocating to Texas or some other location; (3) a general lack of

communication from the FLDS church leaders among themselves and their followers, and a good deal of confusion about how to deal with the unfolding situation, which included the fact that their prophet was facing serious criminal charges in Utah state court and that he and the Trust had been sued in two tort lawsuits in Utah state courts; (4) a belief based on the first two orders granted by the Utah court that the Special Fiduciary had relatively limited authority that focused primarily on seeing that taxes were paid and that the tort lawsuits were properly defended; and (5) the fact that the plaintiffs themselves were not parties in the proceedings and therefor under no obligation to do anything.

During the first three years after the state case was commenced, then, on the current state of the record, it appears the plaintiffs' failure to seek legal redress was based on following the counsel of their religious leaders and on the belief, or hope, that the actions of the state would not be sufficiently violative of their rights as to necessitate legal action in the courts. During this time it is also significant to recognize that the plaintiffs did not leave their homes or property. They did not relocate to Texas. They stayed on the Trust property in Hildale and Colorado City, while they watched the actions of the Special Fiduciary become a reality in their everyday lives.

When this case was filed in 2008, the circumstances had changed significantly for at least two interrelated reasons: (1) Warren Jeffs changed his position and apparently instructed his followers to get legally involved and (2) the Special Fiduciary had taken steps in administering the Trust to do things that the FLDS members felt could not be tolerated. These included the decision to sell the Berry Knoll Farm property, which many of the FLDS community felt had special spiritual importance, and the planned final subdivision of their homes and property. In

addition, there were a variety of smaller actions that if allowed to happen would cause irreparable harm to the FLDS members.

Accordingly, the plaintiffs altered their course in 2008 by filing this lawsuit. Thereafter, this court is well aware of the details that have caused the case to proceed without any final action by the court on the motion for injunctive relief. The main reasons have been (1) an extensive effort at reaching a mediated settlement, and (2) a stay of this action while the plaintiffs' Petition for Extraordinary Writ was dealt with by the Utah Supreme Court.

These circumstances do not amount to the type of inexcusable delay that supports the dismissal of plaintiffs' claims of serious constitutional violations on the basis of laches. This is particularly the case with respect to the state's continuation of its administration of the Trust. While it is true the plaintiffs could have acted sooner, their reasons and actions under all the circumstances have not been sufficiently unreasonable to warrant a finding of laches.

Turning to the injury caused to the state actors and others by the plaintiffs' waiting until 2008 to file this case, the injury, if any, is also not sufficient to serve as a basis for applying laches, even if the plaintiffs failed to bring their case with appropriate diligence. The injury caused by the plaintiffs' delay in bringing their claims falls into three categories: (1) the Special Fiduciary's own unpaid bills; (2) the settlements that were reached in the two tort lawsuits; and (3) other (mostly unidentified) decisions made and positions taken based on the Special Fiduciary's actions. None of these equal the kind of obligations, expectations, and dependencies that warrant the extraordinary remedy of laches, a remedy which would place the payment of the Special Fiduciary's accountants and lawyers (from money earned from the sale of plaintiffs' own

property) ahead of the plaintiffs' rights to receive a fair hearing on their constitutional claims.

The tort lawsuit settlements certainly can be dealt with by the same legal system that one would expect to be able to allow these plaintiffs to somewhere obtain a ruling on the merits of their constitutional claims.

If the plaintiffs had abandoned their property and moved to Texas, or if they had waited a considerably longer period of time before seeking redress of their constitutional rights, or even if the damages and injury to the state and third parties was irreparable or more extensive, laches may be an appropriate remedy, but on the current state of the record the case for laches is not made. This is especially true given this court's view, as expressed above, that the defendants' actions were, and continue to be, in clear violation of the Establishment Clause and most likely in violation of the Free Exercise rights of the plaintiffs. On the present state of the record, it would be inequitable in the extreme to dismiss this case in its entirety on the basis of laches and thereby allow these serious constitutional violations to multiply and get worse.

This court is aware of no case where laches has been found under circumstances similar to the instant case. This includes the critical fact that the unconstitutional violation is an everyday ongoing reality. Every passing day, the thousands of FLDS members who brought this case are experiencing the actions and decisions of a state appointed fiduciary regarding the property in which they live. The 1998 Trust may have been reformed three years ago but its illegal administration by the state is happening with every passing day. To apply laches in this situation would be to place the violation of the First Amendment behind the fees and expenses of the very state actors, and those of the (mostly) former, and now disaffected, members of the

FLDS church who have encouraged the state actors to take over the Trust. If the defendants are in territory where they are constitutionally not permitted to be, the law should require their eviction, not sanction their continued presence just so they can be paid for the invasion.

**Res Judicata**

Regarding res judicata, the defendants claim this court is bound by the Utah Supreme Court's finding of laches and must dismiss the case. The plaintiffs agree that this remedy is required if the Utah Supreme Court's ruling is considered to be on the merits for res judicata purposes, but they contend it was not. Defendants, obviously, disagree. Both sides, however, agree that the law of the state of Utah on this point is not settled.

Nor do the parties agree on the general state of the law in other federal or state jurisdictions. They both claim support in a proper application of Rule 41(b) of the Federal and Utah Rules of Civil Procedure. They both insist that the cases cited by their opponent(s) are misrepresented and inapposite. They both contend the cases from other jurisdictions are strongly in their favor, and they insist a ruling not in their favor would be a serious miscarriage of justice.

Currently, there is no clear precedent from the Utah Supreme Court or any other Utah state court regarding whether laches always constitutes a "judgment on the merits" for res judicata purposes. Plaintiffs argue that Utah would not find laches to provide a basis for res judicata in the circumstances of this case because to do so would be inconsistent with Utah law that holds that dismissal of a claim on the basis of a statute of limitations violation is not a judgment on the merits. They also assert that Utah has "drawn its descriptions of Utah preclusion law from California," which has held that judgments on the basis of laches are not on

the merits for res judicata purposes. *See Searle Bros. v. Searle*, 588 P.2d 689, 691 (Utah 1978); Plaintiffs' Opening Mem. at 43.

Furthermore, plaintiffs point to the Utah Supreme Court's decision in the recent *FLDS* case where the court stated "[w]e decline to reach the merits of these claims," 239 P.3d at 1066, as evidence that the decision was not on the merits for res judicata purposes.

Moreover, in supplemental briefing, the plaintiffs assert that because of the unique nature of the action before the Utah Supreme Court—a Petition for Extraordinary Writ, which is discretionary in nature, as apposed to an appeal as of right—a finding of res judicata would be improper. And, finally the plaintiffs argue that "the overwhelming majority of courts and commentators hold that a laches or limitations dismissal in state court does not preclude a subsequent action in a federal court or a different state court." (Plaintiffs' Supp. Reply Brief Regarding Res Judicata Issue at 3.)

Defendants, on the other hand, contend that the Utah Supreme Court's ruling is preclusive under the Full Faith and Credit statute, that it is "on the merits" for res judicata purposes pursuant to controlling Utah law, and they cite many policy reasons which should prevent this court from considering the instant case. The defendants recognize that there is no direct guidance from the Utah Supreme Court on this issue, but assert that Utah would be inclined to follow the law of Arizona in this area, citing *Day v. Wiswall's Estate*, 381 P.2d 217 (Arizona 1963), in which the Arizona Supreme Court held that laches constitutes a judgment on the merits for res judicata purposes.

A close inspection of the arguments of the parties and the underlying reasons supporting

the doctrines of laches and res judicata leads this court to the opinion that in the circumstances of this case, the Utah Supreme Court's finding of laches was not a judgment on the merits for res judicata purposes. Accordingly, this court is not precluded from further action in this case.

To begin with, it is well to remember that general notions of fairness provide the basis for both the doctrines of res judicata and laches. They both recognize the essential fairness in the view that at some point litigation over a particular controversy must come to an end. The law recognizes that while every person is entitled to his day in court, that is, a full and fair opportunity to be heard, that person is not necessarily entitled to a second day, or a third. As one court aptly put it, "there is justice too in an end to conflict and the quiet of peace." *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 481 (5th Cir. 1980). Accordingly, the common law of equity developed to deny opportunities to mount additional or collateral attacks on legal issues which already had an opportunity to be presented for resolution in a court with jurisdiction. This is the essence of the doctrines of res judicata and collateral estoppel. Initially, each of these doctrines strictly required a final judgment on the merits. Over time, however, "the meaning of the term 'judgment on the merits' has gradually undergone change and has come to be applied to some judgments that do not pass entirely upon the substantive merits of a claim," 47 Am. Jur. 2d Judgments § 540 (2010), and pursuant to various statutes and court decisions, some "judgments not passing directly on the substance of the claim" have nevertheless operated as a bar under res judicata and collateral estoppel rationales. *Id.*

The Arizona Supreme Court opinion in *Day v. Wiswall's Estate*, 381 P.2d 217 (Ariz. 1963), is an example of one of these court decisions that recognized preclusive effect even when

the earlier proceeding was technically not decided on the merits but rather on the basis of laches. The California Supreme Court's decision in *Johnson v. City of Loma Linda*, 5 P.3d 874 (Cal. 2000), also a case where the underlying litigation was dismissed on the basis of laches, comes to a different conclusion, finding that the laches ruling was not on the merits for res judicata purposes. Under the current state of the law, then, it is apparent there are times when laches is deemed to support the application of res judicata and there are also times when it is not. While all of the reasons for such different results are not entirely clear, and may vary from court to court, it appears that one common element, and one that makes the Arizona and California decisions consistent with each other, is whether the underlying case in which laches was found included a fair examination of the circumstances and merits of the suit. This principle was clearly an important factor in both the Arizona and California cases.

*Day*, the Arizona case, involved an action brought by a plaintiff seeking a declaration that portions of her stepmother's estate should be held in constructive trust for her benefit. 381 P.2d at 218-19. The plaintiff claimed to be an heir to 1/22nd of her father's California estate, and to one-half of her mother's California-based community property. The mother died in 1899 and the father in 1911. Some 50 years after the distribution of this property to her stepmother, the plaintiff claimed she could still trace the property.

The plaintiff brought suits against the same parties in both Arizona and California. While the Arizona case was pending appeal, a judgment was rendered in the Superior Court of Los Angeles County, California dealing with the same property, issues, and parties as those brought by the plaintiff in Arizona. At the conclusion of a trial "upon the facts," the California

court made a finding of laches against the plaintiff, in pertinent part, as follows:

> The separate and community interests [which plaintiff seeks to reach] * * * have been so intermingled over the period of approximately 56 years that it would now be inequitable to segregate and evaluate such interest separately, and for such delay plaintiff is guilty of laches insofar as she seeks relief under actions * * * No. 666,006 * * * [and] No. 714,004.

*Id.* at 220.

The plaintiff claimed that the Arizona court should not give preclusive effect to the California decision because it was on the basis of laches and therefore not "on the merits." In disagreeing with her, the Arizona Supreme Court stated, "the doctrine of laches is properly applied only after a consideration of the circumstances and merits of a suit," and that "[t]he judgment in the California suit was not one of dismissal, but, after a full hearing and consideration of evidence and a finding of laches as a fact, was that the plaintiff *take nothing* by reason of the actions. It was therefore a judgment on the merits." *Id.* at 220 (emphasis in original).

The California case, *Johnson v. City of Loma Linda*, stated that "a judgment denying a petition for writ of administrative mandate because of the defense of laches is not a judgment on the merits for purposes of res judicata." 5 P.3d at 884. The court explained that "[a] judgment is on the merits for purposes of res judicata if the substance of the case is tried and determined," and that under California law "[t]he defense of laches has nothing to do with the merits of the cause against which it is asserted . . . . The telling consideration must be that laches constitutes an affirmative defense *which does not reach the merits of the cause*." *Id.* (internal quotations and citations omitted) (emphasis in original). The court concluded its opinion with the

following:

> The City notes that the doctrine of res judicata promotes the public policies of giving certainty to legal proceedings, preventing parties from being unfairly subjected to repetitive litigation, and preserving judicial resources. These public policies, the City argues, would be promoted if we were to hold that a trial court's ruling on the basis of laches is a judgment on the merits. What the City overlooks, however, is that the doctrine of res judicata also requires that the prior dispute be resolved on its merits. That requirement would not be satisfied if we were to adopt the City's argument.

*Id.* at 884 (internal citations omitted).

In the recent *FLDS* case, the Utah Supreme Court identifies the doctrine of laches in Utah as follows:

> The length of what constitutes a lack of diligence depend[s] on the circumstances of each case, because the propriety of refusing a claim is equally predicated upon the gravity of the prejudice suffered . . . and the length of [the] delay. In determining whether to apply the doctrine of laches, we consider the relative harm caused by the petitioner's delay, the relative harm to the petitioner, and whether or not the respondent acted in good faith. Further, reasonable delay caused by an effort to settle a dispute does not invoke the doctrine of laches.

*FLDS v. Lindberg*, 2010 UT 51, ¶ 28 (internal quotations and footnotes omitted).

Under this definition, the court recognizes an obligation to perform an assessment of the merits of the plaintiffs' case in addition to the factors of delay and prejudice to others. In this regard, the Utah Supreme Court takes the same view of the definition of laches as the Arizona Supreme Court, that is, laches requires the consideration of the circumstances and merits of a suit. In the *FLDS* case, however, aside from the Utah Supreme Court's bare statement that laches entails a consideration of "the relative harm to the petitioner," the court undertakes no assessment of any kind whatsoever as to whether the plaintiffs' claims of serious constitutional violations had any merit at all. There is no attention given to whether the state district court's

reformation of the Trust was in violation of the First Amendment or whether the day-to-day administration and management of the Trust property constituted the ongoing serious constitutional violations on which the plaintiffs' case was based. Attention was devoted solely to discussing the delay and the alleged prejudice caused by the delay. Under these circumstances, the "merits" of plaintiffs' case were not considered. The "relative harm to the petitioner" (the plaintiffs) was not even mentioned. As a result, the plaintiffs have not yet had a forum in which their claims of serious constitutional violations have been entertained or addressed sufficiently to earn a finding that they were on the merits.

In the final analysis, it appears from the case law, and in particular the cases from Arizona and California cited by the parties, that laches is entitled to preclusive effect in some cases, namely where there is some appropriate attention paid to the merits, and not in others. In this regard Utah law is in accordance with both the Arizona and California decisions. The Utah Supreme Court announced in *FLDS* a definition of laches that is the same as the Arizona high court. (Compare Utah's "In determining laches . . . we consider the relative harm caused by the petitioner's delay, the relative harm to the petitioner, and whether or not the respondent acted in good faith," with Arizona's "The doctrine of laches is properly applied only after a consideration of the circumstances and merits of a suit."). Accordingly, it would be expected that the Utah court would take a similar approach to finding laches as having preclusive effect only when, as in the *Day* case, there was a "full hearing and consideration of evidence" in the underlying action. If there is no such consideration of the merits, laches would not have preclusive effect.[2]

_____

[2]The defendants' brief supports this court's view that the merits of the claim must receive some consideration by a court before a laches finding will have preclusive effect. The Arizona

That is unquestionably what happened in *FLDS*. Therefore, consistent with the *Day* case, there is no res judicata effect from Utah's decision in *FLDS*.

On the other hand, Utah law is also consistent with California's law, announced in the *Johnson* case, if a finding of laches is based only on a consideration of (1) delay by the plaintiff and (2) prejudice to the defendant (and third parties), and does not consider the merits of the plaintiff's suit. If that is the definition of laches, or if that is the way the doctrine is applied, then the result is a finding of no preclusive res judicata effect, as was the California court's holding in *Johnson*. Any reading of the *FLDS* case shows that the Utah Supreme Court focused solely on delay and prejudice (to the defendants) and nothing more.

Furthermore, the court finds merit in the plaintiffs' argument that the discretionary nature of the relief available under the Petition for Extraordinary Writ makes a finding of res judicata inappropriate here. *See* Plaintiffs' Supp. Brief Regarding Res Judicata Issue at pp.4-9. In *State v. Barrett*, 2005 UT 88, 127 P.3d 682, the Utah Supreme Court recognized that a party seeking relief under such a Petition "has no right to receive a remedy that corrects a lower court's mishandling of a particular case. Rather, whether relief is ultimately granted is left to the sound discretion of the court hearing the petition." *Id.* at ¶ 23.

The *Barrett* court compared the decision whether to grant relief pursuant to a petition for extraordinary writ to a decision whether to grant a petition for a writ of certiorari. "The exercise

_____

Attorney General explains to the court on page 20 of his brief that "A statute of limitations bar looks only to the timing of the filing of the earlier action, whereas laches requires inquiry into the merits of the claim." He also refers the court to the Utah Supreme Court's definition of laches as requiring consideration of "the relative harm to the petitioner," (page 15 and again on page 20), to emphasize why this court should give res judicata effect to the Utah Supreme Court's opinion in the instant case.

of the court's discretion when deciding whether to grant rule 65B(d) extraordinary relief is akin to this court's exercise of its certiorari review powers. Rule 46 of the Utah Rules of Appellate Procedure states that '[r]eview by a writ of certiorari is not a matter of right, but of judicial discretion and will be granted only for special and important reasons.'" *Id.* at ¶ 24 (quoting Utah R. App. P. 46(a)). It was under these circumstances in which the Utah Supreme Court decided in its sole discretion not to grant the Writ in the FLDS petition. In doing so, the court specifically stated that "we decline to reach the merits of these claims." *FLDS*, 2010 UT 51, ¶ 43. In this regard, pursuant to Fed. R. Civ. Proc. 41(b), it appears the Utah Supreme Court in its dismissal order was signaling that the decision was not operating "as an adjudication on the merits."[3]

For the above reasons and based on the other authorities cited in the plaintiffs' supplemental briefing, the court finds the Utah Supreme Court's decision in *FLDS* was not on the merits for the purposes of res judicata.

**Other Issues/Defenses**

As addressed above, the defendants have asserted many defenses arguing that this court lacks jurisdiction, or that even if this court has jurisdiction, it should not exercise it. And, as stated, the defendants also address, albeit sparingly and unconvincingly, the substance of the plaintiffs' constitutional claims. But, in addition to these assertions in defense of their actions, the defendants also devote large amounts of their briefs, and attention in oral argument, to

---

[3]Rule 41(b) of the Utah Rules of Civil Procedure provides: "*Unless the court in its order for dismissal otherwise specifies*, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication on the merits." (emphasis added). Rule 41(b) of the Federal Rules of Civil Procedure is virtually identical to the Utah rule.

addressing the bad character and alleged criminal wrongdoing of Warren Jeffs. The purpose of these pronouncements, as best the court can make of them, is to persuade this court that it should find the state action constitutionally proper because to find otherwise would allow Warren Jeffs (and presumably his followers) to obtain the Trust property and use it to carry out wrongful and criminal acts. The defendants point, in particular, to Mr. Jeffs' alleged sexual abuse of minors through illegal arranged marriages of young girls to older men and by other means.

The defendants assert that if the state court were to terminate the Trust, as opposed to reforming and managing it, and thereby allow it to be revoked according to its own terms, the Trust property would revert to Warren Jeffs, as president and corporation sole of the FLDS church. This result, they claim, cannot be allowed to happen because Jeffs would simply continue to use the Trust property for nefarious purposes. They point out that he and the Trust were sued in the tort lawsuits on claims of illegal sexual abuse of minors, and that he was prosecuted criminally for such activity in Utah and is currently facing similar charges in Texas. They also cite instances where Mr. Jeffs has made statements that show he is manipulating the Trust property to assist him in his illegal behavior.

The tort lawsuit claimants have sought to intervene in this case with similar rhetoric. They refer to Mr. Jeffs' criminal acts as "the elephant in the room" and argue that the Special Fiduciary must be allowed to continue his work in order to restrict Mr. Jeffs' ability to utilize the Trust and its property in aid of his criminal abuses against minors and other wrongful behavior.

All of these accusations and pronouncements are not lost on the court. But they lack relevance to the question whether the state actors violated the constitutionally established

boundaries between church and state by their virtual remake and takeover of the 1998 Trust.

The fact of the matter is that the state court based its decision to reform the Trust, and turn its

administration over to the Special Fiduciary, on the malfeasance of Warren Jeffs and the other

trustees in failing to defend the tort lawsuits and thereby subject the Trust property to possible

default judgments. Although the defendants asserted in oral argument, and suggest in their

briefs, that part of the reason for reforming the Trust was because of a legal determination by the

state court that it was being used to facilitate illegal activity, there is no support for that

assertion.

While it is true the state court judge in reforming the Trust recognized that the FLDS

church practiced polygamy, which is illegal, and that the Special Fiduciary would not in any

manner be allowed to make Trust administration decisions on the basis of polygamist practices,

the state judge nowhere based her decision to reform or administer the Trust on a finding that it

was being used to commit or support criminal activity. The state-judge's Memorandum

Decision states:

> The reasons for reformation are multiple. Earlier in these proceedings the Court
> determined that the suspended trustees had "committed [] serious breach[es] of
> trust," and demonstrated "unfitness, unwillingness, or persistent failure . . . to
> administer the trust effectively" on behalf of the beneficiaries of the Trust.
> Specifically, the suspended trustees and, in particular, Warren Jeffs in his capacity
> as FLDS President and President of the Board of Trustees, violated various duties
> including the duties of loyalty and 'prudent administration' of the Trust. To be
> sure, the Restatement granted the suspended trustees great discretion in managing
> the Trust. Nevertheless, the Code provides that even when the controlling trust
> instrument uses such terms as "'absolute,' 'sole,' or 'uncontrolled' [discretion,]
> the trustee <u>shall</u> exercise discretionary power in good faith in accordance with the
> terms and purposes of the trust <u>and</u> the interests of the beneficiaries."
>
> While certain specific claims against the suspended trustees may be in

dispute, there is no question that the suspended trustees failed to defend the Trust against various lawsuits to which the Trust is a party. By failing to defend the Trust, the suspended trustees violated the Utah Code, and allowed the Trust to be exposed to entry of default judgments against it. Entry of judgment in those cases would permit prevailing parties to seize Trust assets in satisfaction of the judgment. Additionally, the suspended trustees knowingly and willfully failed to comply with two Court orders: First, they failed to provide an accounting of Trust assets. Second, they failed to assist the Special Fiduciary by collecting and providing information about how the Trust has been administered.

. . . [I]n addition to the problems that have resulted from the trustees' administrative defaults, the Court's review of the Restatement has led it to conclude that various dispositive (i.e., substantive) provisions of that instrument are fundamentally flawed and unworkable. Accordingly, the Court–with the help of interested parties–will need to address both types of issues as part of the Trust's reformation.

*In the Matter of the United Effort Plan Trust*, Case No. 053900848, at ¶¶ 21-23.

If there is a case to be made by the states that the property within the FLDS Trust is being managed and distributed to facilitate sex crimes against minors, or to facilitate polygamy, or to discriminate against young males within the Church, then the state may wish to make such a case in the appropriate place and consistent with due process, and seek the appropriate remedies, which may include forfeiture and confiscation of the Trust property by the state, but there is no support in the record before the court that such a case was ever made in either Utah or Arizona.

Furthermore, even if such a proceeding had been held, and a decision had been reached that the Trust property was being used to facilitate crimes, the remedy cannot be one of remaking the Trust and administering it in the manner employed by the state actors in this case. Such action, even if it followed a finding of impropriety or criminality in the use of the Trust property, would still run afoul of the Establishment Clause. It would still improperly involve the state in taking over a religiously-based program and turning it into a secular one based on new non-

religious rules recognized by the state. It would constitute the type of excessive entanglement between the state and religion not permitted under the Constitution. It is one thing for a state to tell a church and its members that they, just like all other residents of the state, may not smoke peyote, or commit child sexual abuse, or violate any other law of general application. And it is proper to prosecute the offenders and to seek all available legal remedies, such as property forfeiture. But it is quite another thing, altogether, to reorganize the religious activities of such churches and their members to make them conform to the states' version of appropriate secular behavior.

In sum, it is the method the states chose to utilize in dealing with the Trust that this court finds to offend the Constitution and to support preliminary injunctive relief. There may be other methods that could reach many of the goals the states seem to be pursuing, but they are of course not at issue here. The court has listened to the many complaints about Warren Jeffs and the allegations of his and some of his followers' criminal and tortous misconduct, but finds that these allegations as a matter of law do not justify the constitutional infirmities of the state action.

## <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS the plaintiffs' motion for a preliminary injunction, effective immediately, on terms identical to the present Temporary Restraining Order. A separate order will hereafter be entered further identifying the precise extent of the preliminary injunction. Defendant Utah Attorney General Mark Shurtleff's, defendant Arizona Attorney General Thomas C. Horne's, and defendant Denise Posse Lindberg's motions to dismiss are DENIED. The tort lawsuit claimants' motion to intervene is GRANTED.

IT IS SO ORDERED.

DATED this 24th day of February, 2011.

_____
Dee Benson
United States District Judge